# EXHIBIT 1

**Lola Hogan, CPCU, ARM, ARe**
Lola Hogan Insurance Consulting, LLC
(831) 402-4069
lola@hogan-consulting.com
www.linkedin.com/in/lolahogan
www.lolahogan.com



### SUMMARY

With over 30 years of insurance industry experience, which includes 20 plus years of experience as an insurance executive, Lola Hogan understands and can explain both the theoretical and practical aspects of claims handling. For 11 years, she served as the Vice President and Chief Claim Officer for Sequoia Insurance Company in Monterey, California. In addition to her management duties, Ms. Hogan has personally handled and managed a broad range of complex, high exposure first and third-party claims, umbrella claims and suits against the company, throughout her career. Under her leadership, her claims departments have consistently had superior reinsurance audit results. She has personally handled well over 100 mediations and MSC's and is a frequent speaker on a wide variety of claims related issues. Ms. Hogan also has extensive experience in giving deposition and trial testimony.

### POSITIONS HELD

**Lola Hogan Insurance Consulting LLC**     2014 - present
*Insurance Consultant – Expert Witness*

**Nationwide Insurance Company**     2016-2019
*Commercial Casualty Complex Loss Consultant*

**Riverport Insurance Company**     2015 -2016
*Senior Litigation Specialist*

**Nonprofits' Insurance Alliance Group, Santa Cruz, CA**     2014 - 2015
**Nonprofits' Insurance Alliance of California (NIAC)** – founded 1989
**Alliance of Nonprofits for Insurance Risk Retention Group (ANI-RRG)** - founded 2001
*Senior Litigation Specialist – Temporary*

***Sequoia Insurance Company – An AmTrust Financial Company***     2013 – 2014
$ 100 million Commercial Lines P&C Company
*Claim Manager*

***Sequoia Insurance Company***     2003 – 2013
$100 million Commercial Lines P&C Company with small Personal Lines Operation
*Vice President and Chief Claims Officer (company sold April 2013)*

**Nonprofits' Insurance Alliance Group, Santa Cruz, CA**     1997 – 2003
**Nonprofits' Insurance Alliance of California (NIAC)** – founded 1989
**Alliance of Nonprofits for Insurance Risk Retention Group (ANI-RRG)** - founded 2001
*Vice President, Claims*

**Sequoia Insurance Company, Pleasanton, CA**     1994 – 1997
*Director of Claims*

**Major Insurance Carriers, CA**     1975 – 1994
*Branch Claim Manager; Multi Line Resident Adjuster*

### AREAS OF EXPERTISE- PERSONAL AND COMMERCIAL LINES
- Claims Handling
- Third Party Liability – Duty to Defend, Duty to Settle
- First and Third Party Bad Faith

*Resume of Lola Hogan, CPCU, ARM ARe*
*Page 2*

**EXPERT WITNESS TESTIMONY**
- *Octavio Lopez vs National General Assurance:* For defendant, National General. Deposition 2019
- *Modir vs State Farm:* For defendant State Farm. Deposition and Trial Testimony 2019
- *Mayfield vs State Farm:* For defendant, State Farm. Deposition 2018
- *Ospina vs State Farm*: For defendant, State Farm. Deposition 2018
- *Stevenson v. Farmers:*  For defendant, Farmers. Deposition 2017; Trial Testimony 2018
- *LA Care Health Plan v Homeland:* For defendant, Homeland Insurance (One Beacon) Deposition 2017
- *Endurance v VM Energy*: For plaintiff, Endurance. Deposition 2017
- *Cagle v Fire Insurance Exchange:* For defendant, Fire Insurance Exchange. Deposition 2015
- *Caetano v.  State Farm:* For defendant, State Farm. Deposition and Trial Testimony 2015

**SELECTED PRESENTATIONS**
- *"Budgets, Performance, Metrics and You: Handling Cases Efficiently and Ethically: What's the Secret Sauce?"* Panel Presentation of Association of Defense Trial Attorneys (ADTA) April 2017
- *"Gender and Generation Gaps: Building Bridges of Inclusion"* Panel Presentation of Association of Defense Counsel of Northern California and Nevada (ADCNCN) November 2016
- *"Your Clients Don't Have to Be Homer Simpson: Strategies for Avoiding Preventable Bad Faith"*  Panel Presentation Federation of Defense and Corporate Counsel (FDCC) Winter Meeting - March 2016
- *"Rescind, Defend or Deny: Misrepresentation Remedies"* Panel Presentation Federation of Defense and Corporate Counsel (FDCC) Winter Meeting -  March 2016
- *"What to Expect: Client Expectations and Delivering Your Best Product"* Panel presentation Association of Defense Counsel of Northern California and Nevada. Law Firm Management Seminar August 2015
- *"Cumis Counsel: Current Coverage and Defense Issues"* Panel Presentation Association of Defense Counsel of Northern California and Nevada, July 2014
- *"Legal Billing Audit – Good, Bad or Something in Between?"* Panel Presentation Pacific Claim Executives Association Spring Seminar - 2014

**PROFESSIONAL TRAINING**
- CPCU Designation
- ARe Designation
- ARM Designation
- Industry conferences and seminars

**PROFESSIONAL AFFILIATIONS**
- Federation of Defense and Corporate Counsel (FDCC) Member  2013 - Present
- Pacific Claims Executive Association  President 2007   Member 1999 – Present
- Association of Northern CA Defense Counsel Industry Liaison 1996 – 98, 2007- 2019
- San Francisco Chapter CPCU 1997- Present

**EDUCATION**

| BA History | MA Secondary Education |
| --- | --- |
| University of California at Davis | California State University, Sacramento |
| *Graduated Outstanding Woman* | |

**INDEPENDENT ADJUSTER LICENSES HELD**
AK AL AR AZ CA CT DE FL GA HI ID IN KY LA ME MN MS MT NC NH NM NV OK OR RI TX UT VT WA WV WY

**PERSONAL**
Ms. Hogan lives in Monterey, California with her husband and two Siamese cats.
She enjoys travel, reading and a glass of chardonnay with friends.

In the past four years I have testified as an expert in the following matters:

*Ron Caetano and Tina Toste vs. State Farm General Insurance Company; State Farm Mutual Automobile Insurance Company*, Kings County Superior Court Case No.: 13 C0105 Deposition and Trial for defendant State Farm. February 2015

*Dorsetta Cagle vs. Freutel Roofing, Inc., Eagle Star Buildings, Inc., Elizabeth Gray, Farmers Insurance Company, Inc., Farmers Insurance Exchange, Fire Insurance Exchange* San Mateo County Superior Court Case No.: CIV 525485 Deposition for defendant Farmers. May 2015

*LA Care Health Plan v Homeland* US District Court Central District of California Western Division Case No.: 2:16-cv-04810-VAP-AGR Deposition for defendant Homeland. September 2017

*Endurance American Specialty Insurance Company vs. Admiral Insurance Company, a Delaware Corporation, VM Energy, LLC a California limbered liability company, Sullivan Hill Lewin Rex & Engel, a professional law corporation.* San Diego County Superior Court Case No.: 37-2015-00028446-CU-IC-CTL Deposition for Plaintiff Endurance. September 2017

*Teresa Stevenson vs. Farmers Insurance Group* San Mateo County Superior Court Case No.: CIV 535684 Depositions (2) and Trial for defendant Farmers. September 2017; January 2018

*Ospina vs State Farm* Orange County Superior Court Case No.: 30-2015-00891365 Deposition for defendant State Farm. July 2018

*Mayfield vs State Farm* Orange County Superior Court Case No.: 30-2015-00815571 Deposition for Defendant State Farm. August 2018

*Modir vs State Farm* San Diego Superior Court Case No.: 320100015141-CU-BC-CTL Deposition for Defendant and Trial for Defendant State Farm. September 2019; October 2019

*Octavio Lopez vs National General Assurance* Riverside County Superior Court Case No.: RIC1808643

*Shannen Doherty vs State Farm Insurance Company*

United States District Court Central District of California

Lola Hogan, CPCU ARM ARe
October 21, 2019

1.  **Qualifications and Experience:**

I have been employed in the insurance claims industry for over 30 years. I was Vice President, Chief Claim Officer of Sequoia Insurance Company from 2003 to 2013 when the company was sold. From 1997 to 2003, I was Vice President of Claims of Nonprofits' Insurance Alliance of California (NIAC). From 1994 to 1997, I was Director of Claims for Sequoia Insurance under a prior owner. I was a branch claim manager for American States Insurance for 6 years. In all of these positions, I was responsible for auditing the quality of claim handling or supervising others performing file reviews.

In addition to the management positions described above, I have personally handled a broad range of complex, high exposure first- and third-party claims, umbrella claims, and suits against insurance companies.

I am familiar with the generally accepted practices and procedures of the insurance industry with respect to claim handling and the California Fair Claims Practices Act.

As Vice President, Chief Claim Officer of Sequoia Insurance I was deposed as the Person Most Knowledgeable in twelve lawsuits against the company alleging bad faith in first- and third-party cases. I testified at trial in five of those matters. I was also deposed and testified in a Reinsurance Arbitration. I have been deposed as an expert in nine matters and testified as an expert in trial four times.

I received a BA degree from the University of California, Davis and an MA degree from California State University, Sacramento. The Chartered Property and Casualty Underwriter (CPCU) and the Associate in Risk Management (ARM) designations were earned in 1986 and the Associate in Reinsurance designation (ARe) was earned in 2014. I am currently licensed as an independent adjuster in 31 states, including California.

2.  **Material Reviewed:**

State Farm Insurance Claim File 75-6539-W17
State Farm Homeowners Policy 71-L5-6086-1
Shannen Doherty's Responses to State Farm's Interrogatories

3.  **Professional Fees:**

I am being compensated at $350 per hour for time spent on this matter and $175 per hour for travel. My rates for testimony are the same.

4.  **Attachments:**

© 2019

Further information regarding my experience is provided in my *curriculum vitae.*
A list of the matters on which I have testified in the past 4 years is also attached.

5.  **Scope of Work:**

I have been asked by State Farm Insurance Company to review the handling of the claim related to *Shannen Doherty vs State Farm Insurance Company*, venued in the United States District Court of the Central District of California.

6.  **Factual Background:**

On June 27, 2018 State Farm issued Homeowners policy 71-L5-6086-1 with effective dates of June 27, 2018 to June 27, 2019.

On November 8, 2018 the Woolsey Fire erupted in Southern California. The plaintiff's insurance claim was reported to State Farm on November 12, 2018.

**Timeline Concerning Building Coverage A and Contents Coverage B:**

On November 12, 2018 State Farm received notification of a loss.

On November 17, 2018 State Farm was advised that the insured's attorney would handle the claim.

On November 21, 2018 State Farm received a letter of representation from the insured's Public Adjuster (PA).

On December 17, 2018 State Farm was allowed to inspect the property. Upon inspection, State Farm believed plaintiff's loss to be relatively minor compared to other homes that were completely destroyed. Plaintiff's residence did not sustain any fire damage. Plaintiff's residence appears to have been closed during the evacuation / fire event.

On December 18, 2018 State Farm completed an estimate for the insured's claim based on State Farm's inspection. State Farm made payment for the smoke loss to the building and contents in the amount of $85,515.19. State Farm provided the insured's representatives with a copy of State Farm's estimate for repairs.

On March 14, 2019 State Farm received a bid for pool repair for $104,862. This estimate far exceeded State Farm's estimate, which was not previously challenged by the insured's representatives.

On March 18, 2019 State Farm requested a re-inspection of the insured's residence.

On March 28, 2019 State Farm completed an inspection of the insured's residence. State Farm's pool consultant, One Pool at a Time, was present during the inspection.

© 2019

On April 29, 2019 State Farm, based in part upon the estimate of its pool consultant, paid the difference between what it previously paid for the pool damage.

On March 14, 2019 State Farm received a new estimate of repairs in the amount of $2,548,108, which listed numerous items that were not discussed during the original inspection in December 2018. The new items in this report included: roof replacement; stucco replacement; interior and exterior painting; pack out, storage, and pack back of contents; sanding and refinishing of the doors and windows; demolition and replacement of the drywall; insulation, veneer plaster, cabinets, and countertops. In light of this estimate for repairs, State Farm requested another inspection, which included a certified industrial hygienist to review the new claims for damage. Due to repeated delays by the insured's representatives, the inspection did not occur until May 7, 2019.

After the May 7, 2019 inspection, State Farm responded to the insured's PA's correspondence memorializing the inspection, wherein the PA thanked State Farm's claim specialist for his professionalism, candor, and understanding approach. In sum, State Farm responded as follows:

1. State Farm agreed to disposal of all perishables, medicines, and cosmetics upon receipt of a list of items and the cost for those items as a "total loss" to be paid by State Farm;
2. State Farm agreed to dispose all exterior furniture that was exposed to heat, smoke, and soot. State Farm further agreed to pay all costs associated with the removal and disposal, and such items would be considered a total loss.
3. State Farm agreed to remove and replace the perimeter chain link fence.
4. State Farm agreed that the insured's residence needed to be packed out and cleaned. Further, State Farm agreed that, based upon an agreed upon costs, funds would be afforded. It was also agreed that the mattresses and box springs would be discarded and considered a total loss.
5. State Farm agreed to replace the flex ductwork as it could not be cleaned, subject to receipt of a reasonable cost, and hire an expert to inspect the roof to determine if there was any fire related damage.
6. State Farm agreed to additional lodging, and it was waiting for a reasonable cost of rental in Malibu area
7. State Farm agreed to repair/replace the electric gate. State Farm was to provide an estimate in the same week so repairs could begin.
8. The insured was to hire an engineer to evaluate the retaining wall.
9. State Farm did not agree that the exterior structure of the residence sustained heat or fire related damage. However, it was noted that State Farm would retain an engineer to work with plaintiff's retained engineer.
10. Further, it was noted that State Farm was waiting for additional tests from Ninyo & Moore for the garage reclaimed wood ceiling.
11. State Farm agreed to replace the vegetable plants inside the garden boxes and was waiting for reasonable cost to replace. Moreover, State Farm advised there was coverage for dirt or land under the policy.
12. State Farm agreed to wait for test cleaning before determining a protocol for the clothing

On May 7, 2019 State Farm requested a geotechnical engineer to evaluate the alleged damage to the exterior stucco.

On May 22, 2019 the PA submitted bids for exterior electrical gate, $39,980; Roof, $24,000; Landscaping, $478,450, which brought the total claim cost to $2,740,906.00.

On June 5, 2019 State Farm paid the balance of the limit for trees, shrubs, and landscaping under the policy.

On May 22, 2019 State Farm reminded the insured that it was waiting for the packout/back storage, and fencing estimates, the list of perishables, and other remaining items that plaintiff deemed a total loss. Moreover, State Farm requested an available date for the roof inspection.

On June 25, 2019 State Farm wrote again asking for the packout/back storage estimate; the total loss list of perishables, the other remaining total loss items, and an inspection of the roof.

On July 10, 2019 State Farm received a pack out /back storage estimate for 6 months which totaled $142,233.44. The total loss for the clothing estimate amounted to $1,065,494.59.

On July 16, 1019 State Farm called the insured's attorney and again requested an inspection of the roof and exterior stucco. In addition, State Farm advised it needed a contents expert to inspect and evaluate plaintiff's claimed loss with respect to personal property.

On July 24, 2018 State Farm wrote another letter again asking for an inspection of the stucco, the list of perishables, an inspection of the roof, and an inspection of the contents.

On August 23, 2018 the stucco, roof and contents inspections were done. It was noted that Farm's contents experts would prepare a competitive bid. It was noted that there was no evidence of heat damage to the roof. There was no evidence of heat damage to the exterior stucco. All exterior walls had hairline cracks, not just the south and west facing walls-which were primarily exposed to the heat.

On September 3, 2018 Just Contents estimated $122,923.44 for cleaning general items, content manipulation, and content packing handling, and storage. It was noted that while the insured had unique pieces and top of the line clothing, all were cleanable as the amount of smoke in the house was minimal to none.

To date, the claim is being adjusted.

**Additional Living Expense (ALE) Coverage C:**

On November 15, 2018 the Insured's agent issued two checks for $5000 each as an advance on ALE.

On November 20, 2018 the insured advised State Farm that she needed to rent a house and that her attorney, Peter Scott, would be handling her claim. Peter Scott advised that the insured could not be around any type of damage because she was undergoing treatment for cancer. He advised that the insured was in a hotel, that the insured needed an advance in order to rent a house, and advised that the public adjuster ("PA") would be writing the loss.

© 2019

On November 27, 2019 the PA requested approval of a 6-month lease at $35,000 per month and $5,000 per month for furniture rental.

On November 28, 2018 the PA had not yet permitted inspection of the property. Nevertheless, State Farm agreed to a two-month lease at $35,000 per month, $5000 per month for furniture rental, and State Farm agreed it would follow up on a three-month lease as requested by the insured. However, the insured's representatives demanded a six-month lease, but agreed upon the $5000 per month furniture rental.

On November 29, 2018 State Farm, although the PA had not yet permitted inspection of the property, wired the insured a $25,000 advance on contents, and a $120,000 advance on ALE.

On November 30, 2018, despite the prior agreement, the PA demanded $35,000 per month for furniture rental and it denied the previously agreed to $5000 per month.

On December 1, 2018 State Farm requested hotel and food receipts from the insured.

On December 1, 2018 the PA emailed State Farm an incomplete set of the insured's hotel receipts, and asked how quickly it could be paid.

On December 2, 2018 the PA stated that until State Farm approved the $35,000 per month furniture rental, the insured would remain at the hotel at State Farm's expense.

On December 3, 2018 State Farm again requested a complete copy of the hotel bills, and it advised the Insured's PA that if she was submitting food receipts, to include the amount she would normally spend on groceries and dining out.

On December 5, 2018 the PA stated that the Policy owed benefits at normal standard of living to support the request of $35,000 per month for furniture rental. In addition, that a 6,000 square foot house needed to be fully furnished. Moreover, the PA advised that State Farm could not treat the insured the same as other due to the nature of her profession. The PA also canceled the scheduled inspection.

On December 6, 2019 the PA, despite not allowing an inspection, accused State Farm of intentionally failing to provide coverage, accused State Farm of bad faith, and threated to escalate the claim to the VP if State Farm did not immediately reimburse for ALE and accept the $35,000 per month for furniture rental.  (*PA had not yet permitted inspection of the property).*

On December 12, 2018 State Farm sent PA a letter that advised there had not been compliance with the policy condition requiring assistance and cooperation, ihe insured to exhibit the residence as often as required, and it quoted the Duties After Loss clause in the policy. State Farm also reserved all rights under the policy.

On December 12, 2018, the PA submitted a revised estimate for furniture rental of $12,000 per month, which State Farm accepted. The PA stated he would not go forward until accepted in writing. The PA then scheduled a site inspection for December 17, 2018. State Farm confirmed $12,000 per month for furniture rental via e-mail.

© 2019

On December 13, 2018 State Farm, requested the insured provide the hotel bills as it wanted to process this expense.

On December 14,15,17, and 18, 2018, State Farm: received hotel bills from 11/9/18 to present , (December 18, 2018) of $104,178.95; contacted the PA with questions regarding two rooms and other charges; refused demand for $70,000 deposit on rental as State Farm paid Landlord directly; paid $85,515.79 for the hotel; and agreed to look at charges for second room which was apparently used as an office.

On December 22, 2018 State Farm extended the hotel through December 23, 2018. The claim notes indicated that furniture was delivered on December 19, 2018. State Farm extended the insured a few extra days in order to supply the house.

On January 3, 2019 State Farm paid $39,500 for 3 months furniture rental and delivery charges of $3500, and it paid $35,000 to Landlord for rent, which it offered to hand deliver.

On January 16, 2019 State Farm paid the rent for February.

On January 19 and 24, 2019, the PA submitted receipts for $12,008, demanded immediate payment, and advised that if it was not paid immediately, the Insured would take out a high interest loan and claim costs from State Farm.

On January 26, 29 2019 State Farm reminded PA that State Farm had already paid 3 months of rent for house and furniture, and asked for documentation of regular expenses which had not been received. Although the PA sent in normal expenses for meals away from home, it did not include normal in-home expenses.

On February 9, 2019, the PA asked State Farm when ALE would be paid, and State Farm reminded PA that documentation of normal expenses was still incomplete.

On February 24, 2019 the PA left an after-hours voicemail asking for what additional documents for ALE State Farm needed.

On March 1, 2019 Attorney Scott called State Farm and stated that the previously submitted $160 per week normal expense was for both in home and outside dining

On March 8, 2019 State Farm agreed to extend ALE through April 2019, paid the rent and furniture rental for April, and agreed to further discuss PA's issues with the December/March payment.

On March 18, 2019 State Farm reminded attorney Scott that ALE extended through April 2019 the period of restoration, and that it still needed documentation regarding cost of food to determine what additional payments were due for the period of November 2019, through December 23, 2018.

On March 21, 2019 State Farm extended ALE through May based on revised scope of damage.

On March 26, 2018 State Farm confirmed that April checks had been transmitted. Moreover, Attorney Scott claimed outstanding ALE submitted in January, claimed that food costs are $160 per week for in home and outside dining, and claimed that State Farm wrongfully denied payment.

On April 8, 2018 State Farm emailed Attorney Scott and confirmed that it was going to pay $15,412.50 for hotel and December furniture rental. State Farm also requested information on utilities for before and after the fire. State Farm also requested further clarification regarding the insured's food and alcohol consumption.

On April 19, 2019 State Farm paid $31,279.38 for: Furniture rental for March; Fairmont Hotel 12/15/-12/22 $15,412.50 for Room 25; and Fairmont Hotel 12/15/12/22 $3,566.88 for Room 27.

On May 7, 2019, the PA demanded that State Farm approve a lease that afternoon, but it appeared that the lease agreement was not attached. Moreover, the PA demanded that the $90,000 per month approval needed to be approved the same day.

On May 8, 2019 State Farm located and offered plaintiff two rentals that amounted to $30,000 and $29,000 per month—which the insured deemed unacceptable. State Farm denied the $90,000 per month lease as unreasonable.

On May 9, 2019 State Farm located another rental at $40,950 with comparable size and amenities. However, the insured did not respond to this rental property offer, and State Farm continued to follow up with the property vendor.

On May 16, 2019 Attorney Scott suggested a compromise of $75,000 per month, but State Farm's position was that $49,950 per month was reasonable. Moreover, State Farm advised that the insured could choose the house or apply the rent to another property.

On May 31, 2019 State Farm issued payment of $122,850 for 3 months' rent through July 31, 2019 at $40,950 per month. As of this date, the total amount paid in ALE amounted to **$493,233.34**

**Timeline of Payments as of July 2, 2019**

- 11/15/2018: Agency Advance - $10,000
- 11/29/2018: Advance payment for personal property - $25,000
- 11/29/2018: Advance for ALE - $120,000
- 12/18/2018: Coverage C Payment (Reimbursement for Fairmont Hotel Bill) - $85,515.79
- 1/4/2019: Coverage C Payment (Furniture Rental for 3 months plus set up) - $39,500
- 1/4/2019: Coverage C Payment (January rent) - $35,000
- 1/16/2019: Coverage C Payment (February rent) - $35,000
- 3/8/2019: Coverage C Payment (March furniture rental) - $12,000
- 3/8/2019: Coverage C Payment (March rent) - $35,000
- 3/18/2019: Replacement of refrigerator - $12,059.86
- 3/27/2019: Coverage C Payment (December rent) - $35,000
- 4/19/2019: Coverage A Payment (One Pool at a Time) - $69,248.31

© 2019

- 4/19/2019: Coverage C Payment - $31,279.38
- 5/31/2019: Coverage C Payment (May to July Rent) - $122,850
- 6/5/2019: Coverage A Payment (Trees, shrubs, and landscaping) - $18,471.64
- 6/5/2019: Payment per SF supplemental estimate - $28,550.86.

**Opinions and Bases for Opinions Regarding the Claim Handling by State Farm Insurance**

1. The claim was reported on November 12, 2018, and State Farm was advised that the house did not sustain any structural damage, unlike many homes in the Malibu area, and that the insured was out of town. Three days later, and without inspecting the property, State Farm paid for the agency's advance that amounted to $10,000. Thereafter, State Farm contacted the insured's representatives on November 20, 2018, and discussed her need for an advance in order to rent a house. This complied with the Fair Claims Practice Act that allows an insurance carrier 15 days to acknowledge a claim. This standard was clearly met.

2. State Farm had an obligation under the contract to "conduct a prompt and diligently pursue a thorough, fair and objective investigation…", §2695.7, (d) Fair Claims Practices Regulations (FCPR). State Farm complied with this regulation. In the first phone call, State Farm discussed the insured's living situation and her need to rent a house in light of her medical condition. State Farm also inspected the loss as soon as possible after the smoke loss event. After several attempts to conduct an inspection of the property, and after plaintiff's representatives cancelled several inspections, State Farm was allowed to access the property on December 17, 2018—more than a month after the claim was reported. Moreover, despite these various cancellations, State Farm provided an advance in the amount of $145,000 on November 29, 2018—which was before they were allowed to complete an inspection of the entire property. To that end, when State Farm was allowed to inspect the property with its retained Certified Industrial Hygienist ("CIH"), State Farm prepared an estimate of the loss, which it paid on December 18, 2018 and provided the public adjuster with a copy of the estimate. The investigation and payments are well within the standard of care for the industry.

3. The estimate and payment remained unchallenged until March 14, 2019 when State Farm was presented with an estimate for the pool of $104,862. A pool re-inspection was completed on March 28, 2019 and State Farm paid the difference between their original estimate and the estimate of the State Farm expert on April 19, 2019. State Farm promptly and properly reviewed the new information, conducted another investigation of the damages to the pool, and paid the revised amount in less than 30 days. This is consistent with the custom and practice in the industry and well within the standard of care

4. Also, on March 14, 2019, approximately 3 months after the building and contents coverages were paid, State Farm received an estimate for $2,548,108 from the Insured's construction consultant, Rider Levett Bucknall, Ltd.  Based on this estimate and additional scope of repairs, State Farm immediately requested an inspection with the CIH to identify the variances between the estimates and determine if additional monies were owed. A re-inspection of the property was not allowed until nearly two months later on May 7, 2019.  The claim file indicates that State Farm contacted either the public adjuster or Mr. Scott at least 11 times between March 14, 2019 and May 7, 2019 before getting a confirmed date for the CIH and the roofer to inspect the property.

© 2019

The re-inspection resulted in agreement on several issues. The most undecided issues were the cost of removing the contents, cleaning and storing them and returning them to the premises and a claim that the roof and exterior stucco on the building needed to be completely replaced. State Farm requested an inspection of the roof and an engineer to inspect the stucco approximately 14 times before an inspection was finally allowed on August 23, 2019.

On May 22, 2019 State Farm received estimates for the landscaping in the amount of $478,450, replacement of the roof for $24,000 roof replacement, and $38,980 for replacement of the electronic gate. The landscaping estimate far exceeded the available policy limits and thus, State Farm paid the difference between its original payment on the balance of the policy limit on June 5, 2019.

On June 27, 2019 State Farm received an estimated for removal, storage and return, of the contents of $144,000 and a claim of $1,065,494.59 for clothing claimed to be a total loss. State Farm was able to have their contents expert included in the August 23, 2019 inspection.

The carrier has no control over access to the Insured's property but must rely on the permission of the policy holder or its representative(s). The policy contract reads in part as follows:
> Section I- Conditions 2. Your Duties After a Loss (d) As often as we reasonable require: (1) exhibit the damaged property.

The Insured in this matter, via her public adjuster and attorney, did not comply with this provision of the contract. Every attempt to re-inspect the property in order to review newly presented information and determine if additional benefits were owed were stymied and delayed. Once State Farm was able to re-inspect and re-evaluate the new information, they readily and prompted issued additional monies. State Farm's action were commensurate with industry custom and practice and well within the standard of care.

5.  On December 20, 2018, State Farm originally denied coverage for the refrigerator under Coverage B (i.e., Personal Property) because it was reportedly damaged by spoiled food—which is not a named peril.  However, upon the request of the PA the denial was reviewed again on January 12, 2019, and the denial upheld based upon the inspection and because the public adjuster did not provide new information. Nevertheless, after the PA represented that the refrigerator should be considered under Coverage A and that the cause of the loss was the power shut off, which was caused by the fire,  State Farm re-reviewed the photos and determined that the refrigerator was in fact a built-in model and thus, coverage was afforded. On February 4, 2019, State Farm requested information to support the claimed value of the refrigerator, and then issued a payment for the refrigerator in the amount of $12,059.86 after subtracting a previous overpayment on the claim. As noted above, an insurance carrier has an obligation to review all new information presented and to re-evaluate prior decisions in the light of that new information. This is consistent with the custom and practice of the industry and well within the standard of care.

6.  On November 27, 2018, before permitting inspection of the property, the public adjuster demanded that State Farm fund a 6-month lease at $35,000 per month plus furniture rental. As the claimed damages were limited to smoke and ash and the house was closed up during the evacuation, State Farm could have reasonably insisted on an inspection of the property to determine an estimated period of restoration before committing to long term temporary

© 2019

housing. In an effort to support its policy holder, State Farm agreed to the 3 month rental and payment of $120,000 without conducting a complete inspection of the property in order to determine whether the property was in fact inhabitable When the public adjuster demanded $35,000 per month in furniture rental, State Farm reasonably asserted that was unreasonable and sought out other information, particularly in light of the fact that plaintiff's PA previously agreed to furniture rental in the amount of $5,000 per month. The public adjuster then supplied a revised estimate at $12,000 per month which State Farm accepted. By November 29, 2018 State Farm had wired $25,000 advance on personal property and $120,000 advance on ALE. Clearly, State Farm was not putting its own interests above that of its insured and was making every effort to provide benefits under the policy. State Farm's actions were consistent with the custom and practice in the industry and well within the standard of care

7. Each time evidence was presented that supported the period of restoration was going to be longer than previously believed, State Farm extended it and continued to provide ALE benefits under the policy. When the period of restoration was extended into May, the public adjuster demanded that State Farm agree to a lease at $90,000 per month. State Farm reasonably concluded that $90,000 per month was an unreasonable amount and located alternate housing for $40,950 per month which State Farm agreed to pay—an increase to what the parties previously agreed. The Insured's attorney suggested a compromise figure of $75,950 with the Insured to pay the difference. State Farm reasonably maintained its position that $40,950 was fair and competitive in the market place, and represented a property comparable in size and amenities to the subject property. On May 31, 2019 State Farm paid the Insured $122,850 for 3 months, May, June and July, at $40,950 per month. These actions allowed the insured flexibility to elect how to use them. This is consistent with the custom and practice in the industry and well within the standard of care. As of May 31, 2019, State Farm had paid $493,233.34 in Additional Living Expense Benefits for a home that did not sustain any structural damage.

Discovery and the claim adjustment in this matter is on-going. As additional relevant information is developed, this report may be supplemented.

Dated: October 25, 2019
Pacific Grove, CA

Lola Hogan, CPCU ARM ARe

1                  UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    SHANNEN DOHERTY,

5               Plaintiff,

6         vs.                        No. 2:-19-CV-01963 JFW(PLAX)

7    STATE FARM GENERAL INSURANCE

     COMPANY,

8

                 Defendant.

9

10

     _____

11

12

13

14

15            VIDEOTAPED DEPOSITION of LOLA HOGAN

16                 LOS ANGELES, CALIFORNIA

17               TUESDAY, NOVEMBER 17, 2019

18                       VOLUME 1

19

20

21

22

23   Reported by

     Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

24   Job No. 3812039-1,

25   PAGES 1 - 118

                                              Page 1

1          UNITED STATES DISTRICT COURT
2      FOR THE CENTRAL DISTRICT OF CALIFORNIA
3
4  SHANNEN DOHERTY,
5          Plaintiff,
6      vs.            No. 2:-19-CV-01963 JFW(PLAX)
7  STATE FARM GENERAL INSURANCE
   COMPANY,
8
         Defendant.
9
10

11  _____
12
13
14
15      VIDEOTAPED DEPOSITION of LOLA HOGAN,
16  at 6420 Wilshire Boulevard, Suite 1700,
17  Los Angeles, California, beginning at
18  9:54 a.m., and ending at 12:27 p.m., on
19  Tuesday, November 17, 2019, before Daryl
20  Baucum, RPR, CRR, RMR, CSR No. 10356.
21
22
23
24
25
                                        Page 2

1  APPEARANCES OF COUNSEL (CONTINUED):
2
3
4
5      ALSO PRESENT:
6          MATTHEW HAUSLEY, Videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 4

1  APPEARANCES OF COUNSEL:
2
3  FOR THE PLAINTIFF SHANNEN DOHERTY:
4
5      EARLY, SULLIVAN, WRIGHT, GIZER & MC RAE
6      BY: PETER SCOTT, ATTORNEY AT LAW
7      6420 Wilshire Boulevard
8      Suite 1700
9      Los Angeles, California  90048
10     323.301.4660
11     PScott@EarlySullivan.com
12
13
14  FOR THE DEFENDANT STATE FARM INSURANCE COMPANY:
15
16     COZEN, O;CONNOR
17     BY:  ANGEL MARTI, III, ATTORNEY AT LAW
18     601 South Figueroa Street
19     Suite 3700
20     Los Angeles, California  90017
21     213.892.7900
22     AMarti@Cozen.com
23
24
25
                                        Page 3

1              I N D E X
2
3
4  WITNESS:  LOLA HOGAN
5  EXAMINATION                    PAGE
6  BY: MR. SCOTT                    8
7
8
9
10  QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:
11        (NONE)
12
13
14
15  INFORMATION TO BE SUPPLIED:
16        (NONE)
17
18
19
20
21
22
23
24
25
                                        Page 5

2 (Pages 2 - 5)

**Page 6**

1     DEPOSITION EXHIBITS
2       LOLA HOGAN
3
4 NUMBER    DESCRIPTION      PAGE
5 Exhibit 600  Plaintiff Shannen Doherty's   11
      Notice of Deposition and
6       Subpoena to Produce Documents
      to Defendant's Expert, Lola
7       Hogan of Lola Hogan Insurance
      Consulting, LLC
8
    Exhibit 601  Expert Report of Lola Hogan   13
9       dated October 21, 2019
10 Exhibit 602  Responses to Request   14
      for Production
11
    Exhibit 603  Curriculum vitae of   18
12       Lola Hogan
13 Exhibit 604  Expert witness testimony   20
      of Lola Hogan
14
    Exhibit 605  Fair Claims Settlement   36
15       Practices Regulations
16 Exhibit 606  Homeowners policy of   63
      Shannen Doherty
17
    Exhibit 607  Sample Homeowners policy   65
18
    Exhibit 608  Expert Report of   112
19       Maribeth Danko
20
21
22
23
24
25

**Page 7**

1 LOS ANGELES, CALIFORNIA; TUESDAY, NOVEMBER 17, 2019
2       9:54 A.M.
3
4     THE VIDEOGRAPHER:  Good morning.
5     We're on the video record on December 17,   09:54:29
6 2019, at 9:54 a.m.
7     My name is Natthew Hausley.  I am the
8 videotape operator employed by The Digital
9 Department located in Los Angeles, California.
10     This deposition is taking place at the Law   09:54:47
11 Office of Early, Sullivan, Wright, Gizer and McRae
12 at 6420 Wilshire Boulevard, 17th Floor, Los Angeles,
13 California.
14     The case caption is Doherty versus
15 State Farm General Insurance Company, cause number   09:55:05
16 2:19-cv-01963 JFW (PLAx).
17     The deposition is being taken on behalf of
18 the plaintiff.
19     The witness today Lola Hogan.
20     Counsel, please, state your appearances   09:55:33
21 for the record.
22     MR. SCOTT:  Peter Scott on behalf of
23 Plaintiff.
24     MR. MARTI:  Angel Marti on behalf of
25 State Farm and the deponent.   09:55:40

**Page 8**

1       LOLA HOGAN,
2     having been first duly sworn, was
3     examined and testified as follows:
4
5       EXAMINATION
6 BY MR. SCOTT:
7    Q   Good morning, Ms. Hogan.  My name is Peter
8 Scott.  I represent Plaintiff Shannen Doherty.
9     Can you, please, state and spell your name
10 for the record.   09:56:00
11    A   Lola, L-O-L-A, Hogan, H-O-G-A-N.  My legal
12 name is Carola, C-A-R-O-L-A.
13    Q   Can you give me your office address, as
14 well?   09:56:12
15    A   1149 Seaview Avenue, Pacific Grove,   09:56:12
16 California.
17    Q   Have you ever had your deposition taken
18 before?
19    A   Yes, I have.
20    Q   Approximately how many times?   09:56:19
21    A   As an expert or otherwise?
22    Q   Well, let's start with otherwise, first.
23    A   About twelve or fifteen as the person most
24 knowledgeable for Sequoia Insurance Company and I
25 think this is either twelve or thirteen as an   09:56:33

**Page 9**

1 expert.   09:56:35
2    Q   Ever had your deposition taken in your
3 personal capacity?
4    A   I don't think so.
5    Q   Were all of those depositions taken in   09:56:46
6 cases pending in California?
7    A   Yes, they were.
8    Q   Were all of those cases in state court?
9     Let's start with your 30(b)(6) or person
10 most knowledgeable designation.   09:57:03
11     Were all of those in state court?
12    A   The 30(b)(6) are all written for federal
13 court.  I have not yet testified in federal court
14 and I have written and been retained on several
15 federal cases.   09:57:19
16    Q   As a person most knowledgeable?
17    A   No, I'm sorry, as an expert.
18    Q   Have you ever been deposed as a person
19 most knowledgeable in federal court?
20    A   I don't think so.   09:57:28
21    Q   Have you ever been retained as an expert
22 in federal court?
23    A   Yes.
24    Q   How many times?
25    A   I think there are five or six.   09:57:34

3 (Pages 6 - 9)

```
 1   Q   When was the last deposition that you sat    09:57:54
 2  for?
 3    A   I think it was two weeks ago, two or
 4  three weeks ago, down here.
 5   Q   And what was the name of that case?         09:58:04
 6    A   I am drawing a blank.  I can look it up
 7  for you.
 8   Q   Was it Gregor versus State Farm?
 9    A   Yes, it was.  Thank you.
10   Q   And that was in your capacity as an expert  09:58:14
11  witness?
12    A   That's correct.
13   Q   And on whose behalf were you retained?
14    A   State Farm.
15        I think it's Gregory versus State Farm.    09:58:23
16   Q   We will get to that.
17        I'm am not going to go through the
18  admonitions because I presume you know already.
19        That Gregory case is in federal court; is
20  that right?                                       09:58:36
21    A   Yes, I think so.  I would have to look
22  them up.  I thought I had the last four with me and
23  I gave that to Valerie, but perhaps not.
24   Q   Don't worry.  I am going to go through --
25  I think I got a current copy of your CV here and we  09:58:51
                                               Page 10
```

```
 1  will go through these documents, as well.          09:58:54
 2        MR. MARTI:  Can I get that copy, Counsel.
 3        MR. SCOTT:  Sure.
 4        And Angel, I am going to start at 600
 5  today just because we are double-tracking.         09:59:08
 6        Can you, please, mark this as 600.
 7        (Deposition Exhibit 600 was marked for
 8         identification by the court reporter and
 9         is attached hereto.)
10  BY MR. SCOTT:                                      09:59:33
11   Q   Ms. Hogan, you have been handed
12  Exhibit 600, which is Plaintiff Shannen Doherty's
13  Notice of Deposition and Subpoena to Produce
14  Documents directed to you.
15        And if you turn to the Exhibit A attached    09:59:42
16  thereto, there is a subpoena attached --
17    A   Uh-huh.
18   Q   -- directed to you.
19        My first question is as to the Notice of
20  Deposition, have you ever seen this document before?  09:59:54
21    A   Yes, I have.
22   Q   You have.
23        And you reviewed it?
24    A   Yes.
25   Q   The subpoena attached as Exhibit A, you     10:00:00
                                               Page 11
```

```
 1  reviewed that, as well?                            10:00:02
 2    A   Yes, I did.
 3   Q   And you see that and you're here today
 4  pursuant to that subpoena?
 5    A   I am.                                        10:00:08
 6   Q   And you see that there is a set of
 7  document requests appended to the back of the
 8  subpoena?
 9    A   Yes.
10   Q   Did you bring documents with you this        10:00:16
11  morning responsive to these requests for production?
12    A   Yes, I did.  That's in response to your
13  motion and these are the documents.
14   Q   So for the record, the witness has handed
15  me a piece of paper and a thumb drive that I would  10:00:31
16  like to mark as Exhibit 601, which purport to be the
17  documents produced in response to the subpoena.
18        MR. MARTI:  Counsel, just to let you know,
19  that same document is also in the stack that was
20  just copied, just to let you know.                 10:00:50
21        MR. SCOTT:  That was my next question.
22  BY MR. SCOTT:
23   Q   Ms. Hogan, the stack of documents that
24  were in the blue folder this morning that I copied
25  and your counsel provided to me, are those the same  10:01:00
                                               Page 12
```

```
 1  documents that are included with this thumb drive   10:01:03
 2  you just handed me?
 3    A   They are included on the thumb drive, yes.
 4   Q   Are there additional documents on the
 5  thumb drive not included in this stack?            10:01:14
 6    A   You asked for a list of everything that I
 7  reviewed.  Those are all on the thumb drive.
 8   Q   Understood.
 9        Can I, please, mark this as 601.
10        (Deposition Exhibit 601 was marked for     10:01:36
11         identification by the court reporter and
12         is attached hereto.)
13  BY MR. SCOTT:
14   Q   So, Ms. Hogan, you have just been handed a
15  stack of documents that has been marked as 601 and  10:01:40
16  these are the documents that were provided to me
17  this morning by your counsel, and the colloquy
18  we just had was that these documents in Exhibit 601
19  are included on the thumb drive but there are
20  additional documents on the thumb drive that are the  10:01:53
21  documents that you reviewed in preparation for your
22  report; is that correct?
23    A   That's correct.
24   Q   And is the piece of paper that he handed
25  me along with the thumb drive an index of the       10:02:03
                                               Page 13
```

4 (Pages 10 - 13)

1 documents that are on the USB drive?            10:02:05
2     A   No, that is the response to your request
3 for production.
4     Q   Understood. Okay.
5         (Deposition Exhibit 602 was marked for    10:02:12
6         identification by the court reporter and
7         is attached hereto.)
8 BY MR. SCOTT:
9     Q   And, Ms. Hogan, the Exhibit 602 you have
10 just been handed, that is your responses to the   10:02:32
11 request for production?
12    A   Correct.
13    Q   Are there any documents that you withheld?
14    A   No.
15    Q   Did you do anything to prepare for this    10:02:50
16 deposition today?
17    A   Yes.
18    Q   Can you, please, tell me what.
19    A   I reviewed a lot of the material I had
20 previously reviewed.                             10:02:58
21    Q   Meaning?
22    A   Meaning my report, meaning the
23 depositions, meaning the claim file.
24    Q   Did you meet with your attorney?
25    A   Yes, I did.                              10:03:07

Page 14

1     Q   For approximately how long?              10:03:08
2     A   Three hours, perhaps, yesterday.
3     Q   That was yesterday and that was at his
4 offices?
5     A   Correct.                                 10:03:18
6     Q   What deposition transcripts have you
7 reviewed in this case?
8     A   I reviewed just yesterday the
9 Plaintiff's -- the one from KC, their industrial
10 hygienist's office, the deposition of the        10:03:35
11 RLB Consultant and one other.
12    Q   A fellow name Tony Estone?
13    A   Yes. Thank you.
14    Q   Have you read a deposition by a fellow by
15 the named of Greg Clifford?                     10:04:00
16    A   I have not.
17    Q   Have you spoken with anyone at State Farm
18 in regards to your expert work on this case?
19    A   I have not.
20    Q   So you have not spoken with Mr. Jerry    10:04:23
21 Paredes, for example?
22    A   I have not spokes with Mr. Paredes.
23    Q   You have not spoken with Mr. John
24 Grubaugh, for example?
25    A   I was introduced to Mr. Grubaugh this    10:04:34

Page 15

1 morning. I have not spoken to him about this file.   10:04:36
2     Q   Where did that introduction take place?
3     A   In the lobby of your building.
4     Q   If you could go to at Exhibit 601 -- I
5 believe that we marked -- and turn to -- there is a   10:05:16
6 document entitled "Timeline, Doherty versus
7 State Farm."
8         Do you see that?
9     A   Uh-huh.
10    Q   Can you tell me what this document is.    10:05:27
11    A   Which one do you have? Do you have the
12 page distribution or the timeline?
13    Q   Page distribution is the first one I am
14 looking at.
15    A   The page distribution is just that. It    10:05:37
16 tells me what Bates numbers from the claim file --
17 because some of them are in large chunks -- what
18 they are.
19    Q   This is a document you prepared?
20    A   Yes, I did that.                         10:05:50
21        And these Bates references refer to the
22 State Farm document production?
23    A   The State Farm claim file, correct.
24    Q   The claim file. Okay.
25        And then there is another document in    10:06:10

Page 16

1 there called "Timeline, Doherty versus State Farm."   10:06:12
2     A   Correct.
3     Q   Do you see that? Can you tell me what
4 this document is.
5     A   That is exactly what it says. It's a     10:06:18
6 timeline of events and then a summary of what
7 happened on those days and who the note -- who
8 either wrote the note or created the document or
9 made the comments.
10    Q   And you prepared this document?          10:06:30
11    A   I prepared this document.
12    Q   And what is this -- what documents did you
13 review to prepare this document?
14    A   This is all out of the claim file.
15    Q   Any other documents --                   10:06:42
16    A   No.
17    Q   -- that you relied on in preparing this
18 timeline?
19    A   In the timeline, no.
20    Q   There is another document entitled       10:07:34
21 "Timeline of All Inspections."
22    A   Correct.
23    Q   Can you tell me what that is.
24    A   That's just the dates that the property
25 was inspected.                                  10:07:43

Page 17

5 (Pages 14 - 17)

```
 1    Q   By whom?                            10:07:44
 2    A   It depended on the inspection, but
 3 State Farm inspected on all of these dates, or
 4 someone on their behalf did.
 5    Q   I have two copies of that.  These look to   10:08:12
 6 be the same.
 7    A   Just an accident.
 8        MR. MARTI:  That's the one I was referring
 9 to earlier.  I am not sure why the others weren't
10 copied.                                    10:08:22
11 BY MR. SCOTT:
12    Q   Have you ever been convicted of a crime?
13    A   No.
14    Q   Have you ever been sued?
15    A   Personally, no.                     10:08:28
16    Q   Have you ever been a plaintiff in a
17 lawsuit?
18    A   No.
19    Q   Personally?
20    A   I have not been a plaintiff in a lawsuit.   10:08:34
21    Q   Please mark that 603.
22        (Deposition Exhibit 603 was marked for
23        identification by the court reporter and
24        is attached hereto.)
25
                                              Page 18
```

```
 1 BY MR. SCOTT:                              10:09:02
 2    Q   Ms. Hogan, you have just been handed
 3 Exhibit 603 there.
 4        If you could just take a minute to look at
 5 that and I will tell you what this is and you just   10:09:08
 6 tell me if you are familiar with these documents.
 7        These are the documents that were provided
 8 to us by State Farm in connection with their
 9 designation of you as an expert in this case.
10        Have you seen these documents before?   10:09:19
11    A   Yes, I have.
12    Q   The first three -- first two pages of
13 Exhibit 603, can you tell me what that is?
14    A   That is my current CV.
15    Q   And if you go to the top of the second   10:09:34
16 page, "Expert Witness Testimony," we should add one
17 more case on there and that is the Greg -- Gregory
18 case?
19    A   Gregory, yes.
20        I think the one -- this was sent before   10:09:48
21 the Gregory deposition was taken.  So it wouldn't
22 have been included because I wouldn't have done it
23 yet.
24    Q   Understood.
25        So I'm actually going to ask can I just   10:10:06
                                              Page 19
```

```
 1 mark this as Exhibit 604.                   10:10:09
 2        (Deposition Exhibit 604 was marked for
 3        identification by the court reporter and
 4        is attached hereto.)
 5 BY MR. SCOTT:                              10:10:25
 6    Q   Ms. Hogan, you have just been handed
 7 Exhibit 604, which I think is a more current version
 8 of your CV that I downloaded off your website last
 9 night.
10        And if you turn to the back -- sorry --   10:10:37
11 it's double-sided.
12        The expert witness testimony, it appears
13 it has the Gregory --
14    A   It has Gregory.
15    Q   -- State Farm case listed.           10:10:45
16        That is the case we have been talking
17 about?
18    A   That is correct.
19    Q   Do you, by any chance, have a case number
20 for this case?                             10:10:52
21    A   I can provide it.  I don't have it
22 memorized.
23    Q   Absolutely.  I wouldn't expect you to.
24        If you could go back to 603.
25        In the "Summary" portion, it sort of   10:11:09
                                              Page 20
```

```
 1 summarizes what your experience is and things like   10:11:11
 2 that.
 3        And towards the end of the paragraph, the
 4 sentence that starts with "Under her leadership," do
 5 you see that?                              10:11:22
 6    A   Yes.
 7    Q   It says,
 8        ". . . her claims departments have
 9        consistently had superior reinsurance
10        audit results."                     10:11:28
11        What is a "reinsurance audit result"?
12    A   Insurance companies buy insurance.  They
13 have a certain amount of dollar limit on losses, and
14 after that limit, it functions as a deductible
15 would.                                     10:11:41
16        They buy insurance from reinsurers, and
17 the reinsurers, being concerned for their potential
18 exposure, audit their primary carriers.
19        So they do file reviews and they want to
20 be sure that the reserving is accurate, that the   10:12:01
21 payments that have been made are correct, et cetera,
22 and it's typically in higher-value cases.
23        Sequoia had a limit of -- retained limit
24 of $500,000.  So everything over that would have
25 been reported to a reinsurer so they would have had   10:12:20
                                              Page 21
```

6 (Pages 18 - 21)

1  the information current on the file.          10:12:24
2      Whether they chose to -- excuse me -- we
3  had a $500,000 reporting threshold and a $1 million
4  retention.
5      So that is what they would watch.          10:12:37
6  Q   And would the audit review the claims
7  handling procedures?
8  A   Yes, it would.
9  Q   The next sentence there, it says,
10     "She has personally handled well over          10:12:48
11     100 mediations and MSC's."
12     In what capacity have you handled those
13  mediations and MSC's?
14  A   Everything from a Branch Claims Manager to
15  the Vice President of Claims to the large loss          10:13:00
16  adjusting at Nationwide.
17  Q   So as a representation of the insurance
18  company at these mediations and MSC's?
19  A   Correct.
20  Q   If you go to the "Positions Held" portion          10:13:16
21  on that first page there, I just wanted to go
22  through some of your experience here.
23     It looks like the company that you had the
24  longest tenure with was Sequoia; is that correct?
25  A   That's correct.          10:13:30

Page 22

1  Q   What kind of insurance did Sequoia          10:13:30
2  provide?
3  A   They write property, casualty, commercial
4  lines and had a small personal lines company.
5  The -- they had a specific personal lines company          10:13:39
6  that was also under my supervision and that's what
7  they wrote.
8  Q   And when you say "personal lines," what do
9  you mean by that?
10  A   Personal auto, personal homeowners,          10:13:57
11  personal lines.
12  Q   Approximately what percentage of your time
13  at Sequoia was devoted to the personal lines side of
14  their business?
15  A   I would say probably about 15 to          10:14:10
16  20 percent.
17  Q   What was the highest dollar personal line
18  claim that you oversaw while at Sequoia?
19  A   I don't -- I don't have any idea.  It
20  would be over a million.          10:14:33
21  Q   Less than $2 million?
22  A   There is probably an outlier that was out
23  there.  That would not be a common claim.
24  Q   So the majority of them would have been
25  under $2 million?          10:14:46

Page 23

1  A   Yes.          10:14:47
2  Q   The majority would have been under
3  $1 million?
4  A   Yes, they would have been under
5  $1 million.          10:14:51
6  Q   If you go up to the Riverport Insurance
7  Company portion, what did you do at Riverport?
8  A   After Sequoia was sold and I left, I went
9  to work for Riverport as the Senior Litigation
10  Specialist.  They are based in Minneapolis.          10:15:13
11     It's, you know, a property casualty
12  company.  I did mostly casualty.
13  Q   And what did you do as a Senior Litigation
14  Specialist?
15  A   I just handled claim files.          10:15:25
16  Q   Why is it called a "litigation
17  specialist"?
18  A   Because most -- most everything that I had
19  was in litigation.
20  Q   And when you say "casualty insurance,"          10:15:35
21  what do you bean by that?
22  A   Not property, so bodily injury, general
23  liability, those kinds of cases.
24  Q   Did you do any homeowners insurance while
25  at Riverport?          10:15:50

Page 24

1  A   I don't believe Riverport wrote any          10:15:51
2  homeowners.
3  Q   If you go up to Nationwide Insurance
4  Company, your title is listed as "Commercial
5  Casualty Complex Loss Consultant."          10:16:01
6     What did you do in that position?
7  A   We handled the casual claims that had a
8  value of $1 million and up.
9  Q   And casual, again, is --
10  A   Not property.          10:16:13
11  Q   Personal?
12  A   Personal injury, liability.
13  Q   Did you handle any homeowners insurance
14  claims while at Nationwide?
15  A   Not while at Nationwide.          10:16:23
16  Q   And then finally, Lola Hogan Insurance
17  Consulting, can you tell me the nature of your
18  business?
19  A   I consult on claims handling.
20  Q   Exclusively as an expert witness?          10:16:38
21  A   Exclusively.
22  Q   Any other services that Lola Hogan
23  Insurance Consulting provides?
24  A   Not so far.
25  Q   And you have been doing that since 2014,          10:16:47

Page 25

7 (Pages 22 - 25)

1 approximately?                          10:16:48
2     A   Yes, I am in full time since July of this
3 year.
4     Q   If you could just turn the page to "Expert
5 Witness Testimony."                     10:17:00
6         At the top of the page, there is a heading
7 that says "Expert Witness Testimony."
8         And is this a complete list of the cases
9 in which you have been either deposed or offered
10 trial testimony as an expert witness?   10:17:20
11    A   If it -- well, other than the fact that it
12 doesn't have the Gregory case on it --
13    Q   Very good point.
14    A   -- correct.
15    Q   So if you add the Gregory case on here,   10:17:32
16 this would be a complete list?
17    A   That would be a complete list.
18    Q   Have you ever -- it appears that you have
19 only testified on behalf of defendants; is that
20 right?                                  10:17:46
21    A   I have testified on behalf of carriers.
22        Occasionally -- there are two claims, one
23 on this list and one that is active that I haven't
24 been deposed on that are -- where the carrier is the
25 plaintiff.                              10:18:00
                                            Page 26

1     Q   Have you ever been retained to testify on   10:18:00
2 behalf of an insured?
3     A   I haven't been retained on behalf of a
4 policyholder.
5     Q   So you have exclusively testified on       10:18:10
6 behalf of insurance companies?
7     A   That's correct.
8     Q   Have you ever offered an opinion that the
9 insurance company engaged in bad faith?
10    A   I have offered several opinions that -- in   10:18:18
11 consulting where there have been issues with the
12 claims file.
13    Q   But you have never offered any deposition
14 or trial testimony that an insurance company has
15 engaged in bad faith?                   10:18:33
16    A   That's correct.
17    Q   So if we just include the Gregory case on
18 here, that is it Gregory versus State Farm --
19    A   It is.
20    Q   -- is that right?                 10:18:47
21        So that would be ten cases total that you
22 have been deposed as an expert, not including this
23 one?
24    A   Eleven.  I was deposed twice in Stevenson.
25    Q   But just the number of cases, it would be   10:19:04
                                            Page 27

1 ten not including this one?             10:19:07
2     A   Plus Gregory, I think that is correct.
3     Q   And so five out of those ten, you have
4 testified on behalf of State Farm; is that right?
5     A   That's how it worked out, right.   10:19:20
6     Q   Have you ever offered an opinion that
7 State Farm engaged in bad faith?
8     A   I have on other claims commented on areas
9 that I thought were difficult, not that the overall
10 claim was handled in bad faith but that there would   10:19:36
11 be some issues, and none of those cases have gone
12 any farther.
13    Q   Well, tell me a little bit about that.
14        What -- what cases have you offered that
15 opinion?                               10:19:52
16    A   Oh, I couldn't tell you.  I have done
17 forty -- thirty-five or forty cases total.
18    Q   But you have never offered an opinion in
19 any of those cases that an insurer has engaged in
20 bad faith conduct?                     10:20:07
21        MR. MARTI:  I think that misstates her
22 testimony.
23        THE WITNESS:  I said I have never
24 testified in a deposition that the carrier I
25 represented was in bad faith.  That is correct.   10:20:18
                                            Page 28

1 BY MR. SCOTT:                           10:20:22
2     Q   But have you ever offered any opinion in a
3 written report or otherwise that a carrier has
4 engaged in bad faith conduct?
5         MR. MARTI:  Object to the form.   10:20:34
6         THE WITNESS:  I can't answer that.  I have
7 never -- none of my reports that -- written reports
8 would have an opinion that the person I was
9 reviewing was in bad faith.
10        If I found problems with the file during   10:20:48
11 the course of my review of the claim file, I would
12 call the counsel and discuss it.  What they choose
13 to do with it after that is not my assignment.
14 BY MR. SCOTT:
15    Q   But as an expert, you have never offered   10:21:06
16 the opinion that an insurance company has engaged in
17 bad faith conduct?
18        MR. MARTI:  Asked and answered.
19        THE WITNESS:  As I said, I have offered a
20 number of opinions where I believe there are issues.   10:21:15
21 It's eventually a jury's decision as to whether that
22 action was bad faith.
23        In my opinion, some of them have had
24 issues which could rise to that level in the face of
25 a jury and that's what I tell the attorneys.   10:21:33
                                            Page 29

8 (Pages 26 - 29)

1       MR. MARTI:  Belated objection that it        10:21:39
2 calls for a legal conclusion.
3 BY MR. SCOTT:
4       Q   On this list of expert witness testimony,
5 the ten cases, including Gregory, did any of those        10:21:52
6 cases involve homeowners insurance?
7       A   Yes, they did.
8       Q   Can you tell me which ones.
9       A   Modir, I believe Mayfield did, Cagle
10 versus Fire Insurance and Caetano all did.        10:22:13
11      Q   And are all of these cases in California
12 courts?
13      A   Yes, they are.
14      Q   Are any of them in the Central District of
15 California?        10:22:26
16      A   I don't think so but -- Endurance or L.A.
17 Healthcare, maybe.  I don't remember.  I would have
18 to look them up.  I have that information but I
19 don't know off the top of my head.
20      Q   I may be able to find it on the next page        10:22:42
21 there, but did any of the cases in which the
22 insurance claim involved a homeowners policy involve
23 fire or smoke damage?
24      A   Yes.
25      Q   Can you tell me which ones?        10:22:59

Page 30

1       A   Caetano did.        10:23:01
2       Ospina was a vehicle fire, I believe.
3       I don't remember what Mayfield was.
4       And Modir was a water claim.
5       And Lopez was another vehicle fire.        10:23:22
6       Q   How about the Gregory case, what is that
7 case about?
8       A   That is a water damage.
9       Q   Who is the attorney in the Caetano case on
10 behalf of State Farm?        10:23:42
11      A   I think that was LHP, Pacific Law
12 Partners.
13      Q   Who is the attorney in the Gregory case
14 for State Farm?
15      A   Venture LP.        10:23:54
16      Q   Do you recall the attorney in the Mayfield
17 case for State Farm?
18      A   No.  Again, I would have to look it up for
19 you.
20      Q   Do you recall the attorney in the Modir        10:24:05
21 case for State Farm?
22      A   That was Hughes and Nunn.
23      Q   Have you ever worked with Valerie Rojas
24 before?
25      A   No, I have not.        10:24:17

Page 31

1       Q   How about Mr. Marti?        10:24:18
2       A   No, I have not.
3       Q   Have you ever worked with Cozen, O'Connor
4 previously?
5       A   Not as an expert.        10:24:24
6       As Claims Vice President of Sequoia, Cozen
7 and O'Connor did a lot of our subrogation work.
8       Q   In the Caetano case, what is the dollar
9 value of the claim at issue?
10      A   Several hundred thousand.        10:24:43
11      Q   In the Mayfield case, what is the dollar
12 value of the claim at issue?
13      A   I don't remember the issues and I don't
14 remember what kind of claim it was.  So I can't
15 tell.        10:24:53
16      Q   How about the Modir case, what is the
17 dollar value of the claim at issue?
18      A   That was a relatively small case.  I think
19 it was about a hundred thousand, something along
20 those lines.        10:25:06
21      Q   And then in the Gregory case, what is the
22 dollar value of the claim at issue?
23      A   I believe the claim is for over 150, but I
24 would have to look it up.  I don't remember.
25      Q   The Cagle case, that was a homeowners        10:25:23

Page 32

1 insurance case, you said?        10:25:26
2       A   Yes, it was.
3       Q   And what was the type of damage in that
4 case?
5       A   It was a fire case claim.        10:25:29
6       Q   Fire case.
7       Which is the dollar value of the claim in
8 that case?
9       A   I think it was over $200,000.
10      Q   And it was fire damage to a residence?        10:25:38
11      A   Yes, it was.
12      Q   What is the status of that case, if you
13 know?
14      A   It went to verdict in 2015.
15      Q   What happened?  Did you testify at trial        10:25:49
16 there?
17      A   I did.
18      Q   Because it only says deposition on your --
19      A   No, it says trial testimony.
20      Q   I was talking about Cagle.        10:25:57
21      A   Oh, Cagle.
22      Q   Yes.
23      A   I'm sorry.  I thought you were talking
24 about Caetano.
25      No, Cagle -- Cagle did not go to trial.        10:26:02

Page 33

9 (Pages 30 - 33)

Page 34

1  Q   And Cagle -- just let me reiterate, so try   10:26:04
2  to recap because we may have got our wires crossed
3  there.
4       Cagle involved a homeowners insurance
5  claim for fire damage?                           10:26:14
6  A   No, that was Kitano.
7  Q   What did Cagle involve?
8  A   Water damage.
9  A   Water damage.
10      And what was the dollar value of the claim   10:26:23
11 there?
12 A   I don't know that I ever knew.
13 Q   And you said Kitano went to verdict?
14 A   Yes, it did.
15 Q   Do you recall what the verdict was?          10:26:32
16 A   I believe they found additional coverage
17 for loss of ALE, additional living expense, but no
18 bad faith.
19 Q   Do you have any other employees at
20 Lola Hogan Insurance Consulting?                 10:27:04
21 A   No.
22 Q   Just you?
23 A   Just me.
24 Q   Have you ever been proffered as an expert
25 but the court has refused to qualify you as an    10:27:12

Page 35

1  expert?                                          10:27:16
2  A   No, that has not happened.
3  Q   Approximately, how many hours have you
4  worked on this case, not including the deposition
5  today?                                           10:27:49
6  A   The time sheet is on the --
7  Q   Just an estimate is fine.
8  A   I probably have thirty hours in.  I am not
9  positive.
10 Q   If you could turn to the actual report in   10:28:10
11 Exhibit 601 -- 603.  Sorry.
12      Can you tell me what this document is.
13 A   That's my report on the claim handling.
14 Q   And you drafted this report?
15 A   I did.                                       10:28:29
16 Q   Were there prior iterations of this
17 report?
18 A   No, there are one -- it's one report that
19 I keep playing with, but there are no drafts as
20 iterations.                                      10:28:42
21 Q   Did you receive comments on this report
22 from Cozen, O'Connor before you submitted it in
23 final?
24 A   I think we did a lot of formatting changes
25 but not content.  The only content that we -- I   10:28:54

Page 36

1  changed was the list of the payments because it   10:29:02
2  wasn't clear.
3  Q   So other than that, no substantive changes
4  from Cozen?
5  A   No, no substantive changes from Cozen.      10:29:10
6       (Deposition Exhibit 605 was marked for
7       identification by the court reporter and
8       is attached hereto.)
9  BY MR. SCOTT:
10 Q   Ms. Hogan, you have been handed            10:29:41
11 Exhibit 605, which is a printout of the Fair Claims
12 Settlement Practices Regulations from the California
13 Department of Insurance website.
14      Are you familiar with the Fair Claims
15 Settlement Practices Regulations?               10:29:51
16 A   I am familiar with the fair claims
17 practices.
18 Q   And do these set forth the minimum
19 standards for an insurer's claims handling
20 procedures?                                     10:30:02
21 A   I don't know if I would use the word
22 "minimum," but they are standards that the State of
23 California requires you to meet, at least, yes.
24 Q   And why wouldn't you say "minimum"?
25 A   I just don't think they're necessarily     10:30:18

Page 37

1  minimums.  It's an overall philosophical regulations   10:30:21
2  to ensure that carriers are fair and act with good
3  faith and fair dealing, so.
4  Q   If you could turn to page 15 of 19, it's
5  Section 2695.9 entitled, "Additional Standards     10:30:43
6  Applicable to First Party Residential Commercial and
7  Property Policies."
8       MR. MARTI:  What page is that?
9       MR. SCOTT:  1519.
10 BY MR. SCOTT:                                    10:30:56
11 Q   And take a look at sub-Section D and I am
12 just going to read it into the record and we can
13 discuss it, at least the first portion.
14      It states,
15      "If losses are settled on the basis of a    10:31:05
16      written scope and/or estimate prepared by
17      or for the insurer, the insurer shall
18      supply the claimant with a copy of each
19      document upon which the settlement is
20      based.  The estimate prepared by or for     10:31:18
21      the insurer shall be in accordance with
22      applicable policy provisions, of an amount
23      which will restore the damaged property to
24      no less than its condition prior to the
25      loss and which will allow for repairs to    10:31:31

10 (Pages 34 - 37)

1    be made in a manner which meets accepted    10:31:34
2    trade standards for good and workmanlike
3    construction."
4    Do you see that?
5    A   Yes, I do.    10:31:40
6    Q   And are you familiar with that standard?
7    A   I am familiar with it.
8    Q   And is that the standard that you applied
9    to State Farm's conduct in this lawsuit?
10    A   It is.    10:31:46
11    Q   And you agree that the standard for
12    first-party residential property insurance policies
13    is that the damaged property must be restored to no
14    less than it's condition prior to the loss?
15    MR. MARTI:  Objection to the form.    10:32:02
16    THE WITNESS:  That's what it says.
17    BY MR. SCOTT:
18    Q   And that's what the standard is?
19    A   That's correct.
20    Q   In your opinion, does an insured's unique    10:32:16
21    health issues need to be taken into account when an
22    insurer adjusts a claim?
23    MR. MARTI:  Objection; incomplete
24    hypothetical.
25    You can answer.    10:32:25
Page 38

1    THE WITNESS:  That is impossible to answer    10:32:28
2    on an in general because it depends on the nature of
3    the loss, whether or not it has any relevance to the
4    insured or claimed health condition that the carrier
5    may know nothing about.    10:32:43
6    BY MR. SCOTT:
7    Q   If an insured -- well, you know what, I am
8    not going to talk in hypotheticals.  We will get to
9    it.
10    If you could go back to Exhibit 603 --    10:32:49
11    sorry -- 603 was the report.  This one right there.
12    possibly.
13    A   Okay.  603, got it.
14    Q   I have you flipping around all over the
15    place.  I am sorry.    10:33:13
16    And just page 1 of 10 there, and bullet
17    point two, it says "Material Reviewed."
18    A   That's correct.
19    Q   And then it lists three items there,
20    State Farm Insurance Claim File, State Farm    10:33:23
21    Homeowners Policy, and Shannen Doherty Responses to
22    State Farm's Interrogatories.
23    Is this all the material that you reviewed
24    in generating this report?
25    A   At the time the report was generated, that    10:33:37
Page 39

1    is all I had reviewed, correct.    10:33:39
2    Q   And subsequent to generating this report,
3    have you reviewed additional documents?
4    A   Yes, I have.
5    Q   Can you tell me what they are.    10:33:47
6    A   The ones that were on the list were
7    provided after the fact.  So the deposition
8    testimony, the Sunpoint production -- so those --
9    the depositions and the Sunpoint production, I
10    believe, were all.  I would, again, have to look at    10:34:07
11    the whole list.
12    Q   Did you review the plaintiff's document
13    production in the case?
14    A   No, I don't believe so.
15    Q   After reviewing those additional documents    10:34:19
16    not listed in the report, did it change your
17    opinions in any way?
18    A   No, it did not.
19    Q   Did it change the basis for your opinions
20    in any way?    10:34:31
21    A   No.
22    Q   So the additional documents that you
23    reviewed after the report, are you relying on them
24    in any way to support the opinions in your report?
25    A   Well, I don't know -- having read them,    10:34:42
Page 40

1    they are probably part of my opinions, but there was    10:34:44
2    no significant or demonstrable change either one way
3    or the other as a result of reviewing them.  They
4    generally provided larger background.
5    Q   And when you refer to this State Farm    10:35:08
6    claim file, what are you referring to there, the
7    claims notes or was it something else?
8    A   Well, the entire claim file is 3300 pages.
9    Q   So it's the 3300-page document?
10    A   It's the whole 330 pages.    10:35:26
11    Q   If you could go to the next page, 2 of 10.
12    bullet point five, "Scope of Work," it says,
13    "I have been asked by State Farm Insurance
14    Company to review the handling of the
15    claim related to "Shannen Doherty versus    10:35:42
16    State Farm insurance Company," venued in
17    the United States District Court for the
18    Central District of California."
19    Is that the complete scope of your work in
20    this case?    10:35:53
21    A   Yes, the claims handling.
22    Q   Anything else?
23    A   No.
24    Q   Were you asked to provide advice and
25    opinions on how they should be handling the claim    10:36:00
Page 41

11 (Pages 38 - 41)

1 going forward?                                    10:36:05
2    A   No, I was not.
3    Q   It was just to offer an expert opinion
4 looking at their claims handling to date?
5    A   That's correct.                            10:36:12
6    Q   Have they ever asked you your opinion on
7 how they should respond to a certain item in the
8 claim?
9    A   No, they have not.
10    Q   Number six, "Factual Background," it looks   10:36:26
11 like there is a timeline there.
12       Do you see that?
13    A   Yes.
14    Q   What is that based on?
15    A   It's based on the claim file.             10:36:39
16    Q   You reviewed the claim file and extracted
17 this information from it?
18    A   That's correct.
19    Q   Is this meant to be a complete recitation
20 of the events surrounding this claim?            10:36:48
21    A   It's not every entry into the claim file,
22 no.
23    Q   These were the events that were salient,
24 in your mind, with respect to your opinion?
25    A   They were important to my opinion,        10:36:59
                                                    Page 42

1 correct.                                          10:37:01
2    Q   In forming your opinions, did you rely on
3 any events that were not listed in this timeline?
4       MR. MARTI:  I'm sorry.  Could you repeat
5 that, Counsel.                                    10:37:14
6       (The previous question was read back
7       by the court reporter as follows:
8        "QUESTION:  In forming your opinions,
9       did you rely on any events that were not
10       listed in this timeline?")                  10:37:15
11    MR. MARTI:  Object to the form.
12    THE WITNESS:  I couldn't -- if I listed
13 every event, I would ends up listing the entire
14 notes section of the policy.
15       So I would, obviously, have taken them     10:37:38
16 into account.  Whether I itemized them on this
17 doesn't necessarily mean I didn't consider them.
18 BY MR. SCOTT:
19    Q   I notice you produced this morning an
20 additional timeline.                             10:37:52
21       Do you recall that?
22    A   Yes.
23    Q   Was that generated after this report was
24 prepared?
25    A   The timeline for Sunpoint?               10:37:58
                                                    Page 43

1    Q   There is a timeline in Exhibit 601 that we   10:38:03
2 looked at.
3    A   For the page differentiations.
4    Q   There is a document called "Timeline."
5    A   That is produced first.                    10:38:15
6    Q   So this timeline that is in Exhibit 601,
7 that was generated before the report --
8    A   Correct.
9    Q   -- was completed.
10       And the timeline in Exhibit 601 is more    10:38:29
11 comprehensive than what is shown in Exhibit 603?
12    A   Considerably.
13    Q   Any reason you didn't include all the
14 events in the 601 timeline in the 603 report?
15    A   The 601 timeline is every event, and if I   10:38:44
16 included every event, that sort of defeats the
17 purpose of a report, to gather the most pertinent
18 information relevant to an opinion, but they're all
19 reflected in here.  They're just not all listed.
20    Q   So the events in the timeline in          10:39:05
21 Exhibit 603 are the most important events, in your
22 mind, with respect to your opinions?
23       MR. MARTI:  Misstates her testimony.
24       THE WITNESS:  They help form the basis for
25 showing why I reached the opinions I reached.    10:39:19
                                                    Page 44

1 BY MR. SCOTT:                                     10:39:21
2    Q   And to the extent an event is not listed
3 in the timeline in 603, can one infer from that that
4 it has less importance with respect to the basis for
5 your opinion?                                     10:39:36
6       MR. MARTI:  That misstates her testimony.
7       THE WITNESS:  Not necessarily.
8 BY MR. SCOTT:
9    Q   Why not?
10    A   Well, as I just explained, these are the   10:39:43
11 ones that seemed more directly related to what my
12 opinions are and so it's almost backwards.
13       These support my opinions.  So does the
14 timeline but it doesn't explain why it supports my
15 opinion, and that's what I am attempting to do here.  10:40:08
16    Q   Like, for example, I notice you don't have
17 the November 28 inspection listed in this timeline.
18       Is there a reason for that?
19    A   The November 28 inspection was cancelled.
20    Q   Are you sure about that?                   10:40:26
21       MR. MARTI:  Counsel --
22       THE WITNESS:  Well, in terms of being able
23 to do anything.
24       They did meet at the site, but
25 Mr. Clifford was very clear that they were not going  10:40:36
                                                    Page 45

12 (Pages 42 - 45)

1 to do an estimate and they were not going to do a          10:40:39
2 scope at that visit because he had not had his
3 people out.
4       MR. MARTI:   Just for the record, page 5
5 of 10, November 28, the site visit is listed on          10:40:49
6 there.
7       I believe this timeline is broken down
8 into coverages.
9       THE WITNESS:   That's correct.   It's not
10 a -- it's not a single timeline.   This first part is          10:41:11
11 relevant to A and B.
12 BY MR. SCOTT:
13    Q   So you don't consider that November 28
14 site visit to be an inspection?
15    A   It's an inspection in terms of they were          10:41:19
16 there, but whether or not anything was accomplished
17 at that inspection other than a brief walk around
18 the exterior, no.
19    Q   Do you have any understanding that
20 State Farm was allowed into the interior of the          10:41:35
21 property on November 28?
22    A   Yeah, they were briefly allowed into the
23 interior and the adjuster's notes reflect that.
24    Q   So you don't consider that a site
25 inspection.          10:41:47
                                              Page 46

1    A   Again, it didn't result in a comprehensive          10:41:48
2 ability to -- or complete ability to scope the
3 damages.
4       She does comment that she was inside
5 briefly, the insured's husband came home and let          10:42:02
6 them in, but Mr. Clifford was very clear that this
7 was not going to be a formal inspection.
8    Q   Do you know if State Farm had any of its
9 additional consultants with it at that November 28
10 inspection?          10:42:22
11       MR. MARTI:   Object to the form.
12       THE WITNESS:   I would have to look it up.
13 I know the adjuster was there.   I don't know if she
14 brought anybody with her at that time or not.
15 BY MR. SCOTT:          10:42:34
16    Q   If you go to the December 17, 2018, item
17 on the timeline, it says,
18       "Upon inspection, State Farm believed
19       plaintiff's loss to be relatively minor
20       compared to other homes that were          10:42:47
21       completely destroyed."
22       What is the basis for that statement?
23    A   That would be her notes reflecting -- her
24 note from the visit, that's what she says.
25       She says that they inspected the windows          10:43:20
                                              Page 47

1 and doors, were closed, no smokers in the home.   The          10:43:22
2 public adjuster confirmed that no cleaning had been
3 done yet.   She said upon entry that she did not
4 notice any odor during the inspection of any
5 fabrics.   Debris was seen in the window and          10:43:41
6 thresholds open to the exterior.
7       That's what she says.
8       That leads me to believe that it's a
9 relatively minor smoke claim.
10    Q   So what you just read, that is the basis          10:43:57
11 for your statement that State Farm believed
12 Plaintiff's loss to be relatively minor?
13    A   Yes.
14    Q   Next sentence,
15       "Plaintiff's residence did not sustain any          10:44:08
16       fire damage."
17       What is the basis for that statement?
18    A   Well, that means it didn't burn.
19    Q   And you are exclusively talking about the
20 home?          10:44:17
21    A   Yes.
22    Q   The building?
23    A   Yes.
24    Q   Are you aware of whether fire damaged any
25 other portion of the insured's property?          10:44:23
                                              Page 48

1    A   Well, it burned the trees and it burned a          10:44:25
2 railroad tie and a retaining wall.
3    Q   Are you aware of whether the fire damaged
4 any portion of the residence?
5    A   Are you -- I'm talking flames.          10:44:39
6       MR. MARTI:   Object to the form.
7 BY MR. SCOTT:
8    Q   Yes, flames and heat generated from the
9 flames.
10    A   No.          10:44:45
11    Q   No, what?
12    A   After -- as the claim progressed, the
13 claim was made that the exterior was damaged by
14 heat, and the experts concluded that it was not.
15    Q   Whose experts were that?          10:45:00
16    A   The State Farm experts.
17    Q   Next bullet point, it says,
18       "On December 18, 2018, State Farm
19       completed an estimate for the insured's
20       claim based on State Farm's inspection.          10:45:16
21       State Farm made payment for the smoke loss
22       to the building and contents in the amount
23       of 85,515.19."
24       What is the basis for that fact?
25    A   That they -- the basis for what fact?   The          10:45:33
                                              Page 49

13 (Pages 46 - 49)

Page 50

```
 1  claims -- the claim file?              10:45:38
 2     Q   Can you show me in the claim file where it
 3  says that.
 4     A   Where it says what?
 5     Q   That they made a payment for smoke loss to    10:45:43
 6  the building and contents in the amount of
 7  $85,515.19.
 8        MR. MARTI:  Counsel, do you have the claim
 9  notes with you?
10        MR. SCOTT:  Perhaps in the timeline you       10:45:57
11  generated.
12        THE WITNESS:  I think you are right.  I
13  think that is incorrect.  That was for -- or
14  State Farm called it Coverage C but I don't believe
15  it was.  I believe it was Coverage A.             10:46:34
16  BY MR. SCOTT:
17     Q   What makes you believe it was Coverage A?
18     A   Because I think that was the amount of
19  estimate, including -- now I'm going to get confused
20  here.                                           10:46:51
21        I think you are correct.  I don't think
22  they made payment on December 18.  I think that's
23  where she completed her estimate.
24        And I would have to go back and find the
25  date of the payment but that's what was paid.    10:47:20
```

Page 51

```
 1     Q   And do you know --                 10:47:23
 2     A   Based on an estimate that was done.
 3     Q   And it's your opinion that that $85,000
 4  figure was for Coverage A and B?
 5     A   That's my recollection.            10:47:35
 6     Q   Would your opinion change in any way if
 7  you were to learn that Coverage A and B, or
 8  Coverage A, at least, was not paid out until June of
 9  2019?
10        MR. MARTI:  Object to the form.      10:47:54
11        THE WITNESS:  I don't think that is
12  correct.
13  BY MR. SCOTT:
14     Q   Why not?
15     A   I believe there were payments made prior    10:47:59
16  to that.  I know they paid the pool estimate and the
17  landscaping balance.  They paid all of that prior to
18  June, and that's all Coverage A.
19        In March, they got the estimate from the
20  public adjuster at over a million dollars and asked   10:48:41
21  to reinspect.
22        So they had paid part of A.  I don't
23  remember exactly if they paid -- I believe they paid
24  all they thought they were owed and all the cleaning
25  was included in that original estimate -- cleaning   10:49:00
```

Page 52

```
 1  of the structure.                          10:49:04
 2     Q   Right.
 3        And what is your opinion as to when that
 4  amount was paid?  I'm not trying to trick you.
 5     A   I would have to look.  I really would.  I   10:49:11
 6  mean I know that there was a dispute.  It went
 7  undisputed until the estimate from the public
 8  adjuster appeared in March.
 9     Q   What went undisputed?
10     A   The original State Farm estimate.        10:49:25
11     Q   Which was provided when?
12     A   I thought it was provided in -- after the
13  December 18 inspection.
14     Q   Would your opinion change in any way if
15  you were to learn that this $85,000 figure we're    10:49:40
16  looking at was not, in fact, for Coverage A?
17     A   No, it would just be a mistake on my part.
18     Q   It would have no impact on your opinion?
19     A   No, they're making payments on the claim.
20  She's in her housing.  It's a difficult encounter.   10:50:02
21     Q   Let me ask you this.
22        Conceptually, walk me through the steps of
23  how a claim should be adjusted.
24        MR. MARTI:  Object to the form.
25        THE WITNESS:  There is no simple          10:50:24
```

Page 53

```
 1  one-size-fits-all answer to that question.       10:50:27
 2        You have to determine whether there is
 3  coverage and then you have to inspect or you have to
 4  determine what the loss is, and assuming that it's
 5  covered, then you scope it and estimate it and pay   10:50:41
 6  for it.
 7  BY MR. SCOTT:
 8     Q   So it would start with a tender of a
 9  claim, right?
10     A   A claim has to be reported.  We can't      10:51:01
11  adjust something we don't have.
12     Q   Understood.
13        So first step would be a tender reporting
14  of a claim?
15     A   A claim has to be reported.            10:51:08
16     Q   What would be the next step in your
17  opinion?
18     A   Depends on what kind of claim it is.
19     Q   Let's say it's a fire or smoke damage
20  claim?                                         10:51:16
21     A   Well, again, if the house is gone, then --
22  and you have confirmed that: A, it's the
23  policyholder, and B, it's an insured location, and
24  since every policy does have fire coverage, you
25  would also have to know whether they have any      10:51:32
```

14 (Pages 50 - 53)

Page 54

```
 1  additional living expense.                10:51:36
 2      It might be a dwelling policy and not a
 3  homeowners policy.  You have to know all of that.
 4      If you assume that: A, it's the insured;
 5  B, it's a covered location; C, it's a homeowners   10:51:46
 6  policy; and, D, the insured has no place to live, the
 7  very first thing you want to do is help them find
 8  another place to live.
 9      And typically, carriers will advance a
10  lump sum sight unseen to do that, and State Farm   10:52:04
11  agents have that authority, and that's what happened
12  here.
13      And prior to investigating in this
14  particular case, State Farm authorized a three-month
15  rental, and without knowing whether or not the house  10:52:20
16  was habitable.
17      It had not burned and, in fact, the
18  initial report says I don't know if anything is
19  damaged.
20  Q   And who said that?                10:52:30
21  A   Whoever reported the claim, which is not
22  recorded.
23  Q   And when should the insurer's first
24  inspection occur?
25      MR. MARTI:  Incomplete hypothetical.    10:52:43
```

Page 55

```
 1  BY MR. SCOTT:                          10:52:44
 2  Q   Generally.
 3  A   The hope is that it can occur as soon as
 4  possible, but the insurance company cannot do that
 5  without permission of the owner or his       10:52:55
 6  representatives.
 7  Q   And that first inspection, is that
 8  supposed to be a comprehensive inspection?
 9      MR. MARTI:  Incomplete hypothetical.
10      THE WITNESS:  Again, it depends on the    10:53:08
11  claim.
12      Some claims, you can inspect and scope and
13  estimate on the spot, and some carriers carry field
14  checks and it's done.
15      Other claims, it's hard to tell.        10:53:19
16      And there is everything in between.
17      So if it appears to be a relatively simple
18  loss, then at the time that they're allowed to do
19  the scope and inspection -- and you will recall that
20  the adjuster asked for a minimum of three hours,     10:53:38
21  which she was not given in November to do a complete
22  inspection.
23  BY MR. SCOTT:
24  Q   So coming back to this case, the
25  December 17, 2018, State Farm inspection, in your   10:53:49
```

Page 56

```
 1  opinion, was that a comprehensive inspection of the   10:53:53
 2  property?
 3  A   It was a complete inspection as viewed by
 4  State Farm at that time.
 5  Q   Why do you say "at that time"?          10:54:14
 6  A   Because when State Farm wrote their
 7  estimate, they believed they had written a complete
 8  estimate, and they had.
 9  Q   Was there new information that came to
10  light after that December 18, 2018, inspection?     10:54:31
11  A   Well, there was certainly a difference of
12  opinion that was expressed in the $1 million
13  estimate that showed up in March.
14  Q   It was a difference of opinion, but was
15  there new information available to State Farm?      10:54:43
16      MR. MARTI:  Object to the form.
17      THE WITNESS:  Well, that estimate was new
18  information.  It changed -- it was alleging a much
19  different scope to the work.  So that is new
20  information.                             10:54:56
21  BY MR. SCOTT:
22  Q   The fact that the insured disagreed with
23  the insurance company is new information?
24  A   No, the fact that the insured's
25  representatives presented a scope of work and        10:55:03
```

Page 57

```
 1  estimate for that work that was far greater than     10:55:06
 2  that which State Farm had already evaluated.
 3  Q   And you can't point to any actual new
 4  information on the ground at the property that would
 5  warrant State Farm having to do another inspection,   10:55:22
 6  can you?
 7      MR. MARTI:  Argumentative, object to form.
 8  BY MR. SCOTT:
 9  Q   What changed at the property that would
10  require State Farm to do a reinspection?           10:55:31
11      MR. MARTI:  Object to the form.
12      THE WITNESS:  What changed was the public
13  adjuster's perception of the damages and what was
14  needed to repair them.  That's what changed.
15      That is new information.  That is somebody   10:55:50
16  saying look, you didn't do a thorough enough job and
17  we are claiming this damage over here.
18      That doesn't mean it's there.  It means
19  it's being claimed and the carrier has an obligation
20  to consider all of that once it's presented.        10:56:03
21  BY MR. SCOTT:
22  Q   That is the only new inspection you can
23  identify?
24      MR. MARTI:  Asked and answered,
25  argumentative.                           10:56:10
```

15 (Pages 54 - 57)

**Page 58**

1    THE WITNESS:  What do you mean, what is    10:56:11
2  that, the only new information?
3  BY MR. SCOTT:
4    Q   The fact that the public adjuster
5  submitted a bid or a claim that was broader in scope    10:56:16
6  than State Farm's inspection coverage estimates,
7  that is the only new information that you can
8  identify that would warrant State Farm doing a
9  reinspection of the property.
10    A   I don't understand your question.    10:56:30
11    Q   What don't you understand about it?
12    A   That's what was presented to them in
13  March.  That whole presentation is new to
14  State Farm.
15    Q   Other than that, any other new information    10:56:45
16  you can identify?
17    A   Other than new information that was
18  presented?
19    Q   No, other than the public adjustor
20  submitting a broadened scope claim, is there any    10:56:57
21  other new information you can identify that would
22  warrant State Farm having to do a reinspection of
23  the property?
24    A   At any time or --
25    Q   Yeah.    10:57:08

**Page 59**

1    A   -- ever?    10:57:09
2    Q   Sure.
3    A   I have no idea.
4    Q   Why not?
5    A   Because we have to talk about it at the    10:57:13
6  time we're talking about.
7    At the time this happens in March,
8  State Farm knows what it knows in March, and they
9  get this new information.  They act on it.
10    Down the road, you have claims for the    10:57:32
11  roof.  You have claims for the stucco.  That becomes
12  new information when it's first raised.
13    Everybody's at the house on December 17.
14  The roof isn't mentioned.  The stucco is not
15  mentioned.    10:57:49
16    So how can State Farm predict that some
17  claim that hasn't been made is going to be made and
18  hire somebody to investigate a claim for damage they
19  don't have?
20    Q   Are you sure that those items were not    10:58:09
21  mentioned on the December 18, 2018, inspection?
22    MR. MARTI:  Object to the form.
23    THE WITNESS:  They were not -- the
24  notes -- the claim file does not reflect any claim
25  for damage, as I recall, to the roof.    10:58:29

**Page 60**

1    There was an allegation about the stucco.    10:58:37
2    You know, she did an average job on her
3  first visit.  There is nothing wrong with that.
4  BY MR. SCOTT:
5    Q   So we were talking about kind of a    10:58:55
6  hypothetical walk-through of how a claim should be
7  adjusted.  Do you remember that?
8    And we had identified it goes tender the
9  claim, there is a coverage analysis done.
10    First step is to determine what the ALE    10:59:10
11  should be and issue a lump sum payment.
12    A   Only on -- only on a particular type of
13  claim.  That is not a generic first step.  Every
14  single claim is different.
15    Every single claim has different players    10:59:25
16  and so that is why you can only talk in huge
17  generalities, that you do an inspection, that you
18  try to establish what the damages are, what the loss
19  is, what does the insured need.
20    I have had fire claims where the insured    10:59:40
21  has another residence that is being unoccupied and
22  they just move into that.  It runs the gamut.
23    So it's really, really hard to say here is
24  a box and everything has to fit in it, because it
25  doesn't.    10:59:59

**Page 61**

1    Q   Let me ask you this.    11:00:00
2    At the first site inspection that an
3  insurer does on fire smoke damage claim, is the onus
4  on the insured to point out to the insurance company
5  every item of damage?    11:00:11
6    MR. MARTI:  Incomplete hypothetical, may
7  call for a legal conclusion.
8    THE WITNESS:  If you and I are walking
9  through my smoke-damaged house and you are the
10  adjuster and you are telling me what you see, and if    11:00:24
11  I think I see something else that you haven't seen,
12  I am going to tell you that, and that doesn't mean
13  it's my obligation to adjust the loss.  It just
14  means that we are seeing different things.
15    It's like automobile accidents.  You will    11:00:45
16  ask one person how bad is the damage to your car,
17  oh, it's not too bad.  You go out and inspect the
18  car, there isn't a straight panel on it.
19    The next person has the same accident or
20  has an accident, you ask them what is the damage on    11:01:01
21  your car, oh, it's a total, and you go out there and
22  there is a dent on the fender.
23    So that happens in fire losses, as well.
24    Some people are more complete, I guess, or
25  something.  I'm not sure what the word is, but if    11:01:24

16 (Pages 58 - 61)

**Page 62**

1  you send three people into the same fire loss, you          11:01:28
2  will probably end up with something reasonably close
3  to one another, but they will not be the same.
4  BY MR. SCOTT:
5      Q   Is it beneficial from the insurance          11:01:38
6  company's standpoint to have the insured have done
7  an inventory of the damage prior to the insurance
8  company's site visit?
9          MR. MARTI:  Incomplete hypothetical.
10         THE WITNESS:  I don't recall anybody ever          11:01:53
11 asking for an insured to do an inventory before an
12 inspection.
13 BY MR. SCOTT:
14     Q   I'm not asking if the insurance company
15 asked for one to be done, but is it beneficial to          11:02:00
16 the insurance company for the insured to have done
17 so?
18         MR. MARTI:  Same objection.
19         THE WITNESS:  Anything that helps define
20 the loss is beneficial, whether it's done -- you          11:02:13
21 take a contents loss. I can't do your inventory. I
22 didn't own the property and I don't know what you
23 had.
24         If all the clothing is still there, yes,
25 we can do the inventory but we can't price it. I          11:02:32

**Page 63**

1  don't know where you bought your shirt.          11:02:37
2          MR. SCOTT:  Can we take a five-minute
3  break.
4          MR. MARTI:  That is fine.
5          THE VIDEOGRAPHER:  The time is 11:02 a.m.          11:02:47
6  We are going off the record.
7          (Off the record.)
8          THE VIDEOGRAPHER:  The time is 11:11 a.m.
9  We're back on the record.
10 BY MR. SCOTT:          11:11:07
11     Q   Ms. Hogan, in connection with your
12 preparation of your report, you said you reviewed
13 the policy in this case.
14     A   Yes, I did.
15     Q   And where did you obtain a copy of that          11:11:16
16 policy?
17     A   It was provided to me by counsel.
18     Q   Was it in the claim file?
19     A   No, it's not part of the claim file.
20     Q   The version that you reviewed, did it have          11:11:26
21 little Bates numbers on the bottom?
22     A   I don't remember.
23         (Deposition Exhibit 606 was marked for
24         identification by the court reporter and
25         is attached hereto.)          11:11:54

**Page 64**

1  BY MR. SCOTT:          11:11:56
2      Q   Ms. Hogan, you have been handed
3  Exhibit 606, which my understanding is this is the
4  complete homeowners policy for the insured in this
5  case.          11:12:03
6          And I just wanted to see if this was the
7  policy that you reviewed in connection with your
8  report.
9      A   Yes, it is because it is Bates stamped.
10 It's on my page distribution. So it was part of the          11:12:14
11 claim file.
12     Q   And you have SF 003939?
13     A   I do.
14     Q   Perfect.
15         So Exhibit 606 is the policy that you          11:12:23
16 reviewed in connection with preparation of your
17 report?
18     A   That's correct.
19     Q   And you understand this is the complete
20 policy for the insured?          11:12:31
21     A   Yes, it is.
22     Q   Is it important for the insurance company
23 to provide an accurate copy of the policy to its
24 insured?
25         MR. MARTI:  Object to the form.          11:12:46

**Page 65**

1          THE WITNESS:  Carriers routinely provide          11:12:48
2  copies of the policy to the insured.
3  BY MR. SCOTT:
4      Q   And they're required by the Fire Claims
5  Settlement and Practices Regulations to do so,          11:12:56
6  right?
7      A   When requested, correct, but they -- you
8  know, they already have a copy of the policies, the
9  policyholder.
10     Q   How do you know that?          11:13:04
11     A   Typically, the carrier or the agent sends
12 them a copy when they're first written and then they
13 send updates on renewal.
14     Q   Can I mark this as next in order, please.
15         (Deposition Exhibit 607 was marked for          11:13:19
16         identification by the court reporter and
17         is attached hereto.)
18 BY MR. SCOTT:
19     Q   Ms. Hogan, you have been handed 607, which
20 is an E-mail exchange dated November 13, 2018,          11:13:33
21 between the insured, Shannen Doherty, and Jennifer
22 Glaza at State Farm.
23         Did you review this document in connection
24 with your preparation of your report?
25     A   No, I have not seen that.          11:13:46

17 (Pages 62 - 65)

**Page 66**

1  Q   If you look at the bottom E-mail on the   11:13:48
2  chain, the insured says,
3        "Hi Jennifer,
4        "Can you send me the policy on
5  my house please?"   11:13:54
6        And then the next E-mail up, Jennifer
7  Glaza from State Farm writes,
8        "Here you go, please let me know
9  if you need anything."
10       And if you look at the attachment, that is   11:14:04
11 not the policy that -- this is not the insured's
12 homeowners policy, is it?
13  A   It's a sample homeowners policy.
14  Q   Right.  But it's not the insured's
15 homeowners policy.   11:14:20
16  A   It doesn't contain the insured's
17 declarations page and list of other forms that may
18 or may not be attached, no.  It's a simple
19 homeowners policy.
20  Q   And the insured's policy has numerous   11:14:34
21 endorsements, as well, as to change the coverage; is
22 hat right?
23  A   Hers does, yes.
24  Q   And the policy attached as Exhibit 607,
25 from your review, does that appear to contain the   11:14:48

**Page 67**

1  same endorsements?   11:14:51
2  A   No, I think it's just a sample of the
3  basic HO3.
4        It does have -- hang on a second here.  It
5  has optional -- it's got the standard policy forms   11:15:02
6  that are in use.
7        It's not specific to a particular risk,
8  correct.
9  Q   Do you know if State Farm ever sent the
10 insured an accurate copy of her policy?   11:15:20
11  MR. MARTI:  Assumes facts.
12       THE WITNESS:  My recollection is a
13 certified copy was requested by either the public
14 adjuster or you, and one was provided.
15 BY MR. SCOTT:   11:15:35
16  Q   Do you know when that was?
17  A   I don't recall off the top of my head but
18 I do remember that it was requested.
19  Q   And that would be in your timeline?
20  A   It should be.   11:16:00
21  Q   Reviewing this Exhibit 607, does this
22 change your opinions in any way?
23  A   No, it's a sample copy sent by the agent.
24 They do that all the time.
25  Q   Even when the insured requests a copy of   11:16:18

**Page 68**

1  her policy?   11:16:21
2        MR. MARTI:  Argumentative.
3        THE WITNESS:  I don't know what went
4  through Jennifer's mind, but what it appears that
5  she thought that what was being asked for is a copy   11:16:28
6  of the form that applies to the loss.
7        I don't know because I don't know Jennifer
8  and I haven't spoken with her.
9  BY MR. SCOTT:
10  Q   Let's go back to your opinions in   11:16:49
11 Exhibit 603.
12       And if you could go to page 8 of 10, I
13 believe that's where your opinions start.
14       Opinion number one, it says,
15       "The claim was reported on November 12,   11:17:13
16 2018, and State Farm was advised that the
17 house did not sustain any structural
18 damage."
19       Do you see that?
20  A   Yes.   11:17:22
21  Q   Where did you get that from?  Claims
22 notes?
23  A   Yes.
24  Q   The fact that it took State Farm until
25 November 20, 2018, to respond to the insured's   11:17:44

**Page 69**

1  tender, you thought that was within the standards of   11:17:46
2  customs and practices of the industry.  That was
3  fine.
4        MR. MARTI:  Assumes facts.
5        THE WITNESS:  that they actually   11:17:57
6  spoke to her, I believe, on the 20th.
7  BY MR. SCOTT:
8  Q   Yes, that's what I said.
9  A   I thought you said November 28.
10  Q   No, sorry, November 20.   11:18:05
11       The fact that it took them until
12 November 20 to get back to her, that's no problem
13 getting back to her, in your opinion?
14  A   Well, there were also notes that they
15 tried to get ahold of her and they also tried to get   11:18:15
16 ahold of Mr. Scott, and they can't help it if there
17 is no one that answers the phone.
18  Q   Do you know when they tried to make those
19 contacts?
20  A   I think he tried -- it was referred to the   11:18:25
21 adjuster Portio, and yeah, he tried to reach them on
22 the 20th.
23  Q   So the eight-day period between the tender
24 and the first contact, no issue with that, in your
25 mind?   11:19:10

18 (Pages 66 - 69)

1      MR. MARTI:  Assumes facts.          11:19:11
2      THE WITNESS:  It's not unreasonable.
3  BY MR. SCOTT:
4      Q   And you believe that is fully within the
5  standards of the industry?                  11:19:31
6      A   Yes, it is within the standards of the
7  industry.  They have fifteen days.
8      Q   Well, that is the maximum amount they
9  have, right?
10     A   That is the maximum.  That doesn't mean   11:19:40
11 that we don't need it, occasionally.
12     Q   In opinion number two, I notice -- if you
13 could just take a minute to read through it, if you
14 would like, but my first question is I notice you
15 don't mention the November 28 inspection.      11:20:19
16     My question is why.
17     A   Because I didn't think it was an
18 opportunity to conduct a prompt and thorough and
19 fair and objective inspection.  They were not given
20 that opportunity on that day.               11:20:33
21     Q   And in your mind, what constitutes a
22 thorough investigation?
23     A   Whatever is necessary to establish the
24 amount of the loss, assuming, again, that it's
25 covered and it's covered property and everything.  11:20:48

Page 70

1      Q   Can you name anything specific on the 28th  11:20:50
2  that the insurance company was not permitted to
3  inspect?
4      A   They weren't allowed any time, and without
5  enough time to -- like, for example, cleaning the   11:21:01
6  windows, you have to be able to count and diagram
7  the windows and the doors and that sort of thing,
8  and she was not permitted time to do an
9  investigation.  She got a walk-through.
10     Q   Do you know if State Farm had a CIH with   11:21:26
11 them on the November 28 initial site visit?
12     A   I don't believe they did.
13     Q   And then if you go to the last sentence --
14 or actually the second to last -- it says,
15     "To that end, when State Farm was allowed    11:21:42
16     to inspect the property with its retained
17     Certified Industrial Hygienist, State Farm
18     prepared an estimate of the loss, which it
19     paid on December 18, 2018, and provided
20     the public adjuster with a copy of that     11:21:55
21     estimate."
22     When you are asking about the payment of
23 the loss estimate on December 18, 2018, was that the
24 $85,000 figure we were talking about?
25     A   Yeah, I think it was.                   11:22:07

Page 71

1      Q   So that may be an error?              11:22:08
2      A   That may be an error, but I do know that
3  they did prepare an estimate that day and that the
4  public adjuster was given a copy.
5      Q   Do you know when that loss estimate was   11:22:19
6  actually paid?
7      A   I would have to go back and read the
8  statements of loss.
9      Q   Do you consider the December 18, 2018,
10 inspection to be an opportunity for the insurance   11:22:31
11 company to conduct a thorough inspection of the
12 property?
13     MR. MARTI:  Misstates the facts.  I think
14 you said December 18.
15     MR. SCOTT:  Yeah, was it the 17th?        11:22:46
16     MR. MARTI:  I believe so.
17     MR. SCOTT:  You are right.  Let me restate
18 the question.
19 BY MR. SCOTT:
20     Q   Do you consider the December 17, 2018,   11:22:51
21 site inspection to be an opportunity for State Farm
22 to have conducted a thorough investigation of the
23 property?
24     A   And at the time they did conduct it, it
25 was thorough.                                 11:23:03

Page 72

1      Q   So the next opinion, number three, it   11:23:12
2  says,
3      "The estimate and payment remained
4      unchallenged until March 14, 2019, when
5      State Farm was presented with an estimate   11:23:21
6      for the pool of #104,862."
7      So again, the payment reference in that
8  sentence, is that the $85,000 or was there another
9  one you were thinking of?
10     And if it helps you, I think you have a    11:23:39
11 payment history outlined --
12     A   Yes.
13     Q   -- in your report --
14     A   Yes.
15     Q   -- that maybe you want to refer to.     11:23:44
16     A   I know that in the original estimate,
17 there was an amount allocated to the pool.  So that
18 was -- that was inspected in the December
19 inspection.
20     And then in March, they get the one for    11:23:55
21 104, and they want to challenge that, which they are
22 allowed to do.
23     So they get a pool consultant, and based
24 on that estimate, they paid the difference between
25 the amount in the original estimate that was        11:24:13

Page 73

19 (Pages 70 - 73)

Page 74

```
 1  allocated to the pool and the subsequent estimate    11:24:14
 2  from One Pool At A Time.
 3       Q   Let me actually talk with you about the
 4  pool for a bit.
 5       I believe -- and tell me if this sounds    11:24:26
 6  inaccurate to you -- the initial estimate for the
 7  pool damage was around $6000, something like that.
 8       A   Yes.
 9       Q   Does that sound right?
10       A   Yes, sounds about right.    11:24:37
11       Q   And that was based on their initial site
12  visit on December 17.
13       A   That was my understanding, correct.
14       Q   And in March, the insured submitted a
15  $104,000 pool repair estimate.    11:24:46
16       A   Correct.
17       Q   And then based on that estimate,
18  State Farm went and conducted another investigation
19  of the pool with One Pool At A Time?
20       A   Correct.    11:24:57
21       Q   And determined that the loss was actually
22  more around the $66,000 range.
23       A   The State Farm consultant reviewed the
24  $104,000 estimate and agreed with the scope of work
25  but offered to do the same -- essentially, the same    11:25:14
```

Page 75

```
 1  scope for considerably less money.    11:25:17
 2       Q   Why didn't State Farm estimate that scope
 3  of work originally when it visited on December 17?
 4       MR. MARTI:  May call for speculation.
 5       THE WITNESS:  You would have to ask her,    11:25:34
 6  specifically, but it doesn't surprise me that their
 7  estimate -- that she did an estimate based on what
 8  she could observe.
 9       And it wouldn't be usual for someone to
10  assume that you had to essentially rebuild the pool,    11:25:50
11  because generally speaking, the pool plaster is
12  nonporous because it holds water, and so cleaning is
13  generally enough and maybe replacing some equipment.
14       I think she had a different kind of filter
15  system or something than usual which the adjuster    11:26:15
16  may not have recognized at the time, but she did
17  consider what she thought at that time was
18  reasonable for the pool.
19  BY MR. SCOTT:
20       Q   And the fact that State Farm ultimately    11:26:27
21  changed its coverage opinion up nearly eleven-fold,
22  that is reasonable, in your opinion?
23       A   Sure, based on the subsequent evaluation.
24       Q   And in your opinion, did State Farm
25  conduct a thorough investigation of the pool at the    11:26:43
```

Page 76

```
 1  initial site investigation?    11:26:45
 2       A   It did for what she believed was the
 3  damage, correct.
 4       MR. MARTI:  Vague and ambiguous.
 5  BY MR. SCOTT:    11:26:59
 6       Q   And then just going back to number three
 7  here, that first sentence, "The estimate and payment
 8  remained unchallenged until March 14, 2019," were
 9  you aware of the xactimate report submitted to
10  State Farm by the public adjuster on February 15,    11:27:14
11  2019?
12       A   I knew they submitted an xactimate
13  estimate. I don't know the date.
14       Q   Do you have any knowledge of the amount of
15  that xactimate estimate?    11:27:28
16       A   I believe it was like a million dollars
17  something.
18       Q   Would you consider that a challenge to
19  State Farm's initial coverage estimate?
20       A   I don't know if I would use the word    11:27:41
21  "challenge," but it certainly was a completely
22  different scope.
23       And frankly, I would be quite surprised if
24  I were the adjuster.
25       Q   Do you know if the adjuster took any    11:27:57
```

Page 77

```
 1  action in response to the xactimate estimate    11:27:59
 2  submittal?
 3       MR. MARTI:  Object to the form?
 4       THE WITNESS:  I would have to read the
 5  notes to know if there was a -- excuse me --    11:28:06
 6  specific response.
 7  BY MR. SCOTT:
 8       Q   Nothing jumps out in your mind, though?
 9       A   No, and I believe they also had a change
10  of adjuster at the time, so.    11:28:15
11       Q   You know, that is actually something else
12  I wanted to talk with you about.
13       The adjuster on this claim changed four
14  times, I think.
15       A   Uh-huh.    11:28:27
16       Q   Is that typical?
17       A   I don't know if I would use the word
18  "typical," but it's certainly not unusual on a
19  large, massive catastrophe claim, which is the
20  Woolsey Fire.    11:28:40
21       It would be very common for a carrier to
22  bring in some catastrophe adjusters to do immediate
23  triage, and they might be on the claim for a couple
24  of days or a couple of weeks or a couple of months
25  depending on the nature of the claim, and then    11:28:55
```

20 (Pages 74 - 77)

1 people leave, people get reassigned, a supervisor    11:29:01
2 discovers that an adjuster is over their head and
3 needs some help or the claim has become
4 diplomatically difficult and someone with more
5 experience might be needed.    11:29:20
6    This was not an easy claim.
7    Q   Does a change in adjuster many times
8 result in additional delays on the adjustment of the
9 claim?
10    A   No.    11:29:32
11    Q   "No"?
12    A   No.
13    They did a very good job on both changes
14 of reviewing the entire file and coming up to speed
15 before they jumped in.    11:29:40
16    Remember, this was a relatively small loss
17 on its first appearance.
18    Q   Back on point number three, this second
19 sentence says,
20    "A pool re-inspection was completed on    11:29:59
21    March 28, 2019, and State Farm paid the
22    difference between their original estimate
23    and the estimate of the State Farm expert
24    on April 19, 2019."
25    Do you see that?    11:30:12

Page 78

1    A   Yes.    11:30:12
2    Q   In your opinion, does that comply with the
3 Fair Claim Settlement Practices Regulations?
4    A   Yes.
5    Q   Yeah?    11:30:19
6    A   Yeah.
7    Q   And it says,
8    "State Farm promptly and properly reviewed
9    the new information."
10    Do you see that?    11:30:30
11    A   Yes.
12    Q   What new information are you referring to
13 there?
14    A   I am using the term that they now have
15 someone claiming that it's going to cost $104,000 to    11:30:35
16 rebuild this pool.
17    That is new information. That is not
18 State Farm's original assessment.
19    So they responded to it and they said wow,
20 okay, we will get -- we will get a pool guy out    11:30:50
21 there and confirm that that's the case.
22    Q   Any other new information you are
23 referencing there in that --
24    A   Relative to the pool?
25    Q   Yeah.    11:31:03

Page 79

1    A   No.    11:31:03
2    Q   But as far as you know, the situation on
3 the ground at the property, nothing had changed
4 there to warrant a new inspection, right?
5    MR. MARTI:   Object to the form.    11:31:15
6    THE WITNESS:   I am not quite sure what you
7 are asking, but it became apparent that since there
8 were no efforts at mitigation at any time, that it's
9 possible that the pool condition changed enough that
10 what was ultimately determined to be needed became    11:31:35
11 needed.
12 BY MR. SCOTT:
13    Q   Well, let's talk about that.
14    What efforts to mitigate should the
15 insured have engaged in?    11:31:47
16    A   It could have been anything. It could
17 have been having the pool drained.
18    Q   Did State Farm pay to have the pool
19 drained?
20    A   Did they?    11:31:59
21    Q   Yeah.
22    A   When?
23    Q   Before she submitted her pool bid on
24 March -- in March of 2019, did State Farm pay to
25 have that pool drained?    11:32:12

Page 80

1    A   They paid what they felt was sufficient to    11:32:14
2 remediate the pool. It turned out not to be.
3    I don't know whether or not between
4 November 8 and March 24 when they reinspect the
5 pool, I don't know -- I have no background in    11:32:33
6 chemistry.
7    I don't know what was happening in the
8 pool, and whether or not the situation was
9 materially different three months later or
10 four months later. I don't have any way of    11:32:47
11 knowing that.
12    Q   But in regards to this sentence, the new
13 inspection that you are referencing is the bid that
14 the insured submitted.
15    A   Correct. And the fact that it was    11:32:57
16 expanding the scope of loss for the pool.
17    Q   What do you mean by "expanding the scope
18 of loss"?
19    A   Well, it was a bid to practically rebuild
20 the pool. That is a new claim. I mean not a new    11:33:11
21 event but it's new -- it's a new assertion. It's a
22 new -- that's new information to the carrier.
23    I think the pool needs to be rebuilt. Oh,
24 we didn't think that. Now, I have new information
25 or a new -- a new allegation or a new piece of    11:33:36

Page 81

21 (Pages 78 - 81)

1 information that I didn't have before.    11:33:44
2    It doesn't -- it's not related to do I
3 know the pool needs to be rebuilt. It's -- I'm
4 making the claim that the pool needs to be rebuilt.
5 That's new.    11:33:55
6    Q   So the new information is, basically, just
7 that the insured complained that State Farm's
8 estimate was too low?
9    MR. MARTI:  Misstates the testimony.
10    THE WITNESS:  The new information is that    11:34:05
11 the public adjuster submitted an estimate for
12 $104,000 to rebuild the pool. That was news to
13 State Farm.
14 BY MR. SCOTT:
15    Q   Opinion number four, it says,    11:34:13
16    "Also, on March 14, 2019, approximately
17    3 months after the building and contents
18    coverages were paid, State Farm received
19    an estimate for $2,548,108 from the
20    insured's construction consultant, Rider    11:34:42
21    Levitt Bucknell" -- B-U-C-K-N-E-L-L --
22    "Ltd."
23    Do you see that?
24    A   Yes, I do.
25    Q   What building and contents coverage being    11:34:57
Page 82

1 paid is referenced here in number four?    11:35:00
2    A   That would just be the original State Farm
3 estimate, that I am not sure when it was actually
4 paid.
5    Q   It could have been paid after March?    11:35:07
6    A   Yes, it could have been. I would -- I
7 would have to go back and look at the payment
8 records, correct.
9    Q   But regardless of when that was paid, it
10 wouldn't change your opinion one way or another with    11:35:16
11 respect to four?
12    A   No, because of the incredible multiplier
13 of damages that was now being claimed.
14    Q   And then it goes on to say,
15    "Based on this estimate and additional    11:35:32
16    scope of repairs, State Farm immediately
17    requested an inspection with the Certified
18    Industrial Hygenist to identify the
19    variances between the estimates and
20    determine if additional moneys were owed."    11:35:45
21    Do you see that?
22    A   Yes.
23    Q   What did you mean by "immediately"?
24    A   They tried to set up an appointment to
25 reinspect and they had to coordinate their hygienist    11:35:56
Page 83

1 with the public adjuster with the insured with the    11:36:01
2 attorney, sometimes with both public adjusters.
3 It's difficult to coordinate.
4    So I would have to look again at the
5 specific data, but "immediately" in this context    11:36:12
6 means we have to have another inspection because
7 this is so far off the charts from what we
8 originally determined to be the extent of the loss
9 that we have got to go back out.
10    Q   So the new information warranting a    11:36:48
11 reinspection of the property is just the submittal
12 of the bid from RLB?
13    A   It's the contents of the submittal.
14    State Farm had determined that you clean
15 all the horizontal surfaces.    11:37:02
16    RLB wants to replace all the sheet rock.
17    That's quite a difference, and would
18 absolutely require inspection.
19    Q   Reinspection?
20    A   Reinspection.    11:37:16
21    Q   Do you know if State Farm took into
22 account the insured's medical condition in adjusting
23 this claim?
24    A   In what way?
25    Q   In any way.    11:37:27
Page 84

1    MR. MARTI:  May call for speculation.    11:37:30
2    THE WITNESS:  I can only comment on what
3 was in the notes.
4    They were aware of it. There was a, you
5 know, hygienist out there.    11:37:43
6    I suspect the way you would have to take
7 that into account, you would have to do the cleaning
8 first to see if it was successful, and you might
9 have to consult with another physician, have her
10 medical records read to determine whether or not    11:38:01
11 that was an accurate statement in the first place.
12 BY MR. SCOTT:
13    Q   Are you aware of State Farm consulting
14 with any physician with respect to the insured's
15 medical condition with respect to this claim?    11:38:14
16    A   Well, there wouldn't be reason to do that
17 until after the place was remediated to see if it
18 was remediated to whatever standard the medical
19 profession deemed was necessary.
20    Q   Do you know if State Farm took the    11:38:29
21 insured's medical condition into consideration in
22 determining the scope of remediation necessary?
23    MR. MARTI:  Calls for speculation.
24    THE WITNESS:  I have no idea.
25
Page 85

22 (Pages 82 - 85)

BY MR. SCOTT:                              11:38:40

Q   You don't know.

Should they have?

A   It's not relevant yet and -- I mean if you
are going to remediate the home, then it has to get        11:38:49
done, at least the first go-round, to see how well
that was affected, how -- whether it was successful.

And then you would have to take those
results to a physician and say is this clean enough
based on your medical opinion, Doctor.                     11:39:20

Well, they can't do it until something has
happened.

Q   Did State Farm take any steps to do that?

A   The place hasn't been remediated as of
today, as far as I know.                                   11:39:33

Q   I had a question and forgot it now.  We
will come back to it.

Do you know if State Farm instructed any
of its consultants to take the insured's medical
condition into account in preparing their scope of        11:39:56
loss?

A   They're not doctors.  They are consultants
and they're consulting on the loss and that is all
they can do.

They can't -- you can't take medical       11:40:15

Page 86

condition into consideration if you don't know what        11:40:18
the affect is and you are not a doctor.

And again, they're talking about
particulates.  Well, remove the particulates and
then see how well you did.                                 11:40:33

At that point, that would be State Farm's
decision to say let's see if we got it clean enough,
but the consultant can't do that.

Q   So in your opinion, the insured should
have spent a good portion of her policy limits doing       11:40:47
test cleanings of her personal property to see if it
could be adequately remediated?

MR. MARTI:  Misstates her testimony.

THE WITNESS:  She had a $35,000 -- I
believe $35,000 or $25,000 personal property              11:41:03
advance.  That could have done some test cleaning or
the -- it was also, I believe, included to -- or the
State Farm hygienist said that, you know, the
interior needed to be cleaned and the flat surface
and the windows and the door sills and all of that.       11:41:28

And then they had been told that the
furniture did not have to be removed, that those
items closest to the point of ingress could be
cleaned in place.

That hasn't happened, to my knowledge, and  11:41:46

Page 87

even down the road, there has been no test cleaning        11:41:50
that I am aware of.

BY MR. SCOTT:

Q   That $35,000 advance you referenced, were
you aware that that was required to be used for the        11:42:01
insured's security deposit for her temporary living?

MR. MARTI:  May misstate the facts.

THE WITNESS:  I don't know what you mean
by "required."

I believe that State Farm's position was    11:42:15
that they were paying the landlord directly.  So I
don't know anything about the deposit other than
there was a $70,000 deposit.

BY MR. SCOTT:

Q   And you don't know one way or another      11:42:28
whether that $35,000 advance on the personal
property the insured had to use to cover the
security deposit for her temporary living?

A   I don't know.

MR. MARTI:  Object to the form.            11:42:38

THE WITNESS:  I don't know what she did
with it.

BY MR. SCOTT:

Q   You don't know.  Okay.

The re- --- the reinspection of the         11:42:48

Page 88

property that happened on May 7, 2019 -- is that           11:42:51
right?

MR. MARTI:  I don't think so.  I think the
date is wrong.

THE WITNESS:  May 7.  I have got May 7.     11:43:04

MR. SCOTT:  I think it's May 7.

MR. MARTI:  Sorry.

BY MR. SCOTT:

Q   But in or around May 7, 2019, was there
any reason that you could see in the claims file why       11:43:11
that scope of inspection could not have been
completed earlier?

MR. MARTI:  May call for speculation.

THE WITNESS:  They based their scope on
their original industrial hygienist's report.  So         11:43:26
they couldn't revise that based on their hygienist's
report until the hygienist did another report.

BY MR. SCOTT:

Q   What was it that changed that required
State Farm to do a reinspection of the property, I         11:43:49
suppose is my question.

A   The $2.5 million.

Q   The fact that the insured submitted a bid
that disagreed with what State Farm's position was?

A   It was the scope.                       11:43:59

Page 89

23 (Pages 86 - 89)

1      MR. MARTI:  Object to the form.            11:44:00
2  BY MR. SCOTT:
3      Q    When you say "scope," what do you mean?
4      A    I mean what that bid included such as
5  destruction of the sheet rock, destruction of --      11:44:05
6  there was a million dollars of clothing claimed when
7  none of it had been test cleaned or inventoried.  It
8  had just been listed.
9          So I don't know how they could have done
10 that before this inspection because it wasn't -- it   11:44:29
11 wasn't claimed.
12     Q    State Farm couldn't have anticipated that
13 the clothing in the property would have sustained
14 smoke damage.
15         Is that your testimony?                  11:44:42
16     MR. MARTI:  Incomplete hypothetical, may
17 misstate her testimony.
18     THE WITNESS:  No, that's not what I said.
19         I said based on their initial inspection
20 with the industrial hygienist, they allowed for      11:44:51
21 some of the contents cleaning and did not perceive,
22 I guess, or did not report that all the clothing
23 needed to be, slash, cleaned, replaced, destroyed.
24         So there would be no reason for State Farm
25 to make the claim larger than it was at that time.   11:45:17
                                              Page 90

1          So they go back out with their hygienist   11:45:23
2  and the hygienists generally agree on the extent of
3  contamination or smoke damage or whatever, but
4  disagree on what is appropriate to remediate.
5  BY MR. SCOTT:                                   11:45:42
6      Q    At that May 7, 2019, reinspection,
7  State Farm changed its position on a number of
8  issues; is that right?
9      MR. MARTI:  Object to the form.
10     THE WITNESS:  They came to agreement on a      11:45:58
11 number of issues.
12 BY MR. SCOTT:
13     Q    Well, for example, initially, based on the
14 first inspection, State Farm refused to authorize a
15 pack out of the contents of the property, right?    11:46:09
16     MR. MARTI:  Object to the form.
17     THE WITNESS:  At the initial inspection,
18 State Farm didn't believe based on their hygienist's
19 report that the continents needed to be packed out.
20 BY MR. SCOTT:                                   11:46:23
21     Q    At the May 7 inspection, State Farm
22 changed its position to agree that the contents of
23 the property needed to be packed out, right?
24     A    That is based on their hygienist, as well,
25 not just the insured's hygienist.               11:46:34
                                              Page 91

1      Q    Was there anything that you can identify    11:46:44
2  that changed between the initial inspection and the
3  May 7 reinspection that would warrant State Farm
4  reversing its coverage position with respect to the
5  pack out?                                        11:46:55
6      MR. MARTI:  Object to the form.
7      THE WITNESS:  First of all, they're not
8  reversing their coverage decision.  They are
9  continuing an investigation.
10         A claim is almost like a living thing.  It   11:47:04
11 can morph over time.
12         There was nothing wrong with State Farm's
13 initial investigation, evaluation or scope.  It was
14 based on an expert's inspection.
15         Now, we have a major change in what is       11:47:22
16 being asserted as being damaged and also what is
17 needed to repair/remediate, which their hygienist
18 won't comments on what is appropriate.
19         So it's not a reversal of a coverage
20 opinion.  It's a progression in a claim where now we  11:47:43
21 have a different set of circumstances, and so now,
22 this is the appropriate response.
23 BY MR. SCOTT:
24     Q    And what is the different set of
25 circumstances?                                    11:47:54
                                              Page 92

1      A    That this other claim -- this new          11:47:59
2  information is now being asserted that if you are
3  going to clean all the surfaces, now you have to
4  remove the clothes, but there is nothing -- I don't
5  think there is anything to date that says the entire  11:48:11
6  wardrobe has to be destroyed.
7          So it's a progression.  It's not -- it's
8  not an oh, we were wrong, now we are right.  It's
9  this was reasonable at the time, the first
10 inspection with the first hygienist's report.        11:48:31
11 That's what they believe was reasonable.
12         Now, we have somebody claiming that we
13 have to tear out the sheetrock and we have to
14 replace the floors and we have to rebuild the entire
15 house.                                            11:48:47
16         That is considerably different and it
17 clearly wasn't obvious at the outset or State Farm
18 would have included it.
19     Q    Well, what about the pack out, for
20 example?                                          11:48:58
21         I mean you have seen E-mail communications
22 in the file where the public adjuster as early as
23 December is stating that the entire contents need to
24 be packed out, right?
25     A    Yes.                                      11:49:08
                                              Page 93

                                    24 (Pages 90 - 93)

1    Q  I mean so why did State Farm reverse its    11:49:08
2  position on that in May of 2019?
3        MR. MARTI:  Object to the form.
4        THE WITNESS:  In December, a pack out was
5  not believed to be reasonable or necessary based on    11:49:23
6  the hygienist's report.
7        In May, the hygienist agreed that it's
8  going to take more interior cleaning than was
9  originally thought.  In order to effect that, you
10  have to pack out, but you don't pack out for no    11:49:42
11  reason, which is where it was in December.
12  BY MR. SCOTT:
13    Q  Does that potentially indicate that the
14  December inspection was not a thorough
15  investigation?    11:49:56
16    A  No.
17        MR. MARTI:  Object to the form.
18        THE WITNESS:  No, it doesn't.
19  BY MR. SCOTT:
20    Q  Why not?    11:50:01
21    A  No.
22    Q  Why?
23    A  Because they had a hygienist.  They -- it
24  was a reasonable inspection.  She didn't have any
25  smoke odor.  There is no black soot on the clothes    11:50:10

Page 94

1  in the closet.    11:50:14
2        It's -- it's an average inspection.  It
3  met all the requirements.  It's not wrong.  It
4  evolved and she had -- the adjuster around the time
5  in May has gotten additional information from their    11:50:37
6  own expert now who says yeah, I think that is
7  probably true, I think we need to do that.
8        Well, if they hadn't said it in December,
9  how is State Farm supposed to say oh, the public
10  adjuster wants it packed out so we should pack out?    11:50:58
11        That is not -- they can't do that.  They
12  have to have some basis for the pack out.
13        The public adjuster is not an industrial
14  hygenist.
15    Q  The period of restoration -- is a period    11:51:13
16  of restoration a period of remediation?
17    A  A period of restoration.
18    Q  So the period of restoration initially was
19  set at three months, correct?
20    A  Yes.    11:51:24
21    Q  And that was based on State Farm's initial
22  walk-through or site inspection in December?
23    A  Yes.
24    Q  Is it typical for a carrier to set a
25  short-term period of restoration like that?    11:51:36

Page 95

1        MR. MARTI:  Object to the form.    11:51:38
2        THE WITNESS:  They set the period of
3  restoration as to what they believe it's going to
4  be.  It's not short or long.  It's I think it's
5  going to take three months.    11:51:49
6  BY MR. SCOTT:
7    Q  That period of restoration expired at the
8  end of April of 2019; is that right?
9    A  Yes, I think so.  Plus, they ended up
10  paying for December, as well.  So yes.    11:52:01
11    Q  Did you see in the claims notes that the
12  insured was forced to move out of her short-term
13  rental at the end of April?
14        MR. MARTI:  Object to the form.
15        THE WITNESS:  There is actually no    11:52:12
16  evidence that she was forced to move out at all.
17  The carrier had been paying the landlord.
18        So they never submitted any documentation
19  that there was an eviction or anything else.
20        So I know that's what was claimed, yes.    11:52:28
21  BY MR. SCOTT:
22    Q  The carrier stopped paying for that
23  short-term rental at the end of April, though,
24  correct?
25        MR. MARTI:  Object to the form.    11:52:38

Page 96

1        THE WITNESS:  I think that what happened    11:52:43
2  is they got a demand for rental at $90,000 a month
3  and found alternative housing, and that eventually
4  what happened is they agreed to pay $40,000
5  something, whatever it was exactly, for another    11:53:01
6  three months and did so even though they weren't
7  paying a landlord.  They paid the insured.
8  BY MR. SCOTT:
9    Q  That is a different issue, but I am
10  talking about the Venice property that the insured    11:53:16
11  rented.
12        The insurance company, State Farm, stopped
13  paying ALE expenses at the end of April of 2019,
14  correct?
15        MR. MARTI:  Object to the form.    11:53:28
16        THE WITNESS:  That was -- that was their
17  determination of the end of the period of
18  restoration.
19  BY MR. SCOTT:
20    Q  Right.    11:53:35
21        And then subsequent to the May 7, 2019,
22  reinspection, State Farm agreed that the scope of
23  loss and period of restoration was greater than
24  originally estimated, right?
25    A  Yes, they did.    11:53:52

Page 97

25 (Pages 94 - 97)

1    Q    And State Farm then agreed to restart ALE    11:53:54
2  payments in May.
3    A    I am trying to remember the chain of
4  events.
5        MR. MARTI:  Object to the form.    11:54:04
6        THE WITNESS:  I don't recall.
7        Again, my recollection is that they
8  demanded that a lease be approved immediately and so
9  they were -- they were not stopping payment because
10  they agreed that she was entitled to more ALE.    11:54:55
11  BY MR. SCOTT:
12    Q    But that was after she had been -- they
13  had stopped paying rent for the month of May, right?
14        MR. MARTI:  Object to the form.
15  BY MR. SCOTT:    11:55:09
16    Q    The insured had no money to pay -- well,
17  scratch that.
18        They stopped paying ALE expenses at the
19  end of April and then restarted them at some point
20  in mid-May, correct?    11:55:20
21        MR. MARTI:  Object to the form?
22        THE WITNESS:  That isn't my recollection
23  but let's see here.
24  BY MR. SCOTT:
25    Q    If you look around like May 7, 2019.    11:55:51

Page 98

1    A    That's where I am looking.    11:55:54
2        What the note says is that on May 7, the
3  public adjuster demanded approval of a
4  $90,000-a-month lease.
5    Q    And that's because the insured had no    11:56:30
6  place to stay at that point in time?
7        MR. MARTI:  Assumes facts.
8        THE WITNESS:  I don't think that is
9  accurate.
10  BY MR. SCOTT:    11:56:37
11    Q    No?  Where was she staying?
12        Do you know?
13    A    I don't know.
14    Q    Do you know if State Farm was paying for
15  her prior short-term rental during that time period?    11:56:43
16    A    Paying -- they had paid through April.
17    Q    Right.  So now it's in mid-May.
18    A    Right.  I don't know.
19    Q    I don't know.
20    A    I know that the demand came through out of    11:57:00
21  the blue on May 7 that State Farm agree immediately
22  to pay $90,000 because she was moving.
23        My recollection is that the house she was
24  in in Venice was on month-to-month and there wasn't
25  any particular reason for her to move.    11:57:21

Page 99

1    Q    Except that would you consider State Farm    11:57:24
2  not paying the rent a reason to move?
3        MR. MARTI:  Object to the form.
4        THE WITNESS:  I think that the whole
5  question was ALE was still in flux in terms of --    11:57:39
6  I'm looking for the payment schedule.
7        And the notes don't reflect that ALE's
8  over.  They made a $31,000 payment on April 19.  I
9  guess that was to cover everything through the end
10  of April, and then they debate where she is supposed    11:58:10
11  to go in May.
12        So I don't know what the insured was
13  thinking.
14        I don't know whether or not the public
15  adjuster said at -- you know, in April 15, hey, you    11:58:22
16  know, what are we going to do, we can extend this
17  lease.
18        Instead, what happens is they simply
19  demand a new lease on May 7 for $90,000.
20        So it sort of goes back to the overall    11:58:39
21  complexities of communication in this case.  I mean
22  I don't know what the particular adjuster knew or
23  was thinking.
24  BY MR. SCOTT:
25    Q    Do you have an opinion one way or another    11:58:56

Page 100

1  as to whether the insured should have stayed in that    11:58:58
2  Venice property for the month of May?
3        MR. MARTI:  Object to the form, calls for
4  speculation.
5  BY MR. SCOTT:    11:59:05
6    Q    Just one way or another, if you have an
7  opinion on that.
8    A    It would seem to be simpler than moving.
9    Q    Despite the fact that they don't have
10  money to pay the rent or State Farm had not paid her    11:59:14
11  the money to pay the rents?
12        MR. MARTI:  Object to the form.
13        THE WITNESS:  But nobody asked.  Nobody
14  followed up.
15        The notes are not real specific and it    11:59:23
16  doesn't say oh, we have paid through April.
17        And everyone believes that April is the
18  end of ALE because that's the reasonable period of
19  restoration.
20        The next thing they hear is a May 7 demand    11:59:39
21  for a new lease for $90,000 in another house.
22  BY MR. SCOTT:
23    Q    But that was in response to State Farm's
24  agreement that the period of restoration should be
25  extended, right?    11:59:52

Page 101

26 (Pages 98 - 101)

| | | |
|---|---|---|
| 1 | A   What was in response to? | 11:59:56 |
| 2 | Q   The demand for a new lease. | |
| 3 | A   Was in -- was in response to? | |
| 4 | Q   State Farm's agreement on May 7 that the | |
| 5 | period of restoration needs to be extended. | 12:00:05 |
| 6 | MR. MARTI:  Calls for speculation. | |
| 7 | THE WITNESS:  I don't -- well, as of | |
| 8 | May 7, it was clear that the period of restoration | |
| 9 | would be another ninety days.  That's correct. | |
| 10 | BY MR. SCOTT: | 12:00:18 |
| 11 | Q   And why didn't State Farm make that period | |
| 12 | of restoration determination originally in December? | |
| 13 | A   Because originally in December, the scope | |
| 14 | of loss as identified in their initial investigation | |
| 15 | was that ninety days would be plenty to do the | 12:00:40 |
| 16 | remediation that had been included in that somewhat. | |
| 17 | Q   And that wound up being incorrect. | |
| 18 | MR. MARTI:  Object to the form, | |
| 19 | argumentative, asked and answered, as well. | |
| 20 | THE WITNESS:  It's what it was in | 12:00:53 |
| 21 | December.  That's what the claim was in December. | |
| 22 | It became and evolved into more, but it | |
| 23 | wasn't wrong. | |
| 24 | It was -- you know, it is what it is on | |
| 25 | that time.  You can't go -- you can't go back -- go | 12:01:07 |

Page 102

| | | |
|---|---|---|
| 1 | ahead six months and go well, because this happened, | 12:01:11 |
| 2 | that must have been wrong six months ago. | |
| 3 | It wasn't wrong.  It wasn't incorrect.  It | |
| 4 | was based on an original investigation that for all | |
| 5 | intents and purposes appeared to provide for | 12:01:27 |
| 6 | remediation of the entire loss. | |
| 7 | Later, it turns out that other things are | |
| 8 | claimed and other damages are identified.  That | |
| 9 | doesn't make this estimate wrong.  It just makes it | |
| 10 | what it was in December. | 12:01:46 |
| 11 | And the fact that State Farm continued to | |
| 12 | interact with the public adjuster and respond to all | |
| 13 | these demands and eventually agree with much of the | |
| 14 | recommendations makes that -- makes them doing what | |
| 15 | they're supposed to do, which is continue to adjust | 12:02:07 |
| 16 | the claim until conclusion. | |
| 17 | BY MR. SCOTT: | |
| 18 | Q   Can we go to number five in your opinion | |
| 19 | list.  It's about the refrigerator. | |
| 20 | A   Yes. | 12:02:21 |
| 21 | Q   So originally, State Farm denied coverage | |
| 22 | for the refrigerator claiming that spoiled food was | |
| 23 | not a covered peril, right? | |
| 24 | A   Yes, they did. | |
| 25 | Q   State Farm reversed that position and | 12:02:32 |

Page 103

| | | |
|---|---|---|
| 1 | determined that the refrigerator actually was | 12:02:35 |
| 2 | covered -- | |
| 3 | A   Yes. | |
| 4 | Q   -- about two months later, right? | |
| 5 | A   Well, I think they actually reversed their | 12:02:42 |
| 6 | opinion in about one month and it took another month | |
| 7 | to get the payment, is what I think happened. | |
| 8 | Q   Fair, yeah. | |
| 9 | And then you say in the last -- second to | |
| 10 | last sentence, | 12:02:55 |
| 11 | "As noted above, an insurance carrier has | |
| 12 | an obligation to review all new | |
| 13 | information presented and to re-evaluate | |
| 14 | prior decisions in the light of that new | |
| 15 | information." | 12:03:06 |
| 16 | And I think you know what my question is | |
| 17 | going to be. | |
| 18 | A   Sure. | |
| 19 | Q   What new information was presented that | |
| 20 | would warrant changing their coverage position? | 12:03:11 |
| 21 | A   Well, the adjuster believed that the | |
| 22 | reason that the refrigerator was a loss was because | |
| 23 | of spoiled food, and that's not an unreasonable | |
| 24 | statement or a position in and of itself because | |
| 25 | that's what the policy says, that, you know, it's a | 12:03:26 |

Page 104

| | | |
|---|---|---|
| 1 | named peril and spoiled food is not a named peril, | 12:03:29 |
| 2 | assuming that the refrigerator's personal property | |
| 3 | and not part of the building. | |
| 4 | That was the error, that when you went -- | |
| 5 | when they went back to look at it after the public | 12:03:40 |
| 6 | adjuster said now, wait a minute, there was no power | |
| 7 | and there was no power because of a fire, and you | |
| 8 | can see that, you know, it's a permanently affixed. | |
| 9 | It's not the refrigerator you can pull out and put | |
| 10 | in your garage to get a new one, that they corrected | 12:04:01 |
| 11 | their mistake. | |
| 12 | Should they have seen it at the outset, | |
| 13 | perhaps.  You know, people make mistakes. | |
| 14 | Q   So the new information is just the public | |
| 15 | adjuster challenging their coverage determination? | 12:04:15 |
| 16 | A   No, the public adjuster challenging the | |
| 17 | cause of loss to the refrigerator as not being | |
| 18 | spoiled food, as being loss of electrical due to the | |
| 19 | fire, and the fact that it's not a freestanding | |
| 20 | refrigerator. | 12:04:32 |
| 21 | Q   And in your mind, determining that the | |
| 22 | cause of loss to the refrigerator was spoiled food, | |
| 23 | that is a reasonable coverage determination? | |
| 24 | A   It would have been a correct coverage | |
| 25 | determination for a standalone freezer -- | 12:04:46 |

Page 105

27 (Pages 102 - 105)

1 refrigerator, and, you know, people make mistakes.    12:04:49
2    Q    And then just if you could skip ahead to
3 number seven.
4    A    Sure.
5    Q    It's wrapping up here. I should be done    12:05:09
6 relatively soon.
7        This is about the ALE. I believe you
8 pronounce it "a-lay." Is that how you guys
9 pronounce it in the industry?
10    A    Actually, it is A-L-E, not "a-lay" because    12:05:19
11 allocated lost adjustment expense, which is A-L-A-E,
12 and that is my error. It's A-L-E.
13    Q    I like ALAE better.
14    A    We can use it. We can use it.
15    Q    If you go to just kind of in the middle of    12:05:45
16 the paragraph, it says,
17        "State Farm reasonably concluded that
18        $90,000 per month . . ."
19        Do you see that?
20    A    Uh-huh.    12:05:53
21    Q    (Reading):
22        "State Farm reasonably concluded that
23        $90,000 per month was an unreasonable
24        amount and located alternate housing for
25        $40,950 per month which State Farm agreed    12:06:01
                                          Page 106

1 to pay -- an increase to what the parties    12:06:06
2    previously agreed."
3        What did you mean by "an increase to what
4 the parties previously agreed"?
5    A    Well, they were previously paying $35,000    12:06:15
6 a month in rent.
7    Q    But there was a furniture amount of
8 $12,000, too, right?
9    A    Which I just assumed was going to the new
10 place. So it was the change in the rent, not in the    12:06:25
11 furniture.
12    Q    So you assumed that State Farm was
13 actually paying not $40,950 but $52,950?
14    A    Well, they would have -- I think they
15 would have had to had she taken the house, but I    12:06:41
16 don't know that State Farm knows where she went.
17    Q    So is your position that she would only be
18 entitled to that additional $12,000 furniture amount
19 in the event she moved into the house that they had
20 suggested?    12:07:04
21        MR. SCOTT: Object to the form.
22        THE WITNESS: It's not clear other than
23 they never got to that decision point because she
24 didn't move in -- she didn't accept the house with
25 the pool and the ocean view that they found for the    12:07:17
                                          Page 107

1 $40,000.    12:07:20
2        I don't know whether or not it was
3 furnished, but had that been accepted -- that house
4 been accepted, then they would have dealt with the
5 furniture question.    12:07:31
6 BY MR. SCOTT:
7    Q    So it was reasonable in your mind for them
8 to pay $40,950 per month when they had previously
9 been paying $47,000?
10        MR. MARTI: Object to the form.    12:07:47
11        THE WITNESS: No, what I said was for
12 rent, they were paying 35, and this rent was
13 $40,950.
14        I don't know what they would have done
15 vis-a-vis the furniture. I don't know if the    12:07:59
16 $40,000 house was furnished or not. They never got
17 to the furniture question because she didn't accept
18 the property.
19 BY MR. SCOTT:
20    Q    In your mind, is that $40,950 figure a    12:08:15
21 reasonable amount for her ALE expenses?
22    A    For the rent?
23    Q    Yeah.
24    A    For rent only, sure.
25    Q    And what is that based on?    12:08:29
                                          Page 108

1    A    The fact that it was a comparable --    12:08:30
2 excuse me -- comparable house, that their ALE
3 solutions had located two other properties that
4 apparently were not acceptable, but this one had
5 the, you know, similar size, similar features. It,    12:08:47
6 obviously, isn't going to be exact because she's on
7 a large lot.
8    Q    Do you think that it had comparable
9 furnishings?
10    A    I don't know about the furnishings because    12:09:02
11 it didn't get that far.
12        So I would have to go back and look at the
13 actual pictures and the description to know whether
14 or not it was furnished. I don't remember.
15    Q    Were you aware that ALE solutions had    12:09:12
16 suggested at least one property that rented for
17 $60,000 a month in the summer?
18        MR. MARTI: Object to the form.
19        THE WITNESS: If it's in the notes, it's
20 in the notes. I don't remember, and I don't think    12:09:25
21 it was ever clear whether or not she could have
22 stayed in the Venice house.
23        MR. SCOTT: I just have one final topic
24 that I wanted to go through.
25        MR. MARTI: Do you want to take a little    12:09:47
                                          Page 109

28 (Pages 106 - 109)

1  break before we do?                12:09:49
2      MR. SCOTT:  Maybe I can finish up right
3  now if you want.
4      MR. MARTI:  I just need to go to the
5  restroom.                         12:09:54
6      MR. SCOTT:  We can take five.
7      THE VIDEOGRAPHER:  The time is 12:10 p.m.
8  We are going off the record.
9      (Off the record.)
10     THE VIDEOGRAPHER:  The time is 12:16 p.m.    12:16:14
11 We're back on the record.
12 BY MR. SCOTT:
13     Q   Ms. Hogan, can you turn back to the policy
14 that we previously marked as 606, I believe, and you
15 may be able to point me to this faster than I can    12:17:01
16 find it, but the Coverage C portion.
17     MR. MARTI:  Sometimes I can find it
18 quickly.  Okay.  3943.
19 BY MR. SCOTT:
20     Q   I think that was the endorsement portion.    12:17:39
21     A   You want the main one?
22     Q   The main one.
23     A   Okay.  Find the base policy.  It will be
24 page 4, 3966.
25     Q   If I could direct your attention to    12:18:30

Page 110

1  page SF 003966, and the "Coverage C - Loss of Use"    12:18:31
2  portion in the bottom right-hand corner.
3      I'm just going to read something to you
4  and I want to just get your understanding of what
5  the policy provision means.              12:18:47
6      It says,
7      "Additional Living Expenses:  When a Loss
8  Insured causes the residence premises to
9      become unhabitable, we will cover the
10     necessary increase in cost you incur to    12:18:58
11     maintain your standard of living for up to
12     24 months."
13     My question is what is your understanding
14 of what this "maintain your standard of living"
15 language means?                     12:19:09
16     A   It's a fluid definition.
17     You wouldn't put a family of eight in --
18 that came out of a five-bedroom house into a
19 two-bedroom house if you can avoid it.  Sometimes
20 it's not possible.                    12:19:35
21     And then it also includes the same level
22 of perhaps entertaining or meals or utilities or
23 amenities, you know, those kinds of things.
24     Furniture is an iffy.  It's difficult the
25 higher up you go to get the same kind of furniture    12:20:02

Page 111

1  that is in the house, but a $6000 sofa versus a    12:20:08
2  $2500 sofa, that is not not keeping the standard of
3  living.
4      And a lot of it depends on how the insured
5  sees it.  Some are extremely reasonable, some are    12:20:26
6  practically impossible to please.
7      So it's a -- there is nothing definite.
8  There is no rule, let's say.
9      Q   But it's essentially to provide like kind
10 in quality?                       12:20:45
11     A   As best you can on a reasonable basis and
12 it's supposed to be incurred costs.
13     Q   Can I mark this as next in order.
14     (Deposition Exhibit 608 was marked for
15         identification by the court reporter and    12:21:04
16         is attached hereto.)
17 BY MR. SCOTT:
18     Q   Ms. Hogan, you have been handed
19 Exhibit 608, which is the expert report prepared by
20 Maribeth Banko in rebuttal to your report.    12:21:27
21     Have you seen this?
22     A   I have seen it.
23     Q   Have you reviewed it?
24     A   I read it.
25     Q   Do you have any opinions one way or    12:21:36

Page 112

1  another with respect to the information presented in    12:21:38
2  Ms. Danko's report?
3      A   Well, to the extent that she disagrees
4  with me, yes.
5      Q   Anything specific you can point to in here    12:21:47
6  that you take issue with?
7      A   Well, overall, just the characterization
8  of things like the investigation, et cetera.  We
9  have a completely different view of that.
10     And so I think the carrier did make as    12:22:01
11 best efforts as they could to make reasonable and
12 timely payments to do an investigation, et cetera.
13     Her comments to me are more reflective of
14 a -- let me back up and put it the other way around.
15     This was not a textbook structure claim.    12:22:36
16 This was a difficult claim in many respects due to a
17 number of circumstances, including multiple people
18 to communicate with, et cetera, and it's difficult
19 to apply exact standards to any claim.
20     So the question is did they do a    12:23:09
21 reasonable job; did everything they do -- when you
22 could take it all together, did it work out okay; is
23 it a reasonable result for the claim; were the
24 actions throughout the claim generally reasonable;
25 and in my opinion, they were.  It was a hard claim.    12:23:25

Page 113

29 (Pages 110 - 113)

1 And so you can't take a piece of it and          12:23:32
2 say well, this is bad faith, in my opinion.
3     So that is in the overall -- we're looking
4 at this claim completely differently.
5  Q  She's looking at individual portions of it   12:23:52
6 and you are looking at it as a whole; is that right,
7 just to conceptualize what you are saying?
8  A  In my ultimate opinion, I am talking the
9 whole claim.
10     I also looked at all the little pieces,      12:24:05
11 and, you know, it's like the refrigerator.  Okay?
12 It's a mistake.  It doesn't make the whole claim bad
13 faith.
14     That's the sort of thing I am talking
15 about.                                           12:24:22
16  Q  Just anything else from a kind of global
17 level that you disagree with in her report?
18     I realize -- you know, I don't mean to put
19 you on the spot to go through this line by line.
20  A  I can't do that.                             12:24:39
21     Like I said, she's looking at this
22 differently -- from a different perspective than I
23 am.
24     And I think based on this type -- this
25 claim, that overall it's handled properly and that  12:24:53

Page 114

1 they meet the standards of the Fair Claims Practices  12:24:57
2 Act and that some of the things that she complains
3 about are not really in State Farm's control.
4 They're dependent on the actions of other people and
5 the responses of other people.                   12:25:16
6  Q  For example?
7  A  Well, for example, contact.  You know, the
8 original inspection, she was ready to go right
9 after -- as soon as she got the claim.
10     Well, can't do that.  They set a date.      12:25:28
11 She gets there.  They can't do it.
12     She sets another date.  They cancel that,
13 you know, that kind of thing.  That is something
14 that the carrier can't fix.  Only the insured can
15 fix that.                                        12:25:42
16     If they're not willing or able to provide
17 the access, then they can't do anything, that kind
18 of example.
19     She says they were unreasonable in denying
20 the refrigerator.  I don't think it was           12:26:02
21 unreasonable.  It was a mistake, turned out to be,
22 but I mean they weren't trying to be mean.
23  Q  All right.  Anything else you want to say
24 about that?
25  A  No.  She's, obviously, a very competent     12:26:21

Page 115

1 person and she's given her opinions a lot of      12:26:24
2 thought.  I just don't agree with them.
3  Q  Other than what is mentioned in your
4 written report and other than we have talked about
5 today, any other opinions that you intend to offer  12:26:36
6 at trial in this matter?
7  A  Not at present, anyway.  I mean somebody
8 may give me some other information that I don't have
9 today, but otherwise, no.
10     MR. SCOTT:  I have no further questions     12:26:48
11 for you today, Ms. Hogan.
12     MR. MARTI:  No questions.
13     MR. SCOTT:  We can go off the record, I
14 guess, to talk about how to do this.
15     THE VIDEOGRAPHER:  The time is 12:27 p.m.   12:26:57
16 We're going off the record.
17     (The deposition was concluded at
18     12:27 p.m.)
19
20
21
22
23
24
25

Page 116

1                 DECLARATION
2
3
4
5     I, LOLA HOGAN, do hereby declare that I
6 have read the foregoing transcript; that I have made
7 any corrections as appear noted, in ink, initialed
8 by me, or attached hereto; that my testimony as
9 contained herein, as corrected, is true and correct.
10     I declare under the penalties of perjury
11 under the laws of the State of California that the
12 foregoing is true and correct.
13     This declaration is executed this _____
14 day of _____, 2019, at
15 _____, California.
16
17
18
19
20 _____
      LOLA HOGAN
21
22
23
24
25

Page 117

30 (Pages 114 - 117)

```
 1        I, DARYL BAUCUM, a Certified Shorthand
          Reporter of the State of California, do hereby
 2   certify;
 3        That the foregoing proceedings were taken
 4   before me at the time and place herein set forth,
 5   at which time the witness named in the foregoing
 6   proceeding was placed under oath; that a record
 7   of the proceedings was made by me using machine
 8   shorthand which was thereafter transcribed under my
 9   direction; and that the foregoing pages contain a
10   full, true and accurate record of all proceedings
11   and testimony to the best of my skill and ability.
12        I further certify that I am neither
13   financially interested in the outcome nor a relative
14   or employee of any attorney or any party to this
15   action.
16        IN WITNESS WHEREOF, I have subscribed my
17   name this January 2, 2020
18
19
20
21
22
23
24
25   DARYL BAUCUM, CSR No. 10356
```

Page 118

31 (Page 118)

[& - 9:54]

| & | | | |
| --- | --- | --- | --- |
| **&**   3:5 | 72:20 74:12 75:3 | 78:21 | **602**   6:10 14:5,9 |
| **0** | **1700**   2:16 3:8 | **28th**   71:1 | **603**   6:11 18:21,22 |
| **003939**   64:12 | **17th**   7:12 72:15 | **2:19**   7:16 | 19:3,13 20:24 |
| **003966**   111:1 | **18**   6:11 49:18 | **3** | 35:11 39:10,11,13 |
| **01963**   1:6 2:6 7:16 | 50:22 52:13 56:10 | **3**   82:17 | 44:11,14,21 45:3 |
| **1** | 59:21 71:19,23 | **30**   9:9,12 | 68:11 |
| **1**   1:18,25 22:3 | 72:9,14 | **31,000**   100:8 | **604**   6:13 20:1,2,7 |
| 24:3,5 25:8 39:16 | **19**   1:6 2:6 37:4 | **323.301.4660**   3:10 | **605**   6:14 36:6,11 |
| 56:12 | 78:24 100:8 | **330**   41:10 | **606**   6:16 63:23 |
| **10**   39:16 41:11 | **2** | **3300**   41:8,9 | 64:3,15 110:14 |
| 46:5 68:12 | **2**   1:6 2:6 23:21,25 | **35**   108:12 | **607**   6:17 65:15,19 |
| **100**   22:11 | 41:11 118:17 | **35,000**   87:14,15 | 66:24 67:21 |
| **10356**   1:23 2:20 | **2,548,108**   82:19 | 88:4,16 107:5 | **608**   6:18 112:14,19 |
| 118:25 | **2.5**   89:22 | **36**   6:14 | **63**   6:16 |
| **104**   73:21 | **20**   6:13 23:16 | **3700**   3:19 | **6420**   2:16 3:7 7:12 |
| **104,000**   74:15,24 | 68:25 69:10,12 | **3812039-1**   1:24 | **65**   6:17 |
| 79:15 82:12 | **200,000**   33:9 | **3943**   110:18 | **6568**   118:24 |
| **104,862**   73:6 | **2014**   25:25 | **3966**   110:24 | **66,000**   74:22 |
| **11**   6:5 | **2015**   33:14 | **4** | **7** |
| **112**   6:18 | **2018**   47:16 49:18 | **4**   110:24 | **7**   89:1,5,5,6,9 91:6 |
| **1149**   8:15 | 55:25 56:10 59:21 | **40,000**   97:4 108:1 | 91:21 92:3 97:21 |
| **118**   1:25 | 65:20 68:16,25 | 108:16 | 98:25 99:2,21 |
| **11:02**   63:5 | 71:19,23 72:9,20 | **40,950**   106:25 | 100:19 101:20 |
| **11:11**   63:8 | **2019**   1:17 2:19 6:9 | 107:13 108:8,13 | 102:4,8 |
| **12**   68:15 | 7:1,6 51:9 73:4 | 108:20 | **70,000**   88:13 |
| **12,000**   107:8,18 | 76:8,11 78:21,24 | **47,000**   108:9 | **8** |
| **12:10**   110:7 | 80:24 82:16 89:1 | **5** | **8**   5:6 68:12 81:4 |
| **12:16**   110:10 | 89:9 91:6 94:2 | **5**   46:4 | **85,000**   51:3 52:15 |
| **12:27**   2:18 116:15 | 96:8 97:13,21 | **500,000**   21:24 22:3 | 71:24 73:8 |
| 116:18 | 98:25 117:14 | **52,950**   107:13 | **85,515.19.**   49:23 |
| **13**   6:8 65:20 | **2020**   118:17 | **6** | 50:7 |
| **14**   6:10 73:4 76:8 | **20th**   69:6,22 | **6**   9:9,12 | **9** |
| 82:16 | **21**   6:9 | **60,000**   109:17 | **90,000**   97:2 99:4 |
| **15**   23:15 37:4 | **213.892.7900**   3:21 | **600**   6:5 11:4,6,7,12 | 99:22 100:19 |
| 76:10 100:15 | **24**   81:4 111:12 | **6000**   74:7 112:1 | 101:21 106:18,23 |
| **150**   32:23 | **25,000**   87:15 | **601**   3:18 6:8 12:16 | **90017**   3:20 |
| **1519**   37:9 | **2500**   112:2 | 13:9,10,15,18 16:4 | **90048**   3:9 |
| **17**   1:17 2:19 7:1,5 | **2695.9**   37:5 | 35:11 44:1,6,10,14 | **9:54**   2:18 7:2,6 |
| 47:16 55:25 59:13 | **28**   45:17,19 46:5 | 44:15 | |
| | 46:13,21 47:9 | | |
| | 69:9 70:15 71:11 | | |

Page 1

[a.m. - areas]

| a | | | |
|---|---|---|---|
| **a.m.** 2:18 7:2,6 63:5,8 | 83:15,20 95:5 107:18 111:7 | 103:13 116:2 | **answer** 5:10 29:6 38:25 39:1 53:1 |
| **ability** 47:2,2 118:11 | **address** 8:13 | **agreed** 74:24 94:7 97:4,22 98:1,10 106:25 107:2,4 | **answered** 29:18 57:24 102:19 |
| **able** 30:20 45:22 71:6 110:15 115:16 | **adequately** 87:12 | **agreement** 91:10 101:24 102:4 | **answers** 69:17 |
| | **adjust** 53:11 61:13 103:15 | **ahead** 103:1 106:2 60:7 | **anticipated** 90:12 |
| **absolutely** 20:23 84:18 | **adjusted** 52:23 60:7 | **ahold** 69:15,16 | **anybody** 47:14 62:10 |
| **accept** 107:24 108:17 | **adjuster** 47:13 48:2 51:20 52:8 55:20 58:4 61:10 67:14 69:21 71:20 72:4 75:15 76:10 76:24,25 77:10,13 78:2,7 82:11 84:1 93:22 95:4,10,13 99:3 100:15,22 103:12 104:21 105:6,15,16 | **alae** 106:13 | **anyway** 116:7 |
| **acceptable** 109:4 | | **ale** 34:17 60:10 97:13 98:1,10,18 100:5 101:18 106:7 108:21 109:2,15 | **apparent** 80:7 |
| **accepted** 38:1 108:3,4 | | | **apparently** 109:4 |
| **access** 115:17 | | | **appear** 66:25 117:7 |
| **accident** 18:7 61:19,20 | | **ale's** 100:7 | **appearance** 78:17 |
| **accidents** 61:15 | | **allegation** 60:1 81:25 | **appearances** 3:1 4:1 7:20 |
| **accomplished** 46:16 | | **alleging** 56:18 | **appeared** 52:8 103:5 |
| **account** 38:21 43:16 84:22 85:7 86:20 | **adjuster's** 46:23 57:13 | **allocated** 73:17 74:1 106:11 | **appears** 20:12 26:18 55:17 68:4 |
| | **adjusters** 77:22 84:2 | **allow** 37:25 | **appended** 12:7 |
| **accurate** 21:20 64:23 67:10 85:11 99:9 118:10 | **adjusting** 22:16 84:22 | **allowed** 46:20,22 55:18 71:4,15 73:22 90:20 | **applicable** 37:6,22 |
| | | | **applied** 38:8 |
| **act** 37:2 59:9 115:2 | **adjustment** 78:8 106:11 | **alternate** 106:24 | **applies** 68:6 |
| | **adjustor** 58:19 | **alternative** 97:3 | **apply** 113:19 |
| **action** 29:22 77:1 118:15 | **adjusts** 38:22 | **amarti** 3:22 | **appointment** 83:24 |
| | **admonitions** 10:18 | **ambiguous** 76:4 | **appropriate** 91:4 92:18,22 |
| **actions** 113:24 115:4 | **advance** 54:9 87:16 88:4,16 | **amenities** 111:23 | **approval** 99:3 |
| **active** 26:23 | **advice** 41:24 | **amount** 21:13 37:22 49:22 50:6 50:18 52:4 70:8 70:24 73:17,25 76:14 106:24 107:7,18 108:21 | **approved** 98:8 |
| **actual** 35:10 57:3 109:13 | **advised** 68:16 | | **approximately** 8:20 15:1 23:12 26:1 35:3 82:16 |
| | **affect** 87:2 | **analysis** 60:9 | **april** 78:24 96:8 96:13,23 97:13 98:19 99:16 100:8 100:10,15 101:16 101:17 |
| **add** 19:16 26:15 | **affixed** 105:8 | **angel** 3:17 7:24 11:4 | |
| **additional** 13:4,20 34:16,17 37:5 40:3,15,22 43:20 47:9 54:1 78:8 | **agent** 65:11 67:23 | **angeles** 1:16 2:17 3:9,20 7:1,9,12 | **areas** 28:8 |
| | **agents** 54:11 | | |
| | **ago** 10:3,4 103:2 | | |
| | **agree** 38:11 91:2 91:22 99:21 | | |

[argumentative - cagle]

**argumentative** 57:7,25 68:2 102:19
**asked** 13:6 29:18 41:13,24 42:6 51:20 55:20 57:24 62:15 68:5 101:13 102:19
**asking** 62:11,14 71:22 80:7
**asserted** 92:16 93:2
**assertion** 81:21
**assessment** 79:18
**assignment** 29:13
**assume** 54:4 75:10
**assumed** 107:9,12
**assumes** 67:11 69:4 70:1 99:7
**assuming** 53:4 70:24 105:2
**attached** 11:9,15 11:16,25 13:12 14:7 18:24 20:4 36:8 63:25 65:17 66:18,24 112:16 117:8
**attachment** 66:10
**attempting** 45:15
**attention** 110:25
**attorney** 3:6,17 14:24 31:9,13,16 31:20 84:2 118:14
**attorneys** 29:25
**audit** 21:10,11,18 22:6
**authority** 54:11
**authorize** 91:14
**authorized** 54:14
**auto** 23:10

**automobile** 61:15
**available** 56:15
**avenue** 8:15
**average** 60:2 95:2
**avoid** 111:19
**aware** 48:24 49:3 76:9 85:4,13 88:2 88:5 109:15

**b**

**b** 9:9,12 46:11 51:4,7 53:23 54:5 82:21
**back** 12:7 20:10 20:24 39:10 43:6 50:24 55:24 63:9 68:10 69:12,13 72:7 76:6 78:18 83:7 84:9 86:17 91:1 100:20 102:25 105:5 109:12 110:11,13 113:14
**background** 41:4 42:10 81:5
**backwards** 45:12
**bad** 27:9,15 28:7 28:10,20,25 29:4,9 29:17,22 34:18 61:16,17 114:2,12
**balance** 51:17
**banko** 112:20
**base** 110:23
**based** 24:10 37:20 42:14,15 49:20 51:2 73:23 74:11 74:17 75:7,23 83:15 86:10 89:14 89:16 90:19 91:13 91:18,24 92:14 94:5 95:21 103:4 108:25 114:24

**basic** 67:3
**basically** 82:6
**basis** 37:15 40:19 44:24 45:4 47:22 48:10,17 49:24,25 95:12 112:11
**bates** 16:16,21 63:21 64:9
**baucum** 1:23 2:20 118:1,25
**bean** 24:21
**bedroom** 111:18 111:19
**beginning** 2:17
**behalf** 7:17,22,24 10:13 18:4 26:19 26:21 27:2,3,6 28:4 31:10
**belated** 30:1
**believe** 16:5 25:1 29:20 30:9 31:2 32:23 34:16 40:10 40:14 46:7 48:8 50:14,15,17 51:15 51:23 68:13 69:6 70:4 71:12 72:16 74:5 76:16 77:9 87:15,17 88:10 91:18 93:11 96:3 106:7 110:14
**believed** 47:18 48:11 56:7 76:2 94:5 104:21
**believes** 101:17
**beneficial** 62:5,15 62:20
**best** 112:11 113:11 118:11
**better** 106:13
**bid** 58:5 80:23 81:13,19 84:12

89:23 90:4
**bit** 28:13 74:4
**black** 94:25
**blank** 10:6
**blue** 12:24 99:21
**bodily** 24:22
**bottom** 63:21 66:1 111:2
**bought** 63:1
**boulevard** 2:16 3:7 7:12
**box** 60:24
**branch** 22:14
**break** 63:3 110:1
**brief** 46:17
**briefly** 46:22 47:5
**bring** 12:10 77:22
**broadened** 58:20
**broader** 58:5
**broken** 46:7
**brought** 47:14
**bucknell** 82:21
**building** 16:3 48:22 49:22 50:6 82:17,25 105:3
**bullet** 39:16 41:12 49:17
**burn** 48:18
**burned** 49:1,1 54:17
**business** 23:14 25:18
**buy** 21:12,16

**c**

**c** 8:12 50:14 54:5 82:21 110:16 111:1
**caetano** 30:10 31:1,9 32:8 33:24
**cagle** 30:9 32:25 33:20,21,25,25

Veritext Legal Solutions
866 299-5127

[cagle - coming]

34:1,4,7
**california** 1:2,16
  2:2,17 3:9,20 7:1
  7:9,13 8:16 9:6
  30:11,15 36:12,23
  41:18 117:11,15
  118:1
**call** 29:12 61:7
  75:4 85:1 89:13
**called** 17:1 24:16
  44:4 50:14
**calls** 30:2 85:23
  101:3 102:6
**cancel** 115:12
**cancelled** 45:19
**capacity** 9:3 10:10
  22:12
**caption** 7:14
**car** 61:16,18,21
**carola** 8:12
**carrier** 26:24
  28:24 29:3 39:4
  57:19 65:11 77:21
  81:22 95:24 96:17
  96:22 104:11
  113:10 115:14
**carriers** 21:18
  26:21 37:2 54:9
  55:13 65:1
**carry** 55:13
**case** 7:14 10:5,19
  15:7,18 19:9,17,18
  20:15,16,19,20
  26:12,15 27:17
  31:6,7,9,13,17,21
  32:8,11,16,18,21
  32:25 33:1,4,5,6,8
  33:12 35:4 40:13
  41:20 54:14 55:24
  63:13 64:5 79:21
  100:21

**cases** 9:6,8,15
  21:22 24:23 26:8
  27:21,25 28:11,14
  28:17,19 30:5,6,11
  30:21
**casual** 25:7,9
**casualty** 23:3
  24:11,12,20 25:5
**catastrophe** 77:19
  77:22
**cause** 7:15 105:17
  105:22
**causes** 111:8
**central** 1:2 2:2
  30:14 41:18
**certain** 21:13 42:7
**certainly** 56:11
  76:21 77:18
**certified** 67:13
  71:17 83:17 118:1
**certify** 118:2,12
**cetera** 21:21 113:8
  113:12,18
**chain** 66:2 98:3
**challenge** 73:21
  76:18,21
**challenging**
  105:15,16
**chance** 20:19
**change** 40:16,19
  41:2 51:6 52:14
  66:21 67:22 77:9
  78:7 83:10 92:15
  107:10
**changed** 36:1
  56:18 57:9,12,14
  75:21 77:13 80:3
  80:9 89:19 91:7
  91:22 92:2
**changes** 35:24
  36:3,5 78:13

**changing** 104:20
**characterization**
  113:7
**charts** 84:7
**checks** 55:14
**chemistry** 81:6
**choose** 29:12
**chose** 22:2
**chunks** 16:17
**cih** 71:10
**circumstances**
  92:21,25 113:17
**claim** 14:23 16:16
  16:23,24 17:14
  23:18,23 24:15
  28:10 29:11 30:22
  31:4 32:9,12,14,17
  32:22,23 33:5,7
  34:5,10 35:13
  38:22 39:20 41:6
  41:8,15,25 42:8,15
  42:16,20,21 48:9
  49:12,13,20 50:1,2
  50:8 52:19,23
  53:9,10,14,15,18
  53:20 54:21 55:11
  58:5,20 59:17,18
  59:24,24 60:6,9,13
  60:14,15 61:3
  63:18,19 64:11
  68:15 77:13,19,23
  77:25 78:3,6,9
  79:3 81:20 82:4
  84:23 85:15 90:25
  92:10,20 93:1
  102:21 103:16
  113:15,16,19,23
  113:24,25 114:4,9
  114:12,25 115:9
**claimant** 37:18

**claimed** 39:4
  57:19 83:13 90:6
  90:11 96:20 103:8
**claiming** 57:17
  79:15 93:12
  103:22
**claims** 6:14 21:8
  22:6,14,15 25:7,14
  25:19 26:22 27:12
  28:8 32:6 36:11
  36:14,16,19 41:7
  41:21 42:4 50:1
  55:12,15 59:10,11
  60:20 65:4 68:21
  89:10 96:11 115:1
**clean** 84:14 86:9
  87:7 93:3
**cleaned** 87:19,24
  90:7,23
**cleaning** 48:2
  51:24,25 71:5
  75:12 85:7 87:16
  88:1 90:21 94:8
**cleanings** 87:11
**clear** 36:2 45:25
  47:6 102:8 107:22
  109:21
**clearly** 93:17
**clifford** 15:15
  45:25 47:6
**close** 62:2
**closed** 48:1
**closest** 87:23
**closet** 95:1
**clothes** 93:4 94:25
**clothing** 62:24
  90:6,13,22
**colloquy** 13:17
**come** 86:17
**coming** 55:24
  78:14

[comment - court]

comment 47:4
85:2
commented 28:8
comments 17:9
35:21 92:18
113:13
commercial 23:3
25:4 37:6
common 23:23
77:21
communicate
113:18
communication
100:21
communications
93:21
companies 21:12
27:6
company 1:7 2:7
3:14 7:15 8:24
22:18,23 23:4,5
24:7,12 25:4 27:9
27:14 29:16 41:14
41:16 55:4 56:23
61:4 62:14,16
64:22 71:2 72:11
97:12
company's 62:6,8
comparable 109:1
109:2,8
compared 47:20
competent 115:25
complained 82:7
complains 115:2
complete 26:8,16
26:17 41:19 42:19
47:2 55:21 56:3,7
61:24 64:4,19
completed 44:9
49:19 50:23 78:20
89:12

completely 47:21
76:21 113:9 114:4
complex 25:5
complexities
100:21
comply 79:2
comprehensive
44:11 47:1 55:8
56:1
conceptualize
114:7
conceptually
52:22
concerned 21:17
concluded 49:14
106:17,22 116:17
conclusion 30:2
61:7 103:16
condition 37:24
38:14 39:4 80:9
84:22 85:15,21
86:20 87:1
conduct 28:20
29:4,17 38:9
70:18 72:11,24
75:25
conducted 72:22
74:18
confirm 79:21
confirmed 48:2
53:22
confused 50:19
connection 19:8
63:11 64:7,16
65:23
connor 3:16
consider 43:17
46:13,24 57:20
72:9,20 75:17
76:18 100:1

considerably
44:12 75:1 93:16
consideration
85:21 87:1
consistently 21:9
constitutes 70:21
construction 38:3
82:20
consult 25:19 85:9
consultant 15:11
25:5 73:23 74:23
82:20 87:8
consultants 47:9
86:19,22
consulting 6:7
25:17,23 27:11
34:20 85:13 86:23
contact 69:24
115:7
contacts 69:19
contain 66:16,25
118:9
contained 117:9
contamination
91:3
content 35:25,25
contents 49:22
50:6 62:21 82:17
82:25 84:13 90:21
91:15,22 93:23
context 84:5
continents 91:19
continue 103:15
continued 4:1
103:11
continuing 92:9
control 115:3
convicted 18:12
coordinate 83:25
84:3

copied 12:20,24
18:10
copies 18:5 65:2
copy 10:25 11:2
37:18 63:15 64:23
65:8,12 67:10,13
67:23,25 68:5
71:20 72:4
corner 111:2
correct 10:12
13:22,23 14:12
15:5 16:23 17:2
17:22 20:18 21:21
22:19,24,25 26:14
27:7,16 28:2,25
38:19 39:18 40:1
42:5,18 43:1 44:8
46:9 50:21 51:12
64:18 65:7 67:8
74:13,16,20 76:3
81:15 83:8 95:19
96:24 97:14 98:20
102:9 105:24
117:9,12
corrected 105:10
117:9
corrections 117:7
cost 79:15 111:10
costs 112:12
counsel 3:1 4:1
7:20 11:2 12:18
12:25 13:17 29:12
43:5 45:21 50:8
63:17
count 71:6
couple 77:23,24,24
course 29:11
court 1:1 2:1 9:8
9:11,13,13,19,22
10:19 11:8 13:11
14:6 18:23 20:3

[court - differentiations]

34:25 36:7 41:17
43:7 63:24 65:16
112:15
**courts** 30:12
**cover** 88:17 100:9
111:9
**coverage** 34:16
50:14,15,17 51:4,7
51:8,18 52:16
53:3,24 58:6 60:9
66:21 75:21 76:19
82:25 92:4,8,19
103:21 104:20
105:15,23,24
110:16 111:1
**coverages** 46:8
82:18
**covered** 53:5 54:5
70:25,25 103:23
104:2
**cozen** 3:16 32:3,6
35:22 36:4,5
**cozen.com** 3:22
**created** 17:8
**crime** 18:12
**crossed** 34:2
**crr** 1:23 2:20
**csr** 1:23 2:20
118:25
**current** 10:25
19:14 20:7 22:1
**curriculum** 6:11
**customs** 69:2
**cv** 1:6 2:6 7:16
10:25 19:14 20:8

**d**

**d** 5:1 37:11 54:6
**damage** 30:23
31:8 33:3,10 34:5
34:8,9 48:16
53:19 57:17 59:18

59:25 61:3,5,16,20
62:7 68:18 74:7
76:3 90:14 91:3
**damaged** 37:23
38:13 48:24 49:3
49:13 54:19 61:9
92:16
**damages** 47:3
57:13 60:18 83:13
103:8
**danko** 6:19
**danko's** 113:2
**daryl** 1:23 2:19
118:1,25
**data** 84:5
**date** 42:4 50:25
76:13 89:4 93:5
115:10,12
**dated** 6:9 65:20
**dates** 17:24 18:3
**day** 69:23 70:20
72:3 117:14
**days** 17:7 70:7
77:24 102:9,15
**dealing** 37:3
**dealt** 108:4
**debate** 100:10
**debris** 48:5
**december** 7:5
47:16 49:18 50:22
52:13 55:25 56:10
59:13,21 71:19,23
72:9,14,20 73:18
74:12 75:3 93:23
94:4,11,14 95:8,22
96:10 102:12,13
102:21,21 103:10
**decision** 29:21
87:7 92:8 107:23
**decisions** 104:14

**declaration** 117:1
117:13
**declarations** 66:17
**declare** 117:5,10
**deductible** 21:14
**deemed** 85:19
**defeats** 44:16
**defendant** 1:8 2:8
3:14
**defendant's** 6:6
**defendants** 26:19
**define** 62:19
**definite** 112:7
**definition** 111:16
**delays** 78:8
**demand** 97:2
99:20 100:19
101:20 102:2
**demanded** 98:8
99:3
**demands** 103:13
**demonstrable**
41:2
**denied** 103:21
**dent** 61:22
**denying** 115:19
**department** 7:9
36:13
**departments** 21:8
**depended** 18:2
**dependent** 115:4
**depending** 77:25
**depends** 39:2
53:18 55:10 112:4
**deponent** 7:25
**deposed** 9:18 26:9
26:24 27:22,24
**deposit** 88:6,12,13
88:18
**deposition** 1:15
2:15 6:1,5 7:10,17

8:17 9:2 10:1 11:7
11:13,20 13:10
14:5,16 15:6,10,14
18:22 19:21 20:2
27:13 28:24 33:18
35:4 36:6 40:7
63:23 65:15
112:14 116:17
**depositions** 9:5
14:23 40:9
**description** 6:4
109:13
**designation** 9:10
19:9
**despite** 101:9
**destroyed** 47:21
90:23 93:6
**destruction** 90:5,5
**determination**
97:17 102:12
105:15,23,25
**determine** 53:2,4
60:10 83:20 85:10
**determined** 74:21
80:10 84:8,14
104:1
**determining** 85:22
105:21
**devoted** 23:13
**diagram** 71:6
**difference** 56:11
56:14 73:24 78:22
84:17
**different** 56:19
60:14,15 61:14
75:14 76:22 81:9
92:21,24 93:16
97:9 113:9 114:22
**differentiations**
44:3

Page 6

**[differently - examined]**

differently 114:4
114:22
difficult 28:9
52:20 78:4 84:3
111:24 113:16,18
digital 7:8
diplomatically
78:4
direct 110:25
directed 11:14,18
direction 118:9
directly 45:11
88:11
disagree 91:4
114:17
disagreed 56:22
89:24
disagrees 113:3
discovers 78:2
discuss 29:12
37:13
dispute 52:6
distribution 16:12
16:13,15 64:10
district 1:1,2 2:1,2
30:14 41:17,18
doctor 86:10 87:2
doctors 86:22
document 11:20
12:7,19 16:6,10,19
16:22,25 17:4,8,10
17:11,13,20 35:12
37:19 40:12 41:9
44:4 65:23
documentation
96:18
documents 6:6
11:1,14 12:10,13
12:17,23 13:1,4,15
13:16,18,20,21
14:1,13 17:12,15

19:6,7,10 40:3,15
40:22
doherty 1:4 2:4
3:3 6:16 7:14 8:8
16:6 17:1 39:21
41:15 65:21
doherty's 6:5
11:12
doing 25:25 58:8
87:10 103:14
dollar 21:13 23:17
32:8,11,17,22 33:7
34:10
dollars 51:20
76:16 90:6
door 87:20
doors 48:1 71:7
double 11:5 20:11
downloaded 20:8
drafted 35:14
drafts 35:19
drained 80:17,19
80:25
drawing 10:6
drive 12:15 13:1,3
13:5,7,19,20,25
14:1
due 105:18 113:16
duly 8:2
dwelling 54:2

**e**

e 5:1 65:20 66:1,6
82:21 93:21
106:10,11,12
earlier 18:9 89:12
early 3:5 7:11
93:22
earlysullivan.com
3:11
easy 78:6

effect 94:9
efforts 80:8,14
113:11
eight 69:23 111:17
either 8:25 17:8
26:9 41:2 67:13
electrical 105:18
eleven 27:24 75:21
employed 7:8
employee 118:14
employees 34:19
encounter 52:20
ended 96:9
endorsement
110:20
endorsements
66:21 67:1
ends 43:13
endurance 30:16
engaged 27:9,15
28:7,19 29:4,16
80:15
ensure 37:2
entertaining
111:22
entire 41:8 43:13
78:14 93:5,14,23
103:6
entitled 16:6 17:20
37:5 98:10 107:18
entry 42:21 48:3
equipment 75:13
error 72:1,2 105:4
106:12
essentially 74:25
75:10 112:9
establish 60:18
70:23
estimate 35:7
37:16,20 46:1
49:19 50:19,23

51:2,16,19,25 52:7
52:10 53:5 55:13
56:7,8,13,17 57:1
71:18,21,23 72:3,5
73:3,5,16,24,25
74:1,6,15,17,24
75:2,7,7 76:7,13
76:15,19 77:1
78:22,23 82:8,11
82:19 83:3,15
103:9
estimated 97:24
estimates 58:6
83:19
estone 15:12
et 21:21 113:8,12
113:18
evaluate 104:13
evaluated 57:2
evaluation 75:23
92:13
event 43:13 44:15
44:16 45:2 81:21
107:19
events 17:6 42:20
42:23 43:3,9
44:14,20,21 98:4
eventually 29:21
97:3 103:13
everybody's 59:13
eviction 96:19
evidence 96:16
evolved 95:4
102:22
exact 109:6 113:19
exactly 17:5 51:23
97:5
examination 5:5
8:5
examined 8:3

[example - fire]

example  15:21,24
  45:16 71:5 91:13
  93:20 115:6,7,18
exchange  65:20
exclusively  25:20
  25:21 27:5 48:19
excuse  22:2 77:5
  109:2
executed  117:13
exhibit  6:5,8,10,11
  6:13,14,16,17,18
  11:7,12,15,25
  12:16 13:10,18
  14:5,9 16:4 18:22
  19:3,13 20:1,2,7
  35:11 36:6,11
  39:10 44:1,6,10,11
  44:21 63:23 64:3
  64:15 65:15 66:24
  67:21 68:11
  112:14,19
exhibits  6:1
expanding  81:16
  81:17
expect  20:23
expense  34:17
  54:1 106:11
expenses  97:13
  98:18 108:21
  111:7
experience  21:1
  22:22 78:5
expert  6:6,8,13,18
  8:21 9:1,17,21
  10:10 15:18 19:9
  19:16 20:12 25:20
  26:4,7,10 27:22
  29:15 30:4 32:5
  34:24 35:1 42:3
  78:23 95:6 112:19

expert's  92:14
experts  49:14,15
  49:16
expired  96:7
explain  45:14
explained  45:10
exposure  21:18
expressed  56:12
extend  100:16
extended  101:25
  102:5
extent  45:2 84:8
  91:2 113:3
exterior  46:18
  48:6 49:13
extracted  42:16
extremely  112:5

**f**

fabrics  48:5
face  29:24
fact  26:11 40:7
  49:24,25 52:16
  54:17 56:22,24
  58:4 68:24 69:11
  75:20 81:15 89:23
  101:9 103:11
  105:19 109:1
facts  67:11 69:4
  70:1 72:13 88:7
  99:7
factual  42:10
fair  6:14 36:11,14
  36:16 37:2,3
  70:19 79:3 104:8
  115:1
faith  27:9,15 28:7
  28:10,20,25 29:4,9
  29:17,22 34:18
  37:3 114:2,13
familiar  19:6
  36:14,16 38:6,7

family  111:17
far  25:24 57:1
  80:2 84:7 86:15
  109:11
farm  1:7 2:7 3:14
  7:15,25 10:8,14,15
  15:17 16:7,22,23
  17:1 18:3 19:8
  20:15 27:18 28:4
  28:7 31:10,14,17
  31:21 39:20,20
  41:5,13,16 46:20
  47:8,18 48:11
  49:16,18,21 50:14
  52:10 54:10,14
  55:25 56:4,6,15
  57:2,5,10 58:8,14
  58:22 59:8,16
  65:22 66:7 67:9
  68:16,24 71:10,15
  71:17 72:21 73:5
  74:18,23 75:2,20
  75:24 76:10 78:21
  78:23 79:8 80:18
  80:24 82:13,18
  83:2,16 84:14,21
  85:13,20 86:13,18
  87:18 89:20 90:12
  90:24 91:7,14,18
  91:21 92:3 93:17
  94:1 95:9 97:12
  97:22 98:1 99:14
  99:21 100:1
  101:10 102:11
  103:11,21,25
  106:17,22,25
  107:12,16
farm's  38:9 39:22
  49:20 58:6 76:19
  79:18 82:7 87:6
  88:10 89:24 92:12

95:21 101:23
  102:4 115:3
farther  28:12
faster  110:15
features  109:5
february  76:10
federal  9:12,13,15
  9:19,22 10:19
fellow  15:12,14
felt  81:1
fender  61:22
field  55:13
fifteen  8:23 70:7
figueroa  3:18
figure  51:4 52:15
  71:24 108:20
file  14:23 16:1,16
  16:23,24 17:14
  21:19 22:1 27:12
  29:10,11 39:20
  41:6,8 42:15,16,21
  50:1,2 59:24
  63:18,19 64:11
  78:14 89:10 93:22
files  24:15
filter  75:14
final  35:23 109:23
finally  25:16
financially  118:13
find  30:20 50:24
  54:7 110:16,17,23
fine  35:7 63:4 69:3
finish  110:2
fire  30:10,23 31:2
  31:5 33:5,6,10
  34:5 48:16,24
  49:3 53:19,24
  60:20 61:3,23
  62:1 65:4 77:20
  105:7,19

[first - handling]

**first** 8:2,22 11:19
16:13 19:12,12
22:21 37:6,13
38:12 44:5 46:10
53:13 54:7,23
55:7 59:12 60:3
60:10,13 61:2
65:12 69:24 70:14
76:7 78:17 85:8
85:11 86:6 91:14
92:7 93:9,10
**fit** 60:24
**fits** 53:1
**five** 9:25 28:3,17
41:12 63:2 103:18
110:6 111:18
**fix** 115:14,15
**flames** 49:5,8,9
**flat** 87:19
**flipping** 39:14
**floor** 7:12
**floors** 93:14
**fluid** 111:16
**flux** 100:5
**fold** 75:21
**folder** 12:24
**followed** 101:14
**follows** 8:3 43:7
**food** 103:22
104:23 105:1,18
105:22
**forced** 96:12,16
**foregoing** 117:6
117:12 118:3,5,9
**forgot** 86:16
**form** 29:5 38:15
43:11 44:24 47:11
49:6 51:10 52:24
56:16 57:7,11
59:22 64:25 68:6
77:3 80:5 88:20

90:1 91:9,16 92:6
94:3,17 96:1,14,25
97:15 98:5,14,21
100:3 101:3,12
102:18 107:21
108:10 109:18
**formal** 47:7
**formatting** 35:24
**forming** 43:2,8
**forms** 66:17 67:5
**forth** 36:18 118:4
**forty** 28:17,17
**forward** 42:1
**found** 29:10 34:16
97:3 107:25
**four** 10:22 77:13
81:10 82:15 83:1
83:11
**frankly** 76:23
**freestanding**
105:19
**freezer** 105:25
**full** 26:2 118:10
**fully** 70:4
**functions** 21:14
**furnished** 108:3
108:16 109:14
**furnishings** 109:9
109:10
**furniture** 87:22
107:7,11,18 108:5
108:15,17 111:24
111:25
**further** 116:10
118:12

**g**

**g** 8:11
**gamut** 60:22
**garage** 105:10
**gather** 44:17

**general** 1:7 2:7
7:15 24:22 39:2
**generalities** 60:17
**generally** 41:4
55:2 75:11,13
91:2 113:24
**generated** 39:25
43:23 44:7 49:8
50:11
**generating** 39:24
40:2
**generic** 60:13
**getting** 69:13
**give** 8:13 116:8
**given** 55:21 70:19
72:4 116:1
**gizer** 3:5 7:11
**glaza** 65:22 66:7
**global** 114:16
**go** 10:17,24 11:1
16:4 19:15 20:24
22:20,21 24:6
25:3 33:25 39:10
41:11 47:16 50:24
61:17,21 66:8
68:10,12 71:13
72:7 83:7 84:9
86:6 91:1 100:11
102:25,25,25
103:1,18 106:15
109:12,24 110:4
111:25 114:19
115:8 116:13
**goes** 60:8 83:14
100:20
**going** 10:17,24
11:4 19:25 37:12
39:8 42:1 45:25
46:1 47:7 50:19
59:17 61:12 63:6
76:6 79:15 86:5

93:3 94:8 96:3,5
100:16 104:17
107:9 109:6 110:8
111:3 116:16
**good** 7:4 8:7 26:13
37:2 38:2 78:13
87:10
**gotten** 95:5
**greater** 57:1 97:23
**greg** 15:15 19:17
**gregor** 10:8
**gregory** 10:15,19
19:17,19,21 20:13
20:14 26:12,15
27:17,18 28:2
30:5 31:6,13
32:21
**ground** 57:4 80:3
**grove** 8:15
**grubaugh** 15:24
15:25
**guess** 61:24 90:22
100:9 116:14
**guy** 79:20
**guys** 106:8

**h**

**h** 8:11
**habitable** 54:16
**hand** 111:2
**handed** 11:11
12:14 13:2,14,24
14:10 19:2 20:6
36:10 64:2 65:19
112:18
**handle** 25:13
**handled** 22:10,12
24:15 25:7 28:10
114:25
**handling** 22:7
25:19 35:13 36:19
41:14,21,25 42:4

Veritext Legal Solutions
866 299-5127

[hang - initial]

hang  67:4
happened  17:7
  33:15 35:2 54:11
  86:12 87:25 89:1
  97:1,4 103:1
  104:7
happening  81:7
happens  59:7
  61:23 100:18
hard  55:15 60:23
  113:25
hat  66:22
hausley  4:6 7:7
head  30:19 67:17
  78:2
heading  26:6
health  38:21 39:4
healthcare  30:17
hear  101:20
heat  49:8,14
held  22:20
help  44:24 54:7
  69:16 78:3
helps  62:19 73:10
hereto  11:9 13:12
  14:7 18:24 20:4
  36:8 63:25 65:17
  112:16 117:8
hey  100:15
hi  66:3
higher  21:22
  111:25
highest  23:17
hire  59:18
history  73:11
ho3  67:3
hogan  1:15 2:15
  5:4 6:2,7,7,8,12,13
  7:19 8:1,7,11
  11:11 12:23 13:14
  14:9 19:2 20:6

25:16,22 34:20
  36:10 63:11 64:2
  65:19 110:13
  112:18 116:11
  117:5,20
holds  75:12
home  47:5 48:1,20
  86:5
homeowners  6:16
  6:17 23:10 24:24
  25:2,13 30:6,22
  32:25 34:4 39:21
  54:3,5 64:4 66:12
  66:13,15,19
homes  47:20
hope  55:3
horizontal  84:15
hours  15:2 35:3,8
  55:20
house  53:21 54:15
  59:13 61:9 66:5
  68:17 93:15 99:23
  101:21 107:15,19
  107:24 108:3,16
  109:2,22 111:18
  111:19 112:1
housing  52:20
  97:3 106:24
huge  60:16
hughes  31:22
huh  11:17 16:9
  77:15 106:20
hundred  32:10,19
husband  47:5
hygenist  83:18
  92:17 95:14
hygienist  71:17
  83:25 85:5 87:18
  89:17 90:20 91:1
  91:24,25 94:7,23

hygienist's  15:10
  89:15,16 91:18
  93:10 94:6
hygienists  91:2
hypothetical
  38:24 54:25 55:9
  60:6 61:6 62:9
  90:16
hypotheticals  39:8

i

idea  23:19 59:3
  85:24
identification  11:8
  13:11 14:6 18:23
  20:3 36:7 63:24
  65:16 112:15
identified  60:8
  102:14 103:8
identify  57:23
  58:8,16,21 83:18
  92:1
iffy  111:24
iii  3:17
immediate  77:22
immediately  83:16
  83:23 84:5 98:8
  99:21
impact  52:18
importance  45:4
important  42:25
  44:21 64:22
impossible  39:1
  112:6
inaccurate  74:6
include  27:17
  44:13
included  13:1,3,5
  13:19 19:22 44:16
  51:25 87:17 90:4
  93:18 102:16

includes  111:21
including  27:22
  28:1 30:5 35:4
  50:19 113:17
incomplete  38:23
  54:25 55:9 61:6
  62:9 90:16
incorrect  50:13
  102:17 103:3
increase  107:1,3
  111:10
incredible  83:12
incur  111:10
incurred  112:12
index  13:25
indicate  94:13
individual  114:5
industrial  15:9
  71:17 83:18 89:15
  90:20 95:13
industry  69:2 70:5
  70:7 106:9
infer  45:3
information  5:15
  22:1 30:18 42:17
  44:18 56:9,15,18
  56:20,23 57:4,15
  58:2,7,15,17,21
  59:9,12 79:9,12,17
  79:22 81:22,24
  82:1,6,10 84:10
  93:2 95:5 104:13
  104:15,19 105:14
  113:1 116:8
ingress  87:23
initial  54:18 71:11
  74:6,11 76:1,19
  90:19 91:17 92:2
  92:13 95:21
  102:14

[initialed - know]

| | | | |
|---|---|---|---|
| **initialed** 117:7 | 64:22 71:2 72:10 | **investigating** | **jury's** 29:21 |
| **initially** 91:13 | 97:12 104:11 | 54:13 | **k** |
| 95:18 | **insured** 27:2 39:4 | **investigation** | |
| **injury** 24:22 25:12 | 39:7 53:23 54:4,6 | 70:22 71:9 72:22 | **k** 82:21 |
| **ink** 117:7 | 56:22 60:19,20 | 74:18 75:25 76:1 | **kc** 15:9 |
| **inside** 47:4 | 61:4 62:6,11,16 | 92:9,13 94:15 | **keep** 35:19 |
| **inspect** 53:3 55:12 | 64:4,20,24 65:2,21 | 102:14 103:4 | **keeping** 112:2 |
| 61:17 71:3,16 | 66:2 67:10,25 | 113:8,12 | **kind** 23:1 32:14 |
| **inspected** 17:25 | 74:14 80:15 81:14 | **involve** 30:6,22 | 53:18 60:5 75:14 |
| 18:3 47:25 73:18 | 82:7 84:1 87:9 | 34:7 | 106:15 111:25 |
| **inspection** 18:2 | 88:17 89:23 96:12 | **involved** 30:22 | 112:9 114:16 |
| 45:17,19 46:14,15 | 97:7,10 98:16 | 34:4 | 115:13,17 |
| 46:17,25 47:7,10 | 99:5 100:12 101:1 | **issue** 32:9,12,17 | **kinds** 24:23 |
| 47:18 48:4 49:20 | 111:8 112:4 | 32:22 60:11 69:24 | 111:23 |
| 52:13 54:24 55:7 | 115:14 | 97:9 113:6 | **kitano** 34:6,13 |
| 55:8,19,22,25 56:1 | **insured's** 38:20 | **issues** 27:11 28:11 | **knew** 34:12 76:12 |
| 56:3,10 57:5,22 | 47:5 48:25 49:19 | 29:20,24 32:13 | 100:22 |
| 58:6 59:21 60:17 | 56:24 66:11,14,16 | 38:21 91:8,11 | **know** 10:18 12:18 |
| 61:2 62:12 70:15 | 66:20 68:25 82:20 | **item** 42:7 47:16 | 12:20 24:11 30:19 |
| 70:19 72:10,11,21 | 84:22 85:14,21 | 61:5 | 33:13 34:12 36:21 |
| 73:19 78:20 80:4 | 86:19 88:6 91:25 | **itemized** 43:16 | 39:5,7 40:25 47:8 |
| 81:13 83:17 84:6 | **insurer** 28:19 | **items** 39:19 59:20 | 47:13,13 51:1,16 |
| 84:18 89:11 90:10 | 37:17,17,21 38:22 | 87:23 | 52:6 53:25 54:3 |
| 90:19 91:14,17,21 | 61:3 | **iterations** 35:16 | 54:18 60:2 62:22 |
| 92:2,14 93:10 | **insurer's** 36:19 | 35:20 | 63:1 65:8,10 66:8 |
| 94:14,24 95:2,22 | 54:23 | **j** | 67:9,16 68:3,7,7 |
| 115:8 | **intend** 116:5 | | 69:18 71:10 72:2 |
| **inspections** 17:21 | **intents** 103:5 | **january** 118:17 | 72:5 73:16 76:13 |
| **instructed** 5:10 | **interact** 103:12 | **jennifer** 65:21 | 76:20,25 77:5,11 |
| 86:18 | **interested** 118:13 | 66:3,6 68:7 | 77:17 80:2 81:3,5 |
| **insurance** 1:7 2:7 | **interior** 46:20,23 | **jennifer's** 68:4 | 81:7 82:3 84:21 |
| 3:14 6:7 7:15 8:24 | 87:19 94:8 | **jerry** 15:20 | 85:5,20 86:2,15,18 |
| 21:12,12,16 22:17 | **interrogatories** | **jfw** 1:6 2:6 7:16 | 87:1,18 88:8,12,15 |
| 23:1 24:6,20,24 | 39:22 | **job** 1:24 57:16 | 88:19,21,24 90:9 |
| 25:3,13,16,23 27:6 | **introduced** 15:25 | 60:2 78:13 113:21 | 96:20 99:12,13,14 |
| 27:9,14 29:16 | **introduction** 16:2 | **john** 15:23 | 99:18,19,20 |
| 30:6,10,22 33:1 | **inventoried** 90:7 | **july** 26:2 | 100:12,14,15,16 |
| 34:4,20 36:13 | **inventory** 62:7,11 | **jumped** 78:15 | 100:22 102:24 |
| 38:12 39:20 41:13 | 62:21,25 | **jumps** 77:8 | 104:16,25 105:8 |
| 41:16 55:4 56:23 | **investigate** 59:18 | **june** 51:8,18 | 105:13 106:1 |
| 61:4 62:5,7,14,16 | | **jury** 29:25 | 107:16 108:2,14 |
| | | | 108:15 109:5,10 |

[know – marti]

109:13 111:23
114:11,18 115:7
115:13
**knowing**  54:15
81:11
**knowledge**  76:14
87:25
**knowledgeable**
8:24 9:10,16,19
**knows**  59:8,8
107:16

**l**

**l**  8:11,11,12 82:21
82:21 106:10,11
106:12
**l.a.**  30:16
**landlord**  88:11
96:17 97:7
**landscaping**  51:17
**language**  111:15
**large**  16:17 22:15
77:19 109:7
**larger**  41:4 90:25
**law**  3:6,17 7:10
31:11
**laws**  117:11
**lawsuit**  18:17,20
38:9
**lay**  106:8,10
**leadership**  21:4
**leads**  48:8
**learn**  51:7 52:15
**lease**  98:8 99:4
100:17,19 101:21
102:2
**leave**  78:1
**left**  24:8
**legal**  8:11 30:2
61:7
**level**  29:24 111:21
114:17

**levitt**  82:21
**lhp**  31:11
**liability**  24:23
25:12
**light**  56:10 104:14
**limit**  21:13,14,23
21:23
**limits**  87:10
**line**  23:17 114:19
114:19
**lines**  23:4,4,5,8,11
23:13 32:20
**list**  13:6 26:8,16
26:17,23 30:4
36:1 40:6,11
66:17 103:19
**listed**  20:15 25:4
40:16 43:3,10,12
44:19 45:2,17
46:5 90:8
**listing**  43:13
**lists**  39:19
**litigation**  24:9,13
24:16,19
**little**  28:13 63:21
109:25 114:10
**live**  54:6,8
**living**  34:17 54:1
88:6,18 92:10
111:7,11,14 112:3
**llc**  6:7
**lobby**  16:3
**located**  7:9 106:24
109:3
**location**  53:23
54:5
**lola**  1:15 2:15 5:4
6:2,6,7,8,12,13
7:19 8:1,11 25:16
25:22 34:20 117:5
117:20

**long**  15:1 96:4
**longest**  22:24
**look**  10:6,21 18:5
19:4 30:18 31:18
32:24 37:11 40:10
47:12 52:5 57:16
66:1,10 83:7 84:4
98:25 105:5
109:12
**looked**  44:2
114:10
**looking**  16:14 42:4
52:16 99:1 100:6
114:3,5,6,21
**looks**  22:23 42:10
**lopez**  31:5
**los**  1:16 2:17 3:9
3:20 7:1,9,12
**loss**  22:15 25:5
34:17 37:25 38:14
39:3 47:19 48:12
49:21 50:5 53:4
55:18 60:18 61:13
62:1,20,21 68:6
70:24 71:18,23
72:5,8 74:21
78:16 81:16,18
84:8 86:21,23
97:23 102:14
103:6 104:22
105:17,18,22
111:1,7
**losses**  21:13 37:15
61:23
**lost**  106:11
**lot**  14:19 32:7
35:24 109:7 112:4
116:1
**low**  82:8
**lp**  31:15

**lump**  54:10 60:11

**m**

**machine**  118:7
**mail**  65:20 66:1,6
93:21
**main**  110:21,22
**maintain**  111:11
111:14
**major**  92:15
**majority**  23:24
24:2
**making**  52:19 82:4
**manager**  22:14
**manner**  38:1
**march**  51:19 52:8
56:13 58:13 59:7
59:8 73:4,20
74:14 76:8 78:21
80:24,24 81:4
82:16 83:5
**maribeth**  6:19
112:20
**mark**  11:6 12:16
13:9 18:21 20:1
65:14 112:13
**marked**  11:7
13:10,15 14:5
16:5 18:22 20:2
36:6 63:23 65:15
110:14 112:14
**marti**  3:17 7:24,24
11:2 12:18 18:8
28:21 29:5,18
30:1 32:1 37:8
38:15,23 43:4,11
44:23 45:6,21
46:4 47:11 49:6
50:8 51:10 52:24
54:25 55:9 56:16
57:7,11,24 59:22
61:6 62:9,18 63:4

[marti - note]

64:25 67:11 68:2
69:4 70:1 72:13
72:16 75:4 76:4
77:3 80:5 82:9
85:1,23 87:13
88:7,20 89:3,7,13
90:1,16 91:9,16
92:6 94:3,17 96:1
96:14,25 97:15
98:5,14,21 99:7
100:3 101:3,12
102:6,18 108:10
109:18,25 110:4
110:17 116:12
**massive**  77:19
**material**  14:19
39:17,23
**materially**  81:9
**matter**  116:6
**matthew**  4:6
**maximum**  70:8,10
**mayfield**  30:9 31:3
31:16 32:11
**mc**  3:5
**mcrae**  7:11
**meals**  111:22
**mean**  23:9 43:17
52:6 57:18 58:1
61:12 70:10 81:17
81:20 83:23 86:4
88:8 90:3,4 93:21
94:1 100:21 107:3
114:18 115:22,22
116:7
**meaning**  14:21,22
14:22,23
**means**  48:18 57:18
61:14 84:6 111:5
111:15
**meant**  42:19

**mediations**  22:11
22:13,18
**medical**  84:22
85:10,15,18,21
86:10,19,25
**meet**  14:24 36:23
45:24 115:1
**meets**  38:1
**memorized**  20:22
**mention**  70:15
**mentioned**  59:14
59:15,21 116:3
**met**  95:3
**mid**  98:20 99:17
**middle**  106:15
**million**  22:3 23:20
23:21,25 24:3,5
25:8 51:20 56:12
76:16 89:22 90:6
**mind**  42:24 44:22
68:4 69:25 70:21
77:8 105:21 108:7
108:20
**minimum**  36:18
36:22,24 55:20
**minimums**  37:1
**minneapolis**  24:10
**minor**  47:19 48:9
48:12
**minute**  19:4 63:2
70:13 105:6
**misstate**  88:7
90:17
**misstates**  28:21
44:23 45:6 72:13
82:9 87:13
**mistake**  52:17
105:11 114:12
115:21
**mistakes**  105:13
106:1

**mitigate**  80:14
**mitigation**  80:8
**modir**  30:9 31:4
31:20 32:16
**money**  75:1 98:16
101:10,11
**moneys**  83:20
**month**  54:14 97:2
98:13 99:4,24,24
101:2 104:6,6
106:18,23,25
107:6 108:8
109:17
**months**  77:24 81:9
81:10 82:17 95:19
96:5 97:6 103:1,2
104:4 111:12
**morning**  7:4 8:7
12:11,24 13:17
16:1 43:19
**morph**  92:11
**motion**  12:13
**move**  60:22 96:12
96:16 99:25 100:2
107:24
**moved**  107:19
**moving**  99:22
101:8
**msc's**  22:11,13,18
**multiple**  113:17
**multiplier**  83:12

| n |
|---|

**n**  5:1 8:11 82:21
**name**  7:7 8:7,9,12
10:5 15:12 71:1
118:17
**named**  15:15
105:1,1 118:5
**nationwide**  22:16
25:3,14,15

**natthew**  7:7
**nature**  25:17 39:2
77:25
**nearly**  75:21
**necessarily**  36:25
43:17 45:7
**necessary**  70:23
85:19,22 94:5
111:10
**need**  38:21 60:19
66:9 70:11 93:23
95:7 110:4
**needed**  57:14 78:5
80:10,11 87:19
90:23 91:19,23
92:17
**needs**  78:3 81:23
82:3,4 102:5
**neither**  118:12
**never**  27:13 28:18
28:23 29:7,15
96:18 107:23
108:16
**new**  56:9,15,17,19
56:23 57:3,15,22
58:2,7,13,15,17,21
59:9,12 79:9,12,17
79:22 80:4 81:12
81:20,20,21,21,22
81:22,24,25,25,25
82:5,6,10 84:10
93:1 100:19
101:21 102:2
104:12,14,19
105:10,14 107:9
**news**  82:12
**night**  20:9
**ninety**  102:9,15
**nonporous**  75:12
**note**  17:7,8 47:24
99:2

[noted - particular]

| | | | |
|---|---|---|---|
| **noted** 104:11 117:7 | 100:3 101:3,12 102:18 107:21 108:10 109:18 | **opinion** 27:8 28:6 28:15,18 29:2,8,16 29:23 38:20 42:3 | **oversaw** 23:18 |
| **notes** 41:7 43:14 46:23 47:23 50:9 59:24 68:22 69:14 77:5 85:3 96:11 100:7 101:15 109:19,20 | **objection** 30:1 38:15,23 62:18 | 42:6,24,25 44:18 45:5,15 51:3,6 52:3,14,18 53:17 | **owed** 51:24 83:20 |
| | **objective** 70:19 | | **owner** 55:5 |
| | **obligation** 57:19 61:13 104:12 | 56:1,12,14 68:14 69:13 70:12 73:1 | **p** |
| **notice** 6:5 11:13 11:19 43:19 45:16 48:4 70:12,14 | **observe** 75:8 | 75:21,22,24 79:2 82:15 83:10 86:10 | **p.m.** 2:18 110:7,10 116:15,18 |
| | **obtain** 63:15 | 87:9 92:20 100:25 | **pacific** 8:15 31:11 |
| **november** 1:17 2:19 7:1 45:17,19 46:5,13,21 47:9 55:21 65:20 68:15 68:25 69:9,10,12 70:15 71:11 81:4 | **obvious** 93:17 | 101:7 103:18 104:6 113:25 114:2,8 | **pack** 91:15 92:5 93:19 94:4,10,10 95:10,12 |
| | **obviously** 43:15 109:6 115:25 | | **packed** 91:19,23 93:24 95:10 |
| | **occasionally** 26:22 70:11 | **opinions** 27:10 29:20 40:17,19,24 41:1,25 43:2,8 | **page** 5:5 6:4 16:12 16:13,15 19:16 22:21 26:4,6 30:20 37:4,8 39:16 41:9,11 44:3 46:4 64:10 66:17 68:12 110:24 111:1 |
| **number** 6:4 7:15 20:19 27:25 29:20 42:10 68:14 70:12 73:1 76:6 78:18 82:15 83:1 91:7 91:11 103:18 106:3 113:17 | **occur** 54:24 55:3 | 44:22,25 45:12,13 67:22 68:10,13 | |
| | **ocean** 107:25 | 112:25 116:1,5 | |
| | **october** 6:9 | **opportunity** 70:18 70:20 72:10,21 | |
| | **odor** 48:4 94:25 | **optional** 67:5 | |
| | **offer** 42:3 116:5 | **order** 65:14 94:9 112:13 | |
| | **offered** 26:9 27:8 27:10,13 28:6,14 28:18 29:2,15,19 74:25 | **original** 51:25 52:10 73:16,25 78:22 79:18 83:2 89:15 103:4 115:8 | **pages** 1:25 19:12 41:8,10 118:9 |
| **numbers** 16:16 63:21 | | | **paid** 50:25 51:8,16 51:17,22,23,23 52:4 71:19 72:6 73:24 78:21 81:1 82:18 83:1,4,5,9 97:7 99:16 101:10 101:16 |
| | **office** 7:11 8:13 15:10 | | |
| **numerous** 66:20 | **offices** 15:4 | **originally** 75:3 84:8 94:9 97:24 102:12,13 103:21 | |
| **nunn** 31:22 | **oh** 28:16 33:21 61:17,21 81:23 93:8 95:9 101:16 | | |
| **o** | | **ospina** 31:2 | **panel** 61:18 |
| **o** 3:16 8:11,11,12 | **okay** 14:4 16:24 39:13 79:20 88:24 110:18,23 113:22 114:11 | **outcome** 118:13 | **paper** 12:15 13:24 |
| **o'connor** 32:3,7 35:22 | | **outlier** 23:22 | **paragraph** 21:3 106:16 |
| | | **outlined** 73:11 | |
| **oath** 118:6 | **once** 57:20 | **outset** 93:17 105:12 | **paredes** 15:21,22 |
| **object** 29:5 43:11 47:11 49:6 51:10 52:24 56:16 57:7 57:11 59:22 64:25 77:3 80:5 88:20 90:1 91:9,16 92:6 94:3,17 96:1,14,25 97:15 98:5,14,21 | **ones** 30:8,25 40:6 45:11 | | **part** 41:1 46:10 51:22 52:17 63:19 64:10 105:3 |
| | **onus** 61:3 | **overall** 28:9 37:1 100:20 113:7 114:3,25 | |
| | **open** 48:6 | | **particular** 54:14 60:12 67:7 99:25 100:22 |
| | **operator** 7:8 | | |

Veritext Legal Solutions
866 299-5127

[particulates - presented]

**particulates** 87:4
87:4
**parties** 107:1,4
**partners** 31:12
**party** 37:6 38:12
118:14
**pay** 53:5 80:18,24
97:4 98:16 99:22
101:10,11 107:1
108:8
**paying** 88:11
96:10,17,22 97:7
97:13 98:13,18
99:14,16 100:2
107:5,13 108:9,12
**payment** 49:21
50:5,22,25 60:11
71:22 73:3,7,11
76:7 83:7 98:9
100:6,8 104:7
**payments** 21:21
36:1 51:15 52:19
98:2 113:12
**penalties** 117:10
**pending** 9:6
**people** 46:3 61:24
62:1 78:1,1
105:13 106:1
113:17 115:4,5
**perceive** 90:21
**percent** 23:16
**percentage** 23:12
**perception** 57:13
**perfect** 64:14
**peril** 103:23 105:1
105:1
**period** 69:23
95:15,15,16,17,18
95:25 96:2,7
97:17,23 99:15
101:18,24 102:5,8

102:11
**perjury** 117:10
**permanently**
105:8
**permission** 55:5
**permitted** 71:2,8
**person** 8:23 9:9,16
9:18 29:8 61:16
61:19 116:1
**personal** 9:3 23:4
23:5,8,10,10,11,13
23:17 25:11,12
87:11,15 88:16
105:2
**personally** 18:15
18:19 22:10
**perspective**
114:22
**pertinent** 44:17
**peter** 3:6 7:22 8:7
**philosophical** 37:1
**phone** 69:17
**physician** 85:9,14
86:9
**pictures** 109:13
**piece** 12:15 13:24
81:25 114:1
**pieces** 114:10
**place** 7:10 16:2
39:15 54:6,8
85:11,17 86:14
87:24 99:6 107:10
118:4
**placed** 118:6
**plaintiff** 1:5 2:5
3:3 6:5 7:18,23
8:8 11:12 18:16
18:20 26:25
**plaintiff's** 15:9
40:12 47:19 48:12
48:15

**plaster** 75:11
**plax** 1:6 2:6 7:16
**players** 60:15
**playing** 35:19
**please** 7:20 8:9
11:6 13:9 14:18
18:21 65:14 66:5
66:8 112:6
**plenty** 102:15
**plus** 28:2 96:9
**point** 26:13 39:17
41:12 49:17 57:3
61:4 78:18 87:6
87:23 98:19 99:6
107:23 110:15
113:5
**policies** 37:7 38:12
65:8
**policy** 6:16,17
30:22 37:22 39:21
43:14 53:24 54:2
54:3,6 63:13,16
64:4,7,15,20,23
65:2 66:4,11,12,13
66:15,19,20,24
67:5,10 68:1
87:10 104:25
110:13,23 111:5
**policyholder** 27:4
53:23 65:9
**pool** 51:16 73:6,17
73:23 74:1,2,4,7
74:15,19,19 75:10
75:11,18,25 78:20
79:16,20,24 80:9
80:17,18,23,25
81:2,5,8,16,20,23
82:3,4,12 107:25
**portio** 69:21
**portion** 20:25
22:20 24:7 37:13

48:25 49:4 87:10
110:16,20 111:2
**portions** 114:5
**position** 25:6
88:10 89:24 91:7
91:22 92:4 94:2
103:25 104:20,24
107:17
**positions** 22:20
**positive** 35:9
**possible** 55:4 80:9
111:20
**possibly** 39:12
**potential** 21:17
**potentially** 94:13
**power** 105:6,7
**practically** 81:19
112:6
**practices** 6:15
36:12,15,17 65:5
69:2 79:3 115:1
**predict** 59:16
**premises** 111:8
**preparation** 13:21
63:12 64:16 65:24
**prepare** 14:15
17:13 72:3
**prepared** 16:19
17:10,11 37:16,20
43:24 71:18
112:19
**preparing** 17:17
86:20
**present** 4:5 116:7
**presentation**
58:13
**presented** 56:25
57:20 58:12,18
73:5 104:13,19
113:1

Veritext Legal Solutions
866 299-5127

[president – references]

| | | q | |
|---|---|---|---|
| **president** 22:15 32:6 | **properties** 109:3 | | 94:5,24 101:18 105:23 108:7,21 |
| **presume** 10:18 | **property** 17:24 23:3 24:11,22 25:10 37:7,23 38:12,13 46:21 48:25 56:2 57:4,9 58:9,23 62:22 70:25 71:16 72:12 72:23 80:3 84:11 87:11,15 88:17 89:1,20 90:13 91:15,23 97:10 101:2 105:2 108:18 109:16 | **qualify** 34:25 | 112:5,11 113:11 113:21,23,24 |
| **previous** 43:6 | | **quality** 112:10 | **reasonably** 62:2 106:17,22 |
| **previously** 14:20 32:4 107:2,4,5 108:8 110:14 | | **question** 11:19 12:21 43:6,8 53:1 58:10 70:14,16 72:18 86:16 89:21 100:5 104:16 108:5,17 111:13 113:20 | **reassigned** 78:1 |
| **price** 62:25 | | | **rebuild** 75:10 79:16 81:19 82:12 93:14 |
| **primary** 21:18 | | | |
| **printout** 36:11 | | **questions** 5:10 116:10,12 | **rebuilt** 81:23 82:3 82:4 |
| **prior** 35:16 37:24 38:14 51:15,17 54:13 62:7 99:15 104:14 | | **quickly** 110:18 | **rebuttal** 112:20 |
| | | **quite** 76:23 80:6 84:17 | **recall** 31:16,20 34:15 43:21 55:19 59:25 62:10 67:17 98:6 |
| **probably** 23:15,22 35:8 41:1 62:2 95:7 | **provide** 20:21 23:2 41:24 64:23 65:1 103:5 112:9 115:16 | | |
| | | r | |
| **problem** 69:12 | | **r** 8:12 | **recap** 34:2 |
| **problems** 29:10 | **provided** 12:25 13:16 19:7 40:7 41:4 52:11,12 63:17 67:14 71:19 | **rae** 3:5 | **receive** 35:21 |
| **procedures** 22:7 36:20 | | **railroad** 49:2 | **received** 82:18 |
| | | **raised** 59:12 | **recitation** 42:19 |
| **proceeding** 118:6 | | **range** 74:22 | **recognized** 75:16 |
| **proceedings** 118:3 118:7,10 | **provides** 25:23 | **reach** 69:21 | **recollection** 51:5 67:12 98:7,22 99:23 |
| | **provision** 111:5 | **reached** 44:25,25 | |
| **produce** 6:6 11:13 | **provisions** 37:22 | **read** 15:14 37:12 40:25 43:6 48:10 70:13 72:7 77:4 85:10 111:3 112:24 117:6 | |
| **produced** 12:17 43:19 44:5 | **pscott** 3:11 | | **recommendations** 103:14 |
| **production** 6:10 12:11 14:3,11 16:22 40:8,9,13 | **public** 48:2 51:20 52:7 57:12 58:4 58:19 67:13 71:20 72:4 76:10 82:11 84:1,2 93:22 95:9 95:13 99:3 100:14 103:12 105:5,14 105:16 | | **record** 7:5,21 8:10 12:14 37:12 46:4 63:6,7,9 110:8,9 110:11 116:13,16 118:6,10 |
| | | **reading** 106:21 | |
| | | **ready** 115:8 | |
| **profession** 85:19 | | **real** 101:15 | |
| **proffered** 34:24 | | **realize** 114:18 | |
| **progressed** 49:12 | | **really** 52:5 60:23 60:23 115:3 | **recorded** 54:22 |
| **progression** 92:20 93:7 | **pull** 105:9 | | **records** 83:8 85:10 |
| | **purport** 12:16 | **reason** 44:13 45:18 85:16 89:10 90:24 94:11 99:25 100:2 104:22 | **refer** 16:21 41:5 73:15 |
| **prompt** 70:18 | **purpose** 44:17 | | |
| **promptly** 79:8 | **purposes** 103:5 | | **reference** 73:7 |
| **pronounce** 106:8 106:9 | **pursuant** 12:4 | | **referenced** 83:1 88:4 |
| | **put** 105:9 111:17 113:14 114:18 | **reasonable** 75:18 75:22 93:9,11 | |
| **properly** 79:8 114:25 | | | **references** 16:21 |

[referencing - retained]

referencing   79:23
   81:13
referred   69:20
referring   18:8
   41:6 79:12
reflect   46:23 59:24
   100:7
reflected   44:19
reflecting   47:23
reflective   113:13
refrigerator
   103:19,22 104:1
   104:22 105:9,17
   105:20,22 106:1
   114:11 115:20
refrigerator's
   105:2
refused   34:25
   91:14
regardless   83:9
regards   15:18
   81:12
regulations   6:15
   36:12,15 37:1
   65:5 79:3
reinspect   51:21
   81:4 83:25
reinspection   57:10
   58:9,22 84:11,19
   84:20 88:25 89:20
   91:6 92:3 97:22
reinsurance   21:9
   21:11
reinsurer   21:25
reinsurers   21:16
   21:17
reiterate   34:1
related   41:15
   45:11 82:2
relative   79:24
   118:13

relatively   32:18
   47:19 48:9,12
   55:17 78:16 106:6
relevance   39:3
relevant   44:18
   46:11 86:4
relied   17:17
rely   43:2,9
relying   40:23
remained   73:3
   76:8
remediate   81:2
   86:5 91:4 92:17
remediated   85:17
   85:18 86:14 87:12
remediation   85:22
   95:16 102:16
   103:6
remember   30:17
   31:3 32:13,14,24
   51:23 60:7 63:22
   67:18 78:16 98:3
   109:14,20
remove   87:4 93:4
removed   87:22
renewal   65:13
rent   98:13 100:2
   101:10 107:6,10
   108:12,12,22,24
rental   54:15 96:13
   96:23 97:2 99:15
rented   97:11
   109:16
rents   101:11
repair   57:14 74:15
   92:17
repairs   37:25
   83:16
repeat   43:4
replace   84:16
   93:14

replaced   90:23
replacing   75:13
report   6:8,18
   13:22 14:22 29:3
   35:10,13,14,17,18
   35:21 39:11,24,25
   40:2,16,23,24
   43:23 44:7,14,17
   54:18 63:12 64:8
   64:17 65:24 73:13
   76:9 89:15,17,17
   90:22 91:19 93:10
   94:6 112:19,20
   113:2 114:17
   116:4
reported   1:23
   21:25 53:10,15
   54:21 68:15
reporter   11:8
   13:11 14:6 18:23
   20:3 36:7 43:7
   63:24 65:16
   112:15 118:1
reporting   22:3
   53:13
reports   29:7,7
represent   8:8
representation
   22:17
representatives
   55:6 56:25
represented   28:25
request   6:10 14:2
   14:11
requested   65:7
   67:13,18 83:17
requests   12:7,11
   67:25
require   57:10
   84:18

required   65:4 88:5
   88:9 89:19
requirements   95:3
requires   36:23
reserving   21:20
residence   33:10
   48:15 49:4 60:21
   111:8
residential   37:6
   38:12
respect   42:24
   44:22 45:4 83:11
   85:14,15 92:4
   113:1
respects   113:16
respond   42:7
   68:25 103:12
responded   79:19
response   12:12,17
   14:2 77:1,6 92:22
   101:23 102:1,3
responses   6:10
   14:10 39:21 115:5
responsive   12:11
restart   98:1
restarted   98:19
restate   72:17
restoration   95:15
   95:16,17,18,25
   96:3,7 97:18,23
   101:19,24 102:5,8
   102:12
restore   37:23
restored   38:13
restroom   110:5
result   21:11 41:3
   47:1 78:8 113:23
results   21:10 86:9
retained   9:14,21
   10:13 21:23 27:1
   27:3 71:16

[retaining - sheet]

retaining 49:2
retention 22:4
reversal 92:19
reverse 94:1
reversed 103:25
104:5
reversing 92:4,8
review 17:13 22:6
29:11 40:12 41:14
65:23 66:25
104:12
reviewed 11:23
12:1 13:7,21
14:19,20 15:7,8
39:17,23 40:1,3,23
42:16 63:12,20
64:7,16 74:23
79:8 112:23
reviewing 29:9
40:15 41:3 67:21
78:14
reviews 21:19
revise 89:16
rider 82:20
right 10:20 26:20
27:20 28:4,5
39:11 50:12 52:2
53:9 65:6 66:14
66:22 70:9 72:17
74:9,10 80:4 89:2
91:8,15,23 93:8,24
96:8 97:20,24
98:13 99:17,18
101:25 103:23
104:4 107:8 110:2
111:2 114:6 115:8
115:23
rise 29:24
risk 67:7
riverport 24:6,7,9
24:25 25:1

rlb 15:11 84:12,16
rmr 1:23 2:20
road 59:10 88:1
rock 84:16 90:5
rojas 31:23
roof 59:11,14,25
round 86:6
routinely 65:1
rpr 1:23 2:20
rule 112:8
runs 60:22

s

salient 42:23
sample 6:17 66:13
67:2,23
sat 10:1
saying 57:16 114:7
says 17:5 21:7
22:9 26:7 33:18
33:19 38:16 39:17
41:12 47:17,24,25
48:7 49:17 50:3,4
54:18 66:2 68:14
71:14 73:2 78:19
79:7 82:15 93:5
95:6 99:2 104:25
106:16 111:6
115:19
schedule 100:6
scope 37:16 41:12
41:19 46:2 47:2
53:5 55:12,19
56:19,25 58:5,20
74:24 75:1,2
76:22 81:16,17
83:16 85:22 86:20
89:11,14,25 90:3
92:13 97:22
102:13
scott 3:6 5:6 7:22
7:22 8:6,8 11:3,10

12:21,22 13:13
14:8 18:11 19:1
20:5 29:1,14 30:3
36:9 37:9,10
38:17 39:6 43:18
45:1,8 46:12
47:15 49:7 50:10
50:16 51:13 53:7
55:1,23 56:21
57:8,21 58:3 60:4
62:4,13 63:2,10
64:1 65:3,18
67:15 68:9 69:7
69:16 70:3 72:15
72:17,19 75:19
76:5 77:7 80:12
82:14 85:12 86:1
88:3,14,23 89:6,8
89:18 90:2 91:5
91:12,20 92:23
94:12,19 96:6,21
97:8,19 98:11,15
98:24 99:10
100:24 101:5,22
102:10 103:17
107:21 108:6,19
109:23 110:2,6,12
110:19 112:17
116:10,13
scratch 98:17
seaview 8:15
second 19:15 67:4
71:14 78:18 104:9
section 37:5,11
43:14
security 88:6,18
see 12:3,6 16:8
17:3 21:5 38:4
42:12 61:10,11
64:6 68:19 78:25
79:10 82:23 83:21

85:8,17 86:6 87:5
87:7,11 89:10
96:11 98:23 105:8
106:19
seeing 61:14
seen 11:20 19:10
48:5 61:11 65:25
93:21 105:12
112:21,22
sees 112:5
send 62:1 65:13
66:4
sends 65:11
senior 24:9,13
sent 19:20 67:9,23
sentence 21:4 22:9
48:14 71:13 73:8
76:7 78:19 81:12
104:10
sequoia 8:24 21:23
22:24 23:1,13,18
24:8 32:6
services 25:22
set 12:6 36:18
83:24 92:21,24
95:19,24 96:2
115:10 118:4
sets 115:12
settled 37:15
settlement 6:14
36:12,15 37:19
65:5 79:3
seven 106:3
sf 64:12 111:1
shannen 1:4 2:4
6:5,16 8:8 11:12
39:21 41:15 65:21
shannon 3:3
sheet 35:6 84:16
90:5

Veritext Legal Solutions
866 299-5127

[sheetrock - sub]

sheetrock 93:13
shirt 63:1
short 95:25 96:4
  96:12,23 99:15
shorthand 118:1,8
show 50:2
showed 56:13
showing 44:25
shown 44:11
side 23:13
sided 20:11
sight 54:10
signature 118:24
significant 41:2
sills 87:20
similar 109:5,5
simple 52:25
  55:17 66:18
simpler 101:8
simply 100:18
single 46:10 60:14
  60:15
site 45:24 46:5,14
  46:24 61:2 62:8
  71:11 72:21 74:11
  76:1 95:22
situation 80:2 81:8
six 9:25 42:10
  103:1,2
size 53:1 109:5
skill 118:11
skip 106:2
slash 90:23
small 23:4 32:18
  78:16
smoke 30:23 48:9
  49:21 50:5 53:19
  61:3,9 90:14 91:3
  94:25
smokers 48:1

sofa 112:1,2
sold 24:8
solutions 109:3,15
somebody 57:15
  59:18 93:12 116:7
somewhat 102:16
soon 55:3 106:6
  115:9
soot 94:25
sorry 9:17 20:10
  33:23 35:11 39:11
  39:15 43:4 69:10
  89:7
sort 20:25 44:16
  71:7 100:20
  114:14
sound 74:9
sounds 74:5,10
south 3:18
speaking 75:11
specialist 24:10,14
  24:17
specific 23:5 67:7
  71:1 77:6 84:5
  101:15 113:5
specifically 75:6
speculation 75:4
  85:1,23 89:13
  101:4 102:6
speed 78:14
spell 8:9
spent 87:10
spoiled 103:22
  104:23 105:1,18
  105:22
spoke 69:6
spoken 15:17,20
  15:23 16:1 68:8
spokes 15:22
spot 55:13 114:19

stack 12:19,23
  13:5,15
stamped 64:9
standalone 105:25
standard 38:6,8
  38:11,18 67:5
  85:18 111:11,14
  112:2
standards 36:19
  36:22 37:5 38:2
  69:1 70:5,6
  113:19 115:1
standpoint 62:6
start 8:22 9:9 11:4
  53:8 68:13
starts 21:4
state 1:7 2:7 3:14
  7:15,20,25 8:9 9:8
  9:11 10:8,14,15
  15:17 16:7,22,23
  17:1 18:3 19:8
  20:15 27:18 28:4
  28:7 31:10,14,17
  31:21 36:22 38:9
  39:20,20,22 41:5
  41:13,16 46:20
  47:8,18 48:11
  49:16,18,20,21
  50:14 52:10 54:10
  54:14 55:25 56:4
  56:6,15 57:2,5,10
  58:6,8,14,22 59:8
  59:16 65:22 66:7
  67:9 68:16,24
  71:10,15,17 72:21
  73:5 74:18,23
  75:2,20,24 76:10
  76:19 78:21,23
  79:8,18 80:18,24
  82:7,13,18 83:2,16
  84:14,21 85:13,20

86:13,18 87:6,18
  88:10 89:20,24
  90:12,24 91:7,14
  91:18,21 92:3,12
  93:17 94:1 95:9
  95:21 97:12,22
  98:1 99:14,21
  100:1 101:10,23
  102:4,11 103:11
  103:21,25 106:17
  106:22,25 107:12
  107:16 115:3
  117:11 118:1
statement 47:22
  48:11,17 85:11
  104:24
statements 72:8
states 1:1 2:1
  37:14 41:17
stating 93:23
status 33:12
stay 99:6
stayed 101:1
  109:22
staying 99:11
step 53:13,16
  60:10,13
steps 52:22 86:13
stevenson 27:24
stopped 96:22
  97:12 98:13,18
stopping 98:9
straight 61:18
street 3:18
structural 68:17
structure 52:1
  113:15
stucco 59:11,14
  60:1
sub 37:11

Veritext Legal Solutions
866 299-5127

[submittal - tie]

submittal   77:2
   84:11,13
submitted   35:22
   58:5 74:14 76:9
   76:12 80:23 81:14
   82:11 89:23 96:18
submitting   58:20
subpoena   6:6
   11:13,16,25 12:4,8
   12:17
subrogation   32:7
subscribed   118:16
subsequent   40:2
   74:1 75:23 97:21
substantive   36:3,5
successful   85:8
   86:7
sued   18:14
sufficient   81:1
suggested   107:20
   109:16
suite   2:16 3:8,19
sullivan   3:5 7:11
sum   54:10 60:11
summarizes   21:1
summary   17:6
   20:25
summer   109:17
sunpoint   40:8,9
   43:25
superior   21:9
supervision   23:6
supervisor   78:1
supplied   5:15
supply   37:18
support   40:24
   45:13
supports   45:14
suppose   89:21
supposed   55:8
   95:9 100:10

103:15 112:12
sure   11:3 18:9
   21:20 45:20 59:2
   59:20 61:25 75:23
   80:6 83:3 104:18
   106:4 108:24
surface   87:19
surfaces   84:15
   93:3
surprise   75:6
surprised   76:23
surrounding
   42:20
suspect   85:6
sustain   48:15
   68:17
sustained   90:13
sworn   8:2
system   75:15

t

take   16:2 19:4
   37:11 62:21 63:2
   70:13 85:6 86:8
   86:13,19,25 94:8
   96:5 109:25 110:6
   113:6,22 114:1
taken   7:17 8:17
   9:2,5 19:21 38:21
   43:15 107:15
   118:3
talk   39:8 59:5
   60:16 74:3 77:12
   80:13 116:14
talked   116:4
talking   20:16
   33:20,23 48:19
   49:5 59:6 60:5
   71:24 87:3 97:10
   114:8,14
tear   93:13

tell   14:18 16:10
   17:3,23 19:5,6,13
   25:17 28:13,16
   29:25 30:8,25
   32:15 35:12 40:5
   55:15 61:12 74:5
telling   61:10
tells   16:16
temporary   88:6
   88:18
ten   27:21 28:1,3
   30:5
tender   53:8,13
   60:8 69:1,23
tenure   22:24
term   79:14 95:25
   96:12,23 99:15
terms   45:22 46:15
   100:5
test   87:11,16 88:1
   90:7
testified   8:3 9:13
   26:19,21 27:5
   28:4,24
testify   27:1 33:15
testimony   6:13
   19:16 20:12 26:5
   26:7,10 27:14
   28:22 30:4 33:19
   40:8 44:23 45:6
   82:9 87:13 90:15
   90:17 117:8
   118:11
textbook   113:15
thank   10:9 15:13
thereto   11:16
thing   54:7 71:7
   92:10 101:20
   114:14 115:13
things   21:1 61:14
   103:7 111:23

113:8 115:2
think   8:25 9:4,20
   9:25 10:3,15,21,25
   19:20 20:7 28:2
   28:21 30:16 31:11
   32:18 33:9 35:24
   36:25 50:12,13,18
   50:21,21,22 51:11
   61:11 67:2 69:20
   70:17 71:25 72:13
   73:10 75:14 77:14
   81:23,24 89:3,3,6
   93:5 95:6,7 96:4,9
   97:1 99:8 100:4
   104:5,7,16 107:14
   109:8,20 110:20
   113:10 114:24
   115:20
thinking   73:9
   100:13,23
thirteen   8:25
thirty   28:17 35:8
thorough   57:16
   70:18,22 72:11,22
   72:25 75:25 94:14
thought   10:22
   28:9 33:23 51:24
   52:12 68:5 69:1,9
   75:17 94:9 116:2
thousand   32:10,19
three   10:4 15:2
   19:12 39:19 54:14
   55:20 62:1 73:1
   76:6 78:18 81:9
   95:19 96:5 97:6
threshold   22:3
thresholds   48:6
thumb   12:15 13:1
   13:3,5,7,19,20,25
tie   49:2

[time - water]

**time** 23:12 26:2 35:6 39:25 47:14 55:18 56:4,5 58:24 59:6,7 63:5 63:8 67:24 71:4,5 71:8 72:24 74:2 74:19 75:16,17 77:10 80:8 90:25 92:11 93:9 95:4 99:6,15 102:25 110:7,10 116:15 118:4,5
**timeline** 16:6,12 17:1,6,18,19,21 42:11 43:3,10,20 43:25 44:1,4,6,10 44:14,15,20 45:3 45:14,17 46:7,10 47:17 50:10 67:19
**timely** 113:12
**times** 8:20 9:24 77:14 78:7
**title** 25:4
**today** 7:19 11:5 12:3 14:16 35:5 86:15 116:5,9,11
**told** 87:21
**tony** 15:12
**top** 19:15 26:6 30:19 67:17
**topic** 109:23
**total** 27:21 28:17 61:21
**tracking** 11:5
**trade** 38:2
**transcribed** 118:8
**transcript** 117:6
**transcripts** 15:6
**trees** 49:1
**triage** 77:23

**trial** 26:10 27:14 33:15,19,25 116:6
**trick** 52:4
**tried** 69:15,15,18 69:20,21 83:24
**true** 95:7 117:9,12 118:10
**try** 34:1 60:18
**trying** 52:4 98:3 115:22
**tuesday** 1:17 2:19 7:1
**turn** 11:15 16:5 20:10 26:4 35:10 37:4 110:13
**turned** 81:2 115:21
**turns** 103:7
**twelve** 8:23,25
**twice** 27:24
**two** 10:3,3 18:5 19:12 26:22 39:17 70:12 104:4 109:3 111:19
**type** 33:3 60:12 114:24
**typical** 77:16,18 95:24
**typically** 21:22 54:9 65:11

**u**

**u** 82:21
**uh** 11:17 16:9 77:15 106:20
**ultimate** 114:8
**ultimately** 75:20 80:10
**unchallenged** 73:4 76:8
**understand** 58:10 58:11 64:19

**understanding** 46:19 64:3 74:13 111:4,13
**understood** 13:8 14:4 19:24 53:12
**undisputed** 52:7,9
**unhabitable** 111:9
**unique** 38:20
**united** 1:1 2:1 41:17
**unoccupied** 60:21
**unreasonable** 70:2 104:23 106:23 115:19,21
**unseen** 54:10
**unusual** 77:18
**updates** 65:13
**usb** 14:1
**use** 36:21 67:6 76:20 77:17 88:17 106:14,14 111:1
**usual** 75:9,15
**utilities** 111:22

**v**

**vague** 76:4
**valerie** 10:23 31:23
**value** 21:22 25:8 32:9,12,17,22 33:7 34:10
**variances** 83:19
**vehicle** 31:2,5
**venice** 97:10 99:24 101:2 109:22
**venture** 31:15
**venued** 41:16
**verdict** 33:14 34:13,15
**version** 20:7 63:20
**versus** 7:14 10:8 10:15 16:6 17:1

27:18 30:10 41:15 112:1
**vice** 22:15 32:6
**video** 7:5
**videographer** 4:6 7:4 63:5,8 110:7 110:10 116:15
**videotape** 7:8
**videotaped** 1:15 2:15
**view** 107:25 113:9
**viewed** 56:3
**vis** 108:15,15
**visit** 46:2,5,14 47:24 60:3 62:8 71:11 74:12
**visited** 75:3
**vitae** 6:11
**volume** 1:18
**vs** 1:6 2:6

**w**

**wait** 105:6
**walk** 46:17 52:22 60:6 71:9 95:22
**walking** 61:8
**wall** 49:2
**want** 21:19 54:7 73:15,21 109:25 110:3,21 111:4 115:23
**wanted** 22:21 64:6 77:12 109:24
**wants** 84:16 95:10
**wardrobe** 93:6
**warrant** 57:5 58:8 58:22 80:4 92:3 104:20
**warranting** 84:10
**watch** 22:5
**water** 31:4,8 34:8 34:9 75:12

Veritext Legal Solutions
866 299-5127

**[way - yesterday]**

| | | |
|---|---|---|
| **way** 40:17,20,24 41:2 51:6 52:14 67:22 81:10 83:10 84:24,25 85:6 88:15 100:25 101:6 112:25 113:14 | 92:7 94:4,18 96:2 96:15 97:1,16 98:6,22 99:8 100:4 101:13 102:7,20 107:22 108:11 109:19 118:5,16 | 95:6 104:8 108:23 **year** 26:3 **yesterday** 15:2,3,8 |
| **website** 20:8 36:13 | **woolsey** 77:20 | |
| **weeks** 10:3,4 77:24 | **word** 36:21 61:25 76:20 77:17 | |
| **went** 24:8 33:14 34:13 52:6,9 68:3 74:18 105:4,5 107:16 | **work** 15:18 24:9 32:7 41:12,19 56:19,25 57:1 74:24 75:3 113:22 | |
| **whereof** 118:16 | **worked** 28:5 31:23 32:3 35:4 | |
| **willing** 115:16 | **workmanlike** 38:2 | |
| **wilshire** 2:16 3:7 7:12 | **worry** 10:24 | |
| **window** 48:5 | **wound** 102:17 | |
| **windows** 47:25 71:6,7 87:20 | **wow** 79:19 | |
| **wires** 34:2 | **wrapping** 106:5 | |
| **withheld** 14:13 | **wright** 3:5 7:11 | |
| **witness** 5:4,10 6:13 7:19 10:11 12:14 19:16 20:12 25:20 26:5,7,10 28:23 29:6,19 30:4 38:16 39:1 43:12 44:24 45:7 45:22 46:9 47:12 50:12 51:11 52:25 55:10 56:17 57:12 58:1 59:23 61:8 62:10,19 65:1 67:12 68:3 69:5 70:2 75:5 77:4 80:6 82:10 85:2 85:24 87:14 88:8 88:21 89:5,14 90:18 91:10,17 | **write** 23:3 | |
| | **writes** 66:7 | |
| | **written** 9:12,14 29:3,7 37:16 56:7 65:12 116:4 | |
| | **wrong** 60:3 89:4 92:12 93:8 95:3 102:23 103:2,3,9 | |
| | **wrote** 17:8 23:7 25:1 56:6 | |
| | **x** | |
| | **x** 5:1 | |
| | **xactimate** 76:9,12 76:15 77:1 | |
| | **y** | |
| | **yeah** 46:22 58:25 69:21 71:25 72:15 79:5,6,25 80:21 | |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.