# EXHIBIT 3

# HYGIENETECH

Hygiene Technologies International, Inc.

3625 Del Amo Boulevard, Suite 180
Torrance, California 90503-1643
(310) 370-8370
(310) 370 2474 FAX
www.hygienetech.com

## BRIAN P. DALY, CIH, PE

I am an industrial hygienist, safety engineer, and environmental health scientist, with degrees in Health Science, Environmental and Occupational Health.  I have experience in the areas of occupational hygiene, industrial safety, chemical hazard assessment, microbial growth and exposure assessment, noise exposure evaluation and control, indoor air quality, injury and illness prevention, health and safety training, and emergency response coordination.   My professional responsibilities include the anticipation, recognition, evaluation, and control of chemical, physical, and biological stressors, and identification and control of safety hazards in varied indoor and outdoor occupational, residential, and commercial building environments.

## EDUCATION AND TRAINING

- Master of Science, Health Science, Environmental and Occupational Health, California State University, Northridge, California, 1983
- Bachelor of Science, Health Science, Environmental and Occupational Health, California State University, Northridge, California, 1978
- Hazardous Waste Operations and Emergency Response Training pursuant to Title 29, Code of Federal Regulations, Part 1910, Section 120, Environmental Training Associates, Costa Mesa, California, 1988

## CERTIFICATIONS AND REGISTRATIONS

- Certified Industrial Hygienist, Comprehensive Practice, American Board of Industrial Hygiene, Number 3373, 1986
- Registered Professional Engineer, Safety, State of California, Number SF 3380, 1997

## EXPERIENCE AND BACKGROUND

**1998 - Present**     **Hygiene Technologies International, Inc., Los Angeles, California**
                       President

Since forming the firm in 1998, I have managed a staff of industrial hygienists, safety professionals, engineers, environmental assessors, asbestos consultants, and environmental and public health specialists. I provide technical direction during projects involving industrial hygiene; indoor air quality; microbial growth assessment and abatement; soot, char, and ash assessment; safety engineering; environmental health issues; OSHA regulations; injury and illness prevention; accident investigation; hazard communication; asbestos hazard and abatement consulting; lead hazard assessment and abatement consulting, noise

**BRIAN P. DALY, CIH, PE**
**PAGE 2**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1998 - Present**      **Hygiene Technologies International, Inc., Los Angeles, California**
(Continued)        President

exposure and control; confined space entry; tunnel and underground shaft gas testing; health and safety program and policy development; waste analysis; evaluation of ventilation systems and other engineering controls; assignment of personal protective equipment including respiratory protection; drinking water quality assessment; material safety data sheet (MSDS) development; emergency response coordination and emergency preparedness; and international occupational health and safety regulations.

I provide training on a variety of employee health and safety topics, such as accident investigation, air-supplied and air-purifying respirators, air monitoring and sampling techniques, asbestos health hazards, bacteria- and mold-related health hazards, bloodborne pathogens, chemical hazards, chemical hygiene plans, cold stress, confined space entry, decontamination, drilling safety hazards, drum sampling and handling, excavation safety, exposure guidelines, flammability hazards, fungal growth assessment and abatement, brushfire emission exposure, hazard recognition, hazard categorization, worker right-to-know (hazard communication), hearing conservation, heat stress, indoor air quality, lead health hazards, injury and illness prevention programs, medical surveillance and biological monitoring, noise and noise control, care and use of personal protective equipment, regulatory overview, safe work practices, self-contained breathing apparatus care and use, site characterization, site control, site emergencies and action plans, site health and safety plans, spill control, toxicology, CPR guidelines, and hazardous waste operations.

I provide assistance to clients in developing cost-effective engineering controls that will reduce the potential for injury and/or loss of property. I prepare Infection Control Risk Assessments (ICRA) in hospitals prior to construction and abatement work projects. I review and assist in drafting company policies, bid specifications, and site health and safety plans concerning geotechnical activities, soil excavation, and hazardous material/waste handling activities. I conduct medical center-specific training programs involving varied topics, such as the health hazards associated with exposures to allergens, specific molds and bacteria, irritants, carcinogens, corrosives, noise and ionizing radiation, and to specific chemicals such as asbestos, benzene, lead, PCBs (and dioxins and furans); indoor air quality; soot, char, and ash; and hazardous waste operations and emergency response.

I conduct and supervise fungal and bacterial growth assessment and exposure surveys, primarily in buildings that have had known water intrusion events, such as those caused by window or roof leaks, groundwater seepage, plumbing failures, or sewage spills. I use direct-reading instruments to determine moisture content data in varying building materials. I collect surface samples from building materials to assess fungal and bacterial growth potentials, and air samples to determine concentrations of both viable and nonviable fungi, and viable bacteria. I identify microbes and assess health hazard potentials, identify the sources of water that are potentially attributable to the biological growth, develop abatement strategies, and establish appropriate engineering and personal protective equipment controls during any anticipated remediation work. I provide general consulting during abatement projects, and perform site surveillance, air

**BRIAN P. DALY, CIH, PE
PAGE 3**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1998 - Present**     **Hygiene Technologies International, Inc., Los Angeles, California**
(Continued)          President

monitoring, and surface sampling on such sites. When appropriate, bulk and/or surface samples are collected of food, drinking water, soil, and other matrices in order to determine concentrations of fungal, bacterial, protozoan contamination, or soot, char, and ash. Target microbes have included *Stachybotrys chartarum*, along with species of *Chaetomium*, *Aspergillus*, and *Penicillium* genera; *Cryptococcus neoformans*, an encapsulated yeast; *Escherichia coli* (*E. coli*) and *Legionella pneumophila* bacteria; and *Entamoeba histolytica*.

I consult on health and safety issues as they relate to hazardous waste handling, packaging, minimization, treatment and transportation; and provide health and safety coordination for emergency response teams involved in hazardous waste spill remediation on land and waterways.

I provide expert witness consultation, along with deposition and trial testimony, in connection with claims of industrial accidents and injuries; reported exposures to chemicals, microbes, invertebrates, and allergens, and noise and other physical agents; claims of occupationally-related illnesses and injuries, including leukemia, mesothelioma, interstitial pulmonary fibrosis, mycotoxin effects, allergic sensitization, and hearing loss; fungal and bacterial growth assessment; soot, char, and ash assessment; as well as claims of chemical contamination in air, in liquids, and on solid surfaces. Cases have involved issues concerning asbestos, benzene, fungal and bacterial growth, hazardous waste operations and emergency response, lead and welding fume, methylene chloride and other hydrocarbon solvents, pesticides, oxygen-enriched atmospheres, ventilation systems, use of personal protective equipment, as well as amputations, confined space entry, work at elevated platforms, indoor air quality, lock out/tag out procedures, OSHA and EPA regulation compliance, MSDS requirements, employers' general duty to warn, accident reconstruction, fire incidents, and habitability issues.

**1987 - 1998**     **EnviroHealth, Inc., Long Beach, California**
                  Technical Director

I performed environmental air monitoring and occupational health and safety surveys for the purposes of anticipating, identifying, evaluating and controlling hazards in the workplace. Services included industrial hygiene evaluations, indoor air quality surveys, hazardous material/waste handling consulting, health and safety training, preparation of site health and safety plans, building hazard assessments, asbestos-containing building material identification surveys, asbestos abatement site surveillance and consulting, and hazardous material/waste emergency response coordination. I provided interpretations of exposures in light of OSHA, EPA, and other environmental and occupational health regulations and guidelines. I conducted training programs on varied topics including hazardous waste operations and emergency response, hearing conservation, hazard communication, asbestos health hazards, respiratory protection,

**BRIAN P. DALY, CIH, PE**
**PAGE 4**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1987 - 1998**      **EnviroHealth, Inc., Long Beach, California**
(Continued)       Technical Director

and confined space entry. I provided assistance to clients in developing cost-effective engineering
controls that reduced the potential for injury and/or loss of property. I conducted fungal and bacterial
growth assessment and exposure surveys in buildings that have had known water intrusion events, such
as those caused by window or roof leaks, groundwater seepage, plumbing failures, or sewage spills. I
developed fungal growth abatement strategies and established appropriate engineering and personal
protective equipment controls during anticipated remediation work. I provided project design and general
consulting during abatement projects, and performed site surveillance, air monitoring, and surface sampling
on such sites.

**1984 - 1987**      **IT Corporation, Cerritos, California**
          Senior Industrial Hygienist

I provided industrial hygiene services on a consulting basis to clientele in varying industries. I conducted
surveys designed to identify employee exposures to chemical substances such as welding fume,
petroleum hydrocarbons, lead, inorganic acids, and asbestos. I also conducted surveys to determine
worker exposures to noise, heat and other physical agents; assisted clients in interpreting data in light of
current OSHA, EPA, and other regulatory standards; and recommended control measures and
conducted related health and safety training programs. I provided health and safety assistance to
operating divisions of IT Corporation and I conducted industrial hygiene and safety surveys on sites
associated with hazardous waste management. I provided on-site health and safety supervision and
technical assistance for emergency response operations, including sites at which spills and/or fires
occurred involving PCBs, methyl mercaptan, and other hydrocarbons; acids and other corrosives;
oxidizers; and unidentified particulate. I made recommendations concerning administrative and
engineering controls based on employee exposure potentials, and established personal protective
equipment use protocols during abatement operations and during emergency response remediation.
Responsibilities also included technical research, health and safety training instruction, and accident
investigation.

**1982 - 1984**      **Argonaut Insurance Companies, Los Angeles, California**
          Senior Loss Control Consultant

I assisted policyholders in developing and implementing continuing health and safety programs. Loss
control activities included conducting industrial hygiene and safety surveys as well as presenting loss
statistics and experience modification ratings to management in industry, labor unions, and employee
groups. I consulted on Cal-OSHA regulations, hazardous material handling and storage, health hazards,

**BRIAN P. DALY, CIH, PE**
**PAGE 5**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1982 - 1984**          **Argonaut Insurance Companies, Los Angeles, California**
(Continued)              Senior Loss Control Consultant

and respiratory protection. I conducted health and safety training presentations on hazard communication, personal protective equipment, confined space entry, emergency action plans, fire protection equipment, accident investigation, and hearing conservation.

**1980 - 1982**          **Safety Engineering Laboratories, Chatsworth, California**
                         Safety Engineer

I consulted regarding a variety of health and safety matters including accident investigations involving machine guarding, consumer product design, structural fires, chemical exposures, and use of personal protective equipment. I calculated coefficient of friction data during slip and fall investigations, and conducted vehicular accident investigations during which closing speeds were estimated, and yaw marks and other physical evidence were used to determine causes of collisions. I conducted failure analysis experiments designed to evaluate product safety and I conducted OSHA-like audits in industrial facilities and consulted on matters concerning plant layout and emergency action plans and procedures. I conducted surveys designed to identify employee exposures to chemical substances such as carbon monoxide, particulate including soot and char, petroleum hydrocarbons, inorganic acids, welding fume, lead, and asbestos. I conducted surveys designed to determine worker exposures to noise, heat and of flammable atmospheres. I assisted clients in interpreting data in light of current Cal-OSHA regulatory standards and ACGIH threshold limit values. I recommended administrative engineering control measures designed to reduce exposure potentials and eliminate fire hazard potentials. I reviewed pertinent data in order to develop and draft comprehensive health and safety policies and programs for industrial clients, and I trained personnel regarding hazardous material/waste handling and storage, care and use of personal protective equipment, machine operation and guarding, site inspection techniques, and accident prevention and investigation protocols.

## PAPERS AND PRESENTATIONS

- "Fungal Growth: Hazard and Assessment," panel speaker, presented at the Orange County Bar Association, Construction Law Section, Newport Beach, California, January 2011
- "Occupational Health and Safety Qualitative Assessment during Oil Refining," presented at the China International Petroleum and Chemical Industry-sponsored Safety and Occupational Health Forum, Nanjing, China, October 2008
- Fundamentals of Industrial Hygiene Course, AIHA faculty, Shanghai, China, October 2008
- "Recognizing and Evaluating Workplace Exposures," workshop panel speaker, presented at the AIHA-Sponsored Sino-U.S. Occupational Health Summit Forum, Beijing, China, September 2007

**BRIAN P. DALY, CIH, PE**
**PAGE 6**



## PAPERS AND PRESENTATIONS (CONTINUED)

- "AIHA International Affairs: An Overview," presented to the American Industrial Hygiene Association Northern California local section, San Francisco, California, March 2007
- "Industrial/Occupational Hygiene: Going Global," presented to the American Industrial Hygiene Association Orange County local section, Irvine, California, August 2006
- "Mold Litigation," panel speaker, California, NBI, Los Angeles, California, August 2006
- "Reducing Workers' Compensation Claims and Costs in Your Company," panel speaker, National Business Institute, Irvine, California, January 2006
- "Industrial Hygiene in the United States: An Overview," HygieneTech-Ministry of Health Occupational Health Forum, Beijing, China, November 2003
- "The Mold Challenge in California," panel speaker, National Business Institute, Los Angeles and Anaheim, California, August 2003
- "Fungal Growth: Assessment Strategies and Remedies," Los Angeles, Sacramento, and Fresno, California, May 2002
- "Diesel Exhaust Exposure Potentials in Santa Ana Fire Stations," presented to Public Agency Safety Management Association (PASMA), Palm Springs, California, 1999
- "Fungal Growth: Is There a Problem?" Los Angeles, San Francisco, and Sacramento, California, 1998, 1999, 2000, and 2001
- "Health and Safety Activities at Hazardous Waste Sites: An Overview," presented at the Department of Occupational Health, School of Public Health, Shanghai Medical University, Shanghai China; and at the Guangzhou Occupational Disease Prevention and Treatment Center, Guangzhou Industrial Hygiene Monitoring Station, Guangzhou, China, June 1994
- "Health and Safety Programs at Selected Industrial Sites in Poland, Hungary, and Czech Republic," American Industrial Hygiene Association Orange County local section in Irvine, California, June 1993
- "Evaluation of the Krajska Hygienicka Stanice Stredoceskeho Krase Regional Hygienic Station of Central Bohemia," presented in association with a People-to-People delegation, Prague, Czech Republic, September 1992
- "Noise and Noise Control" presented at Comprehensive Industrial Hygiene Certification Review Course, MBA, Inc., 1989 through 1994

## PROFESSIONAL AFFILIATIONS

- American Industrial Hygiene Association, National and Southern California Section
- American Industrial Hygiene Association, International Affairs Committee, Past Chair
- American Industrial Hygiene Foundation, formerly on the Board of Directors and Past President
- American Academy of Industrial Hygiene
- International Occupational Hygiene Association
- American Conference of Governmental Industrial Hygienists
- American Society of Safety Professionals, Long Beach Chapter



Hygiene Technologies International, Inc.

3625 Del Amo Boulevard, Suite 180
Torrance, California 90503-1643
(310) 370-8370
(310) 370-7026 FAX
www.hygienetech.com

February 3, 2020

Cozen O'Connor
601 South Figueroa Street, Suite 3700
Los Angeles, California 90017

Document No. 91910032

Attention:   Valerie D. Rojas, Esq.

Regarding:   Amended Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
             Shannen Doherty v. State Farm Insurance Company

Dear Ms. Rojas:

I have enclosed a Federal Rule 26 Expert Report that I prepared regarding the above-referenced case. Please consider this document as a supplement report to the document that I prepared and published concerning this case on October 25, 2019. As you know, I prepared that earlier report based largely on the work performed by others at the subject property, and since that time, I personally conducted a survey at the site during which photographs were recorded, samples were collected, and additional observation were made that are relevant to this case. The enclosed report contains all relevant facts, evidence, and opinions contained in the earlier report, plus additional findings that are related to my site survey. Note, though that in the enclosed report I provide additional opinions that should be considered supplements to my earlier opinions. If you have any comments or questions regarding the information provided, please do not hesitate to contact me directly at my office at (310) 370-8370 or by cell phone at (310) 999-1808.

Sincerely,

**HYGIENE TECHNOLOGIES INTERNATIONAL, INC.**

Brian P. Daly, CIH, PE
President

Los Angeles · Torrance · Sacramento · Ontario · Santa Clarita
Chicago · Cleveland · Norfolk · New York



**Hygiene Technologies International, Inc.**

3625 Del Amo Boulevard, Suite 180
Torrance, California 90503-1643
(310) 370-8370
(310) 370-7026 FAX
www.hygienetech.com

## FEDERAL RULE 26 EXPERT REPORT
## BRIAN P. DALY, CIH, PE

### SHANNEN DOHERTY
### V.
### STATE FARM
### INSURANCE COMPANY

### PREPARED FOR:

### COZEN O'CONNOR
### 601 SOUTH FIGUEROA STREET, SUITE 3700
### LOS ANGELES, CALIFORNIA

### PREPARED BY:

### HYGIENE TECHNOLOGIES INTERNATIONAL, INC.
### 3625 DEL AMO BOULEVARD, SUITE 180
### TORRANCE, CALIFORNIA

### FEBRUARY 3, 2020

Los Angeles · Torrance · Sacramento · Ontario · Santa Clarita
Chicago · Cleveland · Norfolk · New York

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 1



## 1.0   INTRODUCTION

This report pertains to the Shannen Doherty residence located at                                    ,
California, which Ms. Doherty and her spouse apparently claim was adversely affected and continue to
be adversely affected by brushfire emissions related to the Woolsey Fire. That fire, which began on or
about November 8, 2018, consumed approximately 97,000 acres of land in Los Angeles and Ventura
Counties, and destroyed 1,643 structures. The Doherty residence was not amongst those structures that
were destroyed, however, HygieneTech was informed that the fire consumed vegetation and homes
relatively near the Doherty property.

During my early work on this case, I was provided with a report by Ninyo & Moore entitled *Wildfire Smoke
Impact Assessment*, S Maria Doherty Residence, Claim No. 75-6539-W17 dated January 3, 2019, and that
report contained sample data, along with assessment details, conclusions and recommendations. Be
advised that such surveys can be described as *surface carbonized particulate assessments*, which typically
involve indoor and outdoor building material surfaces and furniture and other such goods. Typically, the
primary objectives of such surveys are to assess the presence or absence of *combustion byproducts* from
non-solvent fuel sources—specifically char particles, ash, and presumptive soot. Such survey assessment
work generally involves the inspection of various interior and exterior surfaces and/or sample collection from
those surfaces—including window frames, sills, and wells—along with furnishings and personal effects,
which include both "hard" and "soft" goods; and outdoor surfaces such as window ledges, pavements,
building masonry and stucco, roof tiles and felt, along with patio furnishings and perhaps other goods. In
order to achieve these objectives, a consultant will typically perform 1) a visual assessment of selected
surfaces while noting additional observations and background information; 2) an inspection of items to
ascertain if discoloration and/or other physical damage occurred—particularly if the discoloration or damage
may have been reasonably attributed to brushfire effluent exposure (for example, when marked differences
in the levels of suspect combustion byproducts are found when comparing indoor perimeter wall and room-
center deposits) and/or if any subsequent cleaning efforts appeared to have damaged articles; and 3)
sampling that involves a representative number of material surfaces so that the analytical data can then be
used as an additional consideration in the overall assessment of the property. Typically, the assessment will
involve evaluations of indoor floor, wall, and ceiling surfaces; indoor windowsills, and window wells and
frames; indoor floor rugs and draperies; indoor furnishings and other goods (including mattresses, clothing,
artwork and other valuables, and electronic equipment); HVAC system registers; building envelope surfaces,
including window ledges and roof tile and felt; and outdoor building material surfaces such as masonry,
plaster, wood, or stucco; outdoor pavement surfaces; as well as outdoor furnishings and/or features.

Most commonly, industrial hygienists will collect samples using either the tape lift or micro-vacuum
("micro-vac") methods—neither of which is necessarily preferred over the other—with all samples
analyzed in an independent laboratory using polarized light microscopy (PLM) and epi-Reflected Light
Microscopy (RLM), or equivalent. Following receipt of the analytical data, the investigating industrial
hygiene team can then begin the process of evaluating *background levels* of char, ash, and presumptive
soot, which can then be later used to, in part, establish "clearance guidelines" that would also include a
*no visible suspect brushfire effluent* criterion and analytical data that do not exceed *background*.

Be advised that there is no definitive "percentage number" of char, ash, and presumptive soot content in
settled particulate above which HygieneTech would recommend treatment or disposal of potentially fire
effluent-exposed goods. And there most certainly is no "one percentage number" of char, ash, and
presumptive soot content in settled particulate that, above which, can be used as a treatment "trigger" or
cleanup criterion—particularly when two or more consultants are performing assessment surveys at the
same property in which surface samples are collected in different manners and/or those samples are

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 2



## 1.0   INTRODUCTION (CONTINUED)

analyzed by different means and/or by different laboratories.  The reasons for these points should be intuitive, particularly if one considers the following.

- Char and ash are ubiquitous in the outside environment due, in part, to the fact that fires involving the combustion of botanicals occur virtually around the globe and brushfire effluent can sometimes be carried in air for miles.  The actual distance that such effluent may travel from a particular brushfire event is dependent on a variety of factors, such as the extent of the fire, the predominating particle size and weight, wind speed and direction, outdoor humidity, and other environmental conditions.

- Needless to say, char and ash "blanket" essentially all regions of the globe where wildfires are relevant and, certainly, southern California is no exception to that.  Based on the experience of HygieneTech, outdoor soils and pavements (and other such outdoor surfaces) typically contain *background* levels of char (and sometimes ash) ranging between one and five percent (1% and 5%) without any affect by a recent brushfire and with, of course, no visual evidence of recent fire exposure.  Note that char does not "blanket" the environment evenly and, therefore, two samples collected from the same surface can, and often do, render somewhat different results.

- Also note that any change in environmental conditions will change the percentage of char and ash that exists in settled particulate, both indoors and outdoors.  Wind will change the percentage, as will rain, certainly any treatment of surfaces will change the percentage, housekeeping or the lack of housekeeping will change the data, and time will change the readings recorded because with time other settled particulate (from a wide variety of sources) will come to rest on surfaces alongside of the char and ash.  Char in particular, is residual and, therefore, will tend to accumulate over time at those locations where housekeeping is lacking.

- Soot is not common on surfaces unless those surfaces were directly affected by fire—literally *on fire* or positioned in close proximity to some other material that was *on fire*.  Different laboratories will have different criteria for determining the presence of soot, char, and ash, so different laboratories will report different results (even when they analyzed duplicate samples).

So be advised that, based on these and other factors, HygieneTech cannot establish a definitive *pass/fail* criterion prior to performing a survey, but HygieneTech can establish a sampling strategy designed to determine the effect of brushfires at a site, and below is an outline of how that can be done.

- First, HygieneTech examines surfaces both inside and outside a structure to determine if the assessor can ascertain a "bias" of settled particulate that may be attributable to a brushfire.  In other words, HygieneTech looks for settled particulate that appears to be brushfire effluent and HygieneTech evaluates whether the accumulation of the suspect debris could reasonably be attributable to that fire.  Commonly, when such debris exists at all, HygieneTech finds char and ash accumulating on sills and wells at windows and at exterior doors of structures and on nearby interior surfaces.  "Deeper inside" of those structures, HygieneTech invariably finds progressively lesser amounts of visible suspect char and ash on surfaces until HygieneTech no longer finds any visible debris at all with the unaided eye.  The decline of such visible debris typically occurs quickly because, relative to outdoors, the interior air moves much more slowly, and that condition allows the char and ash to settle more quickly.  HygieneTech will then sample a sufficient number of surfaces that appear affected by fire debris.  HygieneTech also samples a sufficient number of those surfaces that appear progressively less affected, and HygieneTech samples surfaces that visually appear unaffected.

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 3



## 1.0  INTRODUCTION (CONTINUED)

- And by doing so, HygieneTech establishes what *background* char and ash levels are for the building interior, along with which surfaces are *above-background*—data that are considered along with physical observations to establish which items require treatment and/or disposal and which do not. HygieneTech uses the same logic out-of-doors with the understanding, of course, that wind speeds and other environmental factors are relevant in the outside environment and, therefore, the fire effluent "plume" will invariably be larger out-of-doors.

- With respect to treatment, the conventional wisdom dictates that hard surfaces—including decks, pools, exterior siding or stucco, roof tiles, glass, ceramic tile, finished wood, and the portions of outdoor furniture not made of fabric—can be cleaned while soft goods sometimes cannot be cleaned to pre-loss conditions. Typically, abatement contractors will opine on matters involving the treatment effectiveness to soft goods, given those contractors are expected to perform to certain "clean-up criteria standards."

- And those "clean-up criteria standards" are essentially two-fold; namely: 1) no visible evidence of brushfire effluent; and 2) post-treatment sampling that shows data that are no greater than *background*, whatever the *background* criterion is for a project.

Be advised that char and ash are not regulated substances and the presence of char and ash on real estate properties is not presumptive evidence that a hazardous material exists on the surfaces from which samples were collected. In such circumstances, the degree of exposure risk and associated health hazards are dictated by principals of toxicology—to wit, the dose/response paradigm—and given that char and ash data attributable to brushfires seldom exceed 50 percent (50%) of the overall settled particulate on surfaces (using the sample and analytical techniques typically employed by HygieneTech), the exposures to persons, including remediation personnel, cannot reasonably be considered more hazardous than an exposure to nuisance dusts. And be advised that the presence of such nuisance dusts—even those with char and ash constituents amounting to ten or more percentage points by weight or area—will not result in damage to the articles from which those samples were collected, nor will the presence of those char and ash constituents result in a shorten useful life of the article, material, or surface finish.

Ninyo & Moore conducted a carbonaceous exposure assessment at the subject Doherty property on December 17, 2018, which was within about five weeks after the time the Woolsey Fire had initially ignited, and those assessors appeared to have used comparable techniques to those described above. Note, though, that the combustion byproduct criteria used by Ninyo & Moore was somewhat conservative, given that they defined a typical "background" range as <1% soot, char and ash and an "upper background" range of 1 to 3% soot, char, and ash (matching the criteria published by EAA, the laboratory that performed the analyses). Nevertheless, the Ninyo & Moore/EAA criteria were reasonably close to those used by HygieneTech and, during their survey, Ninyo & Moore seemed to find above-background carbonaceous brushfire remnants on exterior surfaces and on interior surfaces—particularly those that were nearest perimeter walls having doors leading to the outside. Ninyo & Moore recommended a high efficiency particulate air (HEPA) vacuum cleaning technique that could be essentially described as a thorough housekeeping effort, both indoors and outdoors, which also included duct cleaning, along with damp wiping of surfaces on an as-needed basis. And based on the evidence produced by Ninyo & Moore, HygieneTech would agree with their essential assessment, conclusions, and recommendations—particularly given the time at which that consultant offered their findings and recommendations.

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 4



## 1.0   INTRODUCTION (CONTINUED)

According to records provided, KCE Matrix also conducted a carbonaceous particulate survey at the subject property, and their survey was conducted on November 26, 2018, which was about three weeks prior to the Ninyo & Moore survey at the property (and presumably just a short while after the fire was essentially or literally "under control". Like Ninyo & Moore, KCE Matrix appeared to have used typical survey, sample collection, and analytical techniques that I described previously in this report. In their report, however, KCE Matrix described "A significant amount of suspect soot/char/ash consisting of grayish white particulates with some black particles" at the exterior of the subject home, in the office-garages, and at the interior spaces near doors and windows, with "moderate to significant" amounts of such debris at other interior areas. KCE Matrix also noted "smoke odor" at both the upper and lower level interior spaces of the home and in the garages. And while their analytical data, which were recorded by LA Testing, showed different values for soot, char, and ash from those data presented by Ninyo & Moore just weeks later, my interpretation of the assessment work of both KCE Matrix and Ninyo & Moore is that their collective data were not inconsistent.

Unlike Ninyo & Moore, however, KCE Matrix used some alarm-provoking language in their conclusions, like "extensively impacted by Combustion By-Products (sic)…the CBP impact to the residence and property requires significant remediation." And KCE Matrix then recommended "replacement, repair, remediation and/or implementation of detailed cleaning of building materials and/or contents at the subject residence…." Unfortunately, that provocative language and their inclusion of the term "replacement" as one possible remedy for potentially affected materials can, in the extreme, be interpreted as meaning replace all building materials and contents on the property—perhaps without exception—and that cannot be a reasonable interpretation of the data and other evidence provided by KCE Matrix and Ninyo & Moore. Of course, the KCE Matrix recommendations can also be interpreted as repair all building materials and contents on the property; or remediate all building materials and contents on the property; or detail clean all building material surfaces and contents at the property—or some combination of those treatments—and, therefore, use of such language by a consultant in this case is inappropriate because, simply speaking, that language is imprecise and is vague and ambiguous, to the point of being uninterpretable.

Like Ninyo & Moore, KCE Matrix should have simply recommended specific actions that were consistent with the standard practice in the industry and, in so doing, the recommendations of KCE Matrix would have been consistent with those offered by Ninyo & Moore. I found it interesting to note that KCE Matrix did recommend "implementation of remediation work be performed following the Restoration Industry Association (RIA) Guidelines for Fire and Smoke Damage Repair." Be advised that those guidelines are completely consistent with the recommendations offered by Ninyo & Moore and are not at all consistent with "replacement" of all building materials and contents at the subject property—a recommendation that can only be considered in this case as extreme—which was the first-in-order recommendation offered by KCE Matrix on this project.

Be advised that, in simple terms, when carbonaceous particulate assessment survey findings dictate that hard surfaces are affected by exposure to brushfire effluent, then treatment should be performed using customary options, such a vacuuming with HEPA-filtered equipment, damp wiping with a mild cleaner and/or water (perhaps including the use of a "wood brightener," such as oxalic acid or the equivalent) in order to restore the hard finish to its pre-loss condition. High pressure power washing should not be done involving roofs, exterior siding or stucco surfaces of structures, particularly when damage to finishes exist and/or separations are seen at "cold joints" at the exterior envelope, nor should one power wash fragile items, furniture, or any surfaces that are more easily subject to damage or water retention.

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 5



## 1.0  INTRODUCTION (CONTINUED)

When survey findings dictate that soft goods—such as cushion fabric, umbrella or canopy materials, and
linens, draperies, and carpets or rugs—are affected by exposure to brushfire effluent, then typical
treatments should be used to remove all visible physical evidence of char, ash, and presumptive soot.
This can often be done by laundering, dry cleaning, in-place shampooing, and/or HEPA vacuuming, or a
combination of one or more of those techniques.  HygieneTech can accept that, in some cases,
successful treatment of soft goods, and perhaps some hard goods, may prove to be cost-prohibitive, or
may not be practical or, with respect to soft goods, may not be possible.  Be advised, though, that
successful treatment is, far more likely than not, both feasible and economical.  A professional cleaning
service should be consulted on the effectiveness of treatment of all hard and soft materials.

Following treatment, the items should be visibly free of settled particulate that appears to be char-like,
ash-like, and/or presumptive soot-like.  And following treatment, a representative number of surface
samples should be collected and analyzed by means that are identical to the pre-treatment analytical
methods used during the assessment phase of work.  In so doing, the industrial hygienist will be able to
compare and contrast pre- and post-treatment data for comparison to the established *background* level,
the latter of which should in no case be exceeded in order to achieve successful clearance.  The
established *background* level will, therefore, be used as one of the clearance criteria.

Also be advised that any remediation contractor or other party that categorically claims that hard or soft
goods—for example, painted wood surfaces, masonry, stucco, Spanish roof tiles, hardwood floors,
gypsum board walls, indoor or outdoor upholstered furniture, and electronic equipment—cannot be
successfully cleaned and/or treated to pre-loss condition is, more likely than not, wrong.  As a rule, both
hard and soft components of furniture or material surfaces can be successfully treated to pre-loss
condition, along with roofs, decks, siding and stucco materials, swimming pools, glass, finished wood,
upholstered cushions, umbrellas and canopies, and other such porous and non-porous surfaces.  This
concept should be intuitive, given that in such circumstances, involved parties are addressing
environmental entities (char and ash) to which goods both indoors and outdoors are exposed on a daily
basis.  Indeed, char and ash are among the particulate entities that are routinely removed from
furnishings and other articles through normal housekeeping practices and outdoor landscape and
hardscape maintenance.

On May 3, 2019, Ninyo & Moore reportedly returned to the subject property apparently to inspect a
wooden "Studio" ceiling and to collect two surface samples from that ceiling, which were identified as
"Studio ceiling – wood," and "Studio ceiling grove (sic)."  In a May 14, 2019 letter signed by Stephen
Waide, CIH, CSP, CIEC, CMC, Ninyo & Moore provided data that showed char levels in those sample a
2.2% and 3.4%, respectively, with no ash or soot detected—data that HygieneTech believes are
equivalent to *background*.  In that letter, Ninyo & Moore did not indicate their interpretation of those data
specifically, but they did recommend generally that interior horizontal, vertical, and ceiling surfaces be
cleaned throughout the subject home, and they also provided clarification regarding the
recommendations that they offered in their initial report concerning the subject property.  Based on my
interpretation of the Ninyo & Moore survey results, and in light of the KCE Matrix survey results, I expect
that the recommendations that Ninyo & Moore offered in the May 2019 letter were somewhat overstated,
but, perhaps under the circumstances, not unreasonably so.

And finally, on or about March 12, 2019, RLB delivered a cost estimate that was in excess of $2,500,000 for
work proposed for the subject property.  That work involved power-washing at roof seams, which is ill-
advised (due to the great potential for water intrusion), and the demolition and rebuilding of virtually all

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 6



## 1.0   INTRODUCTION (CONTINUED)

interior and exterior building materials and replacement of all gardens and other landscape, hardscape, and pools, which is, presumably in all or most all cases, unwarranted.  In their estimate document, RLB used the terms "Toxic pool water," which undoubtedly was inaccurate (unless information to the contrary becomes known).  Be advised that the term "toxic" has a well-defined meaning in the restoration and hazardous waste industries, and I have no expectation that the pool water at the subject Doherty property, nor any other surface exposed to airborne brushfire debris was as a result rendered toxic.

## 2.0   QUALIFICATIONS

I, Brian P. Daly, CIH, PE, am an industrial hygienist with Hygiene Technologies International, Inc. (HygieneTech).  I am certified by the American Board of Industrial Hygiene in the comprehensive practice of industrial hygiene.  I am also registered as a Professional Engineer with the State of California.  I have nearly 40 years of experience assessing health hazards, including those posed by sewage, mold and other fungi, and varying chemical and other biological contaminants in domestic environments and industrial workplaces, and in non-industrial settings, such as in office buildings, theatres, airports, and other public buildings.  My Curriculum Vitae is included as an attachment to this report, along with a list of the cases in which I have offered testimony since September 1998.

## 3.0   COMPENSATION

My current hourly rate for investigative work is $475.00 and my current hourly rate for testimony at deposition or trial is $575.00.  Other charges for travel, if that is necessary, will apply under certain circumstances, such as those for mileage, parking, airfare, taxi, hotel, and other such expenses.

## 4.0   DOCUMENTS REVIEWED

I have reviewed the following documents and I would anticipate that additional documents, such as deposition transcripts of defendants' and plaintiffs' experts, expert reports, inspection report, and additional analytical data, would be reviewed if they become available.

* Ninyo & Moore report entitled *Wildfire Smoke Impact Assessment*, S Maria Doherty Residence, Claim No. 75-6539-W17 dated January 3, 2019.

* An e-mail message from Kristina Hill of Ninyo & Moore dated January 3, 2019, addressed to State Farm Fire Claims and Paul Fischer (with a cc to Stephen Waide and Peter Kelley), which appeared to be a "cover letter" to, containing an attachment of, the Ninyo & Moore report cited above.

* A State Farm Home Claims-Fire Claims Automatic Reply: Claim No. 75-6539-W17 dated January 3, 2019.

* An e-mail message from Linda Ton of Ninyo & Moore dated February 25, 2019, addressed to Danielle Woods of State Farm, which contained the text language, "I am confident in the results of the report for the claim number 75-6539-W17."

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 7



## 4.0    DOCUMENTS REVIEWED (CONTINUED)

- An e-mail message from State Farm Fire Claims dated April 25, 2019, addressed to Linda Ton, Peter Kelley and Kristina Hill (with a cc to DF – FIRE – Drop File Document), which contained the text language, "…We have received an estimate from RLB in the amount of $2,548,108…."  That e-mail message had a three-page report cost estimate prepared by Rider Levett Bucknall for residence smoke damage renovation for the subject Shannen Doherty property.

- An e-mail message from State Farm Fire Claims dated April 25, 2019, addressed to Linda Ton, Peter Kelley and Kristina Hill (with a cc to DF – FIRE – Drop File Document), which contained the text language, "Please see the ph.'s hygienist report.  I have asked the attorney for a new date to reinspect the Doherty's residence." with a signature block of Jerry Paredes.  That e-mail message had a 11-page report prepared by KCE Matrix dated November 30, 2018.

- Ninyo & Moore Field Notes (handwritten) by "DMK," dated May 3, 2019.

- Ninyo & Moore letter dated May 14, 2019 that was addressed to Jerry Paredes of State Farm Insurance and signed by Stephen Waide, CIH, CSP, CIEC, CMC.

- An e-mail message from Kristina Hill of Ninyo & Moore dated May 15, 2019, addressed to HOME CLMS-FIRE CLAIMS (with a cc to Stephen Waide, Peter Kelley, and Nancy Anglin), which contained an attachment of the Ninyo & Moore letter cited immediately above and the accompanying documentation and analytical report.

- An Automatic Reply: Claim No. 75-6539-W17 e-mail message from State Farm Fire Claims dated May 15, 2019, addressed to Kristina Hill.

- Plaintiff Shannen Doherty's Rebuttal Expert Disclosure Pursuant to Federal Rule of Civil Procedure 26(a)(2)

- Deposition transcript of Aram Kaloustian dated December 3, 2019 (and exhibits).

- Deposition transcript of Brian Lowder dated December 20, 2019 (and exhibits).

- Deposition transcript of Greggory Clifford dated December 10, 2019 (and exhibits).

- Deposition transcript of Jose Reyes dated November 6, 2019 (and exhibits).

- Deposition transcript of Lawrence Piro, MD dated December 16, 2019.

- The Angeles Clinic and Research Institute documents scribed from mid-2016 to October 2019.

## 5.0    HYGIENE TECH SURVEY FINDINGS

On December 11, 2019, I visited the Shannen Doherty property located at ██████████ with my colleague, Marco Xu, for the purpose of conducting a limited carbonaceous particulate assessment survey.  The primary objective of the survey was to assess the presence or absence of

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 8



## 5.0   HYGIENE TECH SURVEY FINDINGS (CONTINUED)

combustion byproducts from non-solvent fuel sources—specifically char particles, ash, and presumptive soot—on various hard surfaces, both indoors and outdoors, such as floors, walls, backsplashes, sliding glass door tracks, furniture, electronics, recessed lighting, and artwork and decorations; along with soft goods such as upholstered furniture and clothing.   Surface samples were collected to determine combustion byproduct levels so that HygieneTech could then compare more current data to those generated by other consultants in the past that performed post-Woolsey Fire assessment surveys at the subject property. And ultimately, using all data recorded by any party during any known assessment work, HygieneTech would be in the position to offer remediation recommendations that were feasible and effective in restoring materials to pre-loss conditions with respect to combustion byproducts.   The HygieneTech conclusions, recommendations, and a brief discussion of the analytical data appear below. Note that the data provided in this report only represent the combustion byproduct deposits that existed at the sample locations indicated at the time of the survey.

The residence was a multi-story structure with stucco, concrete and other masonry exterior finishes; pitched metal roofs (at varying angles); an exterior deck and covered patio; metal-framed windows and sliding glass doors; varying pavement tiles, concrete block, and other walking surfaces; and planter and other landscaped areas surrounding additional patios and a pool deck (Photos 1 through 10, 18, 19, 26 through 29, and 38 through 44).  Much of the outdoor areas on the property appeared to be in need of general landscape upkeep and maintenance (Photos 8, 13 through 15, 25, 29, and 30) and much of the outdoor furniture appeared to require refinishing likely due to exposure to outside elements—exposures that were undoubtedly unrelated to the Woolsey Fire (Photos 2, 12, 15 through 17, 20, 22 through 25, 30, and 31).  More importantly from a damage standpoint, small and relatively large cracks were seen in the building perimeter stucco finish at windows (Photos 4 and 26) and other areas of the exterior finish (Photos 27 and 28), which most obviously was present at a deck (Photos 40 and 41) that also showed clear evidence of water exposure (Photos 42, 43, and 44)—presumably due to rainwater entering the deck.  Little evidence of possible fire damage was seen out-of-doors at the property, and that evidence included a break in a tree line at the southwestern corner of the property (Photos 33 and 34) and the presence of chain link fencing and screen materials that were stacked together, which appeared to have perhaps been consumed by fire (Photos 35 and 36)—perhaps by the Woolsey Fire.

In contrast, the Doherty home interior appeared well maintained; well kept; well furnished, decorated, and organized (Photos 45 through 74); with no evidence of soot, char, or ash that was potentially related to the Woolsey Fire seen anywhere but at sliding glass door tracks, potentially at window tracks, and exterior door thresholds. Various surfaces in the garage, the latter area of which was also referred to as a music studio, may have contained remnants of brushfire effluent, but that evidence was less clear.

The interior building materials and features included gypsum board walls and ceilings, recessed lighting, plaster fireplaces, stone countertops, hardwood flooring, wooden beamed ceilings, stainless steel appliances, and a partially-finished garage.

During the survey, surface samples were collected for char, ash, and presumptive soot analysis assessment using cellophane tape segments from varying surfaces believed to represent the essential universe of goods and surfaces inside and outside of the subject home. Analyses were performed using polarized light microscopy (PLM) and Reflected Light Microscopy (RLM). All surface assessment data appear with supporting and background information in the enclosed Table 91910032-1. Note that the tabulated data represent carbon-based opaques that are likely associated with the incomplete combustion of wood and other botanicals, candles, rubber, and other non-solvent fuels, but they do not

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 9



## 5.0   HYGIENE TECH SURVEY FINDINGS (CONTINUED)

include carbon-based particulate that is associated with manufacturing or industrial processes, the latter of which was not expected to have been present at the site. A total of 46 surface samples were collected for combustion byproduct analyses. Be advised that no odors consistent with combustion byproducts were noticed at any time during the survey.

Based on the analytical data, HygieneTech believes that the only areas of the subject residence that convincingly showed above-background levels of suspect combustion byproducts potentially due to the Woolsey Fire were at sliding glass door tracks, potentially at all exterior window tracks, and at all exterior pedestrian door thresholds. Although the data recorded from surfaces in the garage/music studio were technically below background, one could reasonably argue that the carbonaceous particulate levels in the garage were generally somewhat higher than the combustion byproducts levels detected in the general living spaces of the Doherty home and thus may represent data that indicate a brushfire effluent exposure.

Therefore, based on the collective work by KCE Matrix, Ninyo & Moore, and HygieneTech at the subject home of Shannen Doherty, HygieneTech recommends that detail cleaning with HEPA vacuums and/or damp wipe methodologies should be performed on all sliding glass door tracks, all exterior window tracks, and at all exterior pedestrian door thresholds in the subject home. Perhaps a consultant can argue that all surfaces in the garage at that property would also require HEPA vacuuming and/or damp wiping as well in order to remove the presumptive brushfire effluent debris—at least as a precaution. The data do not necessarily support that recommendation; however, strictly as a most conservative approach, such detail-cleaning of surfaces and goods in the garage will theoretically reduce brushfire effluent debris exposure potentials for Ms. Doherty. And in so doing, the potential for combustion byproducts to exist at those locations will most certainly be reduced to background and, therefore, any perceived exposure risk will be reduced to background throughout the home and garage. Be advised that only the KCE Matrix and Ninyo & Moore recommendations that are consistent with the HygieneTech treatment recommendations stated here—the latter of which are consistent with RIA guidelines—would be applicable to the subject home as of the date of the HygieneTech survey on December 11, 2019.

A clearance survey should be performed following the recommended treatment of the items, during which a number of surface samples should be collected using a sampling strategy designed to represent the entire lot of treated items and a representative number of air samples should be collected within the home and garage in order to confirm that airborne exposure potentials to ambient soot, char, and ash do not exceed background.

The recommendations offered by HygieneTech concerning combustion byproduct deposits at the subject property do not include the vacuuming or damp wiping of articles or building materials not specifically described above; nor do the stated recommendations suggest the need for the laundering or other cleaning of other items and/or the removal and disposal of any articles or building materials from the property, or the use of ozone generators, air filtration devices, or other such equipment that are at times used by abatement contractors. Be advised that all HygieneTech recommendations are offered without any consideration of insurance policy coverage issues, nor are they offered with regard to the likely sources of the carbonized material detected in samples.

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 10



## 6.0    EXPERT OPINIONS

Be advised that the opinions shown below are the primary expert opinions that I would intend to offer at the time of trial; however, be advised that while my primary opinions appear in this section of the report, other supporting opinions and/or sub-opinions may appear in other sections of this document, and all opinions, regardless of where they appear in this report, apply to my findings in this case.  I offer all opinions to a reasonable degree of scientific certainty.

6.1    On December 17, 2018, which was about five weeks after the nearby Woolsey Fire had ignited and burned through vegetation and structures in the Los Angeles and Ventura Counties areas that were generally nearby to the Doherty Malibu home, Ninyo & Moore conducted a brushfire effluent assessment survey at the subject property and they found evidence of above-background soot, char, and ash levels on exterior and interior surfaces.  And I agree with that assessment based on their analytical data and I agree with their general recommendations to clean surfaces as needed.  Those recommendations are consistent with the Restoration Industry Association (RIA) Guidelines for Fire and Smoke Damage Repair and are consistent with the industry standard.  Note, though, that based on the results of my survey at the subject property, I have modified the extent of cleaning to those activities described in Section 6.13 of this report.

6.2    KCE Matrix also conducted a carbonaceous particulate survey at the subject property, and their survey was conducted on November 26, 2018, which was about three weeks prior to the Ninyo & Moore survey at the property (and presumably just a short while after the fire was "controlled").  Like Ninyo & Moore, KCE Matrix appeared to have used typical industry-standard survey, sample collection, and analytical techniques.    In their report, however, KCE Matrix described "A *significant amount* (emphasis added) of suspect soot/char/ash consisting of grayish white particulates with some black particles" at the exterior of the subject home, in the office-garages, and at the interior spaces near doors and windows, with "moderate to significant" amounts of such debris at other interior areas.  The language quoted was both ambiguous and potentially provocative to parties unfamiliar to such assessment work.

6.3    KCE Matrix also noted "smoke odor" at both the upper and lower level interior spaces of the home and in the garages.  That odor was absent at the time of the Ninyo & Moore survey conducted weeks later, which is not inconsistent with my personal experience.  Also, at the time of my site inspection at the Doherty property on December 11, 2019, no combustion byproduct odors were perceptible at any location at any time.

6.4    While the KCE Matrix analytical data, which were recorded by LA Testing, showed different values for soot, char, and ash from those data presented by Ninyo & Moore, my interpretation of the assessment work by both KCE Matrix and Ninyo & Moore dictates that the two groups of data should not be considered inconsistent.  Their collective data should also not be considered inconsistent with the HygieneTech data recorded on December 11, 2019.

6.5    In their conclusions, KCE Matrix used some alarm-provoking language like "extensively impacted by Combustion By-Products (sic)…the CBP impact to the residence and property requires significant remediation."  And KCE Matrix then recommended "replacement, repair, remediation and/or implementation of detailed cleaning of building materials and/or contents at the subject residence…."  Unfortunately, that provocative language and their inclusion of the term "replacement" as one possible remedy for potentially-affected materials can, in the extreme, be interpreted as meaning *replace* all building materials and contents on the property.  The KCE

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 11



## 6.0    EXPERT OPINIONS (CONTINUED)

Matrix recommendations can also be interpreted as *repair* all building materials and contents on the property; or *remediate* all building materials and contents on the property; or *detail-clean* all building material surfaces and contents at the property—and, therefore, use of such language by a consultant in this case is inappropriate because that language is imprecise and is clearly vague and ambiguous, to the point of being uninterpretable.

6.6    Like Ninyo & Moore, KCE Matrix should have simply recommended specific actions that were consistent with the standard practice in the industry and those recommendations would have been consistent with those offered by Ninyo & Moore, at least as of that time.  Note that KCE Matrix did recommend that "implementation of remediation work be performed following the Restoration Industry Association (RIA) Guidelines for Fire and Smoke Damage Repair."  But be advised that those RIA guidelines are completely consistent with the recommendations offered previously by Ninyo & Moore and HygieneTech at this time, and those guidelines are not at all consistent with "replacement" of all building materials and/or contents at the subject property, which was the first-in-order recommendation offered by KCE Matrix on this project.

6.7    On or about March 12, 2019, Rider Levett Bucknall (RLB) delivered a cost estimate that was in excess of $2,500,000 for work proposed at the subject property.  That work involved power-washing at roof seams, which is ill-advised, and the demolition and rebuilding of virtually all interior and exterior building materials, along with the replacement of all gardens and other landscape, hardscape items, and the refinishing of the pools, which collectively is, presumably in all or most all cases at the subject site, unwarranted ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ In their estimate document, RLB used the terms "Toxic pool water," which undoubtedly was inaccurate (unless information to the contrary becomes known) and most certainly was not apparent at the time of my survey on December 11, 2019.  Be advised that the term "toxic" has a well-defined meaning in the industry, and I have no expectation that the pool water, nor any other surface exposed to airborne brushfire debris, was as a result rendered toxic.

6.8    Ms. Doherty reportedly expressed a concern "about whether she could inhabit her house or not" to Dr. Lawrence Piro—presumably she meant that she wondered if she could inhabit her house without reasonable health concerns—and Dr. Piro ████████████████████████████████, because o███ ███████████████████████.  Intuitively, I have concluded that that recommendation by Dr. Piro must have been based on the presumption that that house posed an airborne particulate exposure risk, which Dr. Piro during his deposition suggested was based on information provided by Ms. Doherty concerning "the fire condition."  Based on my survey of the subject home on December 11, 2019, the living spaces in that structure do not pose an above-background particulate exposure risk and, therefore, I believe that that issue should be reevaluated by Dr. Piro or other qualified professional based on present-day factual information.

6.9    Dr. Piro generated a letter that Ms. Doherty ██████████████████████████ ███████████████████████████.  I would agree without hesitation that Ms. Doherty should not inhabit a smoke-damaged residence.  But be advised that with little effort, which would entail no more than HEPA vacuuming all exterior sliding glass door tracks, all window tracks, and exterior door thresholds, and after detail-cleaning items and building material surfaces in the garage with a HEPA vacuum, all of the known potential Woolsey Fire combustion byproduct effluent material associated with the interior spaces of that home and garage would be satisfactorily treated.  Note

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 12



## 6.0 EXPERT OPINIONS (CONTINUED)

also that the presence of the particulate matter on sliding glass door and/or window tracks and/or on exterior door thresholds would not pose a measurable particulate exposure risk for Ms. Doherty while she is in that home under any predictable circumstances. Be advised that I cannot assess Ms. Doherty's potential airborne particulate exposure in the garage with any more precision that I can estimate her airborne particulate exposure potentials out-of-doors. Most certainly, varying conditions and activities will result in different exposure potentials both in her garage and out-of-doors.

6.10 With respect to the health issues that are relevant to Ms. Doherty, Dr. Piro indicated during his deposition ████████████████████████████████████████—to which I would agree—and I have concluded that no such ████ existed in that home as of my survey on December 11, 2019. As noted above, Dr. Piro also stated ████████████████████ which is a technical and functional impossibility. That home ████████████████ given that a long list of ████ will always exist in typical indoor and outdoor environments, including carbon monoxide (a chemical asphyxiant), benzene (an aromatic hydrocarbon known to cause acute myeloid leukemia), asbestos (a naturally-occurring mineral fiber that is known to cause asbestosis and mesothelioma), along with the presence of mycotoxins (poisonous metabolites produced by some mold species) in a wide variety of foods—just to name a few ████

6.11 ████████████████████████████████████████████████████████████████████████
day-to-day routine, Ms. Doherty apparently reported as early as April 26, 2016, that ████████████████ ████ and that she presumably ████████████████████████ weeks before that date. Equivalent citations appeared in multiple follow up medical records generated by The Angeles Clinic and Research Institute in documents scribed from mid-2016 to early October 2019, the latter being the most recent medical record available to me from that source. Be advised that the subject residence poses no known airborne particulate that would be considered above-background, nor



6.12 If additional demolition is performed in the subject home, that work alone would be expected to increase the exposures to airborne particulate for the occupants—not reduce such exposures. Therefore, if we hear an argument during this case that demolition of one or more building materials at the subject home will prevent the potential for occupants to inhale airborne particulate, which will,

circumstance would be expected to occur during and following any *dusty* activity until, at a minimum, ambient airborne particulate levels (and perhaps other airborne contaminant levels) return to background. Simply stated, unless conditions clearly warrant such work, any activity that results in above-background airborne particulate—including demolition of gypsum board, masonry, tiles, concrete, stucco, granite, plaster, and/or aggressive cleaning measures that produce airborne dust— will result in environmental conditions that will pose unnecessary health risks to Shannen Doherty.

Federal Rule 26 Expert Report of Brian P. Daly, CIH, PE
Shannen Doherty v. State Farm Insurance Company
Page 13



## 6.0    EXPERT OPINIONS (CONTINUED)

6.13    Based on the collective work by KCE Matrix, Ninyo & Moore, and HygieneTech at the home of Ms. Doherty, detail cleaning with HEPA vacuums and/or damp wipe methodologies should be performed on all sliding glass door tracks, all exterior window tracks, and at all exterior pedestrian door thresholds. Perhaps a consultant can argue that all surfaces in the garage at that property would also require HEPA vacuuming and/or damp wiping. The data do not support that recommendation; however, strictly as a precaution, such detail-cleaning of surfaces and goods in the garage will reduce exposure potentials for Ms. Doherty. In so doing, the potential for combustion byproducts to exist at those locations will most certainly be reduced to background and, therefore, any perceived exposure risk will be reduced to background throughout the home and garage. Again, be advised that only the KCE Matrix and Ninyo & Moore recommendations that are consistent with the HygieneTech treatment recommendations stated here—the latter of which are consistent with RIA guidelines—would be applicable to the subject home as of the date of the HygieneTech survey on December 11, 2019.

6.14    HygieneTech recommends, only as a precaution, that surface samples and air samples for combustion byproducts be collected after such treatment work identified in Section 6.13 of this report is completed in order to confirm that carbonaceous particulate is indeed no higher than background, both in the air and on surfaces. Note that if above-background levels of combustion byproducts are found during such a survey after the performance of initial treatment efforts, then treatments should continue until *clearance* is achieved. The clearance criterion in this case should be *background*.

**HYGIENE TECHNOLOGIES INTERNATIONAL, INC.**

Brian P. Daly, CIH, PE
President

Date:    February 3, 2020

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Rushfeldt, Shelley & Drake
Case:  Albertos O. Rivera, et al. v. **Cedars-Sinai Medical Center**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    C 715797
Re:    Oxygen enrichment, deposition (10/27/1991)\*

Client: Cannon & Nelms
Case:  Murray v. **Cal Farm Insurance Company**
Court: County of San Diego Superior Court of the State of California
No:    GIN002661
Re:    Fungal growth, deposition and trial

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Wilshire Borgata Owners Association** v. Wilshire Borgata, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    SC055523
Re:    Fungal growth, deposition

Client: Law Offices of Steven L. Zelig
Case:  **Greene** v. Century National Insurance Co.
Court: County of Los Angeles Superior Court of the State of California
No:    BC155935
Re:    Asbestos, deposition and trial

Client: Doherty & Catlow
Case:  MacKenzie v. **Riverside Medical Center**
Court: County of Los Angeles Superior Court of the State of California
No:    BC183673
Re:    Fungal growth, deposition

Client: Loeb & Loeb
Case:  **Queen Anne Associates** v. Pacific Bell
Court: County of Los Angeles Superior Court of the State of California
No:    BC168187
Re:    Fungal growth, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Studio Village HOA** v. Swinerton & Walberg Co.
Court: County of Los Angeles Superior Court of the State of California
No:    ES007789
Re:    Fungal growth and construction defect, deposition

\* This list is as complete as my records show; no case in which my expert witness testimony was provided has been intentionally omitted.   Note that information concerning only one deposition of mine was available from 1988 (when I began offering expert testimony) to September 1, 1998.  Also note that I do not recall the specifics of any trial testimony of mine during that earlier time period (although some such testimony was provided).  I testified on behalf of the parties shown in **boldface**.

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: California Federal Bank
Case: **California Federal Bank** v. Stultz
Court: County of Marin Superior Court of the State of California
No:     13012
Re:     Fungal growth, trial

Client: Lewis Brisbois Bisgaard & Smith, LLP
Case: Rothmel v. **Allstate Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No:     BC227072
Re:     Fungal growth, deposition

Client: Bistline & Cohoon
Case: Ashcraft v. **Lupo**
Court: County of Los Angeles Superior Court of the State of California
No:     YC035421
Re:     Fungal growth, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case: **Meadowgate** v. Renaissance
Court: County of Los Angeles Superior Court of the State of California
No:     PC024063Y
Re:     Fungal growth and construction defect, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case: **Camelot HOA** v. Steve Jones Construction
Court: County of Ventura Superior Court of the State of California
No:     SC031595
Re:     Fungal growth and construction defect, deposition

Client: Murchison & Cumming
Case: Villaescusa v. **Envirocheck, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:     VC032471
Re:     Asbestos, deposition

Client: Beach, Procter, McCarthy & Slaughter, LLP
Case: Wich v. **Studio Village HOA**
Court: County of Los Angeles Superior Court of the State of California
No:     EC 029939
Re:     Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Cannon & Nelms
Case: John Flynn v. **TIG Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No: SC 070733
Re: Fungal growth, deposition

Client: Garrotto & Garrotto
Case: **Alexander Kahn** v. City of Los Angeles
Court: County of Los Angeles Superior Court of the State of California
No: BC 251878
Re: Fungal and bacterial growth, deposition

Client: Veatch, Carlson, Grogan & Nelson
Case: Edirisingha v. **Top Properties, SWV Group Ltd** and **Robert Behar**
Court: County of Los Angeles Superior Court of the State of California
No: LC 061479
Re: Fungal growth, deposition

Client: Beach, Procter, McCarthy & Slaughter, LLP
Case: Galbreath v. **Belford Park Apartments**
Court: County of Los Angeles Superior Court of the State of California
No: YC 041888
Re: Fungal growth, deposition

Client: Cummins & White
Case: **Allen H. Ginsburg** v. Revere Financial
Court: County of Orange Superior Court of the State of California
No: OCSC 68 59 13
Re: Asbestos, deposition and trial

Client: MacGregor & Berthel
Case: Smith v. JP Enterprises, Inc., et al. **(Allstate Insurance Company)**
Court: County of Orange Superior Court of the State of California
No: 02 CC 05625
Re: Fungal growth, deposition

Client: Nelson Griffin
Case: Underwood v. Anderson, **ESR**, et al.
Court: County of San Diego Superior Court of the State of California
No: GIE005376
Re: Gypsum board dust exposure, deposition

-3-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2020**



Client: Manly & McGuire
Case: **William T. Berry, III** v. Greystone Homes, Inc., et al.
Court: County of Orange Superior Court of the State of California
No:      02CC11290
Re:      Fungal growth, deposition

Client: Manly & McGuire
Case: Christine Byrne v. **Nobel Court, Ltd.**, et al.
Court: County of San Diego Superior Court of the State of California
No:      GIC 780948
Re:      Fungal growth, deposition

Client: Gibbs, Giden, Locher & Turner, LLP
Case: Chandler v. Russworm, et al. (**Artesia Garden Homeowner's Association**)
Court: County of Los Angeles Superior Court of the State of California
No:      YC 044349
Re:      Fungal growth, deposition

Client: Morris, Polich & Purdy, LLP
Case: Patricia Small, et al. v. **Gary Cox**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:      VC 036601
Re:      Fungal growth, deposition

Client: Aleccia, Conner & Socha
Case: Smith v. **Metropolitan Stevedore**
Court: U.S. Department of Labor Office of Administrative Law Judges
No:      2003-LHC-0526
Re:      Hearing loss/Noise exposure, trial

Client: Law Offices of Kabateck & Kropff
Case: **Spiers** v. Coldwell Banker Residential Brokerage, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:      BC266494
Re:      Fungal growth, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case: **Dunbar** and **Nelson** v. KB Construction, et al.
Court: County of Los Angeles Superior Court of the State of California
No:      KC040124R
Re:      Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Law Office of Steven Zelig
Case: **Greco** v. Yeh, et al.
Court: County of Los Angeles Superior Court of the State of California
No:   BC251059
Re:   Fungal growth, deposition

Client: Century Law Group
Case: **Sundar** v. State Farm Insurance Company
Court: County of Los Angeles Superior Court of the State of California
No:   BC286020
Re:   Fungal growth, deposition

Client: Kern & Gonzalez
Case: April Rose Dance v. **Archstone Communities**
Court: County of Ventura, East District, Simi Valley, Superior Court of the State of
      California
No:   SC033885
Re:   Fungal growth, deposition

Client: Waters, McCluskey & Boehle
Case: Meza v. IPS Corporation, et al. (**Joe's Plastics, Inc.** and **Talco Plastics,
      Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No:   VC035026
Re:   Polymer combustion products, deposition

Client: Goldberg & Goldberg
Case: **Sabrina** and **Jonathan Balter** v. 1245 McClellan, LLC, et al.
Court: County of Los Angeles Superior Court of the State of California
No:   SC 073076
Re:   Fungal growth, deposition

Client: Beach, Procter, McCarthy & Slaughter, LLP
Case: Geffcken v. **D'Andrea**, et al.
Court: County of Santa Barbara Superior Court of the State of California
No:   01044044
Re:   Fungal growth, 402 hearing consultation

Client: Kabateck & Garris
Case: **Sergio** and **Phyllis Arguello** v. State Farm General Insurance Company
Court: County of Orange Superior Court of the State of California
No:   03CC01712
Re:   Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Lewis Brisbois Bisgaard & Smith, LLP
Case: Dawn Wormer v. **Nationwide Insurance Company**
Court: County of Orange Superior Court of the State of California
No:    02CC14352
Re:    Fungal growth (*Meruliporia incrassata*), deposition and trial

Client: Law Office of Wendy Reed
Case: Laskey, **Singh** and **Yoo**, et al. v. Boulevard Developers, Inc. et al.
Court: County of Orange Superior Court of the State of California
Nos:   02CC00033 and 03CC04661
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case: Harold Hawley, et al. v. **Howard** and **Corazon Lowry**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 281703
Re:    Fungal growth, trial

Client: Kabateck & Garris
Case: **Ferrigno** v. Mercury Casualty Company
Court: County of Los Angeles Superior Court of the State of California
No:    BC 288783
Re:    Fungal growth, deposition

Client: Waldron & Olson, LLP
Case: **Giacopuzzi, Pomo, Unruh** v. Albertsons, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 293375
Re:    Fungal growth, deposition and trial

Client: Willoughby, Stuart & Bening
Case: Kodash, Inc. v. **American Employers Insurance Company**, et al.
Court: United States District Court
No:    CV03-2327 CAS
Re:    Fungal growth, deposition and binding arbitration

Client: Reuben & Novicoff
Case: **Soudry** v. Allstate Insurance Company
Court: United States District Court, Central District of California
No:    CV03-2415 AHM
Re:    Fungal growth, deposition

-6-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Procter, McCarthy & Slaughter, LLP
Case: Demetra Eaton, et al. v. **Hoag Property Management, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:      BC 290966
Re:      Fungal growth, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case: Sprowl v. **Bainotti**, et al.
Court: County of Ventura Superior Court of the State of California
No:      SC 031711
Re:      Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Reginald ShapiroHolland v. Vista Del Lago Apartments, **Equity Residential Properties Management**, et al.
Court: County of Orange Superior Court of the State of California
No:      03CC03767
Re:      Fungal growth, trial

Client: Wood, Smith, Henning & Berman, LLP
Case: Hurd v. **Richmond American Homes**, et al.
Court: County of Orange Superior Court of the State of California
No:      02CC00235
Re:      Fungal growth, deposition

Client: Sundt Construction, Inc.
Case: **Sundt Construction, Inc.** v. Liberty Security Services, et al.
Court: County of San Diego Superior Court of the State of California
No:      GIC 810581
Re:      Fungal growth, deposition

Client: Steven L. Zelig & Associates, LLP
Case: **Joseph** and **Jill Tabera**, et al. v. Farmers Insurance Company, et al.
Court: County of Los Angeles Superior Court of the State of California
No:      BC 292617
Re:      Fungal growth, deposition

Client: Morris, Polich & Purdy, LLP
Case: Kevin Rix and Christine Steffen v. **James Dimitroff** and **David Kendall**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:      SC 077026
Re:      Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Forgey & Hurrell, LLP and Haight, Brown & Bonesteel, LLP
Case: Loring v. **Walgren**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 257026 and BC 250973
Re:    Fungal growth, deposition and trial

Client: Carl R. Stevens & Associates
Case: **Lex Handel, et al.** v. Grandview Crest, et al.
Court: County of Orange Superior Court of the State of California
No:    02CC13362
Re:    Fungal growth, deposition

Client: Zimmerman, Walker & Monitz
Case: Barth and Leatherbarrow v. **Blakemore**, et al.
Court: County of Los Angeles, West District, Superior Court of the State of California
No:    SC 080879
Re:    Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Yount v. Automobile Club of Southern California, **P. W. Stephens**, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIC 812500
Re:    Fungal growth, deposition

Client: Law Office of Odion Okojie
Case: **Sanchez** v. S. Chow
Court: County of Los Angeles Superior Court of the State of California
No:    BC 308391
Re:    Habitability, deposition

Client: Marcin, Barrera & O'Connor
Case: **Deanna Burton** v. Mercury Casualty Company, et al.
Court: County of Orange Superior Court of the State of California
No:    03CC11998
Re:    Fungal growth, trial

Client: Law Offices of Scott B. Whitenack
Case: Darcee Dee v. **PCS Property Management**
Court: County of Los Angeles Superior Court of the State of California
No:    LC 057 263
Re:    Fungal growth, trial

-8-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Cannon & Nelms
Case: Miles v. **Denault**
Court: County of Los Angeles Superior Court of the State of California
No:      YC 048 956
Re:      Fungal growth, deposition

Client: MacGregor & Berthel
Case: Truex v. **Allstate Insurance Company**
Court: United State District Court
No:      CV 03-6587-TJH (AJWx)
Re:      Fungal growth, deposition

Client: Shaffer, Lax, McNaughton & Chen and Wood, Smith, Henning & Berman,
         LLP
Case: Sannette Gite v. **Fine Finish Sash & Door, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:      SC 079245
Re:      Fungal growth, deposition and trial

Client: Yates Law Firm
Case: **Regency Hotel Management Company,** Inc. v. Evanston Insurance
         Company
Court: United State District Court, District of Colorado
No:      04-M-181
Re:      Fungal growth, deposition and trial

Client: Douglas & Cox, LLP
Case: Tavilla v. **Employers Mutual Casualty Insurance Company,** et al.
Court: Superior Court of Arizona, County of Maricopa
No:      CV 2001-019327
Re:      Fungal growth, deposition and trial

Client: Wood, Smith, Henning & Berman, LLP and MacGregor & Berthel
Case: McMahon v. **American Technologies, Inc., Allstate Insurance Company,**
         et al.
Court: County of Los Angeles Superior Court of the State of California
No:      BC317785
Re:      Fungal growth, deposition and arbitration

Client: Law Offices of Craig J. Silver
Case: **Cucinotti** v. State Farm General Insurance Company, et al.
Court: County of Orange Superior Court of the State of California
No:      04CC06180
Re:      Fungal growth, deposition

-9-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Procter, McCarthy & Slaughter, LLP
Case: Gribble, et al. v. **Park Overall**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 304686
Re:    Fungal growth, deposition

Client: Law Offices of Thomas O'Hagan
Case: Sobieski v. **California School of Culinary Arts**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 316831
Re:    Smoke inhalation, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case: Rickley v. **Goodfriend**
Court: County of Los Angeles Superior Court of the State of California
No:    SC081696
Re:    Hazardous waste/asbestos exposure claim, deposition and trial

Client: Bruce J. Guttman, Attorney at Law
Case: Courtney E. Miller v. Park La Brea Management, et al. **(CMC Painting)**
Court: County of Los Angeles Superior Court of the State of California
No:    BC302047
Re:    Fungal growth, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case: Botwin v. Westerman, **Bentley Oaks HOA**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC082383
Re:    Fungal growth, deposition

Client: Stanton T. Mathews & Associates
Case: **Simon** v. City of Santa Monica, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC082142
Re:    Hydrochloric acid exposure, two depositions and trial testimony

Client: Bacalski, Koska & Ottosen
Case: Susan McClister, et al. v. **Childtime Childcare, Inc.**, et al.
Court: County of Orange Superior Court of the State of California
No:    03CC03554
Re:    Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Wesierski & Zurek, LLP
Case: Leach, et al. v. **Marci Cohen**
Court: County of Los Angeles Superior Court of the State of California
No:     BC322115
Re:     Fungal growth, deposition

Client: Law Offices of Anthony Egbase
Case: **Palma** v. Murrillo
Court: County of Los Angeles Superior Court of the State of California
No:     VC044297
Re:     Fungal growth, deposition

Client: Loewenthal, Hillshafer & Rosen, LLP
Case: **Ondriezek, et al.** v. Shaver
Court: County of Los Angeles Superior Court of the State of California
No:     PC 031736 V
Re:     Fungal growth, deposition and arbitration

Client: Wood, Smith, Henning & Berman, LLP
Case: Ditto, et al. v. **Newcrest Homes**, et al.
Court: County of Orange Superior Court of the State of California
No:     03CC00279
Re:     Fungal growth, deposition

Client: Hughes & Nunn
Case: Gage v. **State Farm General Insurance Company**, et al.
Court: County of San Bernardino Superior Court of the State of California
No:     SCVSS 116384
Re:     Fungal growth, deposition

Client: Watson Law Group
Case: Len Steckler v. **Carolyn Holstein-Mintzer**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC 332264
Re:     Fungal growth, deposition

Client: Stanton T. Mathews & Associates
Case: **Denise Stewart** v. City of Laguna Beach, et al.
Court: County of Orange Superior Court of the State of California
No:     05CC04569
Re:     Slip and fall, deposition

-11-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Law Offices of Craig J. Silver and Haight, Brown & Bonesteel
Case:  Michael and Linda Hall v. **Eckenroth, et al.**
Court: County of San Bernardino Superior Court of the State of California
No:    MCVMS 06800
Re:    Fungal growth, deposition

Client: Ghormley & Associates
Case:  Kristine Adams v. **Newport Crest HOA, et al.**
Court: County of Orange Superior Court of the State of California
No:    05CC05516
Re:    Fungal growth, deposition

Client: Lightfoot Vandevelde Sadowski Crouchley Rutherford Levine LLP
Case:  State of California v. **Jonathan Herz**
Court: U.S. District Court, Central District of California
No:    CR 06-224-MMM
Re:    Asbestos, trial

Client: Marks, Golia & Finch, LLP
Case:  Race, et al. v. **Sierra Window Concepts, et al.**
Court: County of San Diego Superior Court of the State of California
No:    GIC853757
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case:  Walker v. **Allstate Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 263882
Re:    Fungal growth, deposition

Client: Quintilone & Associates
Case:  **Hetman** v. Santa Ana Unified School District
Court: County of Orange Superior Court of the State of California
No:    04CC06534
Re:    Fungal growth, deposition

Client: Morris, Polich & Purdy, LLP
Case:  Rodriguez v. **Nizynski,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 333536
Re:    Fungal growth, deposition

-12-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Loewenthal, Hillshafer & Rosen, LLP
Case: **Abrams** v. Las Brisas Condominium Association, et al.
Court: County of San Diego Superior Court of the State of California
No:     GIN 043105
Re:     Fungal growth, deposition

Client: Flynn, William & Hall, LLP
Case: Sacramento Suncreek Apartments, LLC v. **Suncreek 268, Ltd.**
Court: Sacramento Superior Court of the State of California
No:     05AS02621
Re:     Fungal growth, mediation

Client: Lee & Tran, APLC
Case: Douglas Emmett Realty Fund v. **The Mirisch Agency, Lawrence Mirisch**, et
        al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC326189
Re:     Fungal growth, deposition

Client: Bistline & Cohoon
Case: FIDM Properties, Inc. v. **Red Point Builders, Inc.**, et al.
Court: County of Orange Superior Court of the State of California
No:     05CC07075
Re:     Fungal growth, deposition and trial

Client: Wilson, Elser, Moskowitz, Edelman, & Dicker LLP
Case: Richmond v. Wolseley PLC, et al. (**Kohler Company**)
Court: County of Los Angeles Superior Court of the State of California
No:     BC320588
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Hall, et al. v. **UDC Universal Development**, et al.
Court: County of Orange Superior Court of the State of California
No:     04 CC00020
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Maryam Seyedhosseini v. **Haven Hills, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC348181
Re:     Fungal growth, deposition and trial

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Calendo, Puckett, Sheedy & DiCorrado, LLP
Case: Anderson, et al. v. **Friedman**
Court: County of Los Angeles Superior Court of the State of California
No:    YC052492
Re:    Fungal growth, deposition

Client: Robie & Mathai
Case: **State Farm General Insurance Company** v. Culver City Roofing Company, Inc., Ari-Thane Foam Products, Inc., et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC349329
Re:    Fungal growth, deposition

Client: Law Offices of Robert E. Muir
Case: **Alexis Cohen** v. Van Craig Abbott, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIN 051791
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case: George Myers and Kimberly Larson v. **Allstate Insurance Company**, et al.
Court: County of Orange Superior Court of the State of California
No:    04CC06982
Re:    Fungal growth, deposition

Client: Law Office of Odion Okojie
Case: **Daniel Maher** v. RTI Properties, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    BC351880
Re:    Habitability, deposition

Client: Lewis, Brisbois, Bisgaard & Smith, LLP
Case: Dean, et al. v. **Vedanta Society of Southern California**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 345004
Re:    Fungal growth, deposition and trial

Client: Harrington, Foxx, Dubrow & Canter, LLP
Case: Mary Ann Taylor v. **Nikal, Ltd.**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    EC042106
Re:    Fungal growth, deposition and trial

-14-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Procter, McCarthy & Slaughter, LLP
Case:   Pamela Beaty and Kandis Leigh v. **Harold** and **Harriet Raasch**
Court:  County of Los Angeles Superior Court of the State of California
No:     BC 318638
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:   Bunch v. **Beazer**
Court:  County of Riverside Superior Court of the State of California
No:     RIC 443086
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:   Richards v. **Beazer**
Court:  County of Riverside Superior Court of the State of California
No:     RIC 445329
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:   Brogren v. **Plueger**
Court:  County of Orange Superior Court of the State of California
No:     05CC09153
Re:     Fungal growth; deposition, 402 hearing, and trial

Client: Wood, Smith, Henning & Berman, LLP
Case:   Roland Jene Johnson Trust v. **Evanston Insurance Company**
Court:  County of Los Angeles Superior Court of the State of California
No:     BC 348030
Re:     Fungal growth, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case:   Clemens and Young v. **Green Meadows Estates HOA**, et al.
Court:  County of Ventura Superior Court of the State of California
No:     SC 043270
Re:     Fungal growth, deposition

Client: Foley & Mansfield
Case:   Peter Daniels, et al. v. Albay Construction, et al. **(Ameron International
        Corp.)**
Court:  County of Alameda Superior Court of the State of California
No:     RG 07-320730
Re:     Crocidolite asbestos/mesothelioma, deposition (12/04/2007)

-15-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Dicks & Workman
Case: **Alexis Cohen** v. Republic Van Lines, et al.
Court: County of San Diego Superior Court of the State of California
No:     GIN 051791
Re:     Fungal growth, deposition and trial

Client: Inglis, Ledbetter & Gower, LLP
Case: Zaks v. **Chang**
Court: County of Los Angeles Superior Court of the State of California
No:     BC365849
Re:     Noise exposure, deposition and trial

Client: Procter, McCarthy & Slaughter, LLP
Case: Thaler v. **Boskovich Farms, Inc., et al.**
Court: County of Ventura Superior Court of the State of California
No:     SC 045325
Re:     Pesticide exposure, deposition

Client: Hodges and Thomas
Case: Willenberg v. **More**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     YC055117
Re:     Fungal growth, deposition

Client: Rudloff, Wood, & Barros, LLP
Case: Steven Hergenroeder, et al. v. **Travelers Property Insurance Company, et
       al.**
Court: USDC ED CAL (Fresno)
No:     1:06-CV-01232-OWW-SMS
Re:     Black water/*E. coli*, trial

Client: Wendel, Rosen, Black & Dean
Case: Henrik Plumbing, Inc. v. **Essex Management Corporation, et al.**
Court: Los Angeles County Superior Court of the State of California
No:     BC0337985
Re:     Asbestos, deposition

Client: Morris, Polich & Purdy, LLP
Case: Hamza v. **Rivero**
Court: Los Angeles County Superior Court of the State of California
No:     EC044490
Re:     Fungal growth, deposition

-16-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Hollins Schechter and Wood Smith Henning & Berman, LLP
Case: Blessley v. **Fire Insurance Exchange**, et al.
Court: Orange County Superior Court of the State of California
No:   07CC09154
Re:   Fungal growth, deposition and trial

Client: Wood Smith Henning & Berman, LLP
Case: Hampton Bay Court Townhomes v. **Storm/Western Development**
Court: Los Angeles County Superior Court of the State of California
No:   YC048199
Re:   Fungal growth, deposition

Client: Poole & Shaffery, LLP
Case: Veda Marie Garcia v. Allied Diagnostic Imaging, **(I.C. Compounds** and **Litho-Chem)**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:   BC 310867
Re:   Benzene and other hydrocarbon exposure related to non-Hodgkin's lymphoma, deposition

Client: Veatch Carlson
Case: Stillwell v. **Mavroudis**, et al.
Court: Los Angeles County Superior Court of the State of California
No:   EC 043225
Re:   Fungal growth, deposition

Client: Yunker & Schneider
Case: Marshall v. **D.R. Horton**
Court: Los Angeles County Superior Court of the State of California
No:   BC 354426
Re:   Fungal growth, arbitration

Client: Harrington, Foxx, Dubrow & Canter, LLP
Case: Barragan, et al. v. **Parkin Garden Apartments**, et al.
Court: County of Orange Superior Court of the State of California
No:   30-2007 00100867
Re:   Habitability, depositions (2)

Client: Horton, Oberrecht, Kirkpatrick & Martha
Case: Motschenbacher v. **Burlingham**, et al.
Court: County of Orange Superior Court of the State of California
No:   07CC10892
Re:   Fungal growth (*Meruliporia incrassata*), deposition

-17-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Bremer Whyte Brown & O'Meara, LLP
Case: Wallick v. **City of Morro Bay, et al.**
Court: County of San Luis Obispo Superior Court of the State of California
No:     CV 060199
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Marton and Dickinson v. **Dung**
Court: County of Los Angeles Superior Court of the State of California
No:     BC 380262
Re:     Fungal growth, hearing testimony

Client: Wood, Smith, Henning & Berman, LLP
Case: Gersten v. Asbestos Corporation Limited, et al. **(Gibson & Hill)**
Court: County of Alameda Superior Court of the State of California
No:     RG08402343
Re:     Asbestos, 402 hearing consulting and attendance

Client: Hollins + Schechter
Case: Hawkins v. Richmond American Homes, et al. **(Fire Insurance Exchange)**
Court: County of San Diego, North County Division Superior Court of the State of
         California
No:     37-2007-00055121-CU-PO-NC
Re:     Fungal growth, deposition

Client: Cumberland, Coates & Duenow, LLP
Case: Marksman Range and Threads v. **Fisher**, et al.
Court: County of San Luis Obispo Superior Court of the State of California
No:     CV 070495
Re:     Inorganic lead, deposition

Client: Landsberg Margulies
Case: Charalambous v. **Ridgegate**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC380995
Re:     Fungal growth, deposition

Client: Petit, Kohn, Ingrassia & Lutz
Case: **Advanced Honeycomb Technologies, Inc.** v. Western Farms Services, et
         al.
Court: County of San Diego Superior Court of the State of California
No:     37-2007-00055814-CU-PO-NC
Re:     Resin emission exposure, deposition and trial

-18-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2020**



Client: Luce, Forward, Hamilton & Scripps LLC
Case:   Peterman Lumber v. **Robinson & Robinson** and Leathertrend, LLC
Court:  County of San Diego Superior Court of the State of California
No:     37-2008-00081154
Re:     Lead-based paint in a consumer product, trial

Client: Hornberger & Brewer, LLP
Case:   **Chan** v. Bridge Residential Advisors, LLC, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:     07-1761-AH04563
Re:     Fungal growth assessment, deposition and arbitration

Client: Procter, Slaughter & Reagan, LLP and Ryan, Mercaldo & Worthington, LLP
Case:   Sprague v. **L.E. Medrano, Inc., et al.**
Court:  County of San Diego Superior Court of the State of California
No:     GIC 871123
Re:     Asbestos, silica, and char, trial

Client: Spolin, Silverman & Cohn, LLP
Case:   **Yale-Wilshire, Ltd.** v. Lisa Chan-Flagg, DDS
Court:  County of Los Angeles Superior Court of the State of California
No:     BC 382446 (SC096480)
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:   Thomas Wayne Reese v. Gans Ink & Supply Company, (**Van Son Holland** and **Weiman Products**), et al.
Court:  County of Los Angeles Superior Court of the State of California
No:     BC 332936
Re:     Benzene, toluene, xylenes, kerosene, and other hydrocarbon exposure related to non-Hodgkin's lymphoma, deposition

Client: Law Offices of Robert A. Walker
Case:   Whitacre v. **Smith**
Court:  County of Los Angeles Superior Court of the State of California
No:     NC051733
Re:     Fungal growth, depositions (2)

Client: Cassidy Warner & Associates
Case:   Solano, et al. v. **Brandon, LLC**, et al.
Court:  County of Orange Superior Court of the State of California
No:     30-2008 00108779
Re:     Habitability, deposition

-19-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Wood, Smith, Henning & Berman, LLP
Case: Steven White v. **Los Angeles Indian Oaks**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC 090246
Re:    Fungal growth, deposition (10/19/2009) and trial

Client: Archer Norris
Case: Neutz v. **Fire Insurance Exchange (Farmers Group of Insurance)**, et al.
Court: County of Orange Superior Court of the State of California
No:    07CC11499
Re:    Fungal growth, deposition

Client: Poole & Shaffery
Case: David and Pilar Vanderhyde v. Expo Industries, Inc., et al. (**TFI Building Materials, Inc.** and **San Diego Pipe and Supply**)
Court: County of San Diego Superior Court of the State of California
No:    2008-00094992-CU-AS-CTL
Re:    Asbestos/mesothelioma, depositions (2)

Client: Hanger, Steinberg, Shapiro & Ash
Case: Ramirez v. **Estrada**
Court: County of Los Angeles Superior Court of the State of California
No:    KC054526
Re:    Fungal growth, deposition

Client: Burrell & Seletos
Case: Lane v. **DRW Properties III, LLC**
Court: Maricopa County Superior Court of the State of California - OCH
No:    CV2008-014301
Re:    Fungal growth, trial

Client: Wesierski & Zurek LLP
Case: Lauren Fetzer, et al. v. **Sadiq Saferzadeh**
Court: County of Orange Superior Court of the State of California
No:    30-2009 00117812
Re:    Fungal growth, deposition (12/17/2009) and trial (02/22/2010)

Client: Wood, Smith, Henning & Berman, LLP
Case: Clara Labrenz v. Johns-Manville, et al. (**F.L. Smidth, Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC414132
Re:    Asbestos, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Procter, Slaughter & Reagan, LLP
Case: Paul Wagner v. **3711 Ocean Front Condominiums**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     SC095382
Re:     Fungal growth, deposition

Client: Hurrell & Cantrall, LLP
Case: Sundquist v. BP West Coast Products, et al. **(PPG Industries, Inc.)**
Court: County of Los Angeles Superior Court of the State of California
No:     BC362023
Re:     Benzene/multiple myeloma, deposition

Client: Ezer & Williamson
Case: **Tobias** v. Sarno
Court: County of Los Angeles Superior Court of the State of California
No:     SC101733
Re:     Fungal growth/dust mites, depositions (2)

Client: Loewenthal, Hillshafer & Rosen, LLP
Case: **Traviatta** v. Deerot Rexford, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC389829
Re:     Fungal growth, deposition

Client: Flynn / Williams, LLP
Case: **Sacramento Suncreek Apartment, LLC** v. The Randall Group Inc., et al.
Court: County of Sacramento Superior Court of the State of California
No:     05AS02621
Re:     Fungal growth, deposition

Client: MacGregor & Berthel
Case: Breton v. **Allstate Insurance Company,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:     SC 100604
Re:     Fungal growth, deposition

Client: Ghormley & Associates
Case: Vassilios Zachos, et al. v. **Gary L. Hendricks, et al.**
Court: County of Riverside Superior Court of the State of California
No:     RIC 466 779
Re:     Fungal growth, deposition (10/15/2010) and trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Gordon & Rees and Lewis, Brisbois, Bisgaard & Smith
Case: Susie and David Maya v. Applied Waterproofing Technology, Inc., **PM Realty Group, L.P., and Hillcrest MOB, LP**
Court: County of San Diego Superior Court of the State of California
No:    37-2009-0083254-CU-PO-CTL
Re:    Hydrocarbon exposure, deposition

Client: Martin & Bonnett
Case: **Sinan Fazlovic** v. Maricopa County, et al.
Court: U.S. District Court for the District of Arizona
No:    CIV-09-1151-PHX-DKD
Re:    Self-contained breathing apparatus (SCBA)/respirator selection/fit-test Requirements/OSHA regulations, deposition (10/28/2010) and trial

Client: Wood, Smith, Henning & Berman, LLP
Case: La-Sheresa Fleming, et al. v. **Lynda White, Syreeka White, Lloyd White,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC420814
Re:    Habitability, deposition

Client: Hurrell Cantrall, LLP; Sedwick, Detert, Moran & Arnold; and Dickie, McCamey & Chilcote
Case: Marquez v. **Sherwin-Williams, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC393173
Re:    Solvents/welding fume/silica, deposition

Client: Sedgwick, Detert, Moran & Arnold, LLP
Case: **Kemper Insurance** v. Servpro, et al.
Court: County of San Diego Superior Court of the State of California
No:    37-2009-00057966-CU-CL-NC
Re:    Chlorinated hydrocarbon chemicals, deposition (04/28/2011)

Client: Kaye, McLane & Bednarski and Law Offices of Dale M. Rubin
Case: United States of America v. **Yi** and **Bostick**
Court: U.S. District Court for the Central District of California
No:    CR10-00793-PA
Re:    Asbestos toxicology, sentencing hearing

Client: Procter, Slaughter & Reagan, LLP
Case: Galloway, et al. v. **Villa Velletri Homeowners Association**, et al.
Court: County of Los Angeles, West District, Superior Court of the State of California
No:    SC105565
Re:    Fungal growth, deposition

-22-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: MacGregor & Berthel
Case: Verniero, et al. v. **Allstate Insurance Company**, et al.
Court: County of Los Angeles, Central District, Superior Court of the State of
California
No: BC388553
Re: Fungal growth, deposition and trial

Client: Felman & El Dabe
Case: **Indigo, et al.** v. Carrillo
Court: County of Los Angeles, Central District, Superior Court of the State of
California
No: 11U05548
Re: Bedbug infestation, trial

Client: Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Case: Bebawy v. **Van Peebles**
Court: County of Los Angeles Superior Court of the State of California
No: BC410034
Re: Fungal growth, deposition and trial

Client: Hanger, Steinberg, Shapiro & Ash, LLP
Case: Woo, et al. v. **Mediterranean Chateau HOA, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC416704
Re: Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Gayner v. **Harper Keys Allan**
Court: County of San Diego Superior Court of the State of California
No: 37-2010-0009177-CU-BC-CTL
Re: Fungal growth, deposition (09/06/2011) and trial

Client: Wood, Smith, Henning & Berman, LLP
Case: Robert Contreras, et al. v. **Calsol**, **Safety-Kleen**, et al.
Court: County of Los Angeles, Central Civil West Superior Court of the State of
California
No: Judicial Council Coordination Proceeding No. 4601
Re: Benzene, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Crehan v. **Seraji**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: EC050267
Re: Habitability, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Gordon & Rees, LLP
Case: Lionello v. Amcord, Inc., et al. (**Oxnard Building Materials**)
Court: County of Orange Superior Court of the State of California
No: 30-2009-00312582
Re: Asbestos, deposition

Client: Gordon & Rees, LLP
Case: Kish-Sahm v. Various Asbestos Defendants (**Master and Sons, Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No: PC046655
Re: Asbestos, deposition

Client: Holland & Knight
Case: Ortiz, et al. v. Flavor and Extract Manufacturers Association of the United States, (**Chr. Hansen**), et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC364831
Re: Diacetyl, deposition

Client: Gordon & Rees, LLP
Case: Valdivia v. Various Asbestos Defendants (**Oxnard Building Materials**)
Court: County of San Francisco Superior Court of the State of California
No: CGC-09-275311
Re: Asbestos, deposition

Client: Law offices of Robert A. Walker
Case: Schechtman v. D'Azur Villas, Inc., et al. (**Hiebert**)
Court: County of Los Angeles Superior Court of the State of California
No: YC061810
Re: Fungal growth, deposition

Client: Daniels Fine Israel Schonbuch & Lebovits, LLP
Case: Bardack v. **Tomjanovich**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: SC101085
Re: Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Koudriatseva v. **Versailles Lake Investors, et al.**
Court: County of Orange Superior Court of the State of California
No: 30-2010-00362027
Re: Fungal growth/habitability, trial

-24-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Swanson Law Firm
Case: **Kostenly** v. Wells Fargo Bank, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    GC043421
Re:    Fungal growth, deposition

Client: Hurrell Cantrall, LLP
Case: Nikolai Jakymyshyn v. **DAP, Inc.**, et al.
Court: County of Los Angeles Superior Court
No:    BC418823
Re:    Toluene/methyl ethyl ketone health hazards, deposition (03/08/2012) and trial

Client: Sayre & Levitt, LLP
Case: **Kim Garrett** v. St. Joseph's Hospital, et al.
Court: County of Orange Superior Court of the State of California
No:    30-2010-00404179
Re:    Biocide health hazards, deposition

Client: Law offices of Robert A. Walker
Case: Mazen v. **Toluca Village Townhomes Association**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    EC054691
Re:    Fungal growth, deposition and trial

Client: Wood, Smith, Henning & Berman, LLP
Case: 2156 Stratford Circle LLC v. **Hastings Tile and Bath, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC385913
Re:    Fungal growth, deposition

Client: Green, Bryant & French
Case: **McAdams** v. MRO Elliott Management, Inc., et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC410391
Re:    Fungal growth and other allergen exposure potential, deposition (04/17/2012)

Client: Kaloogian & Fuselier, LLP
Case: **Esparza** v. Centex, et al.
Court: County of San Diego Superior Court of the State of California
No:    37-2007-00055233-CU-BC-NC
Re:    Fungal growth and other allergen exposure potential, deposition and trial

-25-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
### SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Wood, Smith, Henning & Berman, LLP
Case: Marline and Joseph Petitpas v. Amcord, Inc., et al. (**Shea Homes**)
Court: County of Los Angeles Superior Court of the State of California
No:     BC473216
Re:     Asbestos, deposition

Client: Calendo, Puckett, Sheedy & DiCorrado, LLP
Case: **Jacob** v. Super King Market, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     75-M600-666
Re:     *Streptococcus pyogenes*/necrotizing fasciitis, deposition

Client: Morris Polich & Purdy LLP
Case: Hunter v. **Nakamura**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     YC064602
Re:     Fungal growth and other potential allergens, deposition (07/25/2012)

Client: Gordon & Rees, LLP
Case: Johnson v. Aqua-Chem, Inc., et al. (**Baxter Healthcare**)
Court: County of Los Angeles Superior Court of the State of California
No:     JCCP 4674/BC470843
Re:     Asbestos/mesothelioma, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Budke v. **Housing Authority of Santa Barbara**
Court: County of Santa Barbara Superior Court of the State of California
No:     1383047
Re:     Fungal growth/asbestos, 402 hearing and trial

Client: Slaughter & Reagan, LLP
Case: Nagel, et al. v. **Western**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     JAMS Reference No. 1210030090
Re:     Fungal growth, deposition, binding arbitration

Client: Murtaugh, Meyer, Nelson & Treglia, LLP and Law Office of Christopher P.
        Ruiz
Case: Alem, et al. v. Owens, et al. (**Halton Corporation**)
Court: County of Orange Superior Court of the State of California
No:     30-2011-00451590
Re:     Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Hanger, Steinberg, Shapiro & Ash
Case: Mohler, et al. v. **Stein**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC 479923
Re: Methamphetamine, deposition (03/27/2013)

Client: Chulak & Perez
Case: **Lucera HOA** v. Pacific Lucera, L.P., et al.
Court: County of San Diego Superior Court of the State of California
No: 37-2008-00096543-CU-CD-CTL
Re: Fungal growth, deposition (05/22/2013) and trial

Client: Wisotsky, Procter & Shyer
Case: Clark v. **Broan-Nutone LLC, et al.**
Court: County of Ventura Superior Court
No: 56-2012-00414110-CU-PL-VTA
Re: Asbestos, trial

Client: Poole & Shaffery, LLP
Case: Horton v. **Skye Partners 2, Inc., et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC424669
Re: Isocyanate exposure, deposition

Client: Gordon & Rees, LLP; Bonne Bridges Mueller O'Keefe & Nichols; Walsworth Franklin Bevins & McCall, LLP; Morris, Polich & Purdy, LLP; and Katz & Associates
Case: Vellios v. **Marmar Properties, L.P., et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC434872
Re: Manganese exposure, deposition

Client: Wisotsky, Procter & Shyer
Case: Oller v. **Kirakosian**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC468058
Re: Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Laurelwood at Palomares Hills Association v. **Shappell Industries**, et al.
Court: County of Alameda Superior Court of the State of California
No: RG10511306
Re: Fungal growth, deposition

-27-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
### SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Fidone & Motooka, LLP
Case: Hassid v. **Princess Apartments, et al.**
Court: Los Angeles Housing + Community Investment Department
No:    4360 011 025
Re:    Fungal growth/asbestos/inorganic lead exposures, hearing attendance

Client: Holland & Knight
Case: Rosas, et al. v. Flavorchem Corporation, et al. **(Chr. Hansen)**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 400974
Re:    Diacetyl, deposition

Client: McKenna, Long & Aldridge
Case: Ali Ahmad v. **Fireman's Fund Insurance Company,** et al.
Court: County of Ventura Superior Court of the State of California
No:    56-2011-00398331-CU-IC-SIM
Re:    Mold growth, depositions (2) and trial

Client: Morris, Polich & Purdy, LLP
Case: Schlidt, et al. v. **Newton, Pulos,** et al.
Court: County of Ventura Superior Court of the State of California
No:    Claim 0252254065
Re:    Asbestos/fungal growth, mediation

Client: Poole & Shaffery, LLP
Case: Johnson, et al. v. Armored Autogroup, et al. **(Turtle Wax, Inc.)**
Court: County of Alameda Superior Court of the State of California
No:    RG13669270
Re:    Benzene, deposition

Client: Lewis, Brisbois, Bisgaard & Smith, LLP
Case: Mary Ann Durning v. **The Wilshire-Westholme HOA,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC120887
Re:    Fungal growth/bacterial growth, deposition (04/14/2014)

Client: Nelsen, Thompson, Pegue & Thornton
Case: Houshang Peyman v. **Mid-Century Insurance Company,** et al.
Court: County of Los Angeles Superior Court of the State of California – Central
       District
No:    BC493305
Re:    Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Daniels, Fine, Israel, Schonbuch & Lebovitz, LLP
Case: Peggy Wintermute v. **Isadore Wendel, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: SC 114546
Re: Carbon monoxide exposure, deposition (06/14/2014) and trial

Client: Gordon & Rees, LLP
Case: Bokkes, et al. v. **Plotkin**
Court: County of Orange Superior Court
No: 30-2011 005225362
Re: Fungal growth; deposition and 402 hearing

Client: Grant, Genovese & Baratta, LLP
Case: Perez v. **Park Estates Investors, Inc.**
Court: Arbitration
No: ADRS Case 14-1487-DSC
Re: Fungal growth; arbitration

Client: McClaugherty & Associates
Case: Ghafyar, et al. v. **Matern, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC526268
Re: Fungal growth, deposition

Client: Bremer, Whyte, Brown & O'Meara and Bohl, Nixon & Schoneman
Case: Maxim Tselevich, et al. v. **City of Los Angeles, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC475621
Re: Sewage/mold growth; depositions (2)

Client: Wisotsky, Procter & Shyer
Case: Boxer v. **Buteyn**
Court: County of Los Angeles Superior Court of the State of California
No: BC522433
Re: Carbon monoxide exposure, deposition and trial

Client: Gates, O'Doherty, Gonter & Guy, LLP
Case: McKeehan Construction, Inc. v. **Vintage Wine Cellars, Inc.**
Court: County of Orange Superior Court of the State of California
No: 30-2014-00725477
Re: Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Slaughter, Reagan & Cole, LLP
Case: Surjue v. **555 Evergreen Townhomes HOA**
Court: County of Los Angeles Superior Court of the State of California
No: YC068409
Re: Fungal growth, deposition and trial

Client: Horton, Oberrecht, Kirkpatrick & Martha
Case: Bee, et al. v. **Hawken, et al.**
Court: County of San Diego Superior Court of the State of California
No: 37-2014-0038147-CU-PO-CTL
Re: Fungal growth, deposition

Client: L/O of David S. Baumwohl and Myers, Widders, Gibson, Jones & Feingold, LLP
Case: Bakas, et al. v. **Mountainback HOA, et al.**
Court: Mono County Superior Court of the State of California
No: CV110005
Re: Fungal growth, deposition and trial

Client: Kutak Rock, LLP
Case: Jennifer Thompson, et al. v. **Manouc Simsian, et al.**
Court: Los Angeles County Superior Court of the State of California
No: BC509561
Re: Fungal growth/asbestos/lead-containing material exposures, deposition (10/01/2015)

Client: Wisotsky, Procter & Shyer
Case: Veronica Alvarado, et al. v. **Perez**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC547620
Re: Habitability, deposition (10/14/2015)

Client: Adelson, Testan, Brundo, Novell & Jimenez
Case: Carl Wagner, et al. v. **Blue Ribbon Plumbing**, et al.
Court: Workers' Compensation Appeals Board
No: ADJ7045384
Re: Asbestos, deposition (12/14/2015)

Client: Wood, Smith, Henning & Berman, LLP; Bremer, Whyte, Brown & O'Meara, LLP; Gordon & Rees, LLP; and Raimondo & Associates
Case: Erik Joe Morales v. **Well-Pict Berries, Anacapa Foods, Anacapa Berry Farms, Westside Strawberry Farms, T.T. Miyasaka, RAMCO Enterprises,** and **Soilfume, Inc., et al.**
Court: County of Ventura Superior Court of the State of California
No: 56-2016-00481672-CU-TT-VTA
Re: Industrial hygiene/pesticides and fumigants, deposition

-30-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: MacGregor & Berthel
Case: Neda Raschkovsky, et al. v. **Allstate Insurance Company**, et al.
Court: United States District Court, Central District of California
No:    2:15-cv-00216-RGK-JPRx
Re:    Fungal growth, deposition

Client: Gibbs, Giden, Locher, Turner, Senet & Wittbrodt, LLP
Case: Byron Hontas v. **The Stratford Collection**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    PC056007
Re:    Habitability/vector control (rats), deposition

Client: Yang Professional Law Corporation
Case: Lopez v. AGFA, et al. **(Van Son Holland)**
Court: County of Los Angeles Superior Court of the State of California
No:    BC515732
Re:    Benzene, deposition and trial

Client: Slaughter, Reagan & Cole, LLP
Case: Denise Kurtzer v. **1239 23rd Street Homeowners Association**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC120602
Re:    Fungal growth, deposition (03/17/2016)

Client: Gilbert, Harrell, Sumerford & Martin
Case: XTRA Lease, LLC v. **Repipe-California, Inc.**
Court: County of St. Louis Circuit Court of the State of Missouri
No:    Cause 14SL-CC03401
Re:    Styrene contamination and exposure, deposition

Client: Wood, Smith, Henning & Berman, LLP and Manfredi, Levine, Eccles, Miller & Lanson
Case: Olen, et al. v. **Doctorow, et al.**
Court: County of Ventura Superior Court of the State of California
No:    56-2013-00442696-CU-TT-VTA
Re:    Fungal growth, 402 hearing

Client: Sedgwick LLP
Case: Comey v. **State Farm Insurance Company**
Court: County of Orange Superior Court of the State of California
No:    30-2014-00745930
Re:    Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Grant, Genovese & Baratta
Case: Adams v. **Newport Crest HOA, et al.**
Court: County of Orange Superior Court of the State of California
No:     07CC01390
Re:     Fungal growth, trial

Client: James P. O'Neill, Attorney at Law
Case: Bowen, et al. v. **Cheng, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC 553296
Re:     Fungal growth, trial

Client: Kutak Rock, LLP
Case: Wheat v. **Hagy, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC 442604
Re:     Fungal growth, deposition

Client: Gates, O'Doherty, Gonter & Guy, LLP
Case: **Sunset Riviera HOA** v. Srenco
Court: County of Los Angeles Superior Court of the State of California
No:     BC 546209
Re:     Fungal growth, deposition and trial

Client: Hurrell & Cantrall, LLP
Case: Dominguez v. **PPG, PRC DeSoto International, Inc.** et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC 533123
Re:     Hexavalent chromium, deposition

Client: Gibbs, Giden, Locher, Turner, Senet & Wittbrodt, LLP
Case: Osama Sidaros v. **B & B Hardware,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC610591
Re:     Asbestos, deposition

Client: Kennedy & Souza, APC
Case: Dabney, et al. v. H. N. and Frances C. Berger Foundation, et al. **(John Payne
        and Ambient Environmental, Inc.)**
Court: County of Riverside Superior Court of the State of California
No:     PSC 1301804
Re:     Fungal growth, deposition

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Slaughter, Reagan & Cole, LLP
Case: **Celine Burke, Behrendt Celine Enterprises, LP** v. Michael Conner
Court: County of Santa Barbara Superior Court of the State of California
No:     16CV04503
Re:     Fungal growth, trial

Client: Prindle Law
Case: Martine Sweedler v. **Avalon Bay, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC533811
Re:     Fungal growth, deposition

Client: Lewis, Brisbois, Bisgaard & Smith, LLP
Case: Balaoing, et al. v. **Alliance Communities, Inc.**, et al.
Court: County of San Diego Superior Court of the State of California
No:     37-2015-00034173-CU-PO-CTL
Re:     Fungal growth, deposition

Client: Yang Professional Law Corporation
Case: Delta Dawgs Construction Corporation, Express Restoration v. Defeng Lu
        (**Copperfit Industries, Inc.** as a Cross-defendant)
Court: County of Los Angeles Superior Court of the State of California
No:     EC064849
Re:     Fungal growth, deposition

Client: Adelson, Testan, Brundo, Novell & Jimenez
Case: Shields v. Commercial Casualty Insurance Co., et al. (**Bug & Hare Repair**)
Court: Workers' Compensation
No:     ADJ8709640
Re:     Asbestos, deposition

Client: Yang Professional Law Corporation
Case: William Ramsey, et al. v. **Aline Cam Van Tran**
Court: County of Los Angeles Superior Court of the State of California
No:     BC547099
Re:     Habitability/bedbugs, arbitration

Client: MacGregor & Berthel
Case: Yanikian v. **Allstate Insurance Company**, et al.
Court: United States District Court, Central District of California
No:     2:16-cv-03030-BRO-PJW
Re:     Sewage contamination, trial

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Weston & McElvain
Case: Duitch v. **Travelers Insurance Company,** et al.
Court: United States District Court, Central District of California
No:    2:16-cv-05625-PSG-JC
Re:    Building damage related to fungal growth and other so-called contamination,
       deposition

Client: Morrow & White
Case: **Restec Contractors** v. Cleveland Wrecking Company, et al.
Court: County of Kern Superior Court of the State of California
No:    S-1500-CV-280305 LHB
Re:    Asbestos and related debris field contamination, deposition

Client: Stocker & Lancaster
Case: Tao v. **Moodie, et al.**
Court: County of Orange Superior Court of the State of California
No:    30-2015-00820497-CU-MC-CJC
Re:    Fungal growth and failure to disclose during real estate transaction;
       deposition (09/06/2017) and trial

Client: Turner Law Firm
Case: **Murray** v. 916 Benedict, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC507780
Re:    Fungal growth, deposition

Client: Norton & Melnik
Case: Hardison, et al. v. **38700 10ᵗʰ Street East LLC**
Court: County of Los Angeles Superior Court of the State of California
No:    BC655507
Re:    Habitability, deposition

Client: Yang Professional Law Corporation
Case: Knohl-Trider, et al. v. **Foster, Soriano, et al.**
Court: County of Orange Superior Court of the State of California
No:    30-2016-00874402-CU-PO-CJC
Re:    Phantom odor, deposition and trial

Client: Santana, Vierra & Symonds
       Employees of Liberty Mutual Group, Inc.
Case: Michael Belding v. JSG Trucking and Sedwick Claims Management Services,
       et al. **(Liberty Mutual Insurance Company)**
Court: Workers' Compensation Appeals Board, State of California
No:    ADJ9371916
Re:    Asbestos, deposition (01/23/2018)

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Domine Law
Case: Marci Fine v. **Suntree Townhomes Owners' Association**
Court: County of Los Angeles Superior Court of the State of California
No: 17VESC07983
Re: Fungal growth, trial

Client: Harris & Associates
Case: April Shannon-Vance v. **Los Angeles County Metropolitan Transportation Authority**
Court: County of Los Angeles Superior Court of the State of California
No: BC595048
Re: Industrial hygiene/indoor air quality/fungal growth; deposition (02/28/2018)

Client: Jeffery & Grosfeld
Case: Lawrence, Steven and Yulia v. Sunnyside Ridge Partnership, Tom Bashe, **Eddy Fernando Gonzalez (dba Hammer Construction)**
Court: County of Los Angeles Superior Court of the State of California
No: BC615767
Re: Fungal growth, deposition (03/06/2018)

Client: Hibbitt, Tarbell & Koehler
Case: **Prinz** v. Campus Commons East Ranch Homeowners Association, et al.
Court: County of Sacramento Superior Court of the State of California
No: 34-2013-00147479
Re: Fungal growth, deposition (03/14/2018)

Client: Daniels, Fine, Israel, Schonbuch & Lebovitz
Case: Larin, et al. v. **Inken Corporation, Bee Investment, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC668182
Re: Lead-based paint/learning disabilities/habitability; deposition (04/03/2018)

Client: Everett & Dorey
Case: Chen v. **The Irvine Company, LLC**, et al.
Court: County of Orange Superior Court of the State of California
No: 30-2016-00832531 CU-BC-CJC
Re: Fungal growth, trial (04/18/2018)

Client: Hanger, Steinberg, Shapiro & Ash
Case: Sager, et al. v. **J-Mar Investment Company**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC617543
Re: Fungal growth, deposition (05/08/2018) and trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2020**



Client: Hanger, Steinberg, Shapiro & Ash and The Safarian Firm
Case: Hae Yun Kim, et al. v. **Moonkyu Park**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC620244
Re: Fungal growth, deposition (06/14/2018)

Client: Slaughter, Reagan & Cole, LLP
Case: Olshansky, et al. v. **Dassof, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC659568
Re: Fungal growth, deposition and trial

Client: Hanger, Steinberg, Shapiro & Ash, LLP
Case: Eastman, et al. v. **Ellis,** et al.
Court: County of Los Angeles Superior Court of the State of California
No: BC656803
Re: Fungal growth, deposition (09/18/2018)

Client: Alston & Bird, Dentons U.S. LLP, and Kirkland & Ellis, LLP
Case: Carla Allen v. Brenntag North America, Inc., et al. **(Imerys Talc America and Johnson & Johnson)**
Court: County of Humboldt Superior Court of the State of California
No: DR180132
Re: Asbestos/talc, deposition (09/19/2018) and trial (11/05/2018 and 11/06/2018)

Client: Miller Law Associates
Case: Moore and McGilvray v. **AmGuard Insurance Company**, et al.
Court: County of Santa Barbara Superior Court of the State of California
No: 17CV01780
Re: Asbestos/lead-based paint/sewage/fungal growth, deposition (10/31/2018) and trial (05/01/2019 and 05/02/2019)

Client: Hansen, Kohls, Sommer, & Jacob, LLP
Case: Ali, et al. v. **Mid-Century Insurance**, et al.
Court: County of Alameda Superior Court of the State of California
No: RG16838714
Re: Asbestos, deposition (11/07/2018)

Client: Hartsuyker, Stratman & Williams-Abrego
Case: Gilbreth v. **Sigel**
Court: County of Santa Barbara Superior Court of the State of California
No: 01-18-0000-6175
Re: Char and ash, arbitration

-36-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2020**



Client: Alston & Bird, Dentons U.S. LLP, and Orrick, Herrington & Sutcliffe, LLP
Case:  Teresa Elizabeth Leavitt and Dean J. McElroy v. **Johnson & Johnson**, et al. **(Cyprus Mines Corporation** and **its predecessors)**
Court: County of Alameda Superior Court of the State of California
No:    RG17882401
Re:    Asbestos/talc, deposition (11/19/2018 and 11/29/2018) and trial (02/27/2019 and 03/04/2019)

Client: Procter, Shyer & Winter and Hartsuyker, Stratman & Williams-Abrego
Case:  Navarro v. **Gonzales**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC663855
Re:    Habitability, deposition (11/27/2018)

Client: Wood, Smith, Henning & Berman, LLP and Taylor/Anderson, LLP
Case:  Cullinane v. RCEA, Inc., et al. **(Jones Lang LaSalle, Inc.** and **Cushman & Wakefield)**
Court: County of Orange Superior Court of the State of California
No:    30-2015-00796929-CU-PO-CJC
Re:    Fungal growth, trial (12/04-05/2018)

Client: Alston & Bird and Dentons U.S. LLP
Case:  Dianne Henson v. Colgate-Palmolive Company, et al. **(Imerys Talc America** and **its predecessors)**
Court: County of Los Angeles Superior Court of the State of California
No:    BC702253
Re:    Asbestos/talc, deposition (12/13/2018)

Client: Alston & Bird, Dentons U.S. LLP, and King & Spalding, LLC
Case:  Joseph Woon-Shing Lee and Marina Lai-Kuen Lee v. A.W. Chesterton Company, et al. **(Imerys Talc America** and **its predecessors,** and **Johnson & Johnson)**
Court: County of Solano Superior Court of the State of California
No:    FCS050176
Re:    Asbestos/talc, deposition (01/04/2019)

Client: Alston & Bird and Dentons U.S. LLP
Case:  Robert Blinkinsop and Karen Blinkinsop v. Albertsons Companies, Inc., et al. **(Imerys Talc America** and **its predecessors)**
Court: County of Los Angeles Superior Court of the State of California
No:    JCCP 4674 / BC677764
Re:    Asbestos/talc, deposition (01/09/2019)

Client: Gates, Gonter, Guy, Proudfoot & Muench, LLP
Case:  Taddeo-Bates v. **Villa San Remo Homeowners Association**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC615636
Re:    THC/marijuana smoke odor, deposition (01/10/2019)

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Alston & Bird and Gallagher Sharp LLP
Case: Dean Rininger, Individually and as Special Administrator of the Estate of
JoAnne Rininger v. Hollingsworth & Vose Company, et al. (**Imerys Talc
America and its predecessors**)
Court: Court of Common Pleas, County of Summit, Ohio
No:     AC-2014-11-5256
Re:     Asbestos/talc, deposition (01/11/2019)

Client: Gibbs, Giden, Locher, Turner, Senet & Wittbrodt
Case: Revel v. **Fromm**, et al.
Court: County of Orange Superior Court of the State of California
No:     30-2017-00962706-CU-BC-CJC
Re:     Fungal growth, deposition (01/15/2019)

Client: Alston & Bird, Dentons U.S. LLP, and Kirkland & Ellis, LLP
Case: Pui Fong and Thai Wong v. **Johnson & Johnson**, et al. (**Imerys Talc
America and its predecessors**)
Court: County of Los Angeles Superior Court of the State of California
No:     BC675449
Re:     Asbestos/talc, deposition (01/21/2019) and trial (12/06/2019 and 12/09/2019)

Client: Slaughter, Reagan & Cole, LLP
Case: Moorehead v. **Huang, et al.**
Court: County of Ventura Superior Court of the State of California
No:     56-2017-00494146-CU-PO-VTA
Re:     Fungal growth, deposition (01/28/2019)

Client: Alston & Bird, Dentons U.S. LLP, and King & Spalding, LLP
Case: Gail Koretoff by and through her Guardian ad Litem, Allen Koretoff and
Anneilia Koretoff v. Arkema, Inc., et al. (**Johnson & Johnson**, and **Imerys
Talc America and its predecessors**)
Court: County of Los Angeles Superior Court of the State of California
No:     BC656506
Re:     Asbestos/talc, deposition (01/29/2019)

Client: Everett Dorey, LLP
Case: Chino-Pacific Warehouse Corporation v. **Leslie's Poolmart, Inc.**, et al.
Court: County of San Bernardino Superior Court of the State of California
No:     CIVDS1610810
Re:     Industrial hygiene/property damage (chlorine), deposition (01/30/2019)

Client: Alston & Bird and Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
Case: Moore v. Certainteed Corporation, Deere & Company, Guardline, Inc., et al.
(**Imerys Talc America and its predecessors**)
Court: Harris County, Texas Superior Court
No:     2015-37493-ASB
Re:     Asbestos/talc, deposition (02/11/2019)

-38-

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Dentons U.S. LLP
Case: Patricia Schmitz v. Johnson & Johnson, et al. (**Cyprus Mines Corporation**)
Court: County of Alameda Superior Court of the State of California
No:     RG18923615
Re:     Asbestos/talc, deposition (03/27/2019)

Client: Hanger, Steinberg, Shapiro & Ash, LLP
Case: **Benjamin, et al.** v. Soleimani, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     SC124566
Re:     Fungal growth/sewage, deposition (04/18/2019)

Client: Law Offices of John J. Thyne, III
Case: Polk v. **Gerrity**, et al.
Court: County of Santa Barbara Superior Court of the State of California
No:     18CV00938
Re:     Fungal growth/mycotoxins, deposition (05/30/2019) and trial (11/19/2019)

Client: Gordon Rees Scully Mansukhani, LLP; Bowman and Brooke, LLP; and Clark Hill
Case: Jimmy H. Thomas and Sonya Thomas v. Akzo Nobel, et al. (**The Savogran Company, W.M. Barr,** and **Berg Lacquer)**
Court: County of Alameda Superior Court of the State of California
No:     RG17882514
Re:     Benzene/myelodysplastic syndrome (MDS), deposition (06/19/2019)

Client: Kirkland & Ellis, LLP and Orrick, Herrington & Sutcliffe, LLP
Case: Cabibi v. Avon Products, et al. (**Johnson & Johnson)**
Court: County of Los Angeles Superior Court of the State of California
No:     BC665257
Re:     Asbestos/talc, deposition (06/21/2019) and trial (09/16/2019 and 09/17/2019)

Client: Jackson Lewis, P.C.
Case: Stephanie Van de Motter and Sally Tillotson v. **The Irvine Company, LLC, The Irvine Company Apartment Community, Inc.,** and **Irvine Community Development Company, LLC,** et al.
Court: County of Los Angeles Superior Court of the State of California – Santa Monica
No:     SC126761
Re:     Fungal growth, deposition (08/15/2019) and mediation (09/24/2019)

Client: Slaughter, Reagan & Cole, LLP
Case: Addison Marchese, et al. v. **Barry Farbenbloom, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC671426
Re:     Fungal growth/mycotoxins, deposition (09/09/2019)

## BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2020



Client: Weston & McElvain, LLP
Case: Health Pro Dental Corporation, et al. v. **Travelers Property Casualty Company of America, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC645118
Re: Fungal growth/mycotoxins, deposition (12/18/2019)

Client: Cozen O'Connor
Case: Doherty v. **State Farm General Insurance Company,** et al.
Court: United States District Court – Central District of California
No: 2:19-cv-01963 JFW (PLAx)
Re: Soot, char, and ash, deposition (12/20/2019)

Client: Gordon Rees Scully Mansukhani, LLP
Case: Bruce Rhyne and Janice Rhyne v. United States Steel Corporation, et al. **(The Savogran Company)**
Court: United States District Court – Western District of North Carolina, Charlotte Division
No: 3:18-cv-00197-RJC-DSC
Re: Benzene/acute myeloid leukemia (AML), deposition (01/17/2020)

Client: Phillips, Spallas & Angstadt, LLP
Case: Alejandra Garcia-Aguilar, et al. v. **Broad 26 Enterprises, et al.**
Court: County of Los Angeles Superior Court of the State of California – Central District
No: BC703738
Re: Habitability/mold growth/vector control, deposition (01/23/2020)

Client: Gordon Rees Scully Mansukhani, LLP
Case: Teresa Wade, individually and as Personal Representative of the Estate of Robert Wade v. United States Steel Corporation, et al. **(The Savogran Company)**
Court: Court of Common Pleas, State of South Carolina, County of Charleston
No: 2018-CP-10-01583
Re: Benzene/acute myeloid leukemia (AML), deposition (01/31/2020)

Client: Dorenfeld Law, Inc.
Case: Christina Beck v. **The Estate of William Merzbach, Nina Merzbach** and **Ralph Merzbach,** Pacific Realtors and Does 1 through 30, inclusive
Court: County of Los Angeles Superior Court of the State of California – Central District
No: BC706293
Re: Habitability/mold growth, deposition (02/03/2020)

-40-

Page 1 (Pages 1-4)

**Page 1**

1        UNITED STATES DISTRICT COURT
2        CENTRAL DISTRICT OF CALIFORNIA
3
4   SHANNEN DOHERTY,                  )
5        PLAINTIFF,                   )
6        VS.                          ) Case No.
                                      ) 2:19-cv-01963 JFW
7   STATE FARM GENERAL INSURANCE      ) (PLAx)
    COMPANY, AND DOES 1 THROUGH       )
8   10, INCLUSIVE,                    )
9        DEFENDANTS.                  )
10   _____  )
11
12
13    VIDEOTAPED DEPOSITION OF BRIAN DALY, CIH, PE
14       FRIDAY, DECEMBER 20, 2019, 3:11 P.M.
15            LOS ANGELES, CALIFORNIA
16
17
18
19
20
21
22
23  Reported by Desiree Cooks,
    CSR No. 14075
24  Job No. 7777
25

**Page 3**

1  APPEARANCES:
2
    For the Plaintiff:
3
       EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
4      BY: PETER SCOTT, ESQ.
       6420 Wilshire Boulevard, 17th Floor
5      Los Angeles, California 90048
       (323) 301-4660
6      Pscott@earlysullivan.com
7
    For the Defendants:
8
       COZEN O'CONNOR
9      BY: VALERIE ROJAS, ESQ.
       601 South Figueroa Street, Suite 3700
10     Los Angeles, California 90017
       (213) 892-7900
11     Vrojas@cozen.com
12
13  Also Present:
14     Tim Barker, Videographer
15
16
17
18
19
20
21
22
23
24
25

**Page 2**

1        UNITED STATES DISTRICT COURT
2        CENTRAL DISTRICT OF CALIFORNIA
3
4   SHANNEN DOHERTY,           )
5        PLAINTIFF,            )
                               )
6        VS.                   ) Case No.
                               ) 2:19-cv-01963 JFW
7   STATE FARM GENERAL INSURANCE ) (PLAx)
    COMPANY, AND DOES 1 THROUGH )
8   10, INCLUSIVE,             )
                               )
9        DEFENDANTS.           )
10   _____ )
11
12
13
14
15
16
17
18
19
20
21  THE VIDEOTAPED DEPOSITION OF BRIAN DALY, CIH, PE, taken
22  at 6420 Wilshire Boulevard, 17th Floor, Los Angeles,
23  California, on Friday, December 20, 2019, at 3:11 P.M.,
24  before Desiree Cooks, Certified Shorthand Reporter, in
25  and for the State of California.

**Page 4**

1                    INDEX
2
3  WITNESS: BRIAN DALY, CIH, PE
4
5  EXAMINATION                      PAGE
6  BY MR. SCOTT                      7
7
8
9
10      INFORMATION REQUESTED
11        PAGE   LINE
12          (NONE)
13
14      DOCUMENTS REQUESTED
15        PAGE   LINE
16          (NONE)
17
18  WITNESS INSTRUCTED NOT TO ANSWER
19        PAGE   LINE
20          (NONE)
21
22
23
24
25

                    Desiree Cooks

Page 5

1    INDEX TO EXHIBITS
2
3    EXHIBIT                              MARKED
4    Exhibit 620  Plaintiff Shannen Doherty's      17
          Notice of Deposition and
5         Subpoena to Produce Documents to
          Defendant's Expert, Brian P.
6         Daly of Hygienetech
7    Exhibit 621  Binder/Documents produced by     18
          Brian Daley and retained by
8         counsel
9    Exhibit 622  Curriculum Vitae of       25
          Brian P. Daly, CIH, PE
10
     Exhibit 623  Email dated June 5th, 2019,      67
11        May 15th, 2019 with attachments
12   Exhibit 624  Wildfire Smoke Impact Assessment  67
          S Maria Doherty Residence
13
     Exhibit 625  Request for Analysis, date       84
14        submitted December 12th, 2019
15   Exhibit 626  Report for Mr. Brian Daly, Marco  84
          Xu, Regarding Project 91910032-1
16
     Exhibit 627  Request for Analysis; date       84
17        submitted: December 13th, 2019
18   Exhibit 628  Data Table 91910032-1            84
19   Exhibit 629  Amended Data Table               87
20
21
22
23
24
25

Page 6

1         FRIDAY, DECEMBER 20, 2019, 3:11 P.M.
2              LOS ANGELES, CALIFORNIA
3
4         THE VIDEOGRAPHER:  Good afternoon.  We're on
5    the videotaped record beginning Disc Number 1 of Volume
6    Number 1 at 3:11 p.m.  My name is Tim Barker, and I'm the
7    videotape operator.  The name of my employer is the
8    Digital Department, Inc., located in Los Angeles,
9    California.  Today's date is December the 20th, 2019.
10        The location of today's deposition is the law
11   offices of Early Sullivan Wright Gizer & McCrae,
12   6420 Wilshire Boulevard, 17th floor, Los Angeles,
13   California 90048.  The case caption is Shannen Doherty
14   vs. State Farm General Insurance Company.  Today's
15   witness is Brian P. Daly.  The party on its behalf of
16   this deposition is being taken on is on the plaintiffs.
17        Will counsel please make verbal introductions
18   for the record.
19        MR. SCOTT:  Peter Scott on behalf of plaintiff.
20        MS. ROJAS:  Valerie Rojas on behalf of
21   defendant State Farm General Insurance Company.
22        THE VIDEOGRAPHER:  And will the Court Reporter
23   please administer the oath.
24   ///
25   ///

Page 7

1              BRIAN P. DALY,
2    having been first duly sworn, testifies as follows:
3
4              EXAMINATION
5    BY MR. SCOTT:
6    Q    Good afternoon, Mr. Daly.  My name is Peter
7    Scott.  I represent Plaintiff Shannen Doherty.  I believe
8    we've met before at the December 11th site inspection.
9         Could you please state and spell your name for
10   the record.
11   A    Sure.  Brian Daly, B-R-I-A-N.  Daly is D-A-L-Y.
12   Q    Can you give me your business address.
13   A    Yes.  It's 3625 Del Amo Boulevard, Suite 180,
14   in Torrance, California 90503.
15   Q    What's the name of your company?
16   A    Hygiene Technologies International, Inc.
17   Q    Ever had your deposition taken before?
18   A    I have.
19   Q    Approximately how many times?
20   A    Probably almost 300.
21   Q    Okay.  I'm going to skip the admonitions if
22   that's okay with you.
23   A    It is.
24   Q    When was the last time you had your deposition
25   taken?

Page 8

1    A    Two days ago.
2    Q    What was the nature of that case?
3    A    That was -- oh, that was a mold growth case
4    that involved an allegation of microtoxins.
5    Q    And that was in your capacity as an expert
6    witness?
7    A    Yes, sir.
8    Q    Have you ever been deposed in a lawsuit outside
9    of your capacity as an expert witness?
10   A    No.
11   Q    So every deposition that you've provided
12   testimony for has been in your capacity as an expert
13   witness?
14   A    Yes.
15   Q    Have you ever been a plaintiff in a lawsuit
16   individually?
17   A    Not outside small claims court doing
18   collections.
19   Q    Collection matters for your company?
20   A    Yes, yeah.
21   Q    Have you ever been a defendant in a lawsuit
22   individually?
23   A    No -- oh, no, no.  Correction:  The company
24   has.  When you say "you," I haven't personally, but
25   Hygiene Tech has been a sub- -- a defendant in lawsuits

Desiree Cooks

Page 3  (Pages 9-12)

**Page 9**

1 occasionally.
2 Q Yeah, can you give me an estimate as to how
3 many lawsuits Hygiene Tech has been a defendant?
4 A I started Hygiene Tech in 1998, and I would say
5 we have had one or so every other year. We're always --
6 we're never a lead defendant. We're usually in the
7 collection of Does towards the end or -- if not the end.
8 I don't think we have any ongoing right now.
9 Q Is there a general subject matter as to what
10 these lawsuits typically relate to?
11 A Oh, sure.
12 Q Can you tell me what that is?
13 A Most of them involved mold growth assessments.
14 Most of them involved bad faith lawsuits in which we were
15 hired by an insured -- I'm sorry. I misspoke -- the
16 insurance carrier to do an assessment, and we were then
17 named as a defendant in that -- in those lawsuits. You
18 didn't ask, but I'll tell you. We were either dismissed
19 or we settled -- our carrier settled for tiny amounts of
20 money, like, less than $5,000.
21 Q What's the nature of Hygiene Tech's business?
22 A We provide health and safety consulting mostly
23 to industry, but also we do some insurance-related
24 property damage work. And much more recently, I
25 provide -- I'm the top person at Hygiene Tech. I provide

**Page 10**

1 expert witness testimony, but it's all within the
2 discipline of health sites.
3 Q Approximately what percentage of Hygiene Tech's
4 business is related to insurance-related damage work, if
5 that's the term that you used? I may be misstating it.
6 A No -- or close enough. I understand the
7 question.
8 Right now, I would say it probably amounts to
9 10 or 15 percent. It was higher before. It was higher
10 before 2008. There was a change, apparently, around the
11 2008 time period. I won't guess why because it would be
12 a guess. Our insurance-related property damage work
13 dropped off sharply that year.
14 Q And what type of services would Hygiene Tech
15 provide in connection with that work?
16 A We mostly did mold growth assessment and soot,
17 char, and ash assessment related to the property damage
18 work.
19 Q So, for example, you recall Ninyo & Moore was a
20 participant in the adjustment of this claim and did some
21 assessment of the damage at the Doherty residence?
22 A Well, the answer to that is essentially yes. I
23 don't know what role they had in adjustment of claims
24 because I don't really do that. But sure, I remember
25 they were involved.

**Page 11**

1 Q Okay. Well, that's the similar role that
2 Hygiene Tech would have provided on behalf of the
3 insurance company?
4 A Sure. Uh-huh.
5 Q Okay. And Hygiene Tech still does that work,
6 but perhaps to a more limited extent?
7 A We almost do none of that type of work anymore.
8 But sure, that we would be willing to do if hired by a
9 carrier, sure, because we have the talent to evaluate
10 health hazards that are posed potentially by indoor air
11 contaminants and settled contaminants. And then, of
12 course, we can assess damage as well.
13 Q You may have answered this in the context of
14 another question, but is there any reason that you know
15 of as to why Hygiene Tech doesn't do that work to a great
16 extent anymore?
17 A I really don't know. There was a change in
18 policy, it seemed, where -- do you want to know more?
19 Q Sure.
20 A In the earlier 2000s, we were aware that
21 carriers would hire us to provide consulting with respect
22 to claims, and they would actually hire us to evaluate
23 health hazards or property damage. And as I indicated,
24 most of them were related to mold in the early going and
25 then later toward the -- I would say the mid 2000s, soot,

**Page 12**

1 char, and ash was a target contaminant as well.
2 I know that with respect to mold growth, some
3 carriers -- maybe even many carriers -- provided a limit
4 of liability or -- I might be using the wrong term, but
5 they would limit the payout for mold. And I recall
6 seeing a $5,000 figure or a $10,000 cap. And,
7 consequently, our carriers weren't asking for consulting
8 on those types of losses because they already had a cap.
9 And I won't guess how they handle that situation, but I
10 think that probably had everything to do with the fact
11 that we no longer did consulting on those earlier types
12 of claims.
13 Q I see. When did you start your expert witness
14 consulting work?
15 A Well, that question suggests that I actually
16 started that work. I actually didn't start. I did my
17 first consulting job, which resulted in me providing
18 expert testimony back in 1988.
19 Q That was the first time you were retained as an
20 expert witness in connection with a litigation?
21 A I think that answer is, essentially, yes. I
22 was hired as a consultant to perform health and safety
23 consulting. It was dealing with an asbestos abatement
24 project, a large one in a large building in Downtown Los
25 Angeles. And at some point toward the end of that

Desiree Cooks

Page 4 (Pages 13-16)

Page 13

1 project, I received an inquiry about providing expert
2 witness testimony, which I had never done before.
3         So, yeah, that led to a deposition. I don't
4 think it led to a trial. And then I -- without
5 advertising or, you know, marketing the company as an
6 expert witness firm or whatever you might call that type
7 of firm, we started receiving calls from attorneys, from
8 law firms asking for expert witness services in -- in the
9 discipline of industrial hygiene and occupational safety.
10         So after that first project or expert witness
11 assignment in '88, I think my next one perhaps was in
12 1990, '91; I recall being deposed in 1991. Perhaps the
13 next one was a year or two later. I'm sure you'd get the
14 idea. Eventually, we were receiving more calls. By the
15 2000s, I would perhaps receive one call a month, and it
16 just slowly built from there without any real intention.
17     Q   Understood. As you sit here today, can you
18 estimate for me the -- the approximate percentage of your
19 work that's devoted to expert testimony work?
20     A   I can. It's somewhere around 10 to 15 percent
21 of our revenue.
22     Q   How about your time individually? Can you
23 estimate for me the approximate percentage that you
24 devote to expert testimony work?
25     A   I can. I use -- when asked, I set it at about

Page 14

1 40 percent. The rest of my time is doing consulting work
2 with the rest of my staff or running the company.
3     Q   Understood. Do you recall when we were talking
4 about when Hygiene Tech would be retained on behalf of an
5 insurer to conduct a damage assessment?
6         Can you give me the names of the insurance
7 companies that retained Hygiene Tech in that capacity to
8 the extent you can remember them off the top of your head
9 right now?
10     A   Well, sure. There are names that are very
11 familiar; Allied or Nationwide was one of those clients.
12 We did work for -- rarely, but we have done work for
13 Allstate, some for State Farm, some for Farmers,
14 Travelers, Lloyd's of London, and for sure some others,
15 but those come to mind.
16     Q   Sure. Did Hygiene Tech ever act as a damage
17 assessor on behalf of insureds in connection with an
18 insurance claim?
19     A   Yes. In the capacity of an expert consultant,
20 yes, because we've done plaintiff work.
21     Q   Yeah, I suppose what I was trying to get at was
22 in the damage assessment work -- right? -- had Hygiene
23 Tech ever been retained on behalf of an insured to
24 conduct a damage assessment with respect to a claim
25 rather than being retained on behalf of the insurance

Page 15

1 company?
2     A   I'm with you. The answer is undoubtedly yes.
3 I don't recall any specifics, but if we can assess
4 damage, regardless if we find it or not, then sure.
5 We'll take those projects and do our job.
6     Q   And you have a specific recollection of being
7 retained on behalf of insureds to do that work?
8     A   I don't, but I'm sure that we have.
9     Q   Okay.
10    A   I would have to do research in order to come up
11 with names.
12    Q   Yeah, you're talking about ten years ago, so I
13 understand.
14    A   Or longer.
15    Q   Yeah. Can you estimate for me the percentage
16 of times that -- well, strike that. Let's disregard that
17 question.
18        You've been retained as an expert witness in
19 the matter of Doherty vs. State Farm General Insurance
20 Company?
21    A   Yes.
22    Q   And you've been retained on behalf of State
23 Farm; is that right?
24    A   Yes.
25    Q   Do you recall when you were retained?

Page 16

1     A   No. But I can look in my file and tell you.
2     Q   Yeah, if you can refer to your time sheet or
3 something like that.
4     A   According to this file, my best estimate would
5 be in the second half of September of this year.
6     Q   And you recall how that retention came about,
7 how you were initially contacted?
8     A   No, but perhaps I can get that answer for you
9 by looking in my file. Do you want me to do that?
10    Q   If there's something you think that will
11 refresh your recollection in there, go right ahead.
12    A   Yeah. I have something here. My office
13 manager, whose name is Elena Dominguez, contacted me
14 indicating that an attorney, Angel Marti of Cozen
15 O'Connor, contacted us on September 25.
16    Q   Do you know how Mr. Marti was referred to your
17 firm?
18    A   No. That would be a guess.
19    Q   Have you ever worked on a case previously with
20 Ms. Rojas to your left?
21    A   Yes.
22    Q   You have?
23    A   I have.
24    Q   Approximately how many times?
25    A   Not many. Maybe just once.

Desiree Cooks

Page 5  (Pages 17-20)

Page 17

1    Q    Okay.  And when we go through your report, you
2  had a list of cases and things like that.
3         Would you be able to identify the cases in that
4  list in which you worked with Ms. Rojas?
5    A    I would because I recall I was deposed in a
6  case -- I think the case in which I worked for Ms. Rojas,
7  and, therefore, that would be on the list.
8    Q    Yeah.  Okay.  So I'm going to get into that
9  shortly.  Can I mark this as -- you know, I think my side
10  has been going -- starting in the 600s.
11        MR. SCOTT:  Can I mark this as 620, please.
12        (Exhibit 620 marked.)
13  BY MR. SCOTT:
14    Q    Mr. Daly, this is Exhibit 620.  This is a
15  notice of deposition in this case.  It's directed to you,
16  and if you see on Attachment A, it's got a subpoena
17  there.
18    A    Yes.
19    Q    Have you ever seen either this notice of
20  deposition -- well, have you seen this notice of
21  deposition before?
22    A    I think I have, although I'm not too sure.
23    Q    You may not have.
24        Have you seen the subpoena attached to the
25  deposition before?

Page 18

1    A    Same answer.  I think -- maybe.
2    Q    Yeah.  And if you --
3    A    I'm not sure.
4    Q    If you see, on the subpoena, there's a document
5  request appended.
6    A    I see that.
7    Q    Did you bring documents with you today
8  responsive to these documents or document requests?
9    A    Well, I imagine I have.  I don't remember
10  seeing this, so I can't -- I think the answer to your
11  question is literally no, I didn't bring anything
12  pursuant to this document, at least, not in my mind.
13    Q    But you did bring a set of documents with you
14  today?
15    A    I did.  I might have brought everything in --
16  that's responsive to this.
17        MR. SCOTT:  Understood.  And you have in front
18  of you a manila folder that has some documents contained
19  within it.  And I had my office make a copy of what's
20  contained in that folder, a hard copy, that I'd like to
21  mark as 621, if I could.
22        And, Valerie, I apologize; I only made one copy
23  for myself.  So you may have to share with Mr. Daly, or
24  he can look at his original and you can look at that one.
25        (Exhibit 621 marked.)

Page 19

1  BY MR. SCOTT:
2    Q    Okay.  Mr. Daly, you were just handed
3  Exhibit 621.  Are these the hard copy documents that you
4  brought with you today?
5    A    Yeah, uh-huh.
6    Q    And you also brought with you a thumb drive; is
7  that right?
8    A    I did.
9    Q    And can you tell me what's contained on that
10  thumb drive?
11    A    Yes.  Just today, I word-processed a photo log,
12  and the photo log is a collection of some of the photos
13  that were recorded during the inspection by me and my
14  colleague of December 11th of this month.
15    Q    Okay.  Anything else on that thumb drive?
16    A    No.
17    Q    Are the photos that you took at that site visit
18  on the thumb drive?
19    A    Well, sure.  The photo log consists of about
20  70, 72 photos and captions.  Those were selected from
21  the -- the universe of photos that were recorded, so not
22  every photo that we recorded on that day is contained in
23  the photo log; however, I do believe we could easily
24  provide you with the raw photos -- a complete set of the
25  raw, which is somewhat duplicative to the photos that are

Page 20

1  in the log.
2    Q    Yeah, I would actually request if you could
3  provide those to me.
4         And I understand you may not be specifically
5  relying on then in forming your opinions, but the photos
6  contained in the photo log on the thumb drive, are those
7  the -- in your mind, the key photos upon which you're
8  relying in forming your opinion?
9    A    Sure.  At least -- yes to the key photos but
10  also representative photos of all the points that I had
11  indicated to make.  You know, I have points, opinions
12  that I would intend to offer, and those photos are
13  consistent and in support of those opinions.
14    Q    Okay.
15    A    So there could be others too.
16        MS. ROJAS:  Peter, just so you know, those are
17  being marked right now confidential, and the link will be
18  sent to you.
19        MR. SCOTT:  Oh, the full suite of photos?
20        MS. ROJAS:  Yeah, the raw photos.
21        MR. SCOTT:  The 600 or so?
22        MS. ROJAS:  Yeah.
23        MR. SCOTT:  Okay.
24        THE WITNESS:  It's not 600.
25        MS. ROJAS:  However many there are.

Desiree Cooks

Page 6  (Pages 21-24)

Page 21

1      THE WITNESS: It's more like 180.
2      MR. SCOTT: Yeah.
3  BY MR. SCOTT:
4    Q    And you understand you're here today pursuant
5  to the subpoena that was attached to this Exhibit 620?
6    A    Well, I would imagine that's true.  No reason
7  to believe that's not true.
8    Q    Okay.  Did you do anything to prepare for your
9  deposition today?
10   A    Well, sure.
11   Q    Can you tell me what that was?
12   A    I prepared a photo log that didn't exist
13  yesterday.
14   Q    And that was in preparation for the deposition?
15   A    Sure.  I reviewed documents.  I reviewed my
16  file.  I reviewed our data recorded by laboratories that
17  we hired to analyze samples.  And that's essentially it.
18   Q    Did you have any meetings with Ms. Rojas in
19  preparation for your deposition today?
20   A    I had a meeting with Ms. Rojas, but it wasn't
21  in preparation for my deposition.  I met with Ms. Rojas
22  between 2:00 and 3:00 today because of a delay in the
23  deposition time but only for that reason.
24   Q    Did you discuss anything at that meeting in
25  preparation for the deposition?

Page 22

1    A    Well, again, your question suggests that that
2  was in preparation for this deposition.  I did discuss
3  things for no other reason than the obvious reasons.  I
4  had discussed some of the data, my findings.  I basically
5  repeated some of the opinions to Ms. Rojas that I had
6  formulated previously.  But, again, none of that was in
7  preparation for this deposition.
8      It basically was just -- I was using the time
9  as an opportunity to re-emphasize my opinions, and then I
10  explained the justification for some new opinions that
11  arguably she had not heard before.
12   Q    And are the new opinions you just referenced,
13  are those contained in your written Federal Rule of Civil
14  Procedure 26 report, or they were formed after that was
15  generated?
16   A    After.
17   Q    Okay.  When you were originally contacted about
18  this case, what was your understanding of the scope of
19  your retention?
20   A    My original scope, which is not very different
21  than my present-day scope, was to review documents with
22  respect to the subject property and render opinions with
23  respect to damage -- I'm being general here -- damage,
24  health issues, and let's call it remediation, scopes of
25  work.

Page 23

1    Q    Did your scope of work include a review and
2  critique of the Ninyo & Moore reports generated in
3  connection with the claim?
4    A    Yes.
5    Q    Did your scope include review and critique of
6  the KCE Matrix reports generated in connection with the
7  claim?
8    A    Yes.  Your question suggests that there are
9  plural; that there's more than one of those two firms.  I
10  don't really remember that there was more than one
11  necessarily.
12   Q    That may be true, yeah.
13   A    Maybe there were more than one, but yes to both
14  of those organizations.
15   Q    Okay.  Anyone else from your company that's
16  been working on this case?
17   A    Yes.
18   Q    Can you tell me who?
19   A    Just one.
20   Q    And who's that?
21   A    Mar- -- well, I guess technically a third
22  person too.  Marco Xu, X-U, is his last name.
23   Q    He was that fellow that was at the site
24  inspection?
25   A    That's right.

Page 24

1    Q    Okay.
2    A    And then just today, because I didn't have the
3  administrative time to do it myself, I had another
4  colleague on staff -- Chun, C-H-U-N, Lau, L-A-U --
5  forward a link or a download of the raw photos.
6    Q    Was that the extent of Chun's involvement in
7  this case?
8    A    Yes.
9    Q    Marco Xu, is he an engineer?
10   A    No.  He's an industrial hygienist.
11   Q    You're an engineer, though?
12   A    I am.  I'm the only one at the company.
13   Q    I got it.  So Marco is a certified industrial
14  hygienist?
15   A    No.  He's an industrial hygienist.  He's not
16  certified.
17   Q    And other than attending at that site
18  inspection and I believe he took some samples, has Marco
19  done any other work on the case?
20   A    Yes.
21   Q    Can you tell me what?
22   A    Yes.  He collected samples, he delivered
23  samples to the laboratory, and he word-processed the data
24  table.
25   Q    Anything else?

Desiree Cooks

Page 25

1    A    I think no.
2    Q    Does Marco have a bio on your web page?
3    A    I don't think so, no.
4    Q    Can you tell me what his qualifications are?
5    A    Sure. He's a degree, industrial hygienist
6  with, I would estimate, four years' experience with us,
7  with Hygiene Tech.
8    Q    He has a bachelor's degree?
9    A    Uh-huh. Yes.
10   Q    Can you tell me what university that was from?
11   A    I don't recall, but I can get you that
12 information.
13   Q    Not necessary.
14   A    I think it's from Cal State, Northridge.
15   Q    That's where you went as well?
16   A    That's where I went. I think that's correct,
17 but I'm not confirming.
18   Q    Understood.
19        MR. SCOTT: Can I mark that next in order, when
20 you get a chance.
21        (Exhibit 622 marked.)
22 BY MR. SCOTT:
23   Q    Mr. Daly, at some point, you generated a
24 Rule 26 expert report in this case, a written
25 report; right?

Page 26

1    A    Yes.
2    Q    The document you have in front of you,
3  Exhibit 622, is that the Rule 26 report?
4    A    Yes.
5    Q    Okay. The first five or so pages, it looks to
6  be a copy of your CV?
7    A    Yes. It's six pages.
8    Q    Six pages. Is that a current CV for you?
9    A    Yes.
10   Q    And all the information contained on this is
11 accurate, to your knowledge?
12   A    Oh, well, of course it's accurate.
13   Q    Okay.
14   A    I think it's also current.
15   Q    Okay. So to your knowledge, nothing has
16 changed since you produced this on October 25th to the
17 present date?
18   A    Yes.
19   Q    All these licenses are still current?
20   A    They are current. Neither is a license,
21 though: One's a certification, and one's a registration.
22   Q    So the certification is still current?
23   A    Yes.
24   Q    The registration is still current?
25   A    Yes.

Page 27

1    Q    Do you have an engineering license?
2    A    Well, no. It's not a license. It's a
3  registration with the State of California.
4    Q    Is there such thing as an engineering license?
5    A    I don't think so, at least not in this state.
6  There could be in other states.
7    Q    It's my own ignorance.
8        MS. ROJAS: I didn't know either.
9  BY MR. SCOTT:
10   Q    Okay. And then after the CV, the six pages,
11 this is a rate sheet?
12   A    It is.
13   Q    And what's your current rate for deposition and
14 trial testimony?
15   A    525 -- I'm sorry. I misspoke. 575.
16   Q    Next page is an October 25, 2019 letter from
17 you to Cozen O'Connor.
18        Do you see that?
19   A    I did.
20   Q    Did you draft that?
21   A    I did.
22   Q    And that's your signature on that?
23   A    Yes.
24   Q    Next appears to be the Federal Rule 26 expert
25 report, and that goes on for approximately eight

Page 28

1  pages; is that right?
2    A    Yes.
3    Q    And that's your written report in this case?
4    A    Yes.
5    Q    Okay. If you turn past that, there's a long
6  expert witness testimony list that goes on for 39 pages.
7        Do you see that?
8    A    I do.
9    Q    Okay. Is this a current list?
10   A    No. The current list would be this month.
11   Q    Okay. Approximately how many cases do you
12 think you need to add on to this to have it be current?
13   A    I'll answer that this way: There literally is
14 just one additional case -- I just reached Page 40;
15 however, there's some notations on some of the existing
16 cases here that I've given updated dates because there
17 has been testimony.
18   Q    Oh, I see.
19   A    Are you with me?
20   Q    Yes.
21   A    There's one brand-new one that wasn't on --
22 that isn't on this list, and then I attended some trials.
23 I believe, since September.
24   Q    Okay. What's the new case that you would need
25 to add on to this list to bring it current? Can you just

Desiree Cooks

Page 8  (Pages 29-32)

Page 29

1  give me the case name?
2   A   Yeah, I can. It's Health Pro Dental vs.
3  Travelers, and that was the depo I just gave two days
4  ago.
5   Q   What court is that case pending in?
6   A   I don't know. I don't remember.
7   Q   Is it in Los Angeles County?
8   A   It should be, yes.
9   Q   Is it a state court case or federal court case?
10   A   I don't think it's a federal because I didn't
11  do a report.
12   Q   And were you retained on behalf of Travelers
13  Insurance Company?
14   A   I was.
15   Q   I recall earlier in the deposition you said
16  that you had previously worked with Ms. Rojas on maybe
17  one or more cases.
18       Could you identify those for me in this list?
19  I think I may have found one on my own, but...
20   A   Well, if you did, then that was it. I think
21  there is only one.
22   Q   On Page 31, the Comey vs. State Farm case; is
23  that it?
24       MS. ROJAS:  No. That wasn't me. I was on the
25  case. I didn't retain him for that. I can help you guys

Page 30

1  out if you want me to.
2       MR. SCOTT:  That may expedite things.
3       MS. ROJAS:  It's the Wilshire Manor case,
4  Brian.
5       THE WITNESS:  Oh, yeah. You know, that's
6  right. And I don't recall whether I was deposed on that.
7  I think perhaps I wasn't, but...
8  BY MR. SCOTT:
9   Q   Do you know what page that's on in here?
10   A   No.
11       MS. ROJAS:  Is it chronological?
12       MR. SCOTT:  Yeah.
13       THE WITNESS:  Essentially.
14       MS. ROJAS:  2015 or...
15       THE WITNESS:  I'm not seeing it.
16  BY MR. SCOTT:
17   Q   Did you provide deposition testimony in that
18  case?
19   A   I don't remember.
20   Q   Did you provide trial testimony in that case?
21   A   I think that is highly unlikely.
22   Q   Have you ever worked with Mike Davisson before?
23   A   I don't think so.
24   Q   Ever worked with Angel Marti before?
25   A   No.

Page 31

1   Q   Have you ever worked with the law firm of Cozen
2  O'Connor before?
3   A   Yeah. One time.
4   Q   And was that the Wilshire Manor case?
5   A   Yes.
6   Q   Have you ever worked with Sedgwick LLP before?
7   A   Yes.
8   Q   Approximately how many times?
9   A   Not much. Maybe -- not more than several.
10   Q   And to your recollection, Mike Davisson was not
11  involved with any of those cases?
12   A   Not that I recall.
13   Q   Just to your recollection?
14   A   Yeah.
15   Q   Okay. Have you ever been retained as an expert
16  on behalf of an insurance company in a litigation?
17   A   Well, I don't know how to answer that, really.
18  I've been retained by insurance carriers in bad faith
19  cases. Is that the capacity --
20   Q   Yeah, as a testifying expert witness, have you
21  ever been retained on behalf of an insurance company?
22   A   Yeah.
23   Q   As a testifying expert witness, have you ever
24  been retained on behalf of an insured against an
25  insurance company?

Page 32

1   A   Yes.
2   Q   Okay. Approximately how many times?
3   A   The latter relationship, so on behalf of
4  plaintiff?
5   Q   Yeah, on behalf of a plaintiff against an
6  insurance company.
7   A   I'm with you. I would say half a dozen or --
8  no, it's got to be more. At least a dozen times, likely
9  more than 12. Interestingly enough -- or at least
10  interesting to me -- I've been deposed by clients, by
11  attorneys who I have worked for.
12   Q   In your capacity as an expert witness?
13   A   Yeah, so against the -- the same individual
14  that, on other cases, has hired me before and since. But
15  that doesn't matter to me.
16   Q   Can you estimate the percentage of your cases
17  in which you've been retained on behalf of an insured
18  against an insurance company?
19   A   No. You and/or I can do it by looking at this
20  list. If you pay attention to the boldface on parties,
21  that's my client.
22   Q   Okay. So that's -- if I wanted to perform that
23  calculation myself, I would look at the bolded entity or
24  individual on the list and just do a percentage
25  calculation?

Desiree Cooks

**Page 33**

1    A    Yeah, exactly.
2    Q    Can you estimate for me the percentage of times
3  you've been retained to offer expert testimony on behalf
4  of an insurance company?
5    A    Well, not really. I don't always know
6  necessarily. If an insurance carrier is involved,
7  sometimes I'm hired by an attorney for an entity, and I
8  have no idea whether there's a liability character -- a
9  party involved. Perhaps the party is self-insured. I
10  don't really get into that, so I don't really know.
11    Q    Sure. But just sitting here today, testifying
12  on behalf of an insurance company -- not necessarily a
13  party that has insurance or insurance company that's
14  maybe paying the bill on behalf of that third party, but
15  on behalf of an insurance company in a first-party case,
16  can you estimate for me the percentage of times you've
17  been retained as an expert witness on behalf of the
18  insurance company in those cases?
19    A    You made it easy for me to answer. Almost
20  never.
21    Q    Okay.
22    A    I think -- I think I have just been hired by an
23  insurance company recently where I was literally just
24  hired by the insurance company, and I have no idea who --
25  I have no idea about any parties that would be involved

**Page 34**

1  necessarily in the claim or if -- even if it's a case.
2  That's rare.
3    Q    And that would be for expert witness testimony?
4    A    Well, not necessarily. I was hired by a
5  carrier to evaluate the timing in which mold growth had
6  occurred based on photographs, and I have no idea why
7  that information is important. I could guess and I'd
8  probably be right, but I have no confirmation on the
9  purpose.
10    Q    You don't know if that's in connection with the
11  litigation, for example?
12    A    True. I don't.
13    Q    Have you ever been retained to offer expert
14  testimony on behalf of State Farm General Insurance
15  Company?
16    A    Only in, I believe, bad faith cases where I'm
17  hired by counsel for State Farm. So the answer is yes.
18    Q    Oh, I see the distinction you're making there.
19  Okay.
20         Can you estimate for me the percentage of times
21  that you've been retained by counsel to provide expert
22  testimony on behalf of an insurance company in connection
23  with the litigation?
24    A    The answer is no, but you could do that
25  calculation, too, by looking at this, just by looking at

**Page 35**

1  the --
2    Q    So if I see an insurance company is bolded on
3  the list, that would be one; right?
4    A    Yes. For sure, that would be one. Or if you
5  had -- if you could assume based on the law firm that
6  hired me -- and they're listed first in each of these
7  entries -- and assume what the relationship would
8  probably be with the boldfaced party that shows just
9  below it, then the answer is yes.
10         And with respect to my expert testimony, that
11  happens a lot because I'm often not contacted by the
12  party that is suing someone else or that is being sued by
13  someone else. I'm hired by counsel.
14    Q    Have you ever offered expert testimony in
15  connection with the litigation on behalf of a client
16  against State Farm General Insurance Company?
17    A    I don't know. Maybe.
18    Q    Okay.
19    A    Certainly wouldn't be outside the realm of
20  possibilities.
21    Q    Sitting here today, you just don't recall any?
22    A    That's right. I don't recall. And also, this
23  isn't a complete list of all the testimony I've ever
24  given, and, certainly, this is not a list at all of all
25  the times I was hired.

**Page 36**

1    Q    Uh-huh. Yeah, understood.
2    A    This is only the testimony list.
3    Q    Are there other times that you've offered or
4  provided expert testimony that are not reflected on this
5  list?
6    A    Yeah. Sure.
7    Q    Is there a reason why they're not on the list?
8    A    Sure.
9    Q    Can you tell me why?
10    A    I wasn't keeping the list until I started
11  Hygiene Tech, and I started keeping the list on
12  September 1st of 1998, but I did find one deposition
13  transcript of mine from '91.
14    Q    So the reason that those aren't on the list is
15  because they're relatively old? They would --
16    A    They're really old.
17    Q    They would have predated 1998, for example?
18    A    Yes.
19    Q    So is this list complete as far as your
20  testimony list from approximately 1998 forward?
21    A    September 1, '98 forward, yeah. Nothing has
22  been elim- -- or omitted, at least knowingly.
23    Q    If you go back to your report here, starting on
24  the first page, did you generate this report?
25    A    I did.

Desiree Cooks

**Page 37**

1  Q   This is your original work product?
2  A   Yes.
3  Q   And you typed all the words into the report
4  here?
5  A   Yes.
6  Q   When was this report completed?
7  A   The date, so October 25 of this year.
8  Q   Were there prior drafts of this report?
9  A   Well, not really.  I'll tell you how I do this
10 type of work, and you'll know what I'm talking about when
11 I say "not really."
12       Usually, I will create a report over one day,
13 over a period of days, not necessarily consecutive.  So
14 I'll have some version of this report that will exist
15 that won't be complete, and that, more likely than not,
16 occurred with respect to this report.
17       And while it's temporarily saved on my computer
18 and hard drive, it's not permanently saved, you know?
19 When I resume work on this report, I modify it, and then
20 there's a new partially written report.
21 Q   Right.  It's a work in progress?
22 A   It's a work in progress.  So there are no
23 drafts.  I didn't, like, think I was done and finished
24 and send it out as a draft.  It wasn't like that.
25 Q   Okay.  That was going to be my next question.

**Page 38**

1       Did you ever have a draft of this report that
2  was sent to Cozen O'Connor for review?
3  A   Not likely.  I don't remember doing that, and I
4  would expect I didn't do that.
5  Q   And you don't recall ever getting comments back
6  on a draft of things to change or something of that
7  nature?
8  A   That's right.
9  Q   Okay.  This was just -- the final work product
10 was generated and was sent on to Cozen O'Connor?
11 A   Yes.
12 Q   If you go to Paragraph 4, Section 4 of the
13 report, "Documents Reviewed" --
14 A   Yes.
15 Q   -- is that a complete list of the documents
16 that you reviewed to generate this report?
17 A   Yes.  At least that's how I intended it.
18 Q   Were there any other standards or industry
19 publications that you relied on to generate the report
20 that are perhaps not listed here?  And just so you know
21 what I'm talking about, like, the RIA guidelines, for
22 example.
23 A   Yeah, I know of the RIA guidelines.  I've got
24 an electronic copy.  I didn't list that here because I
25 didn't review that document specifically for this.  I've

**Page 39**

1  reviewed that document well before I generated this.  I
2  talk about -- since you bring the RIA document up, I talk
3  about that, particularly if others talk about that.  And
4  in this case, others did.
5       So I'll address that in general terms without
6  listing it here because, again, I didn't review it.  This
7  is entitled "Documents Reviewed."  I don't think there's
8  any other document that would fit that category.
9  Q   Yeah, and I can tell you I didn't really see
10 any other one.
11       But would you say that you referenced the RIA
12 guidelines but didn't necessarily rely on them, if that
13 makes sense?
14 A   Well, interesting you bring that up.  I
15 reference it because others did.  I don't really rely on
16 that document when I write my reports, whether they're
17 expert witness Rule 26 reports or consulting reports.  I
18 rely on the results of sampling, health issues that are
19 potentially related if any are potentially related, and
20 my experience and training and education with respect to
21 abatement techniques.
22 Q   Is there a difference between the RIA
23 guidelines and the, quote/unquote, "Industry Standard"
24 for remediation of smoke damage?
25 A   Technically, of course, there will be

**Page 40**

1  differences.  I believe that the industry standard or
2  standards are subject to -- let's call it the eye of the
3  beholder.  Different people have different impressions on
4  what the industry standards may be or should be.
5       I have opinions, also, on that.  Mine are based
6  in science whereas others may be based in -- on other
7  documents and/or on economics.  I don't really get into
8  economics when I make recommendations for abatement or
9  remediation because I don't really know abatement costs,
10 and I don't necessarily know the value of the articles
11 being cleaned or replaced.  So I don't get into that.  I
12 focus on the sites.
13 Q   When you say "economics," are you referring to
14 whether it would cost more to remediate or clean
15 something than it would to just replace it?
16       Is that the --
17 A   Sure.  Yeah.
18 Q   Anything else you're referring to when you say
19 "economics"?
20 A   Not really.
21 Q   So your focus is exclusively on whether an item
22 can be cleaned to its pre-loss condition?
23 A   Well, no.  That's a little different than what
24 I intended.  I focus on damage, what is background, and
25 health.  So I consider all equally.  Because if -- do you

Desiree Cooks

Page 11  (Pages 41-44)

Page 41

1  want to know why?
2  Q   Sure.  Yeah.
3  A   Health is my main focus, and you and I can
4  agree -- and hopefully we can -- that background levels
5  of contaminants, whether they're airborne or
6  surface-born, do not lead to measurable increases in
7  disease, well, then background is normal.  And by
8  "background," I mean what are the values of potential
9  contaminants that have no known single source?
10      And by way of example, I'll explain it this
11  way.  This is, of course, true but in another discipline.
12  We know that background airborne asbestos levels exist in
13  metropolitan areas and other areas, as a matter of fact,
14  as well, at certain levels that we consider,
15  quote/unquote, "background."  That's because we have no
16  single source.
17      We're not talking about being downwind of an
18  asbestos mine.  We're not talking about Somerset County,
19  New Jersey, where a certain company, manufacturer of
20  asbestos-containing materials operated for decades.
21  We're not talking about Libby, Montana, where vermiculite
22  contaminated with asbestos was also mined.  No, we're not
23  talking about those -- let's call them hot spots.  We're
24  talking about just the routine background levels that we
25  can have in metropolitan Los Angeles.  So no known single

Page 42

1  source or multiple sources necessarily for downtown L.A.
2      There are background levels; that does not lead
3  to measurable increased incidence of asbestos-related
4  disease.  I'll stop there with the example.  In this
5  case, we're talking about soot, char, and ash.  That's
6  also an environmental entity.  Those are three
7  environmental entities that exist at some levels.  Okay?
8      So here's my point on all of that.  With that
9  said, if the so-called contaminants are at background,
10  then that means at least two things to me:  One, that
11  means that the environment is not damaged because the
12  levels of the contaminant -- the target contaminants are
13  at background.  It also means that we won't expect to see
14  an increase in health hazard to be potentially exposed.
15      And that's what industrial hygienists do for a
16  living.  We -- we anticipate what contaminants might be
17  there; we measure them; we evaluate them for two
18  health-related issues:  One, acute exposure -- in other
19  words, short term -- that can cause signs and symptoms
20  immediately; and then, we evaluate those exposures over
21  the long term.  We call those chronic exposures.
22      And we made calculations in order to determine
23  the risk of ill effect, whether it's short-term acute
24  symptoms or whether it's a cumulative exposure that will
25  lead to long-term chronic effects.

Page 43

1      So with all that said, that's what we do, and
2  that's what I did here.
3  Q   Okay.  In Malibu, do you know what the
4  background levels of soot, char, and ash are typically?
5  A   Yes.  I can answer that question in terms of
6  surface contamination.  Yes, I do.
7  Q   Yeah, can you tell me what those figures are?
8  A   Well, sure.  Char can be expected to be, I
9  would say, between 1 and 2 percent randomly on surfaces
10  or below.
11  Q   This is in Malibu in particular if --
12  A   Yes.  Uh-huh.
13  Q   Okay.  Got it.
14  A   Well, I don't have to just limit it to Malibu,
15  but I was limiting it to Malibu because of your question.
16  I would expect, in the Los Angeles basin, the same
17  background levels.  Having 1 to 2 percent as the upper
18  end of background on random surfaces without any known
19  source, that is normal.
20  Q   Okay.
21  A   I wouldn't say it would be normal if I
22  collected 20 samples on a property and all of them were
23  at 1 to 2 percent; that would not be normal, so that
24  wouldn't be background.  But having varying degrees from
25  nothing detected at all -- I'm only talking char now.  I

Page 44

1  don't know if I mentioned that --
2  Q   Yeah.
3  A   From no char detected to 2 percent
4  occasionally, then that would be within expectations.
5  Q   Okay.  How about soot?
6  A   I don't expect to have any soot unless you have
7  a source for that soot.  And the source for the soot can
8  be any number of things:  A burning 2-by-4 will make
9  soot.  The cooler the fire, the more soot you'll have.  A
10  burning tire will produce plenty of soot because that's
11  actually an organic material.  It's much more prone.
12  Well, wood is an organic material of course as well.
13  Those are all fuels.
14  Q   So in Malibu, the kind of baseline background
15  you'd expect to see is a -- no detection of soot?
16  A   I wouldn't expect to have high levels of soot
17  outdoors or indoors.  But also, I want to warn you that
18  if you take -- if you go into any building -- let's say
19  this building -- and you take 2,000 samples, some of them
20  are going to show some soot.  That's statistics.
21      Soot does exist.  Some surfaces will have
22  evidence of soot for no known reason.  So if you take
23  enough samples, you'll get all three in some of those
24  samples, and it would take an industrial hygienist or
25  another with, you know, appropriate qualifications to

Page 12 (Pages 45-48)

Page 45

1 evaluate whether that seems to be above background.
2        I must have used that term a number of times
3 now, and really when it comes to issues related to damage
4 and issues related to health, the target is if surfaces
5 or airborne concentrations are above background. That's
6 what -- that's what we use.
7    Q    Okay. And then ash, what would be the kind of
8 baseline background level you'd be expecting to see in
9 Malibu?
10   A    Less. Less ash unless we had an ongoing fire;
11 right? Ash can travel many miles -- you know, tens of
12 miles, a hundred miles depending on the size of the fire.
13 And of course, you'll have ash. But then the ash will
14 basically go to background. It will become part of the
15 environment at the first rain or the first washing.
16   Q    So you'd expect kind of a known --
17   A    Limited. Yeah, not much ash --
18   Q    Okay.
19   A    -- unless there's some good reason for that to
20 exist.
21   Q    And these levels that we just discussed, are
22 these the baseline levels that you were using in your
23 calculations for what the, quote/unquote, "Pre-Loss
24 Condition" of the insured's property is in this case?
25   A    Yes.

Page 46

1    Q    Okay.
2        MR. SCOTT: Can we take a five-minute break.
3        MS. ROJAS: Sure.
4        THE WITNESS: You bet.
5        THE VIDEOGRAPHER: We're going off videotaped
6 record at 4:10 p.m. That will conclude Disc Number 1 on
7 Volume Number 1.
8        (Break held off the record.)
9        THE VIDEOGRAPHER: Back on the videotaped
10 record beginning Disc Number 2 of Volume Number 1 at
11 4:19 p.m.
12 BY MR. SCOTT:
13   Q    Mr. Daly, when you drafted your expert report
14 and finished it on October 25th, were you aware of the
15 insured's medical condition at that point in time?
16   A    Well, I don't know which medical --
17        MS. ROJAS: Objection. Vague and ambiguous.
18        But go ahead.
19        THE WITNESS: I don't know what medical
20 condition you're referring to. I really didn't have a
21 firm idea -- I really didn't have any idea about medical
22 conditions. I was consulting based on just general
23 industrial hygiene practices.
24 BY MR. SCOTT:
25   Q    So as of October 25th, you didn't know what the

Page 47

1 insured's medical condition was?
2    A    Yes.
3    Q    Okay. At some point after you generated this
4 report, did you learn that the insured has a medical
5 condition?
6    A    Yes. At least two, arguably three.
7    Q    And when did you learn that?
8    A    Directly, that was confirmed by me today. I
9 looked at medical records today. I was informed, though,
10 by my client that your client had or has breast cancer
11 that had metastasized to the lymph nodes or vice versa.
12
13
14
15   Q    Same time. And sometime after October 25th,
16 you became aware that she has Stage IV terminal cancer?
17   A    I heard that orally. I didn't read that.
18 Perhaps it's in the medical records. I don't recall
19 seeing that.
20   Q    Did you review the medical records in
21 connection with the formation of any of your opinions in
22 this case?
23   A    Well, I did review them.
24   Q    Did it change your opinion in any way in the
25 case?

Page 48

1    A    In any way, sure. Uh-huh.
2    Q    How so?
3    A
4
5
6
7
8
9
10
11   Q    Okay. Did your review of the medical records
12 change your opinions in any way than what's reflected in
13 the Rule 26 report?
14   A    Yes. I'll expand on that, then. I didn't see
15 any evidence in this house, in the subject property -- so
16 outside the house and inside the house -- that the
17 airborne particulate would be above background. As a
18 matter of fact, I wouldn't even expect it to be
19 measurable by the standard industrial hygiene methods. I
20 reviewed a doctor's report whose name is...
21   Q    Piro?
22   A    Piro. Thank you. Yes. I was going to find
23 it, but thank you.
24        So Dr. Piro wrote a letter that was highly
25 suggestive that he was recommending that Ms. Doherty's

Desiree Cooks

Page 13  (Pages 49-52)



Page 49

1  home environment be particulate-free, which is
2  impossible.  He used a term "toxic"; that's also
3  impossible.
4       However, I got the -- I had the
5  understanding -- and so the conclusion that tied these
6  points together after my report was generated was that I
7  went to the home, and I saw that there's no expectation
8  that we would have above-background levels of
9  particulate, whether it's soot, char, and ash or anything
10  else.
11  ███████████████████████████████
12  ███████████████████████████████████████████
13  ███████████████████████████████████████████
14  ████████████████████not the home
15  environment, not the airborne particulate in that home.
16       Q    Based on your site visit on December 11, do you
17  now believe that that home is in compliance with the
18  standards set forth with Dr. Piro's November 20th letter?
19       A    No.  I'm glad you asked, though.  In Dr. Piro's
20  November 20th letter, he set an impossible standard for
21  the Doherty home.  You'll never achieve that standard.
22  I'll paraphrase.  I mean, I could find it and quote him,
23  but he essentially said █████████████████
24  ████████████████That is impossible.  That home
25  will never be ███████████

Page 50

1       Without going into too many examples that I
2  haven't already talked about, when I visited the home,
3  there was vehicular traffic in the vicinity.  As a matter
4  of fact, there was a car parked close to the front door,
5  and that car presumably uses gasoline as a fuel.  And
6  unleaded gasoline has benzene, and that's toxic, and
7  that's in the environment, and that would be in the home.
8  And there's no expectation that Dr. Piro was talking
9  about removing all benzene from the home.
10       What he was talking about, I presumed -- this
11  is just my interpretation, not speculation, but my
12  interpretation is that he was saying█████████████
13  ████████████████████████████████████████
14  ████████████████████████████████████████
15  ████████████████████████████████████████
16  ████████████████████████████████████████
17  ████████████████████████████████████████
18  ████████████████████████████████████████
19  ████████████████████████████████████████
20  ██████████████████████████████
21  ████████████████████████████████████████
22  █████████████████████████████
23       Q    Did you run your findings -- when you went to
24  the property on December 11th, you took certain samples
25  from the home?

Page 51

1       A    Yes.
2       Q    And you had lab results done on those samples?
3       A    Yes.
4       Q    Did you run those findings by any independent
5  medical professional?
6       A    No.
7  ████████████████████████████████████████
8  ████████████████████████████████████████
9  ████████████████████████████████████████
10       A    Well, I'm not going to say it's exclusively my
11  opinion, but it is my opinion.  And for this case and my
12  testimony, it's only based on my training, education, and
13  experience because I evaluate indoor contaminants and
14  outdoor contaminants routinely.
15       Q    And that opinion was not vetted or run by any
16  other medical professional; is that --
17       A    Not in this case, no.  It has in other cases.
18  And when I say "case," I don't necessarily mean
19  litigation.  But no, I didn't discuss that matter with
20  any medical professional for this case.
21       Q    In your October 25th report, you have certain
22  recommendations as to how the property should be
23  remediated; right?
24       A    Well, yes.  Based on the data that were
25  recorded then, yes.  Uh-huh.

Page 52

1       Q    Yeah, now knowing of the insured's medical
2  condition, do any of your recommendations as to how the
3  property should be remediated change?
4       A    No.  Not because of her medical condition.  I
5  have new recommendations in mind to tell you about based
6  on the data that I recorded.  It's a bit misleading, what
7  I just said, because, literally, we didn't record
8  anything.  We collected the samples; the laboratory
9  recorded them.  Based on those data, I have modified
10  recommendations for you.  It's not at all based on her
11  health status, though; not in any way.
12       Q    Okay.  Let's start here:  What are the new
13  recommendations that you have?
14       Actually, before you go into that, are the new
15  recommendations memorialized in a writing anywhere?
16       A    No.
17       Q    Okay.  Can you tell me the new recommendations
18  you have?
19       A    Yes.  I recommend that so-called remediation be
20  done at openings to the exterior of the building -- in
21  simple English, at sliding glass doors or more
22  traditional pedestrian doors and windows that open at the
23  frames and tracks of those openings -- in order to reduce
24  potential levels of char and ash to background at those
25  tracks and frames.

Desiree Cooks

Page 53

1    I don't recommend repainting.  I don't
2  recommend replacement.  I don't recommend any so-called
3  remediation of ceilings, recessed lighting, walls,
4  floors, or personal effects.  In fact, I recommend
5  against that latter work.
6      Q    When you say "personal effects," what are you
7  referring to?
8      A    Articles in the home.  You know, clothing,
9  bedding, beds.
10     Q    Mattresses?
11     A    Sure, mattr- --- yes.  The personal effects,
12  personal articles in the home that didn't come with the
13  home.
14     Q    Okay.  Soft goods, is that what you're
15  referring to?
16     A    Sure.  And hard goods.
17     Q    How about the HVAC ductwork?  Any remediation
18  required there?
19     A    No.  The data indicate that there is no effect.
20  And just so that we're clear, I'm not just saying that
21  doing that so-called remediation is not recommended based
22  on the data.
23
24
25

Page 54

1
2          That house is not unhelpful with respect to the
3  fire -- the brush fire that occurred about a year ago.
4  If work is done involving the destruction of finishing
5  materials, walls, ceilings, flooring, other effects, you
6  will actually make that house less healthy than it is
7  now.
8          I am strongly encouraging you not to do
9  demolition in that -- in that home.  It's not only not
10  justified by the data, it's a bad idea with respect to
11  the health status of Ms. Doherty.
12     Q    Is it your position that that home is back to
13  pre-loss condition as it stands right now?
14     A    Maybe.  I can tell you why I answer it in that
15  way.
16     Q    Okay.
17     A    At the interior locations of that home, the
18  home is presumably at pre-loss conditions.  I wasn't in
19  the home before the fire, so I can't say that with any
20  certainty or I can't confirm that; however, the data
21  recorded at the interior of the rooms does -- do not
22  suggest that there is a soot, char, and ash problem.
23          Another point is there is a possibility that
24  some combustion by-products enter the home at the time of
25  the fire.  I will assume that that's true.  The only

Page 55

1  evidence that we have that those particles are still
2  there is that the perimeter openings that I've already
3  talked about -- if so-called remediation -- because we're
4  talking about HEPA vacuuming, perhaps a damp wipe along
5  with that.  That's not really remediation.
6          That's why I termed it "so-called" at least
7  twice.  But if that's done at the openings, that will
8  bring the entire home to, presumably, pre-loss condition.
9      Q    And that's based on the sampling that you took
10  on December 11th, that opinion?
11     A    Yes.
12     Q    Okay.
13     A    Well, also -- well, sure, the data and
14  observations made at the time of the December 11th
15  survey.
16     Q    Do you know if Ninyo & Moore took any samples
17  of the soft goods in the home?
18     A    Well, I know they took samples in the home.  I
19  don't recall if they took soft goods.  But regardless of
20  what anyone did in the past, Hygiene Tech took samples
21  from soft goods, and our data showed that the soft goods
22  are in satisfactory condition with respect to combustion
23  products now.
24     Q    Okay.  I'm actually going to go through the
25  samples that you guys sent out last night in -- just one

Page 56

1  by one so we have a clean record.
2          But do you recall which soft goods Hygiene Tech
3  took samples of?
4      A    Well, yeah.  Off the top of my head, we took a
5  sample from a dining room chair cushion, the back of a
6  sofa in the living room that was close to a sliding glass
7  door, and one of the bedspreads -- so the top spread on a
8  bed in the lower level, and I believe at least four
9  articles of clothing.  There's probably more, but off the
10  top of my head, I'll name those.
11     Q    Okay.  With respect to those soft goods, do you
12  know if any of those were in the home during the fire?
13     A    Oh, no.  Of course I don't.  I presume that one
14  or more of them were, but I have to make the assumption
15  that they're representative of soft goods today unless I
16  have reason to disbelieve that.
17     Q    Okay.  But you don't know if any of those soft
18  goods were actually in the home during the fire?
19     A    I don't know yes or no to that question.
20     Q    Just circling back on, kind of, the overarching
21  concept of your new opinions, these new opinion is that the
22  home should not be remediated as per the RLB guidelines
23  because that may increase the dust and contaminants in
24  the house and impact the insured's medical condition?
25     A    Not quite.  I am saying that all of the

Desiree Cooks

Page 57

1  guidelines that would be appropriately considered in this
2  case would not require demolition of building materials
3  to be done. Period. The guidelines would not say that.
4       And I am telling you that, regardless of any
5  consulting work that has been done by anybody involved
6  with the Doherty property to date, even if that -- those
7  opinions were clearly stated that some demolition should
8  be considered, I am telling you that that should not be a
9  consideration now because, regardless of how that home
10  has been treated since the first assessment was done, the
11  evidence of any combustion materials but for the window
12  tracks and sliding glass door tracks and frames is gone.
13       There's nothing more to do. We have already
14  achieved the objective without demolishing anything in
15  that house.
16  Q   And that's based on the sampling you took on
17  December 11th?
18  A   Yes. And the observations made by me. I
19  understand that KCE, for example, smelled odor. Well, by
20  the time I went there, there was no odor. There was no
21  dispersion of dusts anywhere, and I looked for that. I
22  sampled representative materials: soft, hard, in the
23  garage, on the ground floor, on the lower level. I took
24  samples from HVAC system registers, recessed lighting,
25  multiple floors. All data are normal but for the tracks

Page 58

1  and frames.
2       If you resurface anything in that home --
3  walls, ceilings, floors, soft goods -- and you bring new
4  building materials in, you will not only create copious
5  quantities of airborne particulate -- and the doctor
6  tells us to avoid that, yes? -- but you will also bring a
7  wide variety of volatile organic compounds that will
8  off-gas. Those are hydrocarbons. Those are not
9  healthful. Why would we want to do that? We don't.
10       Like I said before, this should be good news
11  for everyone that the house is in -- we are so close to
12  being completely done with the remediation effort in that
13  home that we should do what I have recommended, and then
14  everyone should be satisfied that the home meets the
15  criterion by the doctor.
16  Q   Ninyo & Moore had some recommendations in the
17  two reports that they generated as to how the home should
18  be remediated.
19       Do you recall that?
20  A   I do. Well, I didn't recall that there were
21  two reports, but I think that there probably were.
22  Q   Okay. There were two, and I can show them to
23  you if you want to see them, and to the extent you need
24  to look at it to refresh your recollection as to what
25  their remediation recommendations were, I can certainly

Page 59

1  do that. Is -- are -- I'm just trying to reconcile your
2  new opinion with Ninyo & Moore's opinion and your
3  original opinion.
4       Is it your opinion now that the remediation
5  recommendations provided by Ninyo & Moore should not
6  be -- should not be completed because they may stir up
7  additional dust that could impact the insured's health
8  condition?
9  A   No. It's not that at all. Ninyo & Moore --
10  and I would need to confirm by having the report in front
11  of me, and I don't have it in front of me -- at least I
12  think I don't. Ninyo & Moore recommended that detailed
13  cleaning be done. Let's just -- hopefully, we can agree
14  that that was generally what they said.
15       What I'm telling you is it's already been done,
16  probably -- this is speculation, but I'm probably
17  right -- by housekeeping methods because it's just ash
18  and char that were identified back then, and those
19  materials are generally easy to remove. It's possible
20  that some soft goods may retain some, but it's equally
21  likely that, with normal housekeeping, those particulates
22  would be removed even from soft goods.
23       Now, we sampled soft goods. We took a number
24  of samples from all kinds of different materials, and but
25  from -- and but for those window and door tracks and

Page 60

1  frames, we didn't get any, quote/unquote, "hits." Think
2  about that. What are the odds of that house being
3  contaminated with combustion particles and that being
4  above background yet, for some reason, Hygiene Tech
5  didn't find one article that had that at the interiors of
6  the rooms? That is not likely at all.
7  Q   What was the sampling methodology used by
8  Hygiene Tech on the soft goods?
9  A   We used tape lift methodologies. In other
10  words, a thumbprint with cellophane tape.
11  Q   So all the soft goods were sampled via tape
12  lift method?
13  A   I think so, yes.
14  Q   Were any vacuum samples taken of the soft
15  goods?
16  A   No.
17  Q   Were any vacuum samples at all taken at the
18  home on December 11th?
19  A   No.
20  Q   Was tape lift method the exclusive methodology
21  used to obtain the samples in the home on December 11th?
22  A   Yes. Do you want to know why? There is a
23  reason for that.
24  Q   Yeah. Sure.
25  A   Vacuum methodology is -- by my experience, do

Desiree Cooks

Page 16  (Pages 61-64)

Page 61

1 not produce different types of results in the samples
2 that we took. You wouldn't, for example, expect that
3 char and ash by-products would somehow have nested within
4 the fiber of the soft good without being on the -- on the
5 surface as well. So there is no likelihood that using a
6 different method would render different results.
7      Also, again, to remind you, we took a lot of
8 samples on a lot of different things, and we didn't find
9 any hits, soft or hard, up or down except in those
10 tracks. Oh, and except in the fireplace.
11 Q   Yeah, I saw that one.
12 A   And I intentionally took that sample so that so
13 my audience can appreciate that the house is not soot-,
14 char-, and ash-free, but it's highly localized to a
15 fireplace. And I'm not being critical. Of course I'm
16 not. I have a fireplace at my house, too, and I can
17 probably generate the same data from my fireplace. But
18 that's not an issue with respect to the health of
19 Ms. Doherty; at least I wouldn't expect it to be an
20 above-background issue.
21 Q   Do you recall the hardwood floors that --
22 there's, like, a distressed hardwood flooring at the
23 property that has little nooks and crannies and grooves
24 and things like that.
25      Do you recall that?

Page 62

1 A   Well, I can't use the word "distressed," but
2 the rest of it, the rest of your question is accurate.
3 Q   It's an irregular surface?
4 A   Yes. It's uneven within the grain.
5 Q   Were samples taken of the hardwood floors?
6 A   Yes.
7 Q   How many?
8 Q   Do you want me to count?
9 Q   If it's not going to take you a long time,
10 sure?
11 A   Well, it won't take me too long.
12      Six, it looks like.
13 Q   Okay. And those were taken via tape lift
14 method?
15 A   Yes.
16 Q   And did you consider that an appropriate
17 sampling method for those -- the irregular surface of
18 those hardwood floors?
19 A   Oh, sure. Because we pressed it into the
20 depressions and other parts of the floor, so sure.
21 Q   You believe that the tape got into all the
22 depressions in the hardwood floor?
23 A   Oh, it did. Yes.
24 Q   You're a hundred percent sure of that?
25 A   Sure. There's no reason to believe that that

Page 63

1 didn't happen because we put the tape on -- we compressed
2 the tape on the entire surface, all surfaces, the
3 depressions and otherwise.
4 Q   And you believe that the tape got into every
5 single nook and cranny of those hardwood floors?
6 A   Well, no. Only at the sample locations that we
7 took.
8 Q   Yeah, I guess that's a fair criticism of that
9 question.
10      You believe that, at the sample locations that
11 you took, the tape got into the -- all portions of the
12 irregular surface of the hardwood floor?
13 A   Yes, yeah. At that thumbprint location, yes.
14 Q   Okay. Did you have any criticism of the actual
15 sampling data obtained from the KCE Matrix report? Let
16 me rephrase that. That's a bad question.
17      Do you believe that the sampling data and the
18 sampling lab results obtained by KCE Matrix and reflected
19 in the report are inaccurate in any way?
20 A   No. I didn't assume that for any party here.
21 Q   Okay. So same question for Ninyo & Moore.
22 A   True. I didn't assume that there was any
23 irregularity with respect to sample method or analysis.
24 Q   And you have no -- you're not planning on
25 offering any opinion that the KCE Matrix results are

Page 64

1 flawed in any way?
2 A   No. I have no reason to think that they are.
3 Q   You had something written in your report that
4 you believe that KCE Matrix and Ninyo & Moore data were
5 consistent with one another.
6 A   Did I say that, or did I say not inconsistent?
7 Q   You said "not inconsistent." Is there a
8 difference?
9 A   There's a different meaning.
10 Q   Can you explain what you meant by that?
11 A   Well, sure. Literally, there are differences
12 in their data, but they were -- they're three weeks
13 apart. KCE was there very shortly after the fire, and
14 Ninyo & Moore was there three weeks after that,
15 approximately.
16      So there will be differences, but the
17 differences were predictable between the two lots of
18 data. I wasn't surprised at all, and I didn't look at
19 those data and say, "Ah, someone must have done something
20 wrong or different." I didn't think that at all.
21      I think the logical progression of data from
22 essentially higher levels at the time of KCE Matrix and
23 then the lower levels at the time of Ninyo & Moore and
24 the still lower levels at the time of Hygiene Tech's all
25 match the paradigm that you and I have already talked

Desiree Cooks

Page 65

1 about.
2 Q   If you go back to your report on Page 4 at the
3 bottom of the last full paragraph, it says "A
4 professional cleaning."
5      Do you see that?
6 A   I do.
7 Q   Okay.  "A professional cleaning service should
8 be consulted on the effectiveness of treatment of all
9 hard and soft materials."
10      Do you have any knowledge as to whether --
11 well, let me ask you this:  Have you seen the just
12 contents report prepared for State Farm in connection
13 with the claim?
14 A   I don't think so.
15 Q   Okay.  So you have no opinion on the just
16 contents report in connection with the claim?
17 A   Not as I sit here now.
18 Q   Okay.  The professional cleaning service that
19 would be consulting on the effectiveness of the treatment
20 of the hard and soft goods, do you believe that that firm
21 should have taken into account the insured's medical
22 condition?
23 A   Well, you're asking me questions about, you
24 know, an outfit that I don't know, and, you know,
25 apparently they issued some paperwork that I haven't

Page 66

1 seen, so I really can't say.
2 Q   You know, that's a fair criticism, and let me
3 just see if I can rephrase the question to be in a more
4 general sense.
5      Do you believe that, as an industry standard, a
6 professional cleaning service firm should take into
7 account the insured's medical condition before rendering
8 their opinion as to the effectiveness of cleaning methods
9 on soft goods?
10 A   As an industrial hygienist, my answer to you is
11 yes.  Whether that gets done is a whole 'nother matter
12 because some cleaning techniques can raise dust.  Some
13 cleaning solvents can raise aerosols or vapors.  I think
14 all parties who participate in the application of any
15 material or the generation of any air mover -- including
16 a vacuum cleaner -- should take into account the
17 potential exposed populations.  I do.  And I've told you
18 some of my opinions that are relevant to this case.
19 Q   Do you believe that the remediation
20 recommendations contained in the Ninyo & Moore reports
21 would generate dust?
22 A   Not if they're done properly.  At least I don't
23 recall any recommendations that would generate dust.  As
24 I sit here right now, I don't recall any demolition that
25 was recommended by Ninyo & Moore.

Page 67

1      MR. SCOTT:  I'm going to help us out so we can
2 be a bit more precise on this because I don't -- you
3 shouldn't have to do this just off the top of your head.
4      THE VIDEOGRAPHER:  We'll go off the videotaped
5 record at 4:55 p.m.
6      (Break held off the record.)
7      THE VIDEOGRAPHER:  We're back on the videotaped
8 record at 4:56 p.m.
9      MR. SCOTT:  Can I mark these two sequentially
10 as next in order.
11      (Exhibits 623 & 624 marked.)
12 BY MR. SCOTT:
13 Q   Mr. Daly, you've just been handed the next two
14 exhibits, which are the two Ninyo & Moore reports.
15      Can you just take a look at those and
16 specifically the remediation recommendations in there and
17 let me know if any of those recommendations would stir up
18 dust or other particulate matter that you believe could
19 negatively impact the insured's health condition.
20 A   Looking at the May 14, 2019 report, I would say
21 that the five bullet points, if done correctly, would not
22 or should not result in exposures to your client.  I
23 would presume, because there's no good reason to think
24 otherwise, that this work would be done outside of her
25 presence.  So I would think that this can be done and to

Page 68

1 some degree no doubt has been done already.  And with
2 respect to the other report dated January 3 --
3 Q   I think they start on around Page 5.
4 A   Yes.  Same answer.
5 Q   Okay.  Going back to those Ninyo & Moore
6 reports and also your report, you had a statement in your
7 report, which is in the second to last paragraph in the
8 introduction on Page 5, it starts "Based on my
9 interpretation."
10      Do you see that?  It's the last sentence in
11 that paragraph, "Based on my interpretation."
12 A   I see, uh-huh.
13 Q   "Based on my interpretation of the
14 Ninyo & Moore survey results and in light of the
15 KCE Matrix survey results, I expected the recommendations
16 that Ninyo & Moore offered in the May 2019 letter were
17 somewhat overstated but perhaps under the circumstances
18 not unreasonably so."
19      First question is that they were somewhat
20 overstated?
21 A   I'll be specific.  I didn't see any evidence
22 that all horizontal surfaces like -- horizontal,
23 vertical, and ceiling surfaces required cleaning.  I
24 didn't see any evidence of that, but I understand
25 Ninyo & Moore recommended that.  And from a distance --

Desiree Cooks

Page 18  (Pages 69-72)

**Page 69**

1  and when I wrote my report I was at a distance because I
2  never been at the house -- I said, "Okay.  That probably
3  isn't justified, probably isn't necessary, but from my
4  vantage point, I can't say conclusively and I understand
5  why a consultant might recommend that," in other words,
6  to be on the safe side.
7        However, after my presence in the house, I now
8  know that those recommendations are -- clearly are
9  overstated.  I can say the same thing about the second
10  bullet point, the ductwork, because I took samples from
11  the registers.  And there's no evidence of contamination,
12  so I'm confident that we wouldn't need to have the HVAC
13  system and ducts cleaned.
14        I'll stop there.  You get the idea.
15     Q   Okay.  All right.  Let's go to the expert
16  opinions portion.
17     A   Of my report?
18     Q   Section 5 of your report.
19     A   Okay.
20     Q   So this is Section 5, and there's seven
21  subparagraphs under that.
22        Does that constitute the entirety of your
23  opinions in this case?
24     A   No, but I think those seven recommendations
25  that are -- were relevant at the time this report was

**Page 70**

1  prepared plus the recommendations and the comments that I
2  made to you today with respect to my survey.  I think you
3  have all the opinions, at least all the major opinions.
4     Q   5.1, it's talking about the recommendations
5  that Ninyo & Moore had for the remediation of the
6  property.
7     A   Yes.
8     Q   And then your conclusion there is that those
9  recommendations are consistent with Restoration Industry
10  Association guidelines for fire and smoke damage and are
11  consistent with the industry standard.
12        Is there a difference in your mind between the
13  RIA guidelines and the industry standard?
14     A   Well, it depends on what issue you're talking
15  about.  Literally, the answer is yes, but they're
16  generally consistent with each other.
17     Q   Okay.  Is there a reason why you mention both
18  of them in this 5.1 paragraph?
19     A   Yes.  The RIA guidelines are, in many cases,
20  generic to brush fire contaminant issues indoors.  The
21  industry standard that I am -- that I work with would
22  require the types of samples that we took in addition to
23  contemporaries at Ninyo & Moore and KCE and an
24  appropriate evaluation instead of a generic, broad-brush
25  series of recommendations.

**Page 71**

1        In simple English, you analyze the data, you
2  find out if you're above background.  And if you are,
3  then do something about it.  And then I would refer back
4  to the RIA guidelines about what to do with it.  Now,
5  that's more detail.  That is the industry standard by my
6  personal experience.  It goes a little bit beyond the RIA
7  guidelines, though.
8     Q   Just in that it has specific data with respect
9  to certain areas?
10     A   It has precision, more precision.
11     Q   That's the word for it.  Okay.
12        Would you say that your industry standard is
13  higher than the RIA guidelines?
14     A   I'm not going to weigh in in that way.  It's
15  better than the RIA guidelines because it's more precise.
16  It is a higher level of understanding so that more
17  precise recommendations can be made, especially, in light
18  of health issues with respect to the potentially exposed.
19     Q   Paragraph 5.2, this is geared more towards the
20  KCE Matrix report, and you took issue with some of the
21  language that was in the report.  I think you said it was
22  inflammatory or maybe -- what was the word you used? --
23  ambiguous and potentially proactive?
24     A   Yes, I did.  And I still believe that.
25     Q   Okay.  And why do you say that?

**Page 72**

1     A   Oh, well, I explained, so I'll repeat for you.
2  KCE describes a significant amount of suspect soot, char,
3  and ash.  "Significant amount" means nothing to anybody
4  except perhaps a layperson who can interpret that that
5  means something dangerous, certainly unwanted.  And they
6  indicate a moderate to significant amount of soot, char,
7  and ash at other interior areas.
8        That's ambiguous.  What's that mean?  I don't
9  know that you and I could even agree what that means
10  today, but they said that at the time, and that
11  doesn't -- those are not meaningful terms that are
12  uninterpretable by a layperson.
13     Q   But if they're put in context of the actual
14  sampling data, would you still consider those sentences
15  to be potentially proactive?
16     A   Yes.  Yeah, for the same reasons because
17  they're commingling all of their terms.  A significant
18  amount consisting of grayish white particles or
19  particulates with some black particles at the exterior of
20  the home.
21     Q   Your issue is with the term "significant"?
22     A   Sure.  Then they talk about an office/garage
23  area -- I'm not sure if that's the same area.  I've been
24  to the home, and I'm still not, you know, aware if that's
25  supposed to be the same area -- and at interior spaces

Desiree Cooks

Page 19  (Pages 73-76)

Page 73

1  near doors and windows with moderate to significant
2  amounts at other interior areas. I don't agree with that
3  conclusion, and I think it's suitably vague and ambiguous
4  and provacative to a layperson. If I didn't know what
5  the data meant and I was a layperson that was -- that
6  didn't do hygiene for a living, I can tell you I wouldn't
7  know what this means, but it sounds scary.
8      Q    So you have issues with this summarization of
9  their data but not necessarily with the data results
10  itself?
11     A    Yes. I don't -- I don't challenge the results.
12  I challenge their interpretation, and I think a
13  consultant is duty bound to be clear, and that is not
14  clear.
15     Q    5.6, you have a critique that KCE Matrix didn't
16  recommend specific actions to remediate the property,
17  that they had more of a general guideline, I suppose, is
18  a way to phrase it.
19         Is that an accurate summary of that opinion?
20     A    Actually, no, not really. 5.5 is a better
21  conclusion to address that issue.
22     Q    Okay.
23     A    Do you want me to tell you?
24     Q    Yeah, let me delve into that a bit. The
25  criticism of the KCE Matrix is that they didn't provide

Page 74

1  specific remediation recommendations in their report?
2      A    I think that's fair. They -- they indicated --
3  and this is a quote -- "replacement, repair, remediation,
4  and/or implementation of detailed cleaning of building
5  materials and/or contents at the subject residence." So
6  the reader of their report may have felt that they should
7  replace everything because that's Option Number 1,
8  replace everything including all building materials, all
9  flooring, ceiling, lighting, contents -- everything.
10         That's one result that you can anticipate they
11  meant. Well, that's very different from repair but for,
12  I believe, a gate and a fence and trees. I didn't see
13  anything to repair. Remediation -- well, repair and
14  replacement are very different from remediation, which is
15  basically detailed cleaning.
16         So what is the reader to understand that KCE is
17  saying? They're not clear. They give the option, and I
18  think we have the whole universe of possibilities.
19     Q    Did you read Aaron Collustian's deposition in
20  this case yet?
21     A    I did.
22     Q    You did. Okay. Did you see in there where he
23  talked about the scope of his work on the case and that
24  didn't necessarily include remediation recommendations?
25     A    Yes, but he gave them anyway.

Page 75

1      Q    Well, I mean, I presume that's your opinion,
2  but now knowing that Mr. Collustian did not intend to
3  provide remediation recommendations, does this impact
4  your opinion in 5.5 in any way?
5      A    Well, sure it does because he gave them. If he
6  didn't intend to give remediation opinions, then why did
7  he give them in writing in his report? I take issue. I
8  mean, a consultant should decide what they're consulting
9  on, and then they should consult within the bounds of
10  their scope of work. And if he's not giving
11  recommendations on remediation, then why is he opening
12  the universe of possibilities?
13     Q    Well, I think what he said, just to paraphrase,
14  was that that report should be turned over to a
15  remediation consultant to review and analyze.
16         But you think that that was improper for
17  KCE Matrix even within that context to provide that
18  sentence that the home should be --
19     A    Everything should be replaced or repaired or
20  remediated?
21     Q    Yeah.
22     A    I don't know what he just -- what he meant
23  based on what you just said, and here's why. He said,
24  "Do one of these four things to everything on the
25  property." Who, then -- if not him, who is going to

Page 76

1  decide what needs to be replaced or repaired? That's not
2  the duty of the abatement contractor. I believe that is
3  the responsibility of the consultant. If he's not the
4  consultant, then who is; right?
5          I'm a consultant. I said what I think you
6  should do. It's very different than the four
7  possibilities that Aaron Collustian said. I'm qualified
8  to make that call. The abatement contractor shouldn't
9  make that call. That's a conflict of interest. So
10  someone should stand up as a health and safety
11  professional and say, "This is what I think you ought to
12  do. And if no one did it before me, you've now heard it
13  from me. I'll telling you what should be done."
14     Q    And in your opinion, all that needs to be done
15  is remediation of the openings to the exterior of the
16  building?
17     A    That's all I uncovered. I am very serious
18  about not doing demolition for the reasons I've given.
19  If there are other issues that Hygiene Tech has not
20  addressed that need to be addressed more thoroughly, then
21  I'm perfectly willing to discuss those, if that's not
22  inappropriate. But based on everything that I now know,
23  my recommendations stand, and they will be thoroughly
24  effective.
25     Q    Did Hygiene Tech take any samples of the pool?

Desiree Cooks

Page 77

1    A    No.
2    Q    Any samples of the wood decking around the
3  pool?
4    A    No.  You know, our Appendix A will speak for
5  itself.  There's no reason to believe that the pool or
6  the decking would have been adversely affected by soot,
7  char, and ash.  There's simply no reason to believe that
8  that would be true at all.
9    Q    Even though soot, char, and ash may have gotten
10 into the pool water and seeped into the siding of it?
11   A    Do you think that's possible?
12   Q    Sure.
13   A    I don't think that's likely, and certainly
14 there would be no measurable evidence at this time that
15 that is true.  You know, at the risk of sounding like I'm
16 downplaying possible health hazards, it's just char and
17 ash that we're talking about.  That material is an
18 environmental contaminant that exists outside all the
19 time.  I do not expect that it's going to affect the pool
20 water.  I didn't take -- I didn't bother to take a pool
21 water sample.  I wouldn't expect that it would have any
22 presence of char or ash.  It certainly wouldn't have any
23 soot.
24       The filtering system of that pool would have
25 long taken care of that issue if it were ever an issue.

Page 78

1  I know that the tile on the pool is made of glass; I can
2  tell by looking at it, and I saw some extra sheets of the
3  glass in the backyard or side yard.  That would not be
4  affected -- glass wouldn't be affected.  The ground
5  wouldn't be affected.  I wouldn't expect that the finish,
6  the plaster would be affected.  So, no, the pool's not
7  affected.  The decks -- it's not going to be affected.
8    Q    But you did no independent sampling to confirm
9  that?
10   A    True.  I didn't --
11   Q    But you didn't need to is what --
12   A    I think I didn't need to.
13   Q    And you understand that, in addition to simply
14 making the home safe to inhabit, the insurer has a duty
15 to actually return it to its pre-loss condition?
16   A    I know that's a standard that I've heard.  I'm
17 not an expert on the standards in insurance language, but
18 sure.
19   Q    Do you have any opinion as to whether the pool
20 has been returned to its pre-loss condition?
21   A    I don't have any confirmation; however, I saw
22 no visible collateral damage that would be suggestive
23 that it would be any different than the pre-loss
24 condition.  There's no expectation.  I've seen no
25 evidence with your consultants or with the consultants

Page 79

1  that worked on this project beforehand that that
2  determination was made.  So there just simply is no
3  evidence that the pool is affected now.
4    Q    What's your recommendation for remediation to
5  the wood floors, if anything?
6    A    I wouldn't recommend anything; no grinding, no
7  refinishing, nothing.
8    Q    They're good at pre-loss condition right now,
9  in your opinion?
10   A    Well, sure.  And based on my visual observation
11 and the six sample data.
12   Q    What's your recommendation for remediation to
13 the interior walls, if anything?
14   A    Nothing.  Do nothing.
15   Q    Okay.
16   A    Including add no latex paint.  I don't want the
17 addition of any solvents to the atmosphere inside that
18 house.
19   Q    Based on your observations, the interior walls
20 are at pre-loss condition?
21   A    Sure.  I have no reason to think that that is
22 not true.
23   Q    Okay.  The light fixtures, what's your
24 recommendation for remediation of the light fixtures, if
25 anything?

Page 80

1    A    There is no remediation of the light fixtures.
2  I took three surface samples of the recess lighting
3  fixtures, including one interior of the actual -- I'll
4  call it a can.  There's no evidence of soot, char, and
5  ash that would -- that would require any remediation.
6    Q    So those are at pre-loss condition?
7    A    Yes.
8    Q    With your --
9    A    Let me modify just so that we're clear and we
10 can speed through these answers.  I have no expectation
11 that it's not at pre-loss condition.  I have no
12 confirmation because I wasn't there and no one took any
13 samples before the survey, but the data are normal;
14 therefore, I conclude pre-loss condition exists now.
15   Q    Okay.  I understand that distinction you're
16 drawing there.
17       The electronic equipment in the home, do you
18 have any recommendations for remediation of the
19 electronic equipment?
20   A    No.  For the same reasons.
21   Q    Okay.  You believe that it's at normal levels
22 at this point?
23   A    Yes.  And we've taken samples --
24   Q    Okay.
25   A    -- in one of the areas of the home that would

Desiree Cooks

**Page 81**

1 have been more prone to have an effect than at the house
2 interior because we took samples in the garage on
3 materials and didn't find above-background levels. So if
4 the garage electronics are unaffected, the house
5 electronics are going to be unaffected.
6    Q    The exterior stucco of the property, do you
7 have any recommendations for remediation to the exterior
8 stucco?
9    A    No, I don't. Including -- I wouldn't recommend
10 and I could imagine some abatement contractors might
11 propose this. I wouldn't recommend power washing.
12    Q    Because that could damage the stucco?
13    A    No. Because that can drive water into the
14 cracks that exist in the stucco, including the big cracks
15 at the overhang, at the balcony.
16    Q    Yeah.
17    A    And those larger cracks that only exist there
18 were caused by, undoubtedly, the water that enters the
19 patio -- the balcony tile and matrix, that causes
20 expansion and contraction. And clearly that -- that
21 balcony sees water.
22    Q    And you heard that from Jan Brussel?
23    A    Well, I discussed that with Jan Brussel when I
24 was at the site, but I didn't need Jan Brussel to educate
25 me on that. I know what caused those cracks. I saw the

**Page 82**

1 water marks on the wood, on the underside. I saw the
2 rot. I know it's long-term. I know that water exposure
3 is going to cause expansion and then contraction. I know
4 that the water marks traverse the entire length and width
5 of the balcony. The large cracks were only noticeable at
6 that balcony. There's a bias, therefore, with respect to
7 water exposure.
8         It's clear. There are other cracks that show
9 no bias toward a localized fire elsewhere virtually
10 around the entire property. I don't recommend power
11 washing because you will drive water into those cracks.
12    Q    Okay. I got it. I don't mean to cut you off
13 here.
14    A    I think I was done.
15    Q    I'm trying to get everyone completed.
16         Outdoor furniture, do you have any remediation
17 recommendations for the outdoor furniture?
18    A    Not really. The outdoor furniture is exposed
19 to the elements. I didn't bother to take samples of soft
20 goods outside because you would expect some environmental
21 char and ash, just under normal circumstances. The hard
22 goods outside didn't need remediation because of char and
23 ash exposure.
24    Q    Okay. Do you know what cleaning has been done
25 to the property between the time of the loss and your

**Page 83**

1 site visit on December 11th?
2    A    Only to some degree. Do you want to know what?
3    Q    Yeah.
4    A    I heard that Ms. Doherty apparently told
5 someone -- she didn't tell me -- that she has regular
6 housekeeping, and it looked like it indoors. She clearly
7 doesn't have regular -- I'll call it housekeeping
8 outdoors at the patio furniture because there was debris
9 virtually everywhere out of doors. So there's work for a
10 gardener. I think that work has nothing to do with the
11 fire of a year ago.
12    Q    I'm going to ask you a question, and I may not
13 be using the precise nomenclature that you guys use in
14 the industry, but bear with me. I think you'll be able
15 to understand it.
16         Is there a sort of, like, a reasonableness
17 standard for restoration? In other words, is there a
18 standard that, you know, if you get something to
19 95 percent of pre-loss condition, that's reasonable and
20 that complies with the industry standards for
21 remediation?
22    A    No. I don't know that standard. That's beyond
23 what I do; however, I'll address that issue this way --
24 and I haven't yet done it, so this will be new for you --
25 if you say -- if a person says, "Remediation is needed

**Page 84**

1 because this article needs to be decontaminated," you
2 need to establish a level above which it's considered
3 contaminated. And then you also need to establish a
4 clean-up criterion below which it's considered
5 acceptable.
6         Now, I'm not saying that's 95 percent. I'm
7 saying it's based on health issues. With respect to that
8 issue, the interior of the home already meets the
9 standard. There's no contamination anywhere but for
10 window frames and door frames and tracks.
11         So we haven't established anything as
12 contaminated inside the house, but -- for what I just
13 said; therefore, we already meet the cleanup criterion.
14 And if you already do that, then there's nothing to clean
15 because there's nothing to clean to, if you're with me.
16    MR. SCOTT:  Let's take a five-minute break.
17 I'm going to get into your new stuff, and then they'll --
18    THE VIDEOGRAPHER:  We're going off the
19 videotaped record and it's 5:26 p.m.
20    (Break held off the record.)
21    THE VIDEOGRAPHER:  We're back on the videotaped
22 record beginning Disc Number 3 of Volume Number 1 at
23 5:35 p.m.
24    (Exhibits 625, 626, 627, and 628
25 marked.)

Page 85

BY MR. SCOTT:

2    Q    Mr. Daly, you were just handed Exhibit 625
3  through 628.  These are documents that we received last
4  night from your counsel.
5         Can you just go through one by one and just
6  give me a very brief description of what they are.
7    A    Sure.  It looks like one is missing.  But
8  anyway, from what you gave me, the first one is a request
9  for analysis and chain of custody for the samples
10  collected by my colleague Marco Xu and the analytical
11  report for his samples.
12        The next one is -- 626 actually goes with 627.
13  627 is the request for analysis and chain of custody for
14  626.
15    Q    Okay.
16    A    626 is the analysis that was for fungal growth.
17  And the last -- so 628 is the data table that we
18  generated for the soot, char, and ash samples.  I see
19  there's a word processing error on Page 4 of that
20  document.  I have an updated --
21    Q    I'm going to give that to you.  I didn't mean
22  to try to trick you on this.  This was the original one I
23  got last night.
24    A    Right.  I don't feel tricked.  It's okay.
25    Q    So 628 is the data table that you compiled from

Page 86

1  the lab results in 625?
2    A    Yes.  And also a group of data that you have
3  not marked yet -- my samples, in other words.  You've got
4  Marco's samples.  You don't have my samples here in front
5  of me, and the data table has both Marco's samples and my
6  samples.
7    Q    I have to go back and check.  Maybe I missed
8  that.
9    A    Well, I have that.
10    Q    Oh, it's in your materials?
11    A    It's in my materials, so you now have it.
12    Q    So it's in 621 somewhere.  But 628 is
13  essentially the summary of the lab results from Marco's
14  samples and your samples?
15    A    Yes, sir.
16    Q    Okay.  And all of the samples listed in here,
17  there's sample numbers for, really, a large number of
18  samples that you took, it seems.  All of those samples
19  were done via the tape lift method?
20    A    Yes.
21    Q    Okay.  Any of the samples listed in this
22  Appendix A on 628, were they done via any other sampling
23  method?
24    A    No.
25        MR. SCOTT:  If I can just mark this as next in

Page 87

1  order.
2         (Exhibit 629 marked.)
3  BY MR. SCOTT:
4    Q    This is 629, which is the amended report from
5  628.
6         What was changed in this Exhibit 629 from the
7  earlier report?
8    A    Go to Page 4.  Sample ending in digits 1-0, 10.
9  "Surface Density," the fourth column across, should read
10  "Not detected."  The previous edition had a value that is
11  incorrect.
12    Q    That's the only change?
13    A    That's the only change, right.  And it was just
14  a word processing error.
15    Q    Right.  And then the "Fire Combustion Particle
16  Concentrations Estimated Ratio Percentage" column, that
17  totals the soot, char, and ash percentages detected from
18  the samples?
19    A    In a percent, yes?
20    Q    Yeah.  And "ND" stands for not detected?
21    A    Yes.
22    Q    Are there photos that accompany each one of
23  these samples taken?
24    A    I can't say that there positively is a photo
25  for every one, but there probably is, if not in my photo

Page 88

1  log -- which is on the thumb drive -- and/or in the raw
2  photos.
3    Q    Okay.  And the sample data that's reflected in
4  this Appendix A as well as in -- what's in Marco's lab
5  results or the lab results from Marco's samples and your
6  samples, those were generated based on the samples that
7  you took on December 11th at the home; is that right?
8    A    Yes.
9    Q    All right.  Generally, what are your
10  conclusions that you've drawn from this Appendix A, 629?
11    A    You've already heard them.
12    Q    Can you just summarize it again for me briefly.
13    A    Sure.  If I can tell you that normal indoor
14  levels for char and ash are at a percent or two or less
15  indoors, provided not all the indoor data are at that --
16  are at those percentages, then that is normal.
17        The data recorded indoors at the subject
18  property -- I'm sorry.  I misspoke -- within the subject
19  house, but for those tracks and frames at exterior
20  openings, were entirely normal because you'll see it was
21  either not detected or if the level was at -- above
22  2 percent; it was at a perimeter opening.
23        An exception to that is Sample 14, a sample
24  taken from a Fender Stratocaster guitar was at 2 and a
25  half percent, but that's not inside the house; that's in

Desiree Cooks

Page 23  (Pages 89-92)

**Page 89**

1  a garage, which is not sealed as well as the house.
2  Most of the data, though, are well below
3  1 percent, and much of the data are not detected.
4  Q   And where were these samples sent out for
5  testing?
6  A   At EAA, which I believe was the same laboratory
7  used by -- only by coincidence, incidentally --
8  Ninyo & Moore.
9  Q   Does EAA still possess the samples?
10  A   I don't know.  Maybe.  We don't have them.
11  Q   Yeah.
12  A   So they either have them, which is likely, or
13  they destroyed them, which is not likely because it's
14  well within the time period that laboratories maintain
15  their samples.
16  Q   Have you had a chance to read Ian Spiszman's
17  report in this case?
18  A   Not really.  I -- I saw it, I think, for the
19  first time just before my deposition today.  I did read
20  some text, but I certainly didn't thoroughly read it.
21  Q   Yeah, based on that limited review, do you have
22  any comments or critiques of it at the moment?
23  A   Well, sure.  Do you want to hear?
24  Q   Yeah.
25  A   Ian Spiszman talked about the hazardous or

**Page 90**

1  potential hazardous nature of some fire-effluent
2  particles.  Let me tell you that, with all due respect of
3  Mr. Spiszman -- and I do respect him in his work -- I
4  don't think he should be making comments about the health
5  impact of fire debris.  For example, on Page 2 of 5, he
6  says, "These aerosols are problematic because of their
7  size.  These very fine aerosols have a" -- "have the
8  propensity to remain airborne for long periods of time."
9  I'll stop.
10  That's true, and given that they stay airborne
11  for exceedingly long periods of time, they wouldn't be
12  airborne in that house now.  It's been a year.  They're
13  gone.  They're long gone.  He shouldn't talk about the
14  health impacts in this case because he's not an
15  industrial hygienist.  And consequently, I am better
16  equipped to evaluate health impacts and exposure impacts.
17  I don't want anyone to be worried about
18  language like this.  While literally what he says may be
19  true under some circumstances, health impacts from a fire
20  a year ago don't exist in the Doherty house as of the
21  time I was there.  They don't.
22  Q   Anything else?  When I say, "anything else,"
23  any other critiques of his report at the moment?
24  A   Well, no, because I didn't really review
25  anything else.  I happened to notice that.

**Page 91**

1  Q   Okay.
2  A   So I can't comment on the rest of it.
3  Q   All right.  Other than what's in your Rule 26
4  report and the written report and the, quote/unquote,
5  "new opinions" that you offered today, do you have any
6  other opinions that you intend to provide at the time of
7  trial in this matter?
8  A   I think I don't.  I can't anticipate what I
9  might be asked by you on cross or on direct, but you've
10  heard all my major opinions.  I could have some opinions
11  to those, perhaps, if asked.
12  MR. SCOTT:  Okay.  At the moment, I have no
13  further questions for you.
14  MS. ROJAS:  We will be asking him to review
15  Mr. Spiszman's deposition, just so you know.
16  MR. SCOTT:  Got it.  We can go off the record.
17  THE VIDEOGRAPHER:  We'll go off the videotaped
18  record at 5:47 p.m.  That will conclude Disc Number 3 of
19  Volume Number 1.  And that's all.
20  THE REPORTER:  Counsel, did you want to
21  purchase a certified transcript?
22  MS. ROJAS:  Yes, please.  Thank you.
23  (At 5:47 p.m., the deposition of
24  BRIAN DALY, CIH, PE was adjourned.)
25

**Page 92**

1  DECLARATION UNDER PENALTY OF PERJURY
2
3  I, BRIAN DALY, CIH, PE, do hereby certify under
4  penalty of perjury that I have reviewed the foregoing
5  transcript of my deposition taken on December 20, 2019;
6  that I have made such corrections as appear noted herein
7  in ink; that my testimony as contained herein, as
8  corrected, is true and correct.
9
10  DATED this _____ day of _____.
11  20___, at _____, California.
12
13
14
15
16
17
18  BRIAN DALY, CIH, PE
19
20
21
22
23
24
25

Page 24  (Pages 93-93)

Page 93

REPORTER'S CERTIFICATION

1

2

3    I, Desiree Cooks, Certified Shorthand Reporter in
4    and for the State of California, do hereby certify:

5

6    That the foregoing witness was by me duly sworn;
7    that the deposition was then taken before me at the time
8    and place herein set forth; that the testimony and
9    proceedings were reported stenographically by me and
10   later transcribed into typewriting under my direction;
11   that the foregoing is a true record of the testimony and
12   proceedings taken at that time.
13   Further, that if the foregoing pertains to the
14   original transcript of a deposition in a federal case,
15   before completion of the proceedings, review of the
16   transcript [ ] was [ ] was not requested.

17

18   IN WITNESS WHEREOF, I have subscribed my name on
19   this date:

20

21

22   *Desiree Cooks*

23   _____

24   Desiree Cooks, CSR No. 14075

25

Desiree Cooks

Page 25

**A**

Aaron 74:19
76:7
abatement
12:23, 39:21
40:8, 40:9, 76:2
76:8, 81:10
able 17:3, 83:14
above-backgro...
49:8, 50:19
61:20, 81:3
acceptable 84:5
accompany
87:22
account 65:21
66:7, 66:16
accurate 26:11
26:12, 62:2
73:19
achieve 49:21
achieved 57:14
act 14:16
actions 73:16
activity 48:9
actual 63:14
72:13, 80:3
acute 42:18
42:23
add 28:12
28:25, 79:16
addition 70:22
78:13, 79:17
additional 28:14
50:13, 59:7
address 7:12
39:5, 73:21
83:23
addressed 76:20
76:20
adjourned
91:24
adjustment
10:20, 10:23
administer 6:23
administrative

24:3
admonitions
7:21
adversely 77:6
advertising 13:5
aerosols 66:13
90:6, 90:7
affect 77:19
afternoon 6:4
7:6
ago 8:1, 15:12
29:4, 54:3
83:11, 90:20
agree 41:4
59:13, 72:9
73:2
Ah 64:19
ahead 16:11
46:18
air 11:10, 66:15
airborne 41:5
41:12, 45:5
48:17, 49:15
58:5, 90:8
90:10, 90:12
allegation 8:4
Allied 14:11
Allstate 14:13
ambiguous
46:17, 71:23
72:8, 73:3
amended 5:19
87:4
Amo 7:13
amount 72:2
72:3, 72:6
72:18
amounts 9:19
10:8, 73:2
analysis 5:13
5:16, 63:23
85:9, 85:13
85:16
analytical 85:10
analyze 21:17
71:1, 75:15

and/or 32:19
40:7, 74:4, 74:5
88:1
Angel 16:14
30:24
Angeles 1:15
2:22, 3:5, 3:10
6:2, 6:8, 6:12
12:25, 29:7
41:25, 43:16
answer 4:18
10:22, 12:21
15:2, 16:8, 18:1
18:10, 28:13
31:17, 33:19
34:17, 34:24
35:9, 43:5
54:14, 66:10
68:4, 70:15
answered 11:13
answers 80:10
anticipate 42:16
74:10, 91:8
anybody 57:5
72:3
anymore 11:7
11:16
anyway 74:25
85:8
apart 64:13
apologize 18:22
apparently
10:10, 48:8
65:25, 83:4
appear 92:6
APPEARANC...
3:1
appears 27:24
appended 18:5
Appendix 77:4
86:22, 88:4
88:10
application
66:14
appreciate
61:13

appropriate
44:25, 62:16
70:24
appropriately
57:1
approximate
13:18, 13:23
approximately
7:19, 10:3
16:24, 27:25
28:11, 31:8
32:2, 36:20
64:15
area 72:23
72:23, 72:25
areas 41:13
41:13, 71:9
72:7, 73:2
80:25
arguably 22:11
47:6
article 60:5
84:1
articles 40:10
53:8, 53:12
56:9
asbestos 12:23
41:12, 41:18
41:22
asbestos-contai...
41:20
asbestos-related
42:3
ash 10:17, 12:1
42:5, 43:4, 45:7
45:10, 45:11
45:13, 45:13
45:17, 49:9
52:24, 54:22
59:17, 61:3
72:3, 72:7, 77:7
77:9, 77:17
77:22, 80:5
82:21, 82:23
85:18, 87:17
88:14

ash-free 61:14
asked 13:25
49:19, 91:9
91:11
asking 12:7
13:8, 65:23
91:14
assess 11:12
15:3
assessment 5:12
9:16, 10:16
10:17, 10:21
14:5, 14:22
14:24, 57:10
assessments
9:13
assessor 14:17
assignment
13:11
Association
70:10
assume 35:5
35:7, 54:25
63:20, 63:22
assumption
56:14
atmosphere
79:17
attached 17:24
21:5
Attachment
17:16
attachments
5:11
attended 28:22
attending 24:17
attention 32:20
attorney 16:14
33:7
attorneys 13:7
32:11
audience 61:13
avoid 58:6
aware 11:20
46:14, 47:13
47:16, 72:24

**B**

B-R-I-A-N 7:11
bachelor's 25:8
back 12:18
  36:23, 38:5
  46:9, 54:12
  56:5, 56:20
  59:18, 65:2
  67:7, 68:5, 71:3
  84:21, 86:7
background
  40:24, 41:4
  41:7, 41:8
  41:12, 41:15
  41:24, 42:2
  42:9, 42:13
  43:4, 43:17
  43:18, 43:24
  44:14, 45:1
  45:5, 45:8
  45:14, 48:17
  52:24, 60:4
  71:2
backyard 78:3
bad 9:14, 31:18
  34:16, 54:10
  63:16
balcony 81:15
  81:19, 81:21
  82:5, 82:6
Barker 3:14, 6:6
based 34:6, 35:5
  40:5, 40:6
  46:22, 49:16
  51:12, 51:24
  52:5, 52:9
  52:10, 53:21
  55:9, 57:16
  68:8, 68:11
  68:13, 75:23
  76:22, 79:10
  79:19, 84:7
  88:6, 89:21
baseline 44:14
  45:8, 45:22

basically 22:4
  22:8, 45:14
  74:15
basin 43:16
bear 83:14
bed 56:8
bedding 53:9
beds 53:9
bedspreads 56:7
beginning 6:5
  46:10, 84:22
behalf 6:15
  6:19, 6:20, 11:2
  14:4, 14:17
  14:23, 14:25
  15:7, 15:22
  29:12, 31:16
  31:21, 31:24
  32:3, 32:5
  32:17, 33:3
  33:12, 33:14
  33:15, 33:17
  34:14, 34:22
  35:15
beholder 40:3
believe 7:7
  19:23, 21:7
  24:18, 28:23
  34:16, 40:1
  49:17, 56:8
  62:21, 62:25
  63:4, 63:10
  63:17, 64:4
  65:20, 66:5
  66:19, 67:18
  71:24, 74:12
  76:2, 77:5, 77:7
  80:21, 89:6
benzene 50:6
  50:9
best 16:4
bet 46:4
better 71:15
  73:20, 90:15
beyond 71:6
  83:22

bias 82:6, 82:9
big 81:14
bill 33:14
Binder/Docum...
  5:7
bio 25:2
bit 52:6, 67:2
  71:6, 73:24
black 72:19
bolded 32:23
  35:2
boldface 32:20
boldfaced 35:8
bother 77:20
  82:19
bottom 65:3
Boulevard 2:22
  3:4, 6:12, 7:13
bound 73:13
bounds 75:9
brand-new
  28:21
break 46:2, 46:8
  67:6, 84:16
  84:20
breast 47:10
Brian 1:13, 2:21
  4:3, 5:5, 5:7, 5:9
  5:15, 6:15, 7:1
  7:11, 30:4
  91:24, 92:3
  92:18
brief 85:6
briefly 88:12
bring 18:7
  18:11, 18:13
  28:25, 39:2
  39:14, 55:8
  58:3, 58:6
broad-brush
  70:24
brought 18:15
  19:4, 19:6
brush 54:3
  70:20
Brussel 81:22

81:23, 81:24
building 12:24
  44:18, 44:19
  52:20, 57:2
  58:4, 74:4, 74:8
  76:16
built 13:16
bullet 67:21
  69:10
burning 44:8
  44:10
business 7:12
  9:21, 10:4
by-products
  54:24, 61:3

**C**

C-H-U-N 24:4
Cal 25:14
calculation
  32:23, 32:25
  34:25
calculations
  42:22, 45:23
California 1:2
  1:15, 2:2, 2:23
  2:25, 3:5, 3:10
  6:2, 6:9, 6:13
  7:14, 27:3
  92:11, 93:4
call 13:6, 13:15
  22:24, 40:2
  41:23, 42:21
  76:8, 76:9, 80:4
  83:7
calls 13:7, 13:14
cancer 47:10
  47:16
cap 12:6, 12:8
capacity 8:5, 8:9
  8:12, 14:7
  14:19, 31:19
  32:12
caption 6:13
captions 19:20

car 50:4, 50:5
care 77:25
carrier 9:16
  9:19, 11:9, 33:6
  34:5
carriers 11:21
  12:3, 12:3, 12:7
  31:18
case 1:6, 2:6
  6:13, 8:2, 8:3
  16:19, 17:6
  17:6, 17:15
  22:18, 23:16
  24:7, 24:19
  25:24, 28:3
  28:14, 28:24
  29:1, 29:5, 29:9
  29:9, 29:22
  29:25, 30:3
  30:18, 30:20
  31:4, 33:15
  34:1, 39:4, 42:5
  45:24, 47:22
  47:25, 48:7
  48:7, 50:20
  51:11, 51:17
  51:18, 51:20
  54:1, 57:2
  66:18, 69:23
  74:20, 74:23
  89:17, 90:14
  93:14
cases 17:2, 17:3
  28:11, 28:16
  29:17, 31:11
  31:19, 32:14
  32:16, 33:18
  34:16, 51:17
  70:19
category 39:8
cause 42:19
  82:3
caused 48:4
  81:18, 81:25
causes 81:19
ceiling 68:23

74:9
**ceilings** 53:3
54:5, 58:3
**cellophane**
60:10
**CENTRAL** 1:2
2:2
**certain** 41:14
41:19, 50:24
51:21, 71:9
**certainly** 35:19
35:24, 58:25
72:5, 77:13
77:22, 89:20
**certainty** 54:20
**certification**
26:21, 26:22
93:1
**certified** 2:24
24:13, 24:16
91:21, 93:3
**certify** 92:3
93:4
**chain** 85:9
85:13
**chair** 56:5
**challenge** 73:11
73:12
**chance** 25:20
89:16
**change** 10:10
11:17, 38:6
47:24, 48:12
52:3, 87:12
87:13
**changed** 26:16
87:6
**char** 10:17, 12:1
42:5, 43:4, 43:8
43:25, 44:3
49:9, 52:24
54:22, 59:18
61:3, 61:14
72:2, 72:6, 77:7
77:9, 77:16
77:22, 80:4

82:21, 82:22
85:18, 87:17
88:14
**character** 33:8
**check** 86:7
**chronic** 42:21
42:25
**chronological**
30:11
**Chun** 24:4
**Chun's** 24:6
**cigarette** 48:4
50:22
**cigarettes** 48:6
**CIH** 1:13, 2:21
4:3, 5:9, 91:24
92:3, 92:18
**circling** 56:20
**circumstances**
68:17, 82:21
90:19
**Civil** 22:13
**claim** 10:20
14:18, 14:24
23:3, 23:7, 34:1
65:13, 65:16
**claims** 8:17
10:23, 11:22
12:12
**clean** 40:14
56:1, 84:14
84:15
**clean-up** 84:4
**cleaned** 40:11
40:22, 69:13
**cleaner** 66:16
**cleaning** 59:13
65:4, 65:7
65:18, 66:6
66:8, 66:12
66:13, 68:23
74:4, 74:15
82:24
**cleanup** 84:13
**clear** 53:20
73:13, 73:14

74:17, 80:9
82:8
**clearly** 57:7
69:8, 81:20
83:6
**client** 32:21
35:15, 47:10
47:10, 48:6
48:8, 53:23
67:22
**client's** 49:13
**clients** 14:11
32:10
**close** 10:6, 49:24
50:4, 56:6
58:11
**clothing** 53:8
56:9
**coincidence**
89:7
**collateral** 78:22
**colleague** 19:14
24:4, 85:10
**collected** 24:22
43:22, 52:8
85:10
**collection** 8:19
9:7, 19:12
**collections** 8:18
**Collustian** 75:2
76:7
**Collustian's**
74:19
**column** 87:9
87:16
**combustion**
54:24, 55:22
57:11, 60:3
87:15
**come** 14:15
15:10, 53:12
**comes** 45:3
**Comey** 29:22
**comment** 91:2
**comments** 38:5
70:1, 89:22

90:4
**commingling**
72:17
**companies** 14:7
**company** 1:7
2:7, 6:14, 6:21
7:15, 8:19, 8:23
11:3, 13:5, 14:2
15:1, 15:20
23:15, 24:12
29:13, 31:16
31:21, 31:25
32:6, 32:18
33:4, 33:12
33:13, 33:15
33:18, 33:23
33:24, 34:15
34:22, 35:2
35:16, 41:19
**compiled** 85:25
**complete** 19:24
35:23, 36:19
37:15, 38:15
**completed** 37:6
59:6, 82:15
**completely**
58:12
**completion**
93:15
**compliance**
49:17
**complicate**
50:14, 50:18
**complies** 83:20
**compounds**
58:7
**compressed**
63:1
**computer** 37:17
**concentrations**
45:5, 87:16
**concept** 56:21
**concerned**
49:11, 50:20
**conclude** 46:6
80:14, 91:18

**conclusion** 49:5
51:7, 70:8, 73:3
73:21
**conclusions**
88:10
**conclusively**
69:4
**condition** 40:22
45:24, 46:15
46:20, 47:1
47:5, 52:2, 52:4
54:13, 55:8
55:22, 56:24
59:8, 65:22
66:7, 67:19
78:15, 78:20
78:24, 79:8
79:20, 80:6
80:11, 80:14
83:19
**conditions**
46:22, 54:18
**conduct** 14:5
14:24
**confident** 49:12
69:12
**confidential**
20:17
**confirm** 54:20
59:10, 78:8
**confirmation**
34:8, 78:21
80:12
**confirmed** 47:8
48:3
**confirming**
25:17
**conflict** 76:9
**connection**
10:15, 12:20
14:17, 23:3
23:6, 34:10
34:22, 35:15
47:21, 65:12
65:16
**consecutive**

Page 28

37:13
consequently 12:7, 90:15
consider 40:25 41:14, 62:16 72:14
consideration 57:9
considered 57:1 57:8, 84:2, 84:4
consistent 20:13 64:5, 70:9 70:11, 70:16
consisting 72:18
consists 19:19
constitute 69:22
consult 75:9
consultant 12:22, 14:19 69:5, 73:13 75:8, 75:15 76:3, 76:4, 76:5
consultants 78:25, 78:25
consulted 65:8
consulting 9:22 11:21, 12:7 12:11, 12:14 12:17, 12:23 14:1, 39:17 46:22, 57:5 65:19, 75:8
contacted 16:7 16:13, 16:15 22:17, 35:11
contained 18:18 18:20, 19:9 19:22, 20:6 22:13, 26:10 66:20, 92:7
contaminant 12:1, 42:12 70:20, 77:18
contaminants 11:11, 11:11 41:5, 41:9, 42:9

42:12, 42:16 51:13, 51:14 56:23
contaminated 41:22, 60:3 84:3, 84:12
contamination 43:6, 69:11 84:9
contemporaries 70:23
contents 65:12 65:16, 74:5 74:9
context 11:13 72:13, 75:17
continues 48:8
contraction 81:20, 82:3
contractor 76:2 76:8
contractors 81:10
Cooks 1:23 2:24, 93:3 93:24
cooler 44:9
COPD 47:13 48:3, 48:3, 48:9 49:12, 50:15 50:19, 50:21 51:9, 53:23
copious 58:4
copy 18:19 18:20, 18:22 19:3, 26:6 38:24
correct 25:16 92:8
corrected 92:8
Correction 8:23
corrections 92:6
correctly 67:21
cost 40:14
costs 40:9
counsel 5:8

6:17, 34:17 34:21, 35:13 85:4, 91:20
count 62:8
County 29:7 41:18
course 11:12 26:12, 39:25 41:11, 44:12 45:13, 48:10 56:13, 61:15
court 1:1, 2:1 6:22, 8:17, 29:5 29:9, 29:9
Cozen 3:8 16:14, 27:17 31:1, 38:2 38:10
cracks 81:14 81:14, 81:17 81:25, 82:5 82:8, 82:11
crannies 61:23
cranny 63:5
create 37:12 58:4
criterion 58:15 84:4, 84:13
critical 61:15
criticism 63:8 63:14, 66:2 73:25
critique 23:2 23:5, 73:15
critiques 89:22 90:23
cross 91:9
CSR 1:23, 93:24
cumulative 42:24
current 26:8 26:14, 26:19 26:20, 26:22 26:24, 27:13 28:9, 28:10 28:12, 28:25

Curriculum 5:9
cushion 56:5
custody 85:9 85:13
cut 82:12
CV 26:6, 26:8 27:10

D

D-A-L-Y 7:11
Daley 5:7
Daly 1:13, 2:21 4:3, 5:6, 5:9 5:15, 6:15, 7:1 7:6, 7:11, 7:11 17:14, 18:23 19:2, 25:23 46:13, 67:13 85:2, 91:24 92:3, 92:18
damage 9:24 10:4, 10:12 10:17, 10:21 11:12, 11:23 14:5, 14:16 14:22, 14:24 15:4, 22:23 22:23, 39:24 40:24, 45:3 70:10, 78:22 81:12
damaged 42:11
damp 55:4
dangerous 72:5
data 5:18, 5:19 21:16, 22:4 24:23, 51:24 52:6, 52:9 53:19, 53:22 54:10, 54:20 55:13, 55:21 57:25, 61:17 63:15, 63:17 64:4, 64:12 64:18, 64:19

64:21, 71:1 71:8, 72:14 73:5, 73:9, 73:9 79:11, 80:13 85:17, 85:25 86:2, 86:5, 88:3 88:15, 88:17 89:2, 89:3
date 5:13, 5:16 6:9, 26:17, 37:7 57:6, 93:19
dated 5:10, 68:2 92:10
dates 28:16
Davisson 30:22 31:10
day 19:22, 37:12 92:10
days 8:1, 29:3 37:13
dealing 12:23
debris 83:8 90:5
decades 41:20
December 1:14 2:23, 5:14, 5:17 6:1, 6:9, 7:8 19:14, 49:16 50:24, 55:10 55:14, 57:17 60:18, 60:21 83:1, 88:7, 92:5
decide 75:8 76:1
decking 77:2 77:6
decks 78:7
DECLARATI... 92:1
decontaminated 84:1
defendant 6:21 8:21, 8:25, 9:3 9:6, 9:17
Defendant's 5:5
Defendants 1:9

Desiree Cooks

2:9, 3:7
**degree** 25:5
  25:8, 68:1, 83:2
**degrees** 43:24
**Del** 7:13
**delay** 21:22
**delivered** 24:22
**delve** 73:24
**demolishing**
  57:14
**demolition** 54:9
  57:2, 57:7
  66:24, 76:18
**Density** 87:9
**Dental** 29:2
**Department** 6:8
**depending**
  45:12
**depends** 70:14
**depo** 29:3
**deposed** 8:8
  13:12, 17:5
  30:6, 32:10
**deposition** 1:13
  2:21, 5:4, 6:10
  6:16, 7:17, 7:24
  8:11, 13:3
  17:15, 17:20
  17:21, 17:25
  21:9, 21:14
  21:19, 21:21
  21:23, 21:25
  22:2, 22:7
  27:13, 29:15
  30:17, 36:12
  74:19, 89:19
  91:15, 91:23
  92:5, 93:7
  93:14
**depressions**
  62:20, 62:22
  63:3
**describes** 72:2
**description** 85:6
**Desiree** 1:23
  2:24, 93:3

93:24
**destroyed** 89:13
**destruction** 54:4
**detail** 71:5
**detailed** 59:12
  74:4, 74:15
**detected** 43:25
  44:3, 87:10
  87:17, 87:20
  88:21, 89:3
**detection** 44:15
**determination**
  79:2
**determine** 42:22
**devote** 13:24
**devoted** 13:19
**difference** 39:22
  64:8, 70:12
**differences** 40:1
  64:11, 64:16
  64:17
**different** 22:20
  40:3, 40:3
  40:23, 59:24
  61:1, 61:6, 61:6
  61:8, 64:9
  64:20, 74:11
  74:14, 76:6
  78:23
**Digital** 6:8
**digits** 87:8
**dining** 56:5
**direct** 91:9
**directed** 17:15
**direction** 93:10
**Directly** 47:8
**disbelieve** 56:16
**Disc** 6:5, 46:6
  46:10, 84:22
  91:18
**discipline** 10:2
  13:9, 41:11
**discuss** 21:24
  22:2, 51:19
  76:21
**discussed** 22:4

45:21, 81:23
**disease** 41:7
  42:4
**dismissed** 9:18
**dispersion**
  57:21
**disregard** 15:16
**distance** 68:25
  69:1
**distinction**
  34:18, 80:15
**distressed** 61:22
  62:1
**DISTRICT** 1:1
  1:2, 2:1, 2:2
**doctor** 49:11
  58:5, 58:15
**doctor's** 48:20
**document** 18:4
  18:8, 18:12
  26:2, 38:25
  39:1, 39:2, 39:8
  39:16, 85:20
**documents** 4:14
  5:5, 18:7, 18:8
  18:13, 18:18
  19:3, 21:15
  22:21, 38:13
  38:15, 39:7
  40:7, 85:3
**Doherty** 1:4, 2:4
  5:12, 6:13, 7:7
  10:21, 15:19
  49:21, 50:18
  54:11, 57:6
  61:19, 83:4
  90:20
**Doherty's** 5:4
  48:25
**doing** 8:17, 14:1
  38:3, 53:21
  53:23, 76:18
**Dominguez**
  16:13
**door** 50:4, 56:7
  57:12, 59:25

84:10
**doors** 52:21
  52:22, 73:1
  83:9
**doubt** 68:1
**download** 24:5
**downplaying**
  77:16
**downtown**
  12:24, 42:1
**downwind**
  41:17
**dozen** 32:7, 32:8
**Dr** 48:24, 49:18
  49:19, 50:8
**draft** 27:20
  37:24, 38:1
  38:6
**drafted** 46:13
**drafts** 37:8
  37:23
**drawing** 80:16
**drawn** 88:10
**drive** 19:6
  19:10, 19:15
  19:18, 20:6
  37:18, 81:13
  82:11, 88:1
**dropped** 10:13
**ducts** 69:13
**ductwork** 53:17
  69:10
**due** 90:2
**duly** 7:2, 93:6
**duplicative**
  19:25
**dust** 53:24
  56:23, 59:7
  66:12, 66:21
  66:23, 67:18
**dusts** 57:21
**duty** 73:13, 76:2
  78:14

**E**

**EAA** 89:6, 89:9
**earlier** 11:20
  12:11, 29:15
  87:7
**early** 3:3, 6:11
  11:24
**easily** 19:23
**easy** 33:19
  59:19
**economics** 40:7
  40:8, 40:13
  40:19
**edition** 87:10
**educate** 81:24
**education** 39:20
  51:12
**effect** 42:23
  53:19, 81:1
**effective** 76:24
**effectiveness**
  65:8, 65:19
  66:8
**effects** 42:25
  53:4, 53:6
  53:11, 54:5
**effort** 58:12
**eight** 27:25
**either** 9:18
  17:19, 27:8
  88:21, 89:12
**electronic** 38:24
  80:17, 80:19
**electronics** 81:4
  81:5
**elements** 82:19
**Elena** 16:13
**elim** 36:22
**Email** 5:10
**employer** 6:7
**encouraging**
  54:8
**engineer** 24:9
  24:11
**engineering**

27:1, 27:4
**English** 52:21
71:1
**enter** 54:24
**enters** 81:18
**entire** 55:8, 63:2
82:4, 82:10
**entirely** 88:20
**entirety** 69:22
**entities** 42:7
**entitled** 39:7
**entity** 32:23
33:7, 42:6
**entries** 35:7
**environment** 42:11, 45:15
49:1, 49:15
50:7
**environmental** 42:6, 42:7
77:18, 82:20
**equally** 40:25
59:20
**equipment** 80:17, 80:19
**equipped** 90:16
**error** 85:19
87:14
**especially** 71:17
**ESQ** 3:4, 3:9
**essentially** 10:22, 12:21
21:17, 30:13
49:23, 64:22
86:13
**establish** 84:2
84:3
**established** 84:11
**estimate** 9:2
13:18, 13:23
15:15, 16:4
25:6, 32:16
33:2, 33:16
34:20
**Estimated** 87:16

**evaluate** 11:9
11:22, 34:5
42:17, 42:20
45:1, 51:13
90:16
**evaluation** 70:24
**Eventually** 13:14
**evidence** 44:22
48:15, 55:1
57:11, 68:21
68:24, 69:11
77:14, 78:25
79:3, 80:4
**exacerbate** 50:14
**exactly** 33:1
**EXAMINATI...** 4:5, 7:4
**example** 10:19
34:11, 36:17
38:22, 41:10
42:4, 57:19
61:2, 90:5
**examples** 50:1
**exceedingly** 90:11
**exception** 88:23
**exclusive** 60:20
**exclusively** 40:21, 51:9
51:10
**Exhibit** 5:3, 5:4
5:7, 5:9, 5:10
5:12, 5:13, 5:15
5:16, 5:18, 5:19
17:12, 17:14
18:25, 19:3
21:5, 25:21
26:3, 85:2, 87:2
87:6
**exhibits** 5:1
67:11, 67:14
84:24
**exist** 21:12

37:14, 41:12
42:7, 44:21
45:20, 81:14
81:17, 90:20
**existing** 28:15
**exists** 77:18
80:14
**expand** 48:14
**expansion** 81:20
82:3
**expect** 38:4
42:13, 43:16
44:6, 44:15
44:16, 45:16
48:18, 61:2
61:19, 77:19
77:21, 78:5
82:20
**expectation** 49:7, 50:8
78:24, 80:10
**expectations** 44:4
**expected** 43:8
68:15
**expecting** 45:8
**expedite** 30:2
**experience** 25:6
39:20, 48:4
51:13, 60:25
71:6
**expert** 5:5, 8:5
8:9, 8:12, 10:1
12:13, 12:18
12:20, 13:1
13:6, 13:8
13:10, 13:19
13:24, 14:19
15:18, 25:24
27:24, 28:6
31:15, 31:20
31:23, 32:12
33:3, 33:17
34:3, 34:13
34:21, 35:10
35:14, 36:4

39:17, 46:13
69:15, 78:17
**explain** 41:10
64:10
**explained** 22:10
72:1
**exposed** 42:14
66:17, 71:18
82:18
**exposure** 42:18
42:24, 50:13
50:18, 50:20
82:2, 82:7
82:23, 90:16
**exposures** 42:20
42:21, 49:11
50:21, 67:22
**extent** 11:6
11:16, 14:8
24:6, 58:23
**exterior** 52:20
72:19, 76:15
81:6, 81:7
88:19
**extra** 78:2
**eye** 40:2

**F**

**fact** 12:10
41:13, 48:18
50:4, 53:4
**fair** 50:15, 63:8
66:2, 74:2
**faith** 9:14, 31:18
34:16
**familiar** 14:11
**far** 36:19
**Farm** 1:7, 2:7
6:14, 6:21
14:13, 15:19
15:23, 29:22
34:14, 34:17
35:16, 65:12
**Farmers** 14:13
**federal** 22:13

27:24, 29:9
29:10, 93:14
**feel** 85:24
**fellow** 23:23
**felt** 74:6
**fence** 74:12
**Fender** 88:24
**fiber** 61:4
**Figueroa** 3:9
**figure** 12:6
**figures** 43:7
**file** 16:1, 16:4
16:9, 21:16
**filtering** 77:24
**final** 38:9
**find** 15:4, 36:12
48:22, 49:22
60:5, 61:8, 71:2
81:3
**findings** 22:4
50:23, 51:4
51:7
**fine** 90:7
**finish** 78:5
**finished** 37:23
46:14
**finishing** 54:4
**fire** 44:9, 45:10
45:12, 54:3
54:3, 54:19
54:25, 56:12
56:18, 64:13
70:10, 70:20
82:9, 83:11
87:15, 90:5
90:19
**fire-effluent** 90:1
**fireplace** 61:10
61:15, 61:16
61:17
**firm** 13:6, 13:7
16:17, 31:1
35:5, 46:21
65:20, 66:6
**firms** 13:8, 23:9

Desiree Cooks

| | | | | |
|---|---|---|---|---|
| **first** 7:2, 12:17 12:19, 13:10 26:5, 35:6 36:24, 45:15 45:15, 57:10 68:19, 85:8 89:19 | **found** 29:19 **four** 25:6, 56:8 75:24, 76:6 **fourth** 87:9 **frames** 52:23 52:25, 57:12 58:1, 60:1 84:10, 84:10 | 66:23 **generated** 22:15 23:2, 23:6 25:23, 38:10 39:1, 47:3, 49:6 58:17, 85:18 88:6 | 83:12, 84:17 84:18, 85:21 **good** 6:4, 7:6 45:19, 48:10 53:25, 58:10 61:4, 67:23 79:8 | **H** |
| **first-party** 33:15 | 88:19 | **generation** 66:15 | **goods** 53:14 53:16, 55:17 | **half** 16:5, 32:7 88:25 |
| **fit** 39:8 | **Friday** 1:14 | **generic** 70:20 | 55:19, 55:21 | **handed** 19:2 |
| **five** 26:5, 67:21 | 2:23, 6:1 | 70:24 | 55:21, 56:2 | 67:13, 85:2 |
| **five-minute** 46:2, 84:16 | **front** 18:17 26:2, 50:4 | **getting** 38:5 **give** 7:12, 9:2 | 56:11, 56:15 56:18, 58:3 | **handle** 12:9 **happen** 63:1 |
| **fixtures** 79:23 79:24, 80:1 80:3 | 59:10, 59:11 86:4 | 14:6, 29:1 74:17, 75:6 75:7, 85:6 | 59:20, 59:22 59:23, 60:8 60:11, 60:15 | **happened** 90:25 **happens** 35:11 **hard** 18:20, 19:3 |
| **flawed** 64:1 | **fuel** 50:5 | 85:21 | 65:20, 66:9 | 37:18, 53:16 |
| **floor** 2:22, 3:4 6:12, 57:23 | **fuels** 44:13 **full** 20:19, 65:3 | **given** 28:16 35:24, 76:18 | 82:20, 82:22 **gotten** 77:9 | 57:22, 61:9 65:9, 65:20 |
| 62:20, 62:22 63:12 | **fungal** 85:16 **furniture** 82:16 | 90:10 | **grain** 62:4 **grayish** 72:18 | 82:21 **hardwood** 61:21 |
| **flooring** 54:5 61:22, 74:9 | 82:17, 82:18 83:8 | **giving** 75:10 **Gizer** 3:3, 6:11 | **great** 11:15 **grinding** 79:6 | 61:22, 62:5 62:18, 62:22 |
| **floors** 53:4 57:25, 58:3 | **further** 91:13 93:13 | **glad** 49:19 **glass** 52:21, 56:6 | **grooves** 61:23 **ground** 57:23 | 63:5, 63:12 **hazard** 42:14 |
| 61:21, 62:5 62:18, 63:5 | | 57:12, 78:1 78:3, 78:4 | 78:4 **group** 86:2 | **hazardous** 89:25, 90:1 |
| 79:5 | **G** | **go** 16:11, 17:1 36:23, 38:12 | **growth** 8:3, 9:13 10:16, 12:2 | **hazards** 11:10 11:23, 77:16 |
| **focus** 40:12 40:21, 40:24 41:3 | **garage** 57:23 81:2, 81:4, 89:1 | 44:18, 45:14 46:18, 52:14 55:24, 65:2 | 34:5, 85:16 **guess** 10:11 10:12, 12:9 | **head** 14:8, 56:4 56:10, 67:3 **health** 9:22 |
| **folder** 18:18 18:20 | **gardener** 83:10 **gasoline** 50:5 | 67:4, 69:15 85:5, 86:7, 87:8 | 16:18, 23:21 34:7, 63:8 | 10:2, 11:10 11:23, 12:22 |
| **follows** 7:2 | 50:6 | 91:16, 91:17 | **guideline** 73:17 | 22:24, 29:2 |
| **foregoing** 92:4 93:6, 93:11 | **gate** 74:12 **geared** 71:19 | **goes** 27:25, 28:6 71:6, 85:12 | **guidelines** 38:21 38:23, 39:12 | 39:18, 40:25 41:3, 42:14 |
| 93:13 | **general** 1:7, 2:7 6:14, 6:21, 9:9 | **going** 7:21 11:24, 17:8 | 39:23, 56:22 57:1, 57:3 | 45:4, 52:11 54:11, 59:7 |
| **formation** 47:21 **formed** 22:14 | 15:19, 22:23 34:14, 35:16 | 17:10, 37:25 44:20, 46:5 | 70:10, 70:13 70:19, 71:4 | 61:18, 67:19 71:18, 76:10 |
| **forming** 20:5 20:8 | 39:5, 46:22 66:4, 73:17 | 48:22, 50:1 51:10, 55:24 | 71:7, 71:13 71:15 | 77:16, 84:7 90:4, 90:14 |
| **formulated** 22:6 **forth** 49:18 | **generally** 59:14 59:19, 70:16 | 62:9, 67:1, 68:5 71:14, 75:25 | **guitar** 88:24 **guys** 29:25 | 90:16, 90:19 **health-related** |
| 93:8 | 88:9 | 77:19, 78:7 | 55:25, 83:13 | 42:18 |
| **forward** 24:5 36:20, 36:21 | **generate** 36:24 38:16, 38:19 61:17, 66:21 | 81:5, 82:3 | | **healthful** 58:9 **healthy** 54:6 **hear** 89:23 **heard** 22:11 47:17, 76:12 |

| | | | | |
|---|---|---|---|---|
| 78:16, 81:22 | hopefully 41:4 | **I** | 1:8, 2:8 | inhabit 78:14 |
| 83:4, 88:11 | 59:13 | | inconsistent | initially 16:7 |
| 91:10 | **horizontal** | Ian 89:16, 89:25 | 64:6, 64:7 | ink 92:7 |
| **heightened** 51:8 | 68:22, 68:22 | idea 13:14, 33:8 | incorrect 87:11 | inquiry 13:1 |
| **held** 46:8, 67:6 | **hot** 41:23 | 33:24, 33:25 | increase 42:14 | inside 48:16 |
| 84:20 | **house** 48:15 | 34:6, 46:21 | 53:24, 56:23 | 79:17, 84:12 |
| **help** 29:25, 67:1 | 48:16, 48:16 | 46:21, 48:10 | increased 42:3 | 88:25 |
| **HEPA** 55:4 | 54:2, 54:6 | 54:10, 69:14 | increases 41:6 | inspection 7:8 |
| **high** 44:16 | 56:24, 57:15 | identified 59:18 | independent | 19:13, 23:24 |
| **higher** 10:9 | 58:11, 60:2 | identify 17:3 | 51:4, 78:8 | 24:18 |
| 10:9, 64:22 | 61:13, 61:16 | 29:18 | **INDEX** 4:1, 5:1 | **INSTRUCTED** |
| 71:13, 71:16 | 69:2, 69:7 | ignorance 27:7 | indicate 53:19 | 4:18 |
| **highly** 30:21 | 79:18, 81:1 | imagine 18:9 | 72:6 | insurance 1:7 |
| 48:24, 61:14 | 81:4, 84:12 | 21:6, 81:10 | indicated 11:23 | 2:7, 6:14, 6:21 |
| **hire** 11:21 | 88:19, 88:25 | immediately | 20:11, 74:2 | 9:16, 11:3, 14:6 |
| 11:22 | 89:1, 90:12 | 42:20 | indicating 16:14 | 14:18, 14:25 |
| **hired** 9:15, 11:8 | 90:20 | impact 5:12 | individual 32:13 | 15:19, 29:13 |
| 12:22, 21:17 | **housekeeping** | 56:24, 59:7 | 32:24 | 31:16, 31:18 |
| 32:14, 33:7 | 59:17, 59:21 | 67:19, 75:3 | individually | 31:21, 31:25 |
| 33:22, 33:24 | 83:6, 83:7 | 90:5 | 8:16, 8:22 | 32:6, 32:18 |
| 34:4, 34:17 | **hundred** 45:12 | impacts 90:14 | 13:22 | 33:4, 33:6 |
| 35:6, 35:13 | 62:24 | 90:16, 90:16 | indoor 11:10 | 33:12, 33:13 |
| 35:25 | **HVAC** 53:17 | 90:19 | 51:13, 88:13 | 33:13, 33:15 |
| **hits** 60:1, 61:9 | 57:24, 69:12 | implementation | 88:15 | 33:18, 33:23 |
| **home** 49:1, 49:7 | **hydrocarbons** | 74:4 | indoors 44:17 | 33:24, 34:14 |
| 49:14, 49:15 | 58:8 | important 34:7 | 70:20, 83:6 | 34:22, 35:2 |
| 49:17, 49:21 | **hygiene** 7:16 | impossible 49:2 | 88:15, 88:17 | 35:16, 78:17 |
| 49:23, 49:24 | 8:25, 9:3, 9:4 | 49:3, 49:20 | industrial 13:9 | insurance-relat... |
| 50:2, 50:7, 50:9 | 9:21, 9:25, 10:3 | 49:24 | 24:10, 24:13 | 9:23, 10:4 |
| 50:13, 50:17 | 10:14, 11:2 | impressions | 24:15, 25:5 | 10:12 |
| 50:25, 53:8 | 11:5, 11:15 | 40:3 | 42:15, 44:24 | insured 9:15 |
| 53:12, 53:13 | 13:9, 14:4, 14:7 | improper 75:16 | 46:23, 48:19 | 14:23, 31:24 |
| 54:9, 54:12 | 14:16, 14:22 | inaccurate | 66:10, 90:15 | 32:17, 47:4 |
| 54:17, 54:18 | 25:7, 36:11 | 63:19 | industry 9:23 | insured's 45:24 |
| 54:19, 54:24 | 46:23, 48:19 | inappropriate | 38:18, 39:23 | 46:15, 47:1 |
| 55:8, 55:17 | 55:20, 56:2 | 76:22 | 40:1, 40:4, 66:5 | 51:9, 52:1 |
| 55:18, 56:12 | 60:4, 60:8 | incidence 42:3 | 70:9, 70:11 | 56:24, 59:7 |
| 56:18, 56:22 | 64:24, 73:6 | incidentally | 70:13, 70:21 | 65:21, 66:7 |
| 57:9, 58:2 | 76:19, 76:25 | 89:7 | 71:5, 71:12 | 67:19 |
| 58:13, 58:14 | **Hygienetech** 5:6 | include 23:1 | 83:14, 83:20 | insureds 14:17 |
| 58:17, 60:18 | **hygienist** 24:10 | 23:5, 74:24 | inflammatory | 15:7 |
| 60:21, 72:20 | 24:14, 24:15 | including 66:15 | 71:22 | insurer 14:5 |
| 72:24, 75:18 | 25:5, 44:24 | 74:8, 79:16 | information | 78:14 |
| 78:14, 80:17 | 66:10, 90:15 | 80:3, 81:9 | 4:10, 25:12 | intend 20:12 |
| 80:25, 84:8 | **hygienists** 42:15 | 81:14 | 26:10, 34:7 | 75:2, 75:6, 91:6 |
| 88:7 | | **INCLUSIVE** | informed 47:9 | intended 38:17 |

Page 33

40:24
intention 13:16
intentionally 61:12
interest 76:9
interesting 32:10, 39:14
Interestingly 32:9
interior 54:17
54:21, 72:7
72:25, 73:2
79:13, 79:19
80:3, 81:2, 84:8
interiors 60:5
International 7:16
interpret 72:4
interpretation 50:11, 50:12
50:16, 68:9
68:11, 68:13
73:12
introduction 68:8
introductions 6:17
involved 8:4
9:13, 9:14
10:25, 31:11
33:6, 33:9
33:25, 50:20
54:1, 57:5
involvement 24:6
involving 54:4
irregular 62:3
62:17, 63:12
irregularity 63:23
issue 49:14
61:18, 61:20
70:14, 71:20
72:21, 73:21
75:7, 77:25
77:25, 83:23

84:8
issued 65:25
issues 22:24
39:18, 42:18
45:3, 45:4
70:20, 71:18
73:8, 76:19
84:7
item 40:21
IV 47:16

**J**

Jan 81:22, 81:23
81:24
January 68:2
Jersey 41:19
JFW 1:6, 2:6
job 1:24, 12:17
15:5
June 5:10
justification 22:10, 53:25
justified 54:10
69:3

**K**

KCE 23:6
57:19, 63:15
63:18, 63:25
64:4, 64:13
64:22, 68:15
70:23, 71:20
72:2, 73:15
73:25, 74:16
75:17
keeping 36:10
36:11
key 20:7, 20:9
kind 44:14, 45:7
45:16, 56:20
kinds 59:24
know 10:23
11:14, 11:17
11:18, 12:2

13:5, 16:16
17:9, 20:11
20:16, 27:8
29:6, 30:5, 30:9
31:17, 33:5
33:10, 34:10
35:17, 37:10
37:18, 38:20
38:23, 40:9
40:10, 41:1
41:12, 43:3
44:1, 44:25
45:11, 46:16
46:19, 46:25
53:8, 55:16
55:18, 56:12
56:17, 56:19
60:22, 65:24
65:24, 65:24
66:2, 67:17
69:8, 72:9
72:24, 73:4
73:7, 75:22
76:22, 77:4
77:15, 78:1
78:16, 81:25
82:2, 82:2, 82:3
82:24, 83:2
83:18, 83:22
89:10, 91:15
knowing 52:1
75:2
knowingly 36:22
knowledge 26:11, 26:15
65:10
known 41:9
41:25, 43:18
44:22, 45:16

**L**

L-A-U 24:4
L.A 42:1
lab 51:2, 51:8

63:18, 86:1
86:13, 88:4
88:5
laboratories 21:16, 89:14
laboratory 24:23, 52:8
89:6
language 71:21
78:17, 90:18
large 12:24
12:24, 53:23
82:5, 86:17
larger 81:17
latex 79:16
Lau 24:4
law 6:10, 13:8
31:1, 35:5
lawsuit 8:8, 8:15
8:21
lawsuits 8:25
9:3, 9:10, 9:14
9:17
layperson 72:4
72:12, 73:4
73:5
lead 9:6, 41:6
42:2, 42:25
learn 47:4, 47:7
led 13:3, 13:4
left 16:20
length 82:4
letter 27:16
48:24, 49:18
49:20, 50:16
68:16
level 45:8, 56:8
57:23, 71:16
84:2, 88:21
levels 41:4
41:12, 41:14
41:24, 42:2
42:7, 42:12
43:4, 43:17
44:16, 45:21
45:22, 49:8

52:24, 53:24
64:22, 64:23
64:24, 80:21
81:3, 88:14
liability 12:4
33:8
Libby 41:21
license 26:20
27:1, 27:2, 27:4
licenses 26:19
lift 60:9, 60:12
60:20, 62:13
86:19
light 68:14
71:17, 79:23
79:24, 80:1
lighting 53:3
57:24, 74:9
80:2
likelihood 61:5
limit 12:3, 12:5
43:14
limited 11:6
45:17, 89:21
limiting 43:15
LINE 4:11, 4:15
4:19
link 20:17, 24:5
list 17:2, 17:4
17:7, 28:6, 28:9
28:10, 28:22
28:25, 29:18
32:20, 32:24
35:3, 35:23
35:24, 36:2
36:5, 36:7
36:10, 36:11
36:14, 36:19
36:20, 38:15
38:24
listed 35:6
38:20, 86:16
86:21
listing 39:6
literally 18:11
28:13, 33:23

Desiree Cooks

52:7, 64:11
70:15, 90:18
**litigation** 12:20
31:16, 34:11
34:23, 35:15
51:19
**little** 40:23
61:23, 71:6
**living** 42:16
56:6, 73:6
**Lloyd's** 14:14
**LLP** 3:3, 31:6
**localized** 61:14
82:9
**located** 6:8
**location** 6:10
63:13
**locations** 54:17
63:6, 63:10
**log** 19:11, 19:12
19:19, 19:23
20:1, 20:6
21:12, 88:1
**logical** 64:21
**London** 14:14
**long** 28:5, 42:21
62:9, 62:11
77:25, 90:8
90:11, 90:13
**long-term** 42:25
82:2
**longer** 12:11
15:14
**look** 16:1, 18:24
18:24, 32:23
58:24, 64:18
67:15
**looked** 47:9
57:21, 83:6
**looking** 16:9
32:19, 34:25
34:25, 67:20
78:2
**looks** 26:5
62:12, 85:7
**Los** 1:15, 2:22

3:5, 3:10, 6:2
6:8, 6:12, 12:24
29:7, 41:25
43:16
**loss** 82:25
**losses** 12:8
**lot** 35:11, 61:7
61:8
**lots** 64:17
**lower** 56:8
57:23, 64:23
64:24
**lymph** 47:11

**M**

**main** 41:3
**maintain** 89:14
**major** 70:3
91:10
**making** 34:18
78:14, 90:4
**Malibu** 43:3
43:11, 43:14
43:15, 44:14
45:9
**manager** 16:13
**manila** 18:18
**Manor** 30:3
31:4
**manufacturer**
41:19
**Mar** 23:21
**March** 48:5
**Marco** 5:15
23:22, 24:9
24:13, 24:18
25:2, 85:10
**Marco's** 86:4
86:5, 86:13
88:4, 88:5
**Maria** 5:12
**mark** 17:9
17:11, 18:21
25:19, 67:9
86:25

**marked** 5:3
17:12, 18:25
20:17, 25:21
67:11, 84:25
86:3, 87:2
**marketing** 13:5
**marks** 82:1
82:4
**Marti** 16:14
16:16, 30:24
**match** 64:25
**material** 44:11
44:12, 66:15
77:17
**materials** 41:20
54:5, 57:2
57:11, 57:22
58:4, 59:19
59:24, 65:9
74:5, 74:8, 81:3
86:10, 86:11
**matrix** 23:6
63:15, 63:18
63:25, 64:4
64:22, 68:15
71:20, 73:15
73:25, 75:17
81:19
**matter** 9:7
15:19, 32:15
41:13, 48:18
50:3, 51:19
66:11, 67:18
91:7
**matters** 8:19
**mattr** 53:11
**Mattresses**
53:10
**McCrae** 6:11
**McRAE** 3:3
**mean** 41:8
49:22, 51:18
72:8, 75:1, 75:8
82:12, 85:21
**meaning** 64:9
**meaningful**

72:11
**means** 42:10
42:11, 42:13
72:3, 72:5, 72:9
73:7
**meant** 64:10
73:5, 74:11
75:22
**measurable**
41:6, 42:3
48:19, 77:14
**measure** 42:17
**medical** 46:15
46:16, 46:19
46:21, 47:1
47:4, 47:9
47:18, 47:20
48:5, 48:11
51:5, 51:16
51:20, 52:1
52:4, 56:24
65:21, 66:7
**meet** 84:13
**meeting** 21:20
21:24
**meetings** 21:18
**meets** 58:14
84:8
**memorialized**
52:15
**mention** 70:17
**mentioned** 44:1
**met** 7:8, 21:21
**metastasized**
47:11
**method** 60:12
60:20, 61:6
62:14, 62:17
63:23, 86:19
86:23
**methodologies**
60:9
**methodology**
60:7, 60:20
60:25
**methods** 48:19

59:17, 66:8
**metropolitan**
41:13, 41:25
**microtoxins** 8:4
**mid** 11:25
**Mike** 30:22
31:10
**miles** 45:11
45:12, 45:12
**mind** 14:15
18:12, 20:7
52:5, 70:12
**mine** 36:13
40:5, 41:18
**mined** 41:22
**misleading** 52:6
**missed** 86:7
**missing** 85:7
**misspoke** 9:15
27:15, 88:18
**misstating** 10:5
**moderate** 72:6
73:1
**modified** 52:9
**modify** 37:19
80:9
**mold** 8:3, 9:13
10:16, 11:24
12:2, 12:5, 34:5
**moment** 89:22
90:23, 91:12
**money** 9:20
**Montana** 41:21
**month** 13:15
19:14, 28:10
**Moore** 10:19
23:2, 55:16
58:16, 59:5
59:9, 59:12
63:21, 64:4
64:14, 64:23
66:20, 66:25
67:14, 68:5
68:14, 68:16
68:25, 70:5
70:23, 89:8

**Moore's** 59:2
**mover** 66:15
**multiple** 42:1
57:25

**N**

**name** 6:6, 6:7
7:6, 7:9, 7:15
16:13, 23:22
29:1, 48:20
56:10, 93:18
**named** 9:17
**names** 14:6
14:10, 15:11
**Nationwide**
14:11
**nature** 8:2, 9:21
38:7, 90:1
**ND** 87:20
**near** 73:1
**necessarily**
23:11, 33:6
33:12, 34:1
34:4, 37:13
39:12, 40:10
42:1, 51:18
73:9, 74:24
**necessary** 25:13
69:3
**need** 28:12
28:24, 58:23
59:10, 69:12
76:20, 78:11
78:12, 81:24
82:22, 84:2
84:3
**needed** 83:25
**needs** 76:1
76:14, 84:1
**negatively** 67:19
**Neither** 26:20
**nested** 61:3
**never** 9:6, 13:2
33:20, 49:21
49:25, 69:2

**new** 22:10
22:12, 28:24
37:20, 41:19
52:5, 52:12
52:14, 52:17
56:21, 56:21
58:3, 59:2
83:24, 84:17
91:5
**news** 53:25
58:10
**night** 55:25
85:4, 85:23
**Ninyo** 10:19
23:2, 55:16
58:16, 59:2
59:5, 59:9
59:12, 63:21
64:4, 64:14
64:23, 66:20
66:25, 67:14
68:5, 68:14
68:16, 68:25
70:5, 70:23
89:8
**nodes** 47:11
**nomenclature**
83:13
**nook** 63:5
**nooks** 61:23
**normal** 41:7
43:19, 43:21
43:23, 57:25
59:21, 80:13
80:21, 82:21
88:13, 88:16
88:20
**Northridge**
25:14
**notations** 28:15
**noted** 92:6
**nother** 66:11
**notice** 5:4, 17:15
17:19, 17:20
90:25
**noticeable** 82:5

**November**
49:18, 49:20
**number** 6:5, 6:6
44:8, 45:2, 46:6
46:7, 46:10
46:10, 59:23
74:7, 84:22
84:22, 86:17
91:18, 91:19
**numbers** 86:17

**O**

**O'Connor** 3:8
16:15, 27:17
31:2, 38:2
38:10
**oath** 6:23
**Objection** 46:17
**objective** 57:14
**observation**
79:10
**observations**
55:14, 57:18
79:19
**obtain** 60:21
**obtained** 63:15
63:18
**obvious** 22:3
**occasionally** 9:1
44:4
**occupational**
13:9
**occurred** 34:6
37:16, 54:3
**October** 26:16
27:16, 37:7
46:14, 46:25
47:12, 47:15
51:21
**odds** 60:2
**odor** 57:19
57:20
**off-gas** 58:8
**offer** 20:12, 33:3
34:13

**offered** 35:14
36:3, 68:16
91:5
**offering** 63:25
**office** 16:12
18:19
**office/garage**
72:22
**offices** 6:11
**oh** 8:3, 8:23
9:11, 20:19
26:12, 28:18
30:5, 34:18
56:13, 61:10
62:19, 62:23
72:1, 86:10
**okay** 7:21, 7:22
11:1, 11:5, 15:9
17:1, 17:8, 19:2
19:15, 20:14
20:23, 21:8
22:17, 23:15
24:1, 26:5
26:13, 26:15
27:10, 28:5
28:9, 28:11
28:24, 31:15
32:2, 32:22
33:21, 34:19
35:18, 37:25
38:9, 42:7, 43:3
43:13, 43:20
44:5, 45:7
45:18, 46:1
47:3, 48:11
51:7, 52:12
52:17, 53:14
54:16, 55:12
55:24, 56:11
56:17, 58:22
62:13, 63:14
63:21, 65:7
65:15, 65:18
68:5, 69:2
69:15, 69:19
70:17, 71:11

71:25, 73:22
74:22, 79:15
79:23, 80:15
80:21, 80:24
82:12, 82:24
85:15, 85:24
86:16, 86:21
88:3, 91:1
91:12
**old** 36:15, 36:16
**omitted** 36:22
**once** 16:25
**one's** 26:21
26:21
**ongoing** 9:8
45:10
**open** 52:22
**opening** 75:11
88:22
**openings** 52:20
52:23, 55:2
55:7, 76:15
88:20
**operated** 41:20
**operator** 6:7
**opinion** 20:8
47:24, 51:9
51:11, 51:11
51:15, 55:10
56:21, 59:2
59:2, 59:3, 59:4
63:25, 65:15
66:8, 73:19
75:1, 75:4
76:14, 78:19
79:9
**opinions** 20:5
20:11, 20:13
22:5, 22:9
22:10, 22:12
22:22, 40:5
47:21, 48:12
56:21, 57:7
66:18, 69:16
69:23, 70:3
70:3, 75:6, 91:5

91:6, 91:10 91:10
opportunity 22:9
option 74:7 74:17
orally 47:17
order 15:10 25:19, 42:22 52:23, 67:10 87:1
organic 44:11 44:12, 58:7
organizations 23:14
original 18:24 22:20, 37:1 59:3, 85:22 93:14
originally 22:17
ought 76:11
outdoor 51:14 82:16, 82:17 82:18
outdoors 44:17 83:8
outfit 65:24
outside 8:8, 8:17 35:19, 48:16 67:24, 77:18 82:20, 82:22
overarching 56:20
overhang 81:15
overstated 68:17, 68:20 69:9

**P**

p.m 1:14, 2:23 6:1, 6:6, 46:6 46:11, 67:5 67:8, 84:19 84:23, 91:18 91:23

page 4:5, 4:11 4:15, 4:19, 25:2 27:16, 28:14 29:22, 30:9 36:24, 65:2 68:3, 68:8 85:19, 87:8 90:5
pages 26:5, 26:7 26:8, 27:10 28:1, 28:6
paint 79:16
paperwork 65:25
paradigm 64:25
paragraph 38:12, 65:3 68:7, 68:11 70:18, 71:19
paraphrase 49:22, 75:13
parked 50:4
part 45:14 53:23
partially 37:20
participant 10:20
participate 48:8 66:14
Particle 87:15
particles 55:1 60:3, 72:18 72:19, 90:2
particular 43:11
particularly 39:3
particulate 48:17, 49:9 49:15, 58:5 67:18
particulate-free 49:1
particulates 59:21, 72:19
parties 32:20 33:25, 54:1

66:14
parts 62:20
party 6:15, 33:9 33:9, 33:13 33:14, 35:8 35:12, 63:20
patient 50:14
patio 81:19 83:8
pay 32:20
paying 33:14
payout 12:5
PE 1:13, 2:21 4:3, 5:9, 91:24 92:3, 92:18
pedestrian 52:22
penalty 92:1 92:4
pending 29:5
people 40:3
percent 10:9 13:20, 14:1 43:9, 43:17 43:23, 44:3 62:24, 83:19 84:6, 87:19 88:14, 88:22 88:25, 89:3
percentage 10:3 13:18, 13:23 15:15, 32:16 32:24, 33:2 33:16, 34:20 87:16
percentages 87:17, 88:16
perfectly 76:21
perform 12:22 32:22
perimeter 55:2 88:22
period 10:11 37:13, 57:3 89:14
periods 90:8

90:11
perjury 92:1 92:4
permanently 37:18
person 9:25 23:22, 83:25
personal 53:4 53:6, 53:11 53:12, 71:6
personally 8:24
pertains 93:13
Peter 3:4, 6:19 7:6, 20:16
photo 19:11 19:12, 19:19 19:22, 19:23 20:6, 21:12 87:24, 87:25
photographs 34:6
photos 19:12 19:17, 19:20 19:21, 19:24 19:25, 20:5 20:7, 20:9 20:10, 20:12 20:19, 20:20 24:5, 87:22 88:2
phrase 73:18
Piro 48:21 48:22, 48:24 50:8
Piro's 49:18 49:19
place 93:8
plaintiff 1:5, 2:5 3:2, 5:4, 6:19 7:7, 8:15, 14:20 32:4, 32:5
plaintiffs 6:16
planning 63:24
plaster 78:6
PLAx 1:7, 2:7
please 6:17

6:23, 7:9, 17:11 91:22
plenty 44:10
plural 23:9
plus 70:1
point 12:25 25:23, 42:8 46:15, 47:3 54:23, 69:4 69:10, 80:22
points 20:10 20:11, 49:6 67:21
policy 11:18
pool 76:25, 77:3 77:5, 77:10 77:19, 77:20 77:24, 78:1 78:19, 79:3
pool's 78:6
populations 66:17
portion 69:16
portions 63:11
pose 50:13 50:17, 51:8
posed 11:10
position 54:12
positively 87:24
possess 89:9
possibilities 35:20, 74:18 75:12, 76:7
possibility 54:23
possible 59:19 77:11, 77:16
potential 41:8 52:24, 66:17 90:1
potentially 11:10, 39:19 39:19, 42:14 71:18, 71:23 72:15
power 81:11 82:10

Desiree Cooks

practices 46:23
pre-loss 40:22
  45:23, 54:13
  54:18, 55:8
  78:15, 78:20
  78:23, 79:8
  79:20, 80:6
  80:11, 80:14
  83:19
precise 67:2
  71:15, 71:17
  83:13
precision 71:10
  71:10
predated 36:17
predictable
  64:17
preparation
  21:14, 21:19
  21:21, 21:25
  22:2, 22:7
prepare 21:8
prepared 21:12
  65:12, 70:1
presence 67:25
  69:7, 77:22
present 3:13
  26:17
present-day
  22:21
pressed 62:19
presumably
  50:5, 54:18
  55:8
presume 56:13
  67:23, 75:1
presumed 50:10
previous 87:10
previously
  16:19, 22:6
  29:16
prior 37:8
Pro 29:2
proactive 71:23
  72:15
probably 7:20

10:8, 12:10
  34:8, 35:8, 56:9
  58:21, 59:16
  59:16, 61:17
  69:2, 69:3
  87:25
problem 54:22
problematic
  90:6
Procedure
  22:14
proceedings
  93:9, 93:12
  93:15
processing
  85:19, 87:14
produce 5:5
  44:10, 61:1
produced 5:7
  26:16
product 37:1
  38:9
products 55:23
professional
  51:5, 51:16
  51:20, 65:4
  65:7, 65:18
  66:6, 76:11
progress 37:21
  37:22
progression
  64:21
project 5:15
  12:24, 13:1
  13:10, 79:1
projects 15:5
promotes 48:9
prone 44:11
  81:1
propensity 90:8
properly 66:22
property 9:24
  10:12, 10:17
  11:23, 22:22
  43:22, 45:24
  48:15, 50:24

51:22, 52:3
  57:6, 61:23
  70:6, 73:16
  75:25, 81:6
  82:10, 82:25
  88:18
propose 81:11
provacative
  73:4
provide 9:22
  9:25, 9:25
  10:15, 11:21
  19:24, 20:3
  30:17, 30:20
  34:21, 73:25
  75:3, 75:17
  91:6
provided 8:11
  11:2, 12:3, 36:4
  59:5, 88:15
providing 12:17
  13:1
Pscott@earlys...
  3:6
publications
  38:19
purchase 91:21
purpose 34:9
pursuant 18:12
  21:4
put 63:1, 72:13

**Q**

qualifications
  25:4, 44:25
qualified 76:7
quantities 58:5
question 10:7
  11:14, 12:15
  15:17, 18:11
  22:1, 23:8
  37:25, 43:5
  43:15, 56:19
  62:2, 63:9
  63:16, 63:21

66:3, 68:19
  83:12
questions 65:23
  91:13
quite 56:25
quote 49:22
  74:3
quote/unquote
  39:23, 41:15
  45:23, 60:1
  91:4

**R**

rain 45:15
raise 66:12
  66:13
random 43:18
randomly 43:9
rare 34:2
rarely 14:12
rate 27:11
  27:13
Ratio 87:16
raw 19:24
  19:25, 20:20
  24:5, 88:1
re-emphasize
  22:9
reached 28:14
read 47:17
  74:19, 87:9
  89:16, 89:19
  89:20
reader 74:6
  74:16
real 13:16
really 10:24
  11:17, 23:10
  31:17, 33:5
  33:10, 33:10
  36:16, 37:9
  37:11, 39:9
  39:15, 40:7
  40:9, 40:20
  45:3, 46:20

46:21, 55:5
  66:1, 73:20
  82:18, 86:17
  89:18, 90:24
realm 35:19
reason 11:14
  21:6, 21:23
  22:3, 36:7
  36:14, 44:22
  45:19, 56:16
  60:4, 60:23
  62:25, 64:2
  67:23, 70:17
  77:5, 77:7
  79:21
reasonable
  83:19
reasonableness
  83:16
reasons 22:3
  72:16, 76:18
  80:20
recall 10:19
  12:5, 13:12
  14:3, 15:3
  15:25, 16:6
  17:5, 25:11
  29:15, 30:6
  31:12, 35:21
  35:22, 38:5
  47:18, 55:19
  56:2, 58:19
  58:20, 61:21
  61:25, 66:23
  66:24
receive 13:15
received 13:1
  85:3
receiving 13:7
  13:14
recess 80:2
recessed 53:3
  57:24
recollection
  15:6, 16:11
  31:10, 31:13

| | | | | |
|---|---|---|---|---|
| 58:24 | 54:21, 88:17 | remediate 40:14 | 66:3 | 58:17, 58:21 |
| **recommend** | **records** 47:9 | 73:16 | **replace** 40:15 | 66:20, 67:14 |
| 52:19, 53:1 | 47:18, 47:20 | **remediated** | 74:7, 74:8 | 68:6 |
| 53:2, 53:2, 53:4 | 48:5, 48:11 | 51:23, 52:3 | **replaced** 40:11 | **represent** 7:7 |
| 53:22, 69:5 | **reduce** 52:23 | 56:22, 58:18 | 75:19, 76:1 | **representative** |
| 73:16, 79:6 | **refer** 16:2, 71:3 | 75:20 | **replacement** | 20:10, 56:15 |
| 81:9, 81:11 | **reference** 39:15 | **remediation** | 53:2, 74:3 | 57:22 |
| 82:10 | **referenced** | 22:24, 39:24 | 74:14 | **request** 5:13 |
| **recommendation** | 22:12, 39:11 | 40:9, 52:19 | **report** 5:15 | 5:16, 18:5, 20:2 |
| 79:4, 79:12 | **referred** 16:16 | 53:3, 53:17 | 17:1, 22:14 | 85:8, 85:13 |
| 79:24 | **referring** 40:13 | 53:21, 55:3 | 25:24, 25:25 | **requested** 4:10 |
| **recommendati...** | 40:18, 46:20 | 55:5, 58:12 | 26:3, 27:25 | 4:14, 93:16 |
| 40:8, 51:22 | 53:7, 53:15 | 58:25, 59:4 | 28:3, 29:11 | **requests** 18:8 |
| 52:2, 52:5 | **refinishing** 79:7 | 66:19, 67:16 | 36:23, 36:24 | **require** 57:2 |
| 52:10, 52:13 | **reflected** 36:4 | 70:5, 74:1, 74:3 | 37:3, 37:6, 37:8 | 70:22, 80:5 |
| 52:15, 52:17 | 48:12, 63:18 | 74:13, 74:14 | 37:12, 37:14 | **required** 53:18 |
| 58:16, 58:25 | 88:3 | 74:24, 75:3 | 37:16, 37:19 | 68:23 |
| 59:5, 66:20 | **refresh** 16:11 | 75:6, 75:11 | 37:20, 38:1 | **research** 15:10 |
| 66:23, 67:16 | 58:24 | 75:15, 76:15 | 38:13, 38:16 | **residence** 5:12 |
| 67:17, 68:15 | **Regarding** 5:15 | 79:4, 79:12 | 38:19, 46:13 | 10:21, 74:5 |
| 69:8, 69:24 | **regardless** 15:4 | 79:24, 80:1 | 47:4, 48:13 | **respect** 11:21 |
| 70:1, 70:4, 70:9 | 55:19, 57:4 | 80:5, 80:18 | 48:20, 49:6 | 12:2, 14:24 |
| 70:25, 71:17 | 57:9 | 81:7, 82:16 | 51:21, 59:10 | 22:22, 22:23 |
| 74:1, 74:24 | **registers** 57:24 | 82:22, 83:21 | 63:15, 63:19 | 35:10, 37:16 |
| 75:3, 75:11 | 69:11 | 83:25 | 64:3, 65:2 | 39:20, 49:12 |
| 76:23, 80:18 | **registration** | **remember** | 65:12, 65:16 | 50:21, 54:2 |
| 81:7, 82:17 | 26:21, 26:24 | 10:24, 14:8 | 67:20, 68:2 | 54:10, 55:22 |
| **recommended** | 27:3 | 18:9, 23:10 | 68:6, 68:7, 69:1 | 56:11, 61:18 |
| 53:21, 58:13 | **regular** 83:5 | 29:6, 30:19 | 69:17, 69:18 | 63:23, 68:2 |
| 59:12, 66:25 | 83:7 | 38:3 | 69:25, 71:20 | 70:2, 71:8 |
| 68:25 | **relate** 9:10 | **remind** 61:7 | 71:21, 74:1 | 71:18, 82:6 |
| **recommending** | **related** 10:4 | **remove** 59:19 | 74:6, 75:7 | 84:7, 90:2, 90:3 |
| 48:25 | 10:17, 11:24 | **removed** 59:22 | 75:14, 85:11 | **responsibility** |
| **reconcile** 59:1 | 39:19, 39:19 | **removing** 50:9 | 87:4, 87:7 | 76:3 |
| **record** 6:5, 6:18 | 45:3, 45:4 | **render** 22:22 | 89:17, 90:23 | **responsive** 18:8 |
| 7:10, 46:6, 46:8 | **relationship** | 61:6 | 91:4, 91:4 | 18:16 |
| 46:10, 52:7 | 32:3, 35:7 | **rendering** 66:7 | **reported** 1:23 | **rest** 14:1, 14:2 |
| 56:1, 67:5, 67:6 | **relatively** 36:15 | **repainting** 53:1 | 93:9 | 62:2, 62:2, 91:2 |
| 67:8, 84:19 | **relevant** 48:7 | **repair** 74:3 | **Reporter** 2:24 | **restoration** 70:9 |
| 84:20, 84:22 | 66:18, 69:25 | 74:11, 74:13 | 6:22, 91:20 | 83:17 |
| 91:16, 91:18 | **relied** 38:19 | 74:13 | 93:3 | **result** 50:19 |
| 93:11 | **rely** 39:12 | **repaired** 75:19 | **REPORTER'S** | 67:22, 74:10 |
| **recorded** 19:13 | 39:15, 39:18 | 76:1 | 93:1 | **resulted** 12:17 |
| 19:21, 19:22 | **relying** 20:5 | **repeat** 72:1 | **reports** 23:2 | **results** 39:18 |
| 21:16, 51:25 | 20:8 | **repeated** 22:5 | 23:6, 39:16 | 51:2, 51:8, 61:1 |
| 52:6, 52:9 | **remain** 90:8 | **rephrase** 63:16 | 39:17, 39:17 | 61:6, 63:18 |

63:25, 68:14
68:15, 73:9
73:11, 86:1
86:13, 88:5
88:5
**resume** 37:19
**resurface** 58:2
**retain** 29:25
59:20
**retained** 5:7
12:19, 14:4
14:7, 14:23
14:25, 15:7
15:18, 15:22
15:25, 29:12
31:15, 31:18
31:21, 31:24
32:17, 33:3
33:17, 34:13
34:21
**retention** 16:6
22:19
**return** 78:15
**returned** 78:20
**revenue** 13:21
**review** 22:21
23:1, 23:5, 38:2
38:25, 39:6
47:20, 47:23
48:11, 75:15
89:21, 90:24
91:14, 93:15
**reviewed** 21:15
21:15, 21:16
38:13, 38:16
39:1, 39:7
48:20, 92:4
**RIA** 38:21
38:23, 39:2
39:11, 39:22
70:13, 70:19
71:4, 71:6
71:13, 71:15
**right** 9:8, 10:8
14:9, 14:22
15:23, 16:11

19:7, 20:17
23:25, 25:25
28:1, 30:6, 34:8
35:3, 35:22
37:21, 38:8
45:11, 50:22
51:23, 54:13
59:17, 66:24
69:15, 76:4
79:8, 85:24
87:13, 87:15
88:7, 88:9, 91:3
**risk** 42:23
50:13, 50:18
51:8, 77:15
**RLB** 56:22
**Rojas** 3:9, 6:20
6:20, 16:20
17:4, 17:6
20:16, 20:20
20:22, 20:25
21:18, 21:20
21:21, 22:5
27:8, 29:16
29:24, 30:3
30:11, 30:14
46:3, 46:17
91:14, 91:22
**role** 10:23, 11:1
**room** 56:5, 56:6
**rooms** 54:21
60:6
**rot** 82:2
**routine** 41:24
**routinely** 51:14
**Rule** 22:13
25:24, 26:3
27:24, 39:17
48:13, 91:3
**run** 50:23, 51:4
51:15
**running** 14:2

**S**

**safe** 69:6, 78:14

**safety** 9:22
12:22, 13:9
76:10
**sample** 56:5
61:12, 63:6
63:10, 63:23
77:21, 79:11
86:17, 87:8
88:3, 88:23
88:23
**sampled** 57:22
59:23, 60:11
**samples** 21:17
24:18, 24:22
24:23, 43:22
44:19, 44:23
44:24, 50:24
51:2, 52:8
55:16, 55:18
55:20, 55:25
56:3, 57:24
59:24, 60:14
60:17, 60:21
61:1, 61:8, 62:5
69:10, 70:22
76:25, 77:2
80:2, 80:13
80:23, 81:2
82:19, 85:9
85:11, 85:18
86:3, 86:4, 86:4
86:5, 86:6
86:14, 86:14
86:16, 86:18
86:18, 86:21
87:18, 87:23
88:5, 88:6, 88:6
89:4, 89:9
89:15
**sampling** 39:18
55:9, 57:16
60:7, 62:17
63:15, 63:17
63:18, 72:14
78:8, 86:22
**satisfactory**

55:22
**satisfied** 58:14
**saved** 37:17
37:18
**saw** 49:7, 61:11
78:2, 78:21
81:25, 82:1
89:18
**saying** 50:12
53:20, 56:25
74:17, 84:6
84:7
**says** 65:3, 83:25
90:6, 90:18
**scary** 73:7
**science** 40:6
**scope** 22:18
22:20, 22:21
23:1, 23:5
74:23, 75:10
**scopes** 22:24
**Scott** 3:4, 4:6
6:19, 6:19, 7:5
7:7, 17:11
17:13, 18:17
19:1, 20:19
20:21, 20:23
21:2, 21:3
25:19, 25:22
27:9, 30:2, 30:8
30:12, 30:16
46:2, 46:12
46:24, 67:1
67:9, 67:12
84:16, 85:1
86:25, 87:3
91:12, 91:16
**sealed** 89:1
**second** 16:5
68:7, 69:9
**Section** 38:12
69:18, 69:20
**Sedgwick** 31:6
**see** 12:13, 17:16
18:4, 18:6
27:18, 28:7

28:18, 34:18
35:2, 39:9
42:13, 44:15
45:8, 48:14
58:23, 65:5
66:3, 68:10
68:12, 68:21
68:24, 74:12
74:22, 85:18
88:20
**seeing** 12:6
18:10, 30:15
47:19
**seen** 17:19
17:20, 17:24
65:11, 66:1
78:24
**seeped** 77:10
**sees** 81:21
**selected** 19:20
**self-insured**
33:9
**send** 37:24
**sense** 39:13
66:4
**sent** 20:18, 38:2
38:10, 55:25
89:4
**sentence** 68:10
75:18
**sentences** 72:14
**September** 16:5
16:15, 28:23
36:12, 36:21
**sequentially**
67:9
**series** 70:25
**serious** 76:17
**service** 65:7
65:18, 66:6
**services** 10:14
13:8
**set** 13:25, 18:13
19:24, 49:18
49:20, 93:8
**settled** 9:19

9:19, 11:11
seven 69:20
  69:24
Shannen 1:4
  2:4, 5:4, 6:13
  7:7
share 18:23
sharply 10:13
sheet 16:2
  27:11
sheets 78:2
short 42:19
short-term
  42:23
Shorthand 2:24
  93:3
shortly 17:9
  64:13
show 44:20
  58:22, 82:8
showed 55:21
shows 35:8
side 17:9, 69:6
  78:3
siding 77:10
signature 27:22
significant 72:2
  72:3, 72:6
  72:17, 72:21
  73:1
signs 42:19
  50:15
similar 11:1
simple 52:21
  71:1
simply 77:7
  78:13, 79:2
single 41:9
  41:16, 41:25
  63:5
sir 8:7, 86:15
sit 13:17, 65:17
  66:24
site 7:8, 19:17
  23:23, 24:17
  49:16, 81:24

83:1
sites 10:2, 40:12
sitting 33:11
  35:21
situation 12:9
six 26:7, 26:8
  27:10, 62:12
  79:11
size 45:12, 90:7
skip 7:21
sliding 52:21
  56:6, 57:12
slowly 13:16
small 8:17
smelled 57:19
smoke 5:12
  39:24, 70:10
smokes 48:6
smoking 48:4
  49:13, 50:22
so-called 42:9
  52:19, 53:2
  53:21, 55:3
  55:6
sofa 56:6
soft 53:14, 55:17
  55:19, 55:21
  55:21, 56:2
  56:11, 56:15
  56:17, 57:22
  58:3, 59:20
  59:22, 59:23
  60:8, 60:11
  60:14, 61:4
  61:9, 65:9
  65:20, 66:9
  82:19
solvents 66:13
  79:17
Somerset 41:18
somewhat 19:25
  68:17, 68:19
soot 10:16
  11:25, 42:5
  43:4, 44:5, 44:6
  44:7, 44:7, 44:9

44:9, 44:10
  44:15, 44:16
  44:20, 44:21
  44:22, 49:9
  54:22, 61:13
  72:2, 72:6, 77:6
  77:9, 77:23
  80:4, 85:18
  87:17
sorry 9:15
  27:15, 88:18
sort 83:16
sounding 77:15
sounds 73:7
source 41:9
  41:16, 42:1
  43:19, 44:7
  44:7
sources 42:1
South 3:9
spaces 72:25
speak 77:4
specific 15:6
  68:21, 71:8
  73:16, 74:1
specifically 20:4
  38:25, 67:16
specifics 15:3
speculation
  50:11, 59:16
speed 80:10
spell 7:9
Spiszman 89:25
  90:3
Spiszman's
  89:16, 91:15
spots 41:23
spread 56:7
staff 14:2, 24:4
Stage 47:16
stand 76:10
  76:23
standard 39:23
  40:1, 48:19
  49:20, 49:21
  66:5, 70:11

70:13, 70:21
  71:5, 71:12
  78:16, 83:17
  83:18, 83:22
  84:9
standards 38:18
  40:2, 40:4
  49:18, 78:17
  83:20
stands 54:13
  87:20
start 12:13
  12:16, 52:12
  68:3
started 9:4
  12:16, 13:7
  36:10, 36:11
starting 17:10
  36:23
starts 68:8
state 1:7, 2:7
  2:25, 6:14, 6:21
  7:9, 14:13
  15:19, 15:22
  25:14, 27:3
  27:5, 29:9
  29:22, 34:14
  34:17, 35:16
  65:12, 93:4
stated 57:7
statement 68:6
states 1:1, 2:1
  27:6
statistics 44:20
status 52:11
  54:11
stay 90:10
stenographically
  93:9
stir 59:6, 67:17
stop 42:4, 50:22
  69:14, 90:9
Stratocaster
  88:24
Street 3:9
strike 15:16

strongly 54:8
stucco 81:6
  81:8, 81:12
  81:14
stuff 84:17
sub 8:25
subject 9:9
  22:22, 40:2
  48:15, 74:5
  88:17, 88:18
submitted 5:14
  5:17
subparagraphs
  69:21
subpoena 5:5
  17:16, 17:24
  18:4, 21:5
subscribed
  93:18
sued 35:12
suggest 48:5
  54:22
suggestive 48:25
  78:22
suggests 12:15
  22:1, 23:8
suing 35:12
suitably 73:3
suite 3:9, 7:13
  20:19
Sullivan 3:3
  6:11
summarization
  73:8
summarize
  88:12
summary 73:19
  86:13
support 20:13
suppose 14:21
  73:17
supposed 72:25
sure 7:11, 9:11
  10:24, 11:4
  11:8, 11:9
  11:19, 13:13

14:10, 14:14
14:16, 15:4
15:8, 17:22
18:3, 19:19
20:9, 21:10
21:15, 25:5
33:11, 35:4
36:6, 36:8
40:17, 41:2
43:8, 46:3, 48:1
53:11, 53:16
55:13, 60:24
62:10, 62:19
62:20, 62:24
62:25, 64:11
72:22, 72:23
75:5, 77:12
78:18, 79:10
79:21, 85:7
88:13, 89:23
**surface** 43:6
61:5, 62:3
62:17, 63:2
63:12, 80:2
87:9
**surface-born**
41:6
**surfaces** 43:9
43:18, 44:21
45:4, 63:2
68:22, 68:23
**surprised** 64:18
**survey** 55:15
68:14, 68:15
70:2, 80:13
**suspect** 72:2
**sworn** 7:2, 93:6
**symptoms** 42:19
42:24, 50:15
**system** 57:24
69:13, 77:24

**T**

**table** 5:18, 5:19
24:24, 49:14

85:17, 85:25
86:5
**take** 15:5, 44:18
44:19, 44:22
44:24, 46:2
62:9, 62:11
66:6, 66:16
67:15, 75:7
76:25, 77:20
77:20, 82:19
84:16
**taken** 2:21, 6:16
7:17, 7:25
60:14, 60:17
62:5, 62:13
65:21, 77:25
80:23, 87:23
88:24, 92:5
93:7, 93:12
**talent** 11:9
**talk** 39:2, 39:2
39:3, 72:22
90:13
**talked** 50:2
55:3, 64:25
74:23, 89:25
**talking** 14:3
15:12, 37:10
38:21, 41:17
41:18, 41:21
41:23, 41:24
42:5, 43:25
50:8, 50:10
55:4, 70:4
70:14, 77:17
**tape** 60:9, 60:10
60:11, 60:20
62:13, 62:21
63:1, 63:2, 63:4
63:11, 86:19
**target** 12:1
42:12, 45:4
**Tech** 8:25, 9:3
9:4, 9:25, 10:14
11:2, 11:5
11:15, 14:4

14:7, 14:16
14:23, 25:7
36:11, 55:20
56:2, 60:4, 60:8
76:19, 76:25
**Tech's** 9:21
10:3, 64:24
**technically**
23:21, 39:25
**techniques**
39:21, 66:12
**Technologies**
7:16
**tell** 9:12, 9:18
16:1, 19:9
21:11, 23:18
24:21, 25:4
25:10, 36:9
37:9, 39:9, 43:7
52:5, 52:17
54:14, 73:6
73:23, 78:2
83:5, 88:13
90:2
**telling** 50:17
57:4, 57:8
59:15, 76:13
**tells** 58:6
**temporarily**
37:17
**ten** 15:12
**tens** 45:11
**term** 10:5, 12:4
42:19, 42:21
45:2, 49:2
72:21
**termed** 55:6
**terminal** 47:16
**terms** 39:5, 43:5
72:11, 72:17
**testifies** 7:2
**testifying** 31:20
31:23, 33:11
**testimony** 8:12
10:1, 12:18
13:2, 13:19

13:24, 27:14
28:6, 28:17
30:17, 30:20
33:3, 34:3
34:14, 34:22
35:10, 35:14
35:23, 36:2
36:4, 36:20
51:12, 92:7
93:8, 93:11
**testing** 89:5
**text** 89:20
**thank** 48:22
48:23, 91:22
**thing** 27:4, 69:9
**things** 17:2
22:3, 30:2, 38:6
42:10, 44:8
61:8, 61:24
75:24
**think** 9:8, 12:10
12:21, 13:4
13:11, 16:10
17:6, 17:9
17:22, 18:1
18:10, 25:1
25:3, 25:14
25:16, 26:14
27:5, 28:12
29:10, 29:19
29:20, 30:7
30:21, 30:23
33:22, 33:22
37:23, 39:7
58:21, 59:12
60:1, 60:13
64:2, 64:20
64:21, 65:14
66:13, 67:23
67:25, 68:3
69:24, 70:2
71:21, 73:3
73:12, 74:2
74:18, 75:13
75:16, 76:5
76:11, 77:11

77:13, 78:12
79:21, 82:14
83:10, 83:14
89:18, 90:4
91:8
**third** 23:21
33:14
**thoroughly**
76:20, 76:23
89:20
**three** 42:6
44:23, 47:6
64:12, 64:14
80:2
**thumb** 19:6
19:10, 19:15
19:18, 20:6
88:1
**thumbprint**
60:10, 63:13
**tied** 49:5
**tile** 78:1, 81:19
**Tim** 3:14, 6:6
**time** 7:24, 10:11
12:19, 13:22
14:1, 16:2
21:23, 22:8
24:3, 31:3
46:15, 47:14
47:15, 54:24
55:14, 57:20
62:9, 64:22
64:23, 64:24
69:25, 72:10
77:14, 77:19
82:25, 89:14
89:19, 90:8
90:11, 90:21
91:6, 93:7
93:12
**times** 7:19
15:16, 16:24
31:8, 32:2, 32:8
33:2, 33:16
34:20, 35:25
36:3, 45:2

timing 34:5
tiny 9:19
tire 44:10
tobacco 49:13
today 13:17
  18:7, 18:14
  19:4, 19:11
  21:4, 21:9
  21:19, 21:22
  24:2, 33:11
  35:21, 47:8
  47:9, 56:15
  70:2, 72:10
  89:19, 91:5
today's 6:9, 6:10
  6:14
told 66:17, 83:4
top 9:25, 14:8
  56:4, 56:7
  56:10, 67:3
Torrance 7:14
totals 87:17
toxic 49:2, 50:6
toxin-free 49:23
  49:25
tracks 52:23
  52:25, 57:12
  57:12, 57:25
  59:25, 61:10
  84:10, 88:19
traditional
  52:22
traffic 50:3
training 39:20
  51:12
transcribed
  93:10
transcript 36:13
  91:21, 92:5
  93:14, 93:16
travel 45:11
Travelers 14:14
  29:3, 29:12
traverse 82:4
treated 57:10
treatment 65:8

65:19
trees 74:12
trial 13:4, 27:14
  30:20, 91:7
trials 28:22
trick 85:22
tricked 85:24
true 21:6, 21:7
  23:12, 34:12
  41:11, 49:13
  50:16, 54:25
  63:22, 77:8
  77:15, 78:10
  79:22, 90:10
  90:19, 92:8
  93:11
try 85:22
trying 14:21
  59:1, 82:15
turn 28:5
turned 75:14
twice 55:7
two 8:1, 13:13
  23:9, 29:3
  42:10, 42:17
  47:6, 58:17
  58:21, 58:22
  64:17, 67:9
  67:13, 67:14
  88:14
type 10:14, 11:7
  13:6, 37:10
typed 37:3
types 12:8
  12:11, 61:1
  70:22
typewriting
  93:10
typically 9:10
  43:4

**U**

uh-huh 11:4
  19:5, 25:9, 36:1
  43:12, 48:1

51:25, 68:12
unaffected 81:4
  81:5
uncovered
  76:17
underside 82:1
understand
  10:6, 15:13
  20:4, 21:4
  57:19, 68:24
  69:4, 74:16
  78:13, 80:15
  83:15
understanding
  22:18, 49:5
  71:16
understood
  13:17, 14:3
  18:17, 25:18
  36:1
undoubtedly
  15:2, 81:18
uneven 62:4
unhelpful 54:2
uninterpretable
  72:12
UNITED 1:1
  2:1
universe 19:21
  74:18, 75:12
university 25:10
unleaded 50:6
unreasonably
  68:18
unwanted 72:5
updated 28:16
  85:20
upper 43:17
use 13:25, 45:6
  62:1, 83:13
uses 50:5
usually 9:6
  37:12

**V**

vacuum 60:14
  60:17, 60:25
  66:16
vacuuming 55:4
vague 46:17
  73:3
Valerie 3:9
  6:20, 18:22
value 40:10
  87:10
values 41:8
vantage 69:4
vapors 66:13
variety 58:7
varying 43:24
vehicular 50:3
verbal 6:17
vermiculite
  41:21
versa 47:11
version 37:14
vertical 68:23
vetted 51:15
vice 47:11
vicinity 50:3
Videographer
  3:14, 6:4, 6:22
  46:5, 46:9, 67:4
  67:7, 84:18
  84:21, 91:17
videotape 6:7
videotaped 1:13
  2:21, 6:5, 46:5
  46:9, 67:4, 67:7
  84:19, 84:21
  91:17
virtually 82:9
  83:9
visible 78:22
visit 19:17
  49:16, 83:1
visited 50:2
visual 79:10
Vitae 5:9

volatile 58:7
Volume 6:5
  46:7, 46:10
  84:22, 91:19
Vrojas@cozen....
  3:11
vs 1:6, 2:6, 6:14
  15:19, 29:2
  29:22

**W**

walls 53:3, 54:5
  58:3, 79:13
  79:19
want 11:18
  16:9, 30:1, 41:1
  44:17, 50:12
  58:9, 58:23
  60:22, 62:8
  73:23, 79:16
  83:2, 89:23
  90:17, 91:20
wanted 32:22
warn 44:17
washing 45:15
  81:11, 82:11
water 77:10
  77:20, 77:21
  81:13, 81:18
  81:21, 82:1
  82:2, 82:4, 82:7
  82:11
way 28:13
  41:10, 41:11
  47:24, 48:1
  48:12, 50:14
  50:19, 52:11
  54:15, 63:19
  64:1, 71:14
  73:18, 75:4
  83:23
we've 7:8, 14:20
  80:23
web 25:2
weeks 64:12

Desiree Cooks

64:14
weigh 71:14
went 25:15
  25:16, 49:7
  50:23, 57:20
WHEREOF
93:18
white 72:18
wide 58:7
width 82:4
Wildfire 5:12
willing 11:8
76:21
Wilshire 2:22
  3:4, 6:12, 30:3
  31:4
window 57:11
  59:25, 84:10
windows 52:22
  73:1
wipe 55:4
witness 4:3
  4:18, 6:15, 8:6
  8:9, 8:13, 10:1
  12:13, 12:20
  13:2, 13:6, 13:8
  13:10, 15:18
  20:24, 21:1
  28:6, 30:5
  30:13, 30:15
  31:20, 31:23
  32:12, 33:17
  34:3, 39:17
  46:4, 46:19
  93:6, 93:18
wood 44:12
  77:2, 79:5, 82:1
word 62:1
  71:11, 71:22
  85:19, 87:14
word-processed
  19:11, 24:23
words 37:3
  42:19, 60:10
  69:5, 83:17
  86:3

work 9:24, 10:4
  10:12, 10:15
  10:18, 11:5
  11:7, 11:15
  12:14, 12:16
  13:19, 13:19
  13:24, 14:1
  14:12, 14:12
  14:20, 14:22
  15:7, 22:25
  23:1, 24:19
  37:1, 37:10
  37:19, 37:21
  37:22, 38:9
  48:7, 53:5
  53:22, 53:24
  54:4, 57:5
  67:24, 70:21
  74:23, 75:10
  83:9, 83:10
  90:3
worked 16:19
  17:4, 17:6
  29:16, 30:22
  30:24, 31:1
  31:6, 32:11
  79:1
working 23:16
worried 90:17
Wright 3:3
  6:11
write 39:16
writing 52:15
  75:7
written 22:13
  25:24, 28:3
  37:20, 64:3
  91:4
wrong 12:4
  64:20
wrote 48:24
  69:1

X

X-U 23:22

Xu 5:15, 23:22
  24:9, 85:10

Y

yard 78:3
yeah 8:20, 9:2
  13:3, 14:21
  15:12, 15:15
  16:2, 16:12
  17:8, 18:2, 19:5
  20:2, 20:20
  20:22, 21:2
  23:12, 29:2
  30:5, 30:12
  31:3, 31:14
  31:20, 31:22
  32:5, 32:13
  33:1, 36:1, 36:6
  36:21, 38:23
  39:9, 40:17
  41:2, 43:7, 44:2
  45:17, 52:1
  56:4, 60:24
  61:11, 63:8
  63:13, 72:16
  73:24, 75:21
  81:16, 83:3
  87:20, 89:11
  89:21, 89:24
year 9:5, 10:13
  13:13, 16:5
  37:7, 48:6, 54:3
  83:11, 90:12
  90:20
years 15:12
  25:6
yesterday 21:13

1

1 1:7, 2:7, 6:5
  6:6, 36:21, 43:9
  43:17, 43:23
  46:6, 46:7
  46:10, 74:7

84:22, 89:3
  91:19
10 1:8, 2:8, 10:9
  13:20, 87:8
1-0 87:8
10,000 12:6
11 49:16
11th 7:8, 19:14
  50:24, 55:10
  55:14, 57:17
  60:18, 60:21
  83:1, 88:7
12 32:9
12th 5:14
13th 5:17
14 67:20, 88:23
14075 1:23
  93:24
15 10:9, 13:20
15th 5:11
17 5:4
17th 2:22, 3:4
  6:12
18 5:7
180 7:13, 21:1
1988 12:18
1990 13:12
1991 13:12
1998 9:4, 36:12
  36:17, 36:20
1st 36:12

2

2 43:9, 43:17
  43:23, 44:3
  46:10, 88:22
  88:24, 90:5
2,000 44:19
2:00 21:22
2:19-cv-01963
  1:6, 2:6
20 1:14, 2:23
  6:1, 43:22, 92:5
  92:11
2000s 11:20

11:25, 13:15
2008 10:10
  10:11
2015 30:14
2019 1:14, 2:23
  5:10, 5:11, 5:14
  5:17, 6:1, 6:9
  27:16, 67:20
  68:16, 92:5
20th 6:9, 49:18
  49:20
213 3:10
25 5:9, 16:15
  27:16, 37:7
25th 26:16
  46:14, 46:25
  47:12, 47:15
  51:21
26 22:14, 25:24
  26:3, 27:24
  39:17, 48:13
  91:3
2-by-4 44:8

3

3 68:2, 84:22
  91:18
3:00 21:22
3:11 1:14, 2:23
  6:1, 6:6
300 7:20
301-4660 3:5
31 29:22
323 3:5
3625 7:13
3700 3:9
39 28:6

4

4 38:12, 38:12
  65:2, 85:19
  87:8
4:10 46:6
4:19 46:11

| | | | | |
|---|---|---|---|---|
| **4:55** 67:5<br>**4:56** 67:8<br>**40** 14:1, 28:14<br><br>**5**<br><br>**5** 68:3, 68:8<br> 69:18, 69:20<br> 90:5<br>**5,000** 9:20, 12:6<br>**5.1** 70:4, 70:18<br>**5.2** 71:19<br>**5.5** 73:20, 75:4<br>**5.6** 73:15<br>**5:26** 84:19<br>**5:35** 84:23<br>**5:47** 91:18<br> 91:23<br>**525** 27:15<br>**575** 27:15<br>**5th** 5:10<br><br>**6**<br><br>**600** 20:21, 20:24<br>**600s** 17:10<br>**601** 3:9<br>**620** 5:4, 17:11<br> 17:12, 17:14<br> 21:5<br>**621** 5:7, 18:21<br> 18:25, 19:3<br> 86:12<br>**622** 5:9, 25:21<br> 26:3<br>**623** 5:10, 67:11<br>**624** 5:12, 67:11<br>**625** 5:13, 84:24<br> 85:2, 86:1<br>**626** 5:15, 84:24<br> 85:12, 85:14<br> 85:16<br>**627** 5:16, 84:24<br> 85:12, 85:13<br>**628** 5:18, 84:24<br> 85:3, 85:17 | 85:25, 86:12<br> 86:22, 87:5<br>**629** 5:19, 87:2<br> 87:4, 87:6<br> 88:10<br>**6420** 2:22, 3:4<br> 6:12<br>**67** 5:10, 5:12<br><br>**7**<br><br>**7** 4:6<br>**70** 19:20<br>**72** 19:20<br>**7777** 1:24<br><br>**8**<br><br>**84** 5:13, 5:15<br> 5:16, 5:18<br>**87** 5:19<br>**88** 13:11<br>**892-7900** 3:10<br><br>**9**<br><br>**90017** 3:10<br>**90048** 3:5, 6:13<br>**90503** 7:14<br>**91** 13:12, 36:13<br>**91910032-1** 5:15<br> 5:18<br>**95** 83:19, 84:6<br>**98** 36:21<br><br>**/**<br><br>**///** 6:24, 6:25 | | | |