1  Devin A. McRae, (SBN 223239)
   *dmcrae@earlysullivan.com*
2  Peter Scott, (SBN 247786)
   *pscott@earlysullivan.com*
3  EARLY SULLIVAN WRIGHT
      GIZER & McRAE LLP
4  6420 Wilshire Boulevard, 17th Floor
   Los Angeles, California 90048
5  Telephone:  (323) 301-4660
   Facsimile:  (323) 301-4676
6
7  Attorneys for Plaintiff
   SHANNEN DOHERTY
8

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNEN DOHERTY,<br><br>              Plaintiff,<br><br>       v.<br><br>STATE FARM GENERAL INSURANCE COMPANY and DOES 1 through 10, inclusive,<br><br>              Defendants. | Case No. 2:19-cv-01963-MCS (PLAx)<br><br>**PLAINTIFF SHANNEN DOHERTY'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE CERTAIN TESTIMONY OF BRIAN P. DALY AND RELATED EVIDENCE**<br><br>[Honorable Mark C. Scarsi]<br><br>Date:   November 20, 2020<br>Time:   2:00 p.m.<br>Ctrm:   7C |

582338.2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 20, 2020, at 2:00 pm, or as soon as thereafter as the matter may be heard by Honorable Mark C. Scarsi in Courtroom 7C of the above-captioned court, located at 255 East Temple Street, Los Angeles, CA 90012, Plaintiff Shannen Doherty ("Plaintiff" or "Doherty") will and hereby does move the Court for an in limine order precluding Defendant State Farm General Insurance Company ("Defendant"), its attorneys, and witnesses from referring to, testifying about, or otherwise offering any evidence or argument at trial before the jury from expert witness Brian P. Daly with respect to certain specific sampling, testing and lab results from samples taken by Mr. Daly at his December 11, 2019 site visit. Specifically, all of the lab results are unauthenticated and inadmissible hearsay. Additionally, Mr. Daly's samples and lab results of Ms. Doherty's clothing and bedding are completely irrelevant because none of these items were in the home during the fire and Mr. Daly's environmental samples taken over 13 months later have no bearing on the damage sustained by the clothing that was actually in the home during the fire. Additionally, Mr. Daly's samples taken by the "tape lift" method lack sufficient scientific reliability so as to render them inadmissible.

This Motion is made pursuant to Federal Rule of Civil Procedure 37(a) and Federal Rule of Evidence 403. This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on multiple occasions, including without limitation in person in February 2020, and most recently telephonically on October 27, 2020.

This Motion is based on this Notice of Motion and Motion and the accompanying Memorandum of Points and Authorities contained herein, the pleadings and papers on file in this action, and the argument of counsel presented at the hearing on the motion.

1  Dated: October 30, 2020            EARLY SULLIVAN WRIGHT
2                                      GIZER & McRAE LLP

                                       By: */s/ Peter Scott*
4                                          Devin A. McRae
                                           Peter Scott
5                                          Attorneys for Plaintiff
6                                          SHANNEN DOHERTY

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Shannen Doherty ("Plaintiff" or "Ms. Doherty") moves the Court for an in limine order precluding Defendant State Farm General Insurance Company ("Defendant"), its attorneys, and witnesses from referring to, testifying about, or otherwise offering any evidence or argument at trial before the jury from expert witness Brian P. Daly with respect to the lab results from Mr. Daly's sampling of various items and surfaces in Ms. Doherty's home on December 11, 2019.

By way of relevant procedural history, State Farm retained testifying expert Brian Daly of Hygienetech to opine on and confirm State Farm's results driven remediation determinations. Mr. Daly provided his written expert report on October 25, 2019, which pertained exclusively to commenting on the work previously done by State Farm and Ms. Doherty's retained industrial hygienists during the underlying adjustment of the claim. (Scott Decl. ¶ 2.) On December 11, 2019, a month and half after providing his written report (and *13 months after the fire*), Mr. Daly conducted a site visit of the property and took samples at numerous locations in the interior of the home and on Ms. Doherty's personal effects by sticking a piece of scotch tape on the sampling location and sending the tape out for lab testing. (*Id.* ¶ 5 and Ex. 3.) Mr. Daly then obtained lab reports on these samples from a third-party lab (which has never been identified as a witness in this case) and has offered additional testimony as to the level of contamination in Ms. Doherty's home based entirely on these unauthenticated and hearsay lab results. Mr. Daly's new opinions and the lab testing results upon which they are based are unreliable and inadmissible on a number of different grounds.

*First*, the lab testing upon which Mr. Daly's new opinions are based was conducted by a third-party lab (and not by Mr. Daly). These lab results have not been authenticated in any manner by any witness proffered by State Farm and no such witness has been identified by State Farm. (Scott Decl. ¶ 2.) Without

authentication as to the lab testing results as well as a demonstration of the propriety of the sampling and testing methodology, these lab results are inadmissible.

*Second*, Mr. Daly's six samples of Ms. Doherty's clothing and bedding are completely irrelevant as the items sampled by Mr. Daly were not in the home at the time of the fire and were not brought into the home until at least six months after the fire. Even Mr. Daly has conceded, as he must, that, if these items were not in the home during the fire, they provide him no basis on which to testify as to the smoke contamination to Ms. Doherty's clothing and soft goods from the Woolsey Fire. Further, Ms. Doherty has not tendered for coverage from State Farm any of the clothing or bedding items tested by Mr. Daly (because they were not in the home during the fire). Accordingly, Mr. Daly's lab results for these items are completely irrelevant and of no probative value for the trier of fact.

*Third and finally*, Mr. Daly's methodology for collecting numerous of the samples purportedly tested was so fundamentally deficient that it renders the lab results on these samples and any opinion based thereon effectively worthless and inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Both State Farm and Ms. Doherty's Retained Industrial Hygienists Confirm Significant Smoke Contamination Through Testing Shortly After The Fire

In November 2018, the Woolsey Fire consumed almost 100,000 acres of land in Los Angeles and Ventura Counties. Ms. Doherty's home in Malibu, California was one of the thousands of homes affected. Plaintiff immediately tendered a claim to State Farm, her homeowners insurer. During the adjustment of the claim, both Ms. Doherty and State Farm hired their own independent industrial hygienists to measure the amount of smoke contamination in the dwelling and in Ms. Doherty's personal property. Both State Farm and Ms. Doherty's industrial hygienists concurred that there was significant smoke damage present, but nevertheless, State

Farm's hygienist recommended only very minimal cleaning.

On October 25, 2019, State Farm designated Brian Daly of Hygiene Technologies International, Inc. as an expert witness. (Scott Decl., ¶ 2.) Mr. Daly was retained to comment on the methodology and findings of State Farm and Ms. Doherty's industrial hygienists during the adjustment of the claim and he did so in a report attached to the expert disclosure. (*Id.*) Mr. Daly's initial report contained no opinions other than his comments on the findings of the other experts and he did no independent testing of his own. (*Id.*)

### B. Mr. Daly's Site Visit

On December 5, 2019, State Farm served an inspection demand to allow Mr. Daly to visit Plaintiff's home and conduct, among other activities, "surface and air sampling of smoke residues as a result of the smoke loss. If necessary, State Farm's experts may also measure, survey, test or sample the subject property and/or the allegedly damaged portions of the subject property." (Scott Decl., Ex. 1 [Inspection Demand]). Mr. Daly visited the property on December 11, 2019, **over one year after the fire**. (*Id.* ¶ 5.) While at the property, Mr. Daly took samples of smoke, soot, and ash residue using a "tape-lift" technique, whereby he took adhesive tape and pressed it to various surfaces in order to lift off the residue. (*Id.;* Spiszman Decl., ¶¶ 14-16.) Mr. Daly performed this tape-lift technique throughout the home, including:

- On the hardwood floors (Scott Decl., Ex. 3 [Appendix A], samples 10-13, 24, 26, 28); and
- On articles of clothing and a bedspread (Scott Decl., Ex. 3 [Appendix A], samples 22-23, T907, T911-T912);

Telling of the utter lack of reliability in his methodology, **none** of the articles of clothing or the bed spread sampled by Mr. Daly were in the home during the fire. Indeed, certain of them were **obviously** brand new, still in their garment bags with price tags attached and only recently introduced into the home shortly before the

inspection. (Doherty Decl., ¶ 4.) Further, *none* of the clothing articles sampled by Mr. Daly were tendered by Ms. Doherty to State Farm for coverage. (Doherty Decl., ¶ 5.)

Mr. Daly then claims to have transmitted these samples to an outside third-party laboratory named Environmental Analysis Associates, Inc. in Michigan, who purportedly performed analysis of the substances on the surface of the samples. (Scott Decl., ¶ 6, Ex. 2.) None of the lab results from Environmental Analysis Associates, Inc. have been authenticated and neither State Farm nor Mr. Daly have presented any evidence as to exactly how the so-called lab testing was completed. (*Id.*)

### III. ARGUMENT

#### A. The Lab Testing Results Are Hearsay And Lack Foundation And State Farm May Not Subvert The Rules Of Evidence By Introducing These Inadmissible Lab Results Through The Testimony Of Mr. Daly

Federal Rule of Evidence 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

However, Rule 703 "does not magically render the [inadmissible] evidence admissible." *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F.Supp. 107, 158 (D. Del. 1983), *aff'd sub nom. Appeal of Chase Manhattan Overseas Banking Corp.*, 740 F.2d 956 (3d Cir. 1984). Where an expert relies on inadmissible evidence, Rule 703 allows it to be presented, if at all, only "to explain the basis for the expert's opinion." *See Paddack v. Dave Christensen, Inc.*, 745

F.2d 1254, 1261-62 (9th Cir. 1984). Even then, the evidence can only be introduced if "its probative value in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect." Jones, Rosen, et al., Fed. Civ. Tr. & Evid. (TRG 2017) § 8:1557; *Williams v. Illinois*, 132 S.Ct. 2221, 2234 & n.2 (2012). ***And where, as here, if the real purpose for introducing otherwise-inadmissible evidence is not to explain the basis for an expert's opinion, but instead to establish substantive facts, the evidence must be excluded entirely***. See *Paddock*, 745 F.2d at 1262 ("[Rule 703] does not allow the admission of the [hearsay evidence] to establish the truth of what [it] assert[s]").

The Ninth Circuit illustrated this rule in *Turner v. Burlington N. Santa Fe R. Co.*, affirming a district court's finding that a party could not introduce otherwise-inadmissible hearsay through an expert where the expert "intended to use [the hearsay] as substantive evidence of his . . . conclusions." 338 F.3d 1058, 1062 (9th Cir. 2003). The plaintiffs in *Turner* sued a railroad company, BNSF, after a fire spread from BNSF's property and burned down their home. *Id.* at 1060. BNSF hired a fire investigator, Howard, who determined that the fire originated among piles of debris on BNSF's property. *Id.* After sending the debris samples to a lab for testing, Howard received a report indicating that the debris contained gasoline. *Id.* Based on the report, Howard was prepared to testify that the fire resulted from arson, but the district court excluded that portion of his testimony. *Id.*

The Ninth Circuit affirmed the district court's decision on appeal, noting that Rule 703 "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert." *Id.* at 1062. Consistent with that presumption and Rule 703, the court reasoned:

> The lab report was the only evidence of gasoline in the soil. Howard used the report not as data upon which an expert in his field would reasonably rely in forming an opinion, but rather intended to use it as substantive evidence of his ultimate conclusions that the fire was

intentionally created by pouring gasoline into the soil. ***The lab report was otherwise inadmissible hearsay evidence in the absence of foundation testimony by the laboratory that conducted the testing.*** *Id.*

Here, the similarly ***unauthenticated*** lab test results upon which Mr. Daly purports to rely for his new opinions themselves likewise lack foundation and constitute inadmissible hearsay. The lab results were generated by a third-party lab, who has provided no testimony or evidence to authenticate these results or to explain how the testing was done – and State Farm has not identified any witness who can provide such testimony or evidence. As in *Turner*, State Farm will almost certainly try to introduce the otherwise inadmissible lab results for their substantive truth – such as the purported levels of smoke contamination remaining in Ms. Doherty's residence – under the guise of "explaining the basis" of Mr. Daly's new opinions. Under Rule 703, doing so is improper. *See Turner*, 338 F.3d at 1062; *Paddock*, 745 F.2d at 1262. At trial, the Court should bar State Farm from disclosing the otherwise inadmissible lab results. *See* Jones, Rosen, et al. *Fed. Civ. Tr. & Evid.* (TRG 2017) § 8:1617 ("While an expert may state the matters relied upon in forming an opinion, the expert may not testify about the details of those matters if they are otherwise inadmissible." – i.e., "the expert may not, under the guise of 'reasons,' bring before the jury incompetent hearsay evidence").

Further, to the extent State Farm argues that Ms. Doherty could have resolved the hearsay and lack of foundation issues with respect to the lab results by subpoenaing the lab that performed the testing, this argument is disingenuous as State Farm dumped these lab reports on Ms. Doherty at the close of discovery. (Scott Decl. ¶ 6.) Ms. Doherty was not provided with an opportunity to inquire into the foundation and/or validity of the lab results. Accordingly, the lab results and testimony concerning the lab results must be excluded.

////

### B. The Clothing And Bedding Samples Are Completely Irrelevant And Of No Value To The Trier Of Fact

In addition to being reliable, an expert's testimony must be relevant. The Court must assess whether the proffered expert testimony is sufficiently tied to the facts of the case such that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (citing Fed. R. Evid. 702). Specifically, there must be a "fit" or valid connection between the expert's reasoning or methodology and the pertinent inquiry into the facts at issue before the Court. *Daubert*, 509 U.S. at 591-593.

Mr. Daly took samples of five articles of clothing and one bedspread:

| Sample Number | Item |
| --- | --- |
| 91910032-TL22 | Navy Blue Adidas Shirt |
| 91910032-TL23 | Navy Blue Suit Jacket inside plastic wrapping |
| 91910032-TL25 | Bedspread |
| 91910032-T907 | Gray-colored jacket |
| 91910032-T911 | Gray-colored cashmere sweater (in dry cleaning bag) |
| 91910032-T912 | Black-colored top garment[1] |

However, none of these clothing or bedding items were in the home at the time of the fire. Instead, they were all brought into the home at least six months after the fire event – some having been purchased brand new long after the fire. (Doherty Decl., ¶ 4.) Further, Ms. Doherty did not include any of these items on the Coverage B inventory submitted to State Farm for coverage (clearly, because Ms. Doherty does not claim that they were damaged in the fire). Nevertheless, Mr. Daly took tape lift samples of these items and submitted the samples for laboratory testing, the results of which, as one would expect, showed little to no smoke contamination.

---

[1] Scott Decl., Ex. 3 [Daly Report Appendix A]



Even Mr. Daly himself concedes that his clothing samples are irrelevant to determining the level of contamination from the Woolsey Fire. Per Mr. Daly, testing clothing that was actually in the home at the time of the fire "would give us a better sense of the potential deposition of fire effluent on those materials at the time of the fire. If it's true that none of the five pieces were there at the time of the fire, then I can't address that issue. . . ." (Scott Decl., Ex. 4 [Daly Deposition Vol. II] 170:19-171:3.) Mr. Daly continued: "I can't address the potential for cross-contamination[2] of fire effluent at the time of the fire if I don't sample the goods that were in the house at the time of the fire obviously." (Scott Decl., Ex. 4 [Daly Deposition Vol. II] 174:19-175:3.) Mr. Daly concluded: "If the data that I recorded from the clothing that was present on December 11th of last year, if that clothing was not there during the fire a year and a month before that, well, then I can't use that data to develop an opinion on cross-contamination." (Scott Decl., Ex. 4 [Daly Deposition Vol. II] 176:16-21.)

The laboratory testing results of items unaffected by the Woolsey Fire are of zero relevance to the instant lawsuit. Permitting Mr. Daly to provide expert testimony on these items would be a waste of limited trial time and would likely confuse and mislead the jury. Accordingly, Mr. Daly should be precluded from offering testimony or evidence as to these six samples.

### C. Approximately One-Third Of the Samples Are Scientifically Worthless Under The *Daubert* Standard, As The Sample Collection Methodology Was Completely Inadequate

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony in federal courts:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,

---

[2] By "cross-contamination" Mr. Daly was referring to "[f]ire effluent going from the fire to something else. . . ." (Scott Decl., Ex. 4 [Daly Deposition Vol. II] 175:13-18.)

>may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463–64 (9th Cir. 2014). Courts must assess whether "the reasoning or methodology underlying the [proposed expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts at issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93.

Further, when expert testimony is challenged under *Daubert*, the burden of proof regarding admissibility rests with the party seeking to present the testimony. *Truck Ins. Exch. v. Magnetek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004). "The focus [of the inquiry] . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. In *Kumho,* the Court elaborated upon the *Daubert* gatekeeping function as applied to proposed expert testimony other than classical scientific testimony. The Court emphasized that, even where the proposed expert testimony is not scientific in nature, in the classical sense, the trial judge is nevertheless required to ascertain whether the expert "employs in the courtroom the same level of *intellectual rigor* that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152 (emphasis added).

An expert's testimony must have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999) (citation and alterations omitted). In this regard, district courts are concerned "not [with] the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citations and quotations omitted). The duty falls squarely upon the district court to "act as a 'gatekeeper' to exclude junk science that does not meet Federal

Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir. 2011).

The reliability inquiry is "a flexible one." *Kumho Tire,* 526 U.S. at 150. The Supreme Court has suggested several factors that can be used to determine the reliability of expert testimony: "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey,* 203 F.3d 1160, 1167 (9th Cir .2000) (citing *Daubert*, 509 U.S. at 592-94. However, whether these specific factors are "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire,* 526 U.S. at 153. The trial judge also has broad latitude in determining the appropriate form of the inquiry. *See United States v. Alatorre,* 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into relevance and reliability must take."). Here, the sampling and testing arising out of the December 11, 2019 site visit have serious reliability problems, and should be excluded under Rule 702 and *Daubert.*

The industry standard for obtaining accurate samples for analysis of soot, char and ash contamination on irregular surfaces or porous, weaved fabrics is to utilize a micro-vacuum that can penetrate into the surface or item and obtain the particulate matter that has settled or penetrated beyond the surface level. (Spiszman Decl. ¶¶ 7-12.) The "tape lift" sampling method consists of sticking a piece of scotch tape onto a surface and collecting the particulate matter that sticks to the tape. (*Id.* ¶ 5.) Tape-lift sampling is not proper for irregular surface or porous, weaved fabrics. (*Id.* ¶¶ 9-12.) This is because the tape will only collect the particulate matter that remains on the surface of the item and will not pick up particulates that have settled in nooks or grooves of the irregular surface or that have penetrated into the interior of thick, weaved fabrics. (*Id.*)

Samples obtained through improper methodologies will result in inaccurate and misleading lab results. (Spiszman Decl. ¶ 13.) By way of example, a sample that did not adequately collect the soot, char and ash actually present on an item will yield a lab result that reflects much lower contamination levels than are actually present on the item. (*Id.*) Thus, proper and accurate sampling methodologies are critical to obtaining accurate lab results. (*Id.*)

Numerous of Mr. Daly's samples taken at Ms. Doherty's residence were taken through improper sampling means and any lab results generated therefrom have no scientific reliability. Mr. Daly utilized the "tape lift" sampling methodology for every single sample taken at Ms. Doherty's residence, including on surfaces for which this methodology is wholly inadequate – specifically:

**Hardwood Floors:** Ms. Doherty's residence has distressed, hand-scraped hardwood floors with an irregular deeply grooved surface. (Spiszman Decl. ¶ 15.) Photographs of the hardwood flooring are attached to Mr. Spiszman's declaration as Exhibit B. (*Id.* Ex. B.) Mr. Daly took tape lift samples of the hardwood flooring simply by sticking a piece of scotch tape on the surface of the floor, which would only pick up particulate matter on the top surface and not down in the grooves of the flooring, where particulate matter would naturally settle. (*Id.* ¶ 15.) These samples are identified as Sample Nos. 91910032-TL10, 11, 12, 13, 24, 26, and 28. (*Id.*; *see also* Scott Decl., Ex. 3 [Appendix A].)

**Clothing/Textiles/Upholstered Furniture:** Mr. Daly took tape lift samples from numerous articles of Ms. Doherty's clothing, including heavy wool sweaters and thick bedspreads. (Spiszman Decl. ¶ 16.) Photographs of these items are attached to Mr. Spiszman's declaration as Exhibit C. (*Id.*, Ex. C.) Mr. Daly's tape lifting sampling simply pressed a piece of tape to the surface of these materials, without accessing the interior substrate of the item, where contaminants would penetrate and settle. (*Id.* ¶ 16.) These samples are identified as Sample Nos. 91910032-TL22, 23, 25 and 91910032-T907, 911, and 912. (*Id.*; *see also* Scott

Decl., Ex. 3 [Appendix A].) Additionally, Mr. Daly has no knowledge as to whether these items were even in Ms. Doherty's residence during the fire, which is a critical fact for Mr. Daly to know when forming opinions about the level of contamination resulting from the Woolsey Fire. (Scott Decl. ¶ 5.)[3]

Not surprisingly, as the samples were taken 13 months after the fire and were obtained through inadequate means, the lab results from these samples showed little contamination. (Scott Decl., Ex. 2.) Mr. Daly plans to tout these lab results as evidence that no remediation is required to Ms. Doherty's home. However, these samples are essentially useless; since the materials they were taken from are porous or otherwise irregular, the amount of particles in a surface tape-lifted sample bears no relationship to the amount of particles actually present, or the amount of particles to which people interacting with the item will be exposed. Out of 46 samples, 13 were collected using a completely improper method. (Spiszman Decl., ¶¶ 15, 16.) Accordingly, for this independent reason, these 13 samples should be excluded and Mr. Daly should be prevented from testifying as to them.

Dated: October 30, 2020

EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP

By: */s/ Peter Scott*
Devin A. McRae
Peter Scott
Attorneys for Plaintiff
SHANNEN DOHERTY

---

[3] Indeed, even the industrial hygienist retained by State Farm in connection with the adjustment of the claim acknowledged that Microvac sampling was the appropriate method for collecting samples from Ms. Doherty's soft goods, writing in their report: "MicroVac sampling of soft surfaces was not conducted due to a lack of electricity throughout the home." (Scott Decl., Ex. 5 [Ninyo & Moore Report, p. 2].)