# EXHIBIT 2

| | |
|---|---|
| 1 | **COZEN O'CONNOR** |
| 2 | Valerie D. Rojas, State Bar No. 180041<br>*vrojas@cozen.com* |
| 3 | Angel Marti, III, State Bar No. 305300<br>*amarti@cozen.com* |
| 4 | 601 South Figueroa Street, Suite 3700<br>Los Angeles, CA  90017-5556 |
| 5 | Telephone: 213.892.7900<br>Facsimile: 213.892.7999 |
| 6 | Attorneys for Defendant |
| 7 | STATE FARM GENERAL INSURANCE<br>COMPANY |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNEN DOHERTY, | Case No. 2:19-cv-01963-JFW-PLA |
| Plaintiff, | [State Court Case No. 19SMCV00288] |
| vs. | **DECLARATION OF BRIAN P. DALY, CIH, P.E., IN SUPPORT OF DEFENDANT STATE FARM GENERAL INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S JOINT MOTION IN LIMINE NO. 2 TO EXCLUDE CERTAIN TESTIMONY OF BRIAN P. DALY AND RELATED EVIDENCE** |
| STATE FARM GENERAL INSURANCE COMPANY, and DOES 1 through 10, inclusive, | |
| Defendant. | |
| | Pre-Trial Conference: 2/21/2020<br>MIL Hearing Date:      2/28/2020<br>Trial Date:                    3/3/2020 |

### DECLARATION OF BRIAN P. DALY, CIH, P.E.

I, Brian P. Daly, CIH, P.E., do hereby declare as follows:

1. I am an industrial hygienist with Hygiene Technologies International, Inc. ("Hygiene Tech"). I am certified by the American Board of Industrial Hygiene in the comprehensive practice of industrial hygiene. I am also registered as a

1

1  Professional Engineer with the State of California. I have nearly 40 years of
2  experience assessing health hazards, including those posed by fires, sewage, mold
3  and other fungi, and varying chemical and other biological contaminants in domestic
4  environments and industrial workplaces, and in non-industrial settings, such as in
5  homes, office buildings, theatres, airports, and other public buildings.

6      2.    As part of my retention regarding the above-referenced lawsuit, I
7  reviewed, in pertinent part, Ninyo & Moore's report entitled *Wildfire Smoke Impact*
8  *Assessment;* Ninyo & Moore's handwritten notes; Ninyo & Moore letter dated May
9  14, 2019; KCE Matrix's Report; State Farm's claim file; Plaintiff's Rebuttal Expert
10 Disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2); the depositions of
11 Aram Kaloustian and Ian Spiszman; and the Declaration of Ian Spiszman in support
12 of Joint Motion *in Limine* No. 2.

13     3.    On December 11, 2019, I visited the subject property for the purpose of
14 conducting a limited carbonaceous particulate assessment survey. The primary
15 objective of the inspection was to assess the presence or absence of combustion
16 byproducts from non-solvent fuel sources—specifically char particles, ash, and
17 presumptive soot on various hard surfaces, both indoors and outdoors, such as floors,
18 walls, backsplashes, sliding glass door tracks, furniture, electronics, recessed
19 lighting, and artwork and decoration; along with soft goods such as upholstered
20 furniture and clothing. During my December 11 site inspection, I obtained 46
21 surface samples by tape-life technique from various surfaces and areas around the
22 subject property to determine combustion byproduct levels so that Hygiene Tech
23 could compare more current data to those generated by other consultants that
24 performed post-Woolsey Fire assessment surveys at the subject property. Further,
25 although Mr. Spizman criticizes "tape-lift sampling" on the hardwood floors, this
26 argument fails because the tape-lift materials were, in fact, fully placed within the
27 grooves of the hardwood floor surface and at the joints between floorboards.  In
28 other words, during such sampling , no so-called voids were missed.  Further, any

1   "small, light-weight particles" that may renter the air would have easily been trapped
2   by tape-sampling technique. During the survey on December 11, 2019, multiple
3   tape-lift sample data showed the presence of carbonaceous particulate that were
4   suggestive that a brushfire was a potential source of that particulate; however, of the
5   seven hardwood flooring samples that were collected and analyzed, six showed no
6   carbonaceous particulate whatsoever and one showed a background level of char
7   with no soot-like fine particles and no ash whatsoever.  These data convincingly
8   show no measurable effect to that hardwood floor from a brushfire and, in fact, those
9   data indicate that the hardwood floor was at the time in no need of special handling
10  or housekeeping.  Comparable results were recorded using the same sample
11  collection and analytical procedures involving many other items in the subject home,
12  including clothing, dressers and other furniture, linens and other soft goods, artwork
13  and collectables, backsplashes, and recessed light fixtures—all of which appeared
14  unaffected by soot, char, and ash and all of which were shown analytically to be
15  unaffected by brushfire effluent exposure.

16        4.    Further, with respect to soft goods, tape-lift sampling is equally reliable
17  and an accepted method of sampling in the industry. Plaintiff argues that tape-lift
18  sampling is an ineffective sampling method to use with respect to soft goods such as
19  clothing and upholstered furniture.  Plaintiff argues that soot, char, and ash from a
20  brushfire may enter the weave of fabric of clothing and may enter the cushions and
21  other interior areas of upholstered furniture such that if a tape-lift sample is collected
22  from the surface of such articles, the assessor may not detect brushfire remnants that
23  are contained within.  This theory fails.  First consider that upholstered furniture is
24  upholstered in such a way to prevent particulate from penetrating through the
25  upholstery (in either direction).  So, if furniture at the Doherty residence was
26  brushfire effluent-affected, odors would have been detected, or visual evidence of
27  soot, char, and ash would have been seen, or analytical data showing the presence of
28  carbonaceous debris in above-background levels would have been detected.

Likewise, if clothing at the Doherty residence was brushfire effluent-affected, odors would have been detected, or visual evidence of soot, char, and ash would have been seen, or analytical data showing the presence of carbonaceous debris in above-background levels would have been detected. In fact, no such evidence was found—no odors, no visual signs and no above-background carbonaceous particulate data—were detected on any item of clothing, bedding, or any furniture in that home.

5. It is important to note that industrial hygienists will collect samples using either the tape-lift or micro-vacuum ("micro-vac") methods—neither of which is necessarily preferred over the other—and both are preferred over swab sampling. During my nearly 40 years of experience, and based upon my education and training, tape-lift and micro-vac do not produce different types of results. Both techniques are reliable techniques in the industry in order to assess the presence or absence of combustion byproducts from non-solvent fuel sources. Tape-lift technique is not novel in the industrial hygiene industry, and it is widely accepted and widely used in the industry. In sum, tape-lift technique provides reliable and accurate results—even in uneven and irregular surfaces, such as the hardwood floor of the subject property. Further, tape-lift technique provides reliable and accurate results with respect to soft goods such as upholstered furniture and clothing, based upon my education, training, and experience. Further, among the leading laboratories in the industry that perform char, ash, and presumptive soot analyses— including EAA, Eurofins EMLab P&K, and EMSL—all recognize the value of collecting such samples using the tape-lift method, and all indicate so in their literature and on their websites. In fact, use of tape-lift methods allows the microscopist to analyze such samples with fewer preparation steps, thereby reducing the potential for sample loss or counting errors. To wit, use of the tape-lift methodologies is generally considered in the industrial hygiene community as the "preferred method" because it is highly reliable, it clearly captures all perceptible carbonaceous debris from surfaces with ease, and it renders more accurate and reproducible results. Indeed, HygieneTech has used the tape-lift

4

methodology sample collection method for over two decades and HygieneTech is aware of the use of that sample collection technology by KCE Matrix and many other consultants.

6. After obtaining the samples from the subject property, I provided the 46 tape-lift samples to an outside, independent laboratory for analysis—namely EAA. The laboratory used polarized light microscopy ("PLM") and epi-Reflected Light Microscopy ("RLM"), or equivalent, to provide its analytical data. Following receipt of the analytical data, I began the process of evaluating background levels of char, ash, and presumptive soot, which can then be later used to, in part, establish "clearance guidelines" and to provide recommendations regarding the appropriate method of remediation. The aforementioned process and the analytical data received from the outside, independent laboratory are relied upon by experts in the field of industrial hygiene in order to provide their findings and recommendations. In fact, this same process and method of providing tape-lift samples to an outside, independent laboratory was done by plaintiff's retained consultant, KCE Matrix, Inc. In short, the laboratory results/data are of a type reasonably relied on by experts in the field of industrial hygiene in order to assess the presence or absence of combustion byproducts from non-solvent fuel sources—specifically char particulates, ash, and presumptive soot.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on this 11th day of February 2020 at Los Angeles, California.

_____
Brian P. Daly, CIH, P.E.

5

LEGAL\44815778\1